# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| **MODERN HOLDINGS, LLC, GREENLEAF PLANT FOOD WHOLESALE, INC, GAY BOWEN, and BOBBIE LEMONS**<br><br>       **Plaintiffs,**<br><br>**V.**<br><br>**CORNING INCORPORATED, a New York Corporation**<br><br>**AND**<br><br>**KONINKLIJKE PHILIPS, N.V., a Netherlands Corporation**<br><br>  **Serve: Koninklijke Philips, N.V.**<br>        **Amstelplein 2**<br>        **Breitner Center**<br>        **P7 1096 BC Amsterdam**<br>        **The Netherlands**<br><br>**AND**<br><br>**PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, a Delaware Corporation**<br><br>       **Defendants.** | **Civil Action No. 5: 13-cv-00405-GFVT**<br><br><br><br>**FIRST AMENDED**<br>**CLASS ACTION COMPLAINT** |

Plaintiffs Modern Holdings, LLC ("Modern Holdings"), Greenleaf Plant Food Wholesale, Inc. ("Greenleaf"), Bobbie Lemons ("Lemons"), and Gay Bowen ("Bowen"), on behalf of themselves and others similarly situated (collectively the "Plaintiffs"), for their First Amended Class Action Complaint against Koninklijke Philips, N.V. ("Philips, N.V."), Philips Electronics North America Corporation ("Philips North America"), and Corning Incorporated ("Corning") (collectively "Defendants"), respectfully state as follows:

I.      **PARTIES, JURISDICTION AND VENUE**

    A.      **The Parties.**

      1.      Plaintiff Modern Holdings, LLC, is a Kentucky Limited Liability Company organized and doing business in the Commonwealth of Kentucky that owns property located at 1200 Lebanon Road, with an office address of 725 Maple Avenue, Danville, Kentucky.  Modern Holdings brings this action on behalf of itself and similarly situated individuals who have, between 1952 and the present date (the "Relevant Time Period"), owned property or resided within a five-mile radius of the glass manufacturing facility (the "Facility") located at 320 Vaksdahl Avenue (the "Site") in Danville, Kentucky.  The Facility and Site was owned and operated by Corning, Inc. between 1952 and 1983, and then Philips North America between 1983 and 2013.  Modern Holdings' property at 1200 Lebanon Road is located across the street from the Facility.  Modern Holdings has been damaged by the Defendants' tortious activities – Hazardous Substances from the Facility have migrated onto Modern Holding's property, and have interfered with Modern Holding's use and enjoyment of the property.  Both the presence of Hazardous Substances on Modern Holding's property and the stigma associated with the proximity of Modern Holdings' property to the Facility have decreased the market value of the property located at 1200 Lebanon Road.

      2.      Plaintiff Greenleaf Plant Food Wholesale, Inc. ("Greenleaf"), is an incorporated entity that owns property at 410 Vaksdahl Drive, Danville, Kentucky.  Greenleaf brings this action on behalf of itself and similarly situated individuals who have owned property or resided within a five-mile radius of the Facility between 1952 and the present day.  Greenleaf's property at 410 Vaksdahl Drive is adjacent to the Site.  Greenleaf has been damaged by the Defendants' tortious activities – Hazardous Substances from the Facility have migrated onto Greenleaf's property, and have interfered with Greenleaf's use and enjoyment of the property.  Both the

presence of Hazardous Substances on Greenleaf's property and the stigma associated with the proximity of Greenleaf's property to the Facility have decreased the market value of the property located at 410 Vaksdahl Drive.

      3.     Plaintiff Bobbie Lemons is an individual who has lived in Danville since she was a child.  Lemons now resides at 117 John W.D. Bowling Ct., Danville, Kentucky.  Plaintiff Lemons likewise brings this action on behalf of herself and all similarly situated Plaintiffs who have owned property or resided within a five-mile radius of the Site between 1952 and 2013. Lemons was injured as a result of her exposure to the contamination generated at the Facility – she was diagnosed with multiple sclerosis in 2008 at the age of 40.  Lemons does not have a family history of multiple sclerosis.  Multiple sclerosis has been causally scientifically linked with one or more of the Hazardous Substances that Defendants wrongfully permitted or caused to escape the Site.  Lemons did not discover, and could not have discovered by exercise of reasonable diligence, that her injuries were caused by the Defendants until less than a year prior to the filing of the instant lawsuit.

      4.     Plaintiff Gay Bowen is an individual who resided at 456 Boone Trail, Danville, Kentucky, between 1957 and 1983.  Bowen now resides at 1440 N. W. Old Mill Dr., Lake City, Florida.  Plaintiff Bowen likewise brings this action on behalf of herself and all similarly situated Plaintiffs who have owned property or resided within a five-mile radius of the Site between 1952 and 2013.  Bowen was injured as a result of her exposure to the contamination generated at the Facility – she was diagnosed with Multiple Sclerosis in 1995.  Bowen does not have a family history of multiple sclerosis.  Multiple sclerosis has been causally scientifically linked with one or more of the Hazardous Substances that Defendants wrongfully permitted or caused to escape the Site.  Bowen did not discover, and could not have discovered by exercise of reasonable

diligence, that her injuries were caused by the Defendants until less than a year prior to the filing of the instant lawsuit.

5.      Defendant Philips Electronics North America Corporation is a Delaware foreign business corporation doing business in the Commonwealth of Kentucky, with its corporate headquarters located at 3000 Minute Man Road, Andover, Massachusetts, and which owned and operated, through its agents and/or employees, the glass manufacturing facility and site at 320 Vaksdahl Avenue that is the subject of this lawsuit.  Philips North America is a wholly-owned subsidiary of Philips, N.V.

6.      Defendant Philips, N.V. is a corporation duly organized and existing under the laws of The Netherlands, with its corporate headquarters located at Amstelplein 2, Breitner Center, P7 1096 BC, Amsterdam, The Netherlands.  Philips, N.V. is the parent company of Philips North America.  (Defendant Philips, N.V. is substituted in place of the original named Defendant "Royal Philips Electronics, N.V. Koninklijke" f/k/a Koninklijke Philips Electronics, N.V.)

7.      Defendant Corning Incorporated is a corporation duly organized and existing under the laws of New York, with its corporate headquarters located at 1 Riverfront Plaza, Corning, New York.  On information and belief, Corning is now the owner of the Site and the Facility and is and has been physically in control of any removal of contaminated materials from the Facility or the remediation and removal of soil from the Site.

**B.**      **Jurisdiction And Venue.**

8.      Jurisdiction is proper in this Court pursuant to 28 U.S.C.  § 1332(d)(2); § 1332(d)(5)(B), as this is a class action in which (1) plaintiffs are citizens of a state different from defendants; (2) the proposed plaintiff class contains at least 100 members in the aggregate; and (3) the amount in controversy exceeds five million dollars.

9.     Venue is proper in this Court because the acts complained of occurred in this district.

## II.     CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 23

10.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as members of the proposed Plaintiffs' Class.  The Proposed Class is initially defined as all persons who between 1952 and 2013 have owned property or resided within a five-mile radius of the Site.

11.     Plaintiffs propose that the class be certified as two subclasses to be defined as follows: A.) Individuals or legal entities who have owned property within a five-mile radius of the Site between 1952 and 2013 ("Subclass A"); B.) Individuals who have resided within a five-mile radius of the Site between 1952 and 2013 ("Subclass B").

12.     Subclass A includes Plaintiffs similarly situated to Modern Holdings and Greenleaf, who have suffered property damage as a result of the Defendants' tortious actions.

13.     Subclass B includes Plaintiffs similarly situated to Bowen and Lemons, who have suffered personal injury as a result of the Defendants' tortious actions.

14.     Furthermore, and upon information and belief, the Proposed Class includes Plaintiffs who have both owned property and resided within a five-mile radius of the Facility between 1952 and 2013 and will therefore qualify as members of both Subclasses.

15.     The Proposed Class is so numerous that joinder of all members is impracticable.

16.     There are questions of law and fact common to the Proposed Class.  These common questions include, but are not limited to, the nature, causes and effects, and toxicity of the Hazardous Substances to which all Plaintiffs and Plaintiffs' properties were exposed,  all factual issues relating to Defendants' operation of the Facility, including its generation, storage, and use of materials, products and Hazardous Substances at the Facility; the migration of

Hazardous Substances off-Site ; citations for violations of federal and/or state laws relating to pollution that were received by Defendants; the liability of Defendants; common affirmative defenses raised by the Defendants; remedies available under Kentucky law and the appropriate measure of damages; and questions related to the claim for punitive damages and expenses of litigation.

17.     The claims of each of the representative parties are typical of the claims of the Class – all Plaintiffs seek damages resulting from the pollution and toxic substances emitted from the Facility by the Defendants, which Defendants tortiously permitted to escape the Site. The common proof would show the same unlawful acts by Defendants in the same method against the entire class.

18.     The representative Plaintiffs will fairly and adequately assert and protect the interests of the Class because the interests of the class representatives and the unnamed class members are exactly the same and no antagonism exists between them.  The class representatives have been informed of and are willing to participate in this litigation and perform the duties of class representatives.  Adequate representation is also guaranteed as experienced class counsel have undertaken representation of the class representatives and the yet to be certified class.

19.     This class action provides a fair and efficient method for the adjudication of the controversy because common questions of law regarding whether the Defendants committed the torts alleged in the operation of the Facility thereby causing property damage and personal injury predominate.

20.     The common questions of law and/or fact predominate over any question involving only individual members of the Class.

21.     The size of the Proposed Class is conducive to class action management.  A class action would clearly be more manageable than dozens of separate lawsuits or mass joinder of

over 100 named Plaintiffs in a single action.  The use of experts giving testimony relevant to the claims of all class members is far more efficient and manageable than numerous trials for each Plaintiff of the proposed class.

22.     The prosecution of separate civil actions by individual members of the Proposed Class would create a risk of varying adjudications with respect to individual members of each class which would confront the Defendants with potentially incompatible standards of conduct, and which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

23.     In addition, the cost to hire experts, to conduct discovery, and to present the case for trial for an individual Plaintiff would be essentially the same as preparing and presenting the case for all class members.  The cost of preparation of an individual claim could well exceed the potential recovery of actual damages and would be cost prohibitive for individual actions.  In view of the complexities of the issues and/or the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate claims involving any of the same issues, and efficiencies of preparation and presentation on a class-wide basis therefore outweigh any interest of class members proceeding on an individual basis.

24.     Moreover, anyone who wishes to opt out will be given the opportunity to opt out of this class action.

25.     There is no known litigation already commenced by or against the members of the Proposed Class involving any of the same issues.

26.     It is not likely that the amount which may be recovered by the individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

27.     The Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

## III.  <u>INTRODUCTION</u>

28.     This Complaint alleges Counts against Philips, N.V., Philips North America, and Corning on behalf of the Plaintiffs as follows: (I) Nuisance; (II) Trespass; (III) Negligence, Gross Negligence, and Recklessness; (IV) Strict Liability; (V) Battery; (VI) Fraudulent Concealment;  (VII) Negligent Misrepresentation; and (VIII) Negligent Infliction of Emotional Distress; (IX) Medical Monitoring.

29.     This action arises from the negligent or intentional contamination of the Plaintiffs' properties and injury to persons with Hazardous Substances.  Such substances were caused to be released and leave Defendants' property and enter onto the properties of the Plaintiffs, and have contaminated the Plaintiffs' water, soil, vegetation, air, water, land, and dwellings, thereby causing Plaintiffs to suffer personal injury or an increased risk of serious latent diseases, damage to their properties and personal finances, interference with their exclusive possession of their property, loss of the use and enjoyment of their properties, and destruction of their community.  Plaintiffs seek an injunction requiring Defendants to promptly and completely remove all Hazardous Substances from their properties, and to prevent future migration of Hazardous Substances onto their properties.  The Plaintiffs also seek damages for the diminution in the value of their properties, additional compensatory and punitive damages, and the establishment of a Court supervised medical monitoring program.

IV.     **FACTUAL ALLEGATIONS**

      A.     **Defendants Utilize And/Or Generate Hazardous Substances At The Facility.**

      30.     This controversy relates to a glass and bulb manufacturing facility in Danville, Kentucky.  Corning constructed and operated the glass manufacturing facility (the "Facility") located at 320 Vaksdahl Avenue (the "Site") in 1952.  Prior to 1952, the property was undeveloped.

      31.     Philips North America purchased the Site and Facility in 1983, and operated the Facility as a plant for manufacturing, packaging, and shipping of components for parabolic aluminized reflector (PAR) lamps.  Manufacturing operations by Philips North America continued at the Site until early 2011.

      32.     Philips North America owned the Facility and Site until at least April, 2013, when, upon information and belief, Philips North America sold portions of the Site, including the Facility, back to Corning.

      33.     The Site is approximately 32 acres, roughly rectangular shaped, and is located on the southwest side of Danville, Kentucky.  The Site consists of an approximately 335,000 square foot building with office, manufacturing, and warehouse space.  Other structures around the main building include a hazardous waste storage building, a general purpose storage building, gas cylinder storage building, and a pump house.  The Site is surrounded by a chain link fence.

      34.     The property is located in a mixed commercial and industrial area.  The closest residence is located approximately 1,000 feet to the west.  The Site is bounded to the east by a rail yard owned by the Cincinnati, New Orleans and Texas Pacific Railway Company (Norfolk Southern Corporation), to the west by Vaksdahl Avenue, to the north by Sellers Engineering, and to the south by Greenleaf Plant Food Wholesale, Inc.

35.     The Facility opened in 1952, and was operated by Corning as a glass plant, which included diode glass production.  Trichloroethylene (TCE) was used in the diode glass production process until 1977.  The diode glass manufacturing operation was moved to another Corning plant in 1983, prior to Philips North America's acquisition of the Site in 1983.

36.     Since 1983, Philips North America operated the Site as a glass manufacturing facility that mixed and melted various basic raw materials to form blown and drawn glass products for the lighting industry.  The materials were mixed in a specialized portion of the Facility called "the Mix House."

37.     Three basic types of glass were produced: a soda-lime glass which was drawn into tubing or blown into various types and sizes of glass envelopes for light bulbs; an alkali-lead glass which was drawn into tubing for other glass components used in the lighting industry; and borosilicate glass for manufacturing pressed glass components (reflectors and lenses) for the subsequent assembly into sealed-beam type lighting products.  Philips North America discontinued the bulb acid etching operation around 1999.  Fluorescent tubing and incandescent bulb production ceased in 2005 and 2008, respectively, and the borosilicate hard glass furnace and its pressing operation were the only ongoing operations at the time the plant operations ceased in early 2011.

38.     There are currently three settling ponds at the Site.  Wastewaters resulting from contact cooling of hot lead glass, precipitation runoff from glass cullet storage piles, and a small volume of rinse water from electroplating operations were discharged into a surface impoundment on the eastern side of the Site.

39.     Since 1952, Defendants' Facility has generated hazardous and other solid wastes within and around the facility itself.  These Hazardous Substances negatively impacted the health and well-being of not only the workers at the Facility but also of non-employee Danville

residents.  During its peak operation, there were approximately 400 employees working full time on the Site.

40.    Hazardous Substances used during their manufacturing process, which were spread throughout the Site and throughout Danville by virtue of the Defendants' negligent and/or intentional actions, including but not limited to asbestos, mercury, antimony, arsenic, beryllium, cadmium, chromium, lead, tin, zinc oxide and other heavy metals, thallium, percholoroethene (PCE), 1, 1, 1-Trichloroethane (TCA), methylene chloride, PCB compounds, benzene, toluene, vanadium, benzo(b)flouranthene, benzo(a)pyrene, ethylbenzene, silica, and chlorinated fluorocarbons (CFC), 2-Butanone (MEK), trichloroethylene, and ethanolamine.

41.    Established human toxicological effects associated with just a few of the Hazardous Substances include the following: lung cancer, chronic obstructive pulmonary disease, nose and throat bleeds, nervous conditions, bladder cancer, leukemia, esophageal cancer, pancreatic cancer, renal cancer, brain cancer, liver cancer, Hodgkin's Lymphoma, multiple myeloma, prostate cancer, renal damage/failure; peripheral neuropathy; Multiple Sclerosis; painful bone disorders, cardiovascular disease and hypertension; cognitive defects; personality changes; memory deficits; peripheral neurotoxicity; and damage to the central nervous system. Unfortunately, this list is not exhaustive.

**B.**    **Defendants Corning, Philips North America, And Philips, N.V. Intentionally Or Recklessly Caused The Pollution Of Surrounding Properties.**

42.    Defendants illegally, recklessly or negligently dumped Hazardous Substances onto properties outside the boundaries of the Site.

43.    These properties include but are not limited to property owned by Sellers Engineering Company, and the Cincinnati Railroad adjacent to the north, east, and south of the property.

44.     The Defendants also dumped Hazardous Substances onto fields that were later leased by Defendants to the City of Danville for proposed use as playgrounds and sports fields by children.  Upon information and belief the City of Danville was informed by Corning that the leased property was free of Hazardous Substances.  The dumping by Defendants was done without proper authorization or permits.  Furthermore, in providing the properties containing some of the dump sites in question to the City of Danville, Defendants affirmatively misrepresented and/or failed to disclose the nature of the substances being dumped and the health risks associated with utilizing the properties in question and/or failed in their duty to inform the City or the community at large regarding same.  Defendants likewise affirmatively misrepresented and/or failed in their duty to disclose the inherent dangers associated with the Hazardous Substances that had been dumped onto the properties by Defendants – all to the detriment of the Plaintiffs who reside in or around these dump sites or have utilized the City facilities subsequently located thereon and have been adversely affected thereby.

45.     Defendants also used property owned by the City of Danville located near Clarks Run to dump Hazardous Substances despite knowing that there was, at minimum, a substantial likelihood that these Hazardous Substances would pollute Clarks Run and contaminate other properties in the community.

46.     Upon information and belief, Defendants also illegally dumped Hazardous Substances at various additional sites throughout Danville that are now owned by Plaintiffs and used for commercial or residential purposes.  Whether or not this dumping was done with the permission of the property owners, the dumping by Defendants was done without proper authorization or permits.  Furthermore, Defendants affirmatively misrepresented and/or failed to disclose to the City, the owners of the properties upon which the Hazardous Substances were dumped, or the community at large the nature of the substances being dumped or the health risks

12

associated with dumping the Hazardous Substances in question, all to the detriment of the Plaintiffs who reside in or around these dump sites and have been adversely affected thereby.

47.     Upon information and belief, to the extent the dumping in question was done with the permission of property owners who are Plaintiffs in this litigation, Plaintiffs would not have permitted Defendants to dump the Hazardous Substances in question had the nature of the materials or the adverse health effects associated with the Hazardous Substances been disclosed to Plaintiffs.

48.     Defendants furthermore routinely either negligently or intentionally allowed Hazardous Substances, including arsenic and lead, to be expelled from the Facility and the Site into the air in violation of state and federal law.

49.     Lead expelled into the air by Defendants did enter and settle upon the property of Plaintiffs, and did cause damage to Plaintiffs' properties.

50.      Defendants furthermore routinely either negligently or intentionally allowed Hazardous Substances, including arsenic and lead, to be expelled from the Facility and the Site into the Clarks Run Watershed, which runs parallel to the Site and throughout Danville, without proper permits and in violation of state and federal law.

51.     The settling ponds on the Site were not properly maintained, and regularly overflowed when it rained, with the overflow running directly into the Clarks Run Watershed.

52.     Defendants have also knowingly or recklessly caused the lead dust and other Hazardous Substances throughout the Site and on the roof of the Facility to wash into the Clarks Run Watershed, thereby polluting an area of at least five miles in each direction radiating from the Site.

53.     The Clarks Run Watershed flows through Danville and empties into Herrington Lake, the source of drinking water for many thousands of people in the region.  The groundwater

13

pollution caused by the Defendants has impacted at least those residents and property owners within a five-mile radius of the Facility.

54.     In addition, this contamination has injured Plaintiffs to the extent that they have ingested water taken from the Clarks Run Watershed, creeks, or tributaries or have harvested and ingested vegetation growing in or around these areas.

55.     Defendants were aware that Hazardous Substances could migrate from the Site and spread into surrounding properties.  This is at least partially demonstrated by the fact that Corning and Philips floor workers were routinely assigned the task of walking the Clarks Run Watershed to check for dead animals.

56.     Defendants have knowingly or recklessly caused contamination in the soil on the Site to migrate through the soil and contaminate the soil and groundwater in surrounding properties at least within a five-mile radius of the Site.

57.     Defendants have knowingly or recklessly caused Hazardous Substances to spread from the Facility under and onto the Plaintiffs' properties.

58.     Defendants knew or should have known that the Hazardous Substances from the Facility continued to migrate onto the surrounding Plaintiffs' properties in an uncontrolled manner.

59.     Defendants have been utilizing the Plaintiffs' properties as de facto storage and disposal facilities without the permission of the Plaintiffs.

60.     These de facto storage and disposal facilities lack suitable siting and the extensive safeguards that are required of a permitted facility containing the nature and volume of Hazardous Substances released by all Defendants.

61.     Philips, N.V., the parent company of Philips North America, regularly communicated with Philips North America, and was aware of the extensive off-Site pollution, as

well as the danger this pollution posed to surrounding properties and individuals residing near the Site.  Philips, N.V.  had an independent duty to protect the Plaintiffs and to prevent contamination, pollution, bodily harm, and property damage, yet failed to fulfill this duty.

62.     Because of the action of each Defendant, the Plaintiffs currently suffer or are reasonably certain to suffer serious, severe, and permanent emotional and physical injuries including, but not limited to, cancer, autoimmune problems, respiratory problems, dermatitis, central nervous system problems and other severe medical ailments for which medical attention has been or will be required.

63.     Because of the actions of each Defendant, the Plaintiffs have suffered damages as a result of toxic exposure.  The Plaintiffs are entitled to compensation for current and past illnesses, for past and future medical and hospital expenses, for past and future lost wages and employment benefits, for the increased risk of illness, for medical monitoring, for diminution in quality of life, for infliction of emotional distress, and for all other allowed compensation according to proof.

64.     In addition, the contamination of the Plaintiffs' properties at the hands of all Defendants has resulted in significant damage to the value of the properties, which has economically harmed the Plaintiffs.  The diminution in the value of Plaintiffs' properties will be established at trial by expert evidence, and arises from not only the actual contamination of Plaintiffs' Properties by Hazardous Substances originating from the Site, but also from the stigma associated with being located in the vicinity of the Site.

65.     Because of the Defendants' concealment and evasive actions, certain Plaintiffs' decedents suffered wrongful death.  These Plaintiffs or their estates must be compensated for their sorrow, mental anguish, expenses, and the pain and suffering of their loved ones.

66.     Because of the Defendants' actions, remaining Plaintiffs are reasonably likely to develop physical injuries in the future and, as such, those Plaintiffs require special medical monitoring.

67.     Throughout the Relevant Time Period, in an effort to limit their liability and their expenses associated with proper containment of the Hazardous Substances, the Defendants have knowingly permitted discharges of Hazardous Substances off-site, through outfalls or discharges into the air, in violation of Local, State, and Federal regulations and without the proper permits.

68.     Defendants discharged multiple Hazardous Substances for which they held no discharge permit.  With respect to other Hazardous Substances, Defendants exceeded emissions limits.

69.     Defendants  engaged in a conspiracy and concerted course of action to perpetrate a fraud on the public by failing to disclose these illegal discharges of Hazardous Substances despite having a duty to do so.

70.     Because of these efforts, the local, state and federal agencies responsible for monitoring the Defendants' conduct have not had full and complete knowledge regarding the Defendants' operations or the nature or extent of the Hazardous Substances that have migrated off-Site.

71.     To the extent that local, federal, and state agencies became aware of some of the Defendants' illegal actions, Defendants have received numerous citations for knowing violations of federal and state regulations.

72.     The Defendants engaged in a further conspiracy and concerted course of action to perpetrate a fraud upon the public by paying for or "funding" illegitimate or incomplete "studies" and making material misrepresentations regarding the character of their operations, their

remediation efforts, and of the risks posed to human health as a result of exposure to the Hazardous Substances.

73.     Defendants have therefore misled the public by fraudulently, negligently, and/or knowingly suppressing the true nature and extent of the Hazardous Substances that have migrated off the Site, all at the expense of the health and well-being of the Plaintiffs.

74.     Defendants knew or should have known of the hazards, never informed the Plaintiffs that their health and their very lives were at risk, and never instructed the Plaintiffs on how to avoid the risks to their health.

75.     Defendants violated commonly accepted and well-known safety standards within their industry by allowing and continuing such improper disposal of Hazardous Substances. Further, disposal methods were violations of specific environmental statutes, although not cited.

76.     The Plaintiffs neither knew nor had reason to suspect that they and their properties had been exposed to such Hazardous Substances as a result of Defendants' conduct. In fact, while studies have recently been conducted establishing significant off-Site pollution, the extent of the off-Site pollution remains unknown.

77.     Because of each of the Defendants' actions, Plaintiffs who represent decedent property owners or residents discovered less than one year prior to the filing of this Complaint the connection between the deaths of the decedents and the Defendants' negligent or intentional actions.  Even with the exercise of reasonable diligence, Plaintiffs could not have discovered the connection between the death of their decedents and Defendants' negligent or deliberate actions until less than one year prior to the filing of this Complaint.

78.     Because of the Defendants' concealment and misrepresentation, the Plaintiffs discovered less than one year prior to the filing of this Complaint that they have been exposed to Hazardous Substances, pollutants, and contaminants and that their exposure to these Hazardous

17

Substances had caused personal injury to them and their properties.  Even with the exercise of reasonable diligence, the Plaintiffs could not have discovered more than one year prior to the filing of this Complaint both the existence of the aforementioned injuries and damages, and their connection to Defendants' negligent or deliberate actions.

79.      Defendants have shown a reckless indifference to the impact of their grossly negligent and/or reckless behavior on the Danville community and the Plaintiffs.  Defendants have engaged in grossly negligent and/or reckless, oppressive and fraudulent behavior over the course of many years.

      **C.**     **The Defendants' Tortious Actions Have Continued Up Through The Present Date And Are In Fact Continuing.**

80.      As previously alleged, manufacturing operations at the Facility ceased in 2011.

81.      Subsequent testing performed off-Site along the Clarks Run Watershed has established that significant concentrations of Hazardous Substances, including lead and arsenic have in fact migrated off-Site onto adjacent properties, and into the Clarks Run Watershed.

82.      For instance, sampling was recently conducted to detect lead concentrations above the industrially acceptable soil RSL of 800 mg/kg.  A majority of the off-Site sampling locations, including those significantly far removed from the Site down the Clarks Run Watershed, returned concentrations significantly above this level, ranging from 1000 mg/kg to an astounding 160,000 mg/kg.

83.      Similarly, sampling was recently conducted to detect arsenic concentrations above the acceptable screening level of 22.7 mg/kg.  A majority of the off-Site sampling locations, including those significantly far removed from the Site down the Clarks Run Watershed, returned concentrations significantly above this level, ranging from 27 mg/kg to an astounding 180 mg/kg.

84.     Recent review of these test results by the Commonwealth of Kentucky has led the Kentucky Department for Environmental Protection ("KDEP") to note that the detected levels of lead (as much as 160,000 mg/kg) off-Site in the downstream drainage represents an uncontrolled hazard to human health and the environment.  Philips has been directed by the KEDP to immediately begin interim measures to mitigate the release in the creek.

85.     The KEDP has stated that the extent of the lead and arsenic in the Clarks Run Watershed is not yet defined, and is seeking to gain access to downstream property to continue defining the extent of the contamination.  The KEDP has proposed that the sampling be extended to include additional samples from Clarks Run down to the 4th Street Bridge, approximately one mile away from the Site.

86.     The KEDP has also stated that additional investigation into surface contamination of off-Site properties caused by Defendants is necessary due to high concentration of lead on nearby properties.

87.     As the recent KEDP investigation results demonstrate, the extent to which Defendants' activities have resulted in contamination of off-Site properties is still unknown, and is both ongoing and at levels that are hazardous to human health.

### COUNT I

### (Nuisance)

88.     Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

89.     In the operation of the Facility, all Defendants utilized and generated Hazardous Substances, including but not limited to asbestos, mercury, arsenic, beryllium, cadmium, chromium, lead, tin, zinc oxide and other heavy metals, thallium, percholoroethene (PCE), 1, 1, 1-Trichloroethane (TCA), methylene chloride, PCB compounds, benzene, toluene, vanadium,

benzo(b)flouranthene, benzo(a)pyrene, ethylbenzene, and chlorinated fluorocarbons (CFC), 2-Butanone (MEK), silica, and ethanolamine (the "Hazardous Substances").

90.     In the operation of its facility, all Defendants discharged fallout, odors, chemicals, and Hazardous Substances into the air and groundwater, and thereby into the Plaintiffs' neighborhoods, encompassing those properties falling within at least a five-mile radius.  These Hazardous Substances are invasive and have caused and continue to cause damage to Plaintiffs' who own property within this radius.

91.     The nuisance described, supra, is ongoing, the full extent of which is yet unknown.

92.     All Defendants had a duty to prevent the discharge of Hazardous Substances onto the Plaintiffs' properties, and to prevent the Hazardous Substances from escaping from the Site onto the Plaintiffs' property.

93.     A condition or activity that unreasonably interferes with the use of property is a nuisance.

94.     Plaintiffs did not consent for the Hazardous Substances to physically invade their personal and real property.

95.     By causing Hazardous Substances accumulated and controlled by Defendants to physically invade the Plaintiff's personal and real property, all Defendants substantially and unreasonably interfered with the Plaintiffs' use and enjoyment of their property.

96.     Plaintiffs who own property within a five-mile radius of the Site, including but not limited to Modern Holdings and Greenleaf, have been damaged as a result of Defendants' tortious conduct in that the fair market value of their properties has been materially reduced.

97.     Upon information and belief, the Hazardous Substances emitted by Defendants have contaminated Plaintiff Modern Holdings and Greenleaf's properties in more than a minute

quantity, the extent of which is presently unknown, thereby causing a material reduction in the value of the Plaintiffs' properties.

98.     Plaintiffs Modern Holdings and Greenleaf are furthermore harmed by the contamination that has invaded their properties as a result of the Defendants' tortious activities because such contamination exposes Plaintiffs to potential legal and environmental liabilities.

99.     Finally, the Defendants' tortious activities in permitting Hazardous Substances to migrate off-Site and contaminate surrounding properties has damaged Plaintiffs Modern Holdings and Greenleaf in that the value of their properties has suffered from the stigma of being closely situated to the Site.

100.    The Defendants' tortious activities have furthermore interfered with the Plaintiffs' use and enjoyment of their properties, because the presence of contamination and Hazardous Substances on these properties has and will continue to impair the ability of Plaintiffs Modern Holdings and Greenleaf to dispose of their properties through sale or lease, or to otherwise utilize their properties for the purposes for which they are best suited.

101.    Defendants' substantial and unreasonable interference with Plaintiffs' use and enjoyment of their property constitutes a nuisance for which all Defendants are liable to Plaintiffs for all damages arising from such nuisance, including compensatory and exemplary relief.  Each of the Plaintiffs is entitled to recover damages for the following, including but not limited to:  the loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the value of property; damages arising from the stigma of being closely situated to the Site, restoration costs; consequential and incidental damages; disgorgement of profits realized; unjust enrichment; and punitive damages.

## COUNT II

### (Trespass)

102.     Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

103.     All Defendants engaged in extra-hazardous activities in permitting Hazardous Substances to escape the Site and pollute surrounding properties.

104.     All Defendants intentionally, recklessly, willfully, wantonly, maliciously, and negligently failed to properly construct, maintain, and/or operate the Facility, which caused the invasion and damage of Plaintiffs' personal and real property by particulates, air contaminants, and other Hazardous Substances on dates too numerous to mention.

105.     The trespass described, supra, is ongoing, the full extent of which is yet unknown.

106.      As a direct and proximate result of the foregoing conduct of all Defendants, Hazardous Substances accumulated upon, entered upon, settled upon, seeped onto, and otherwise physically invaded the Plaintiffs' personal and real property.

107.     It was reasonably foreseeable that all Defendants' failure to properly construct, maintain, and/or operate the facility could result in an invasion of Plaintiffs' possessory interests through the emissions of Hazardous Substances.

108.     The Hazardous Substances that entered, settled, physically invaded, and damaged Plaintiffs' personal and real property interfered with and continue to damage the Plaintiffs' interests in the exclusive possession of the Plaintiffs' land and property and constitute a continuous trespass upon the Plaintiffs' property.

109.     Plaintiffs did not consent for the Hazardous Substances to physically invade their land and property.

110.    The Hazardous Substances that Defendants have caused to invade Plaintiffs'
properties have in fact contaminated the subject properties owned by Modern Holdings,
Greenleaf, and other members of the Proposed Class to the extent that the levels of Hazardous
Substances pose a hazard to human health.

111.    The Hazardous Substances that have invaded the properties of Plaintiffs,
including Modern Holdings and Greenleaf, have harmed the properties in that the contamination
has and will continue to impair the ability of Plaintiffs Modern Holdings and Greenleaf to
dispose of their properties through sale or lease, or to otherwise utilize their properties for the
purposes for which they are best suited.

112.    Upon information and belief, the Hazardous Substances emitted by Defendants
have contaminated the properties of Plaintiffs, including Modern Holdings and Greenleaf, in
more than a minute quantity, the extent of which is presently unknown, thereby causing a
material reduction in the value of the Plaintiffs' properties.

113.    Plaintiffs Modern Holdings and Greenleaf are furthermore harmed by the
contamination that has invaded their properties as a result of the Defendants' tortious activities
because such contamination exposes Plaintiffs to potential legal and environmental liabilities.

114.    Finally, the Defendants' tortious activities in permitting Hazardous Substances to
migrate off-Site and contaminate surrounding properties has damaged Plaintiffs, including
Modern Holdings and Greenleaf, in that the value of their properties has suffered from the stigma
of being closely situated to the Site.

115.    As a further direct and proximate result of the foregoing conduct of all
Defendants, Plaintiffs suffered substantial damages to their personal and real property as alleged
herein.  Each of the Plaintiffs is entitled to recover damages for the following, including but not
limited to:  the loss of use and enjoyment of property; the loss of use of the groundwater; the

23

diminution of the value of property; restoration costs; consequential and incidental damages; disgorgement of profits realized; and unjust enrichment; and punitive damages.

116.    By reason of all Defendants' trespass on the Plaintiffs' properties, the Plaintiffs are entitled to injunctive relief requiring the Defendants to promptly and completely remove all Hazardous Substances from the Plaintiffs' land, and prevent the future migration of Hazardous Substances onto the Plaintiffs' land.

117.    All Defendants' actions, which resulted in the trespass upon the Plaintiffs' land and property were, and continue to be, intentional, willful, and malicious and made with a conscious disregard for the rights and safety of the Plaintiffs, entitling the Plaintiffs to compensatory, exemplary, injunctive, and punitive relief.

## COUNT III

### (Negligence, Gross Negligence And Recklessness)

118.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

119.    In constructing, maintaining, operating, controlling, engineering and/or designing the Facility, all Defendants had a duty to exercise ordinary care and diligence so that Hazardous Substances did not invade the Plaintiffs' personal and real property.

120.    All Defendants knowingly or recklessly breached their duty to exercise ordinary care and diligence when they improperly constructed, maintained, operated, engineered, and/or designed the Facility and knew, or should have known, that such actions would cause Plaintiffs' personal and real property to be invaded by Hazardous Substances.

121.    As a direct and proximate result of the failure of all Defendants to exercise ordinary care, thereby causing contamination of the Plaintiffs' properties in amounts that are hazardous to human health and which interfere with the Plaintiffs' use and enjoyment of the

24

property, Plaintiffs owning property within a five-mile radius of the Facility between 1952 and the present date, including Plaintiffs Modern Holdings and Greenleaf, have been damaged and are entitled to recover damages arising from the loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the value of property; restoration costs; consequential and incidental damages.

122.    As a direct and proximate result of all Defendants' failure to exercise ordinary care, Plaintiffs residing within a five-mile radius of the Facility between 1952 and the present date, including Plaintiffs Bowen and Lemons, have suffered personal injury, wrongful death, injury arising from an increased risk of personal injury and sickness in the future, mental anguish, suffering, anxiety, embarrassment, humiliation, distress, agony, and other related nervous conditions and emotional trauma.

123.    Multiple sclerosis is a disease that has been causally scientifically connected to exposure to one or more of the Hazardous Substances generated and tortiously dispersed by Defendants, including but not limited to arsenic and lead.  As a result of Defendants' tortious actions, Plaintiffs Bowen and Lemons have been exposed to these Hazardous Substances in excessive amounts and on multiple occasions. Upon information and belief, the multiple sclerosis suffered by Plaintiffs Bowen and Lemons is directly attributable to the conduct of Defendants in negligently, intentionally, and/or recklessly causing them to be exposed to Hazardous Substances.

124.    The conduct of all Defendants in knowingly allowing conditions to exist that caused or permitted the Hazardous Substances to physically invade the Plaintiffs' personal and real property, constitutes gross negligence, as Defendants' conduct demonstrates a substantial lack of concern for whether an injury resulted to the Plaintiffs, and at least constitutes recklessness.

125.     All Defendants are vicariously liable for the negligence and/or gross negligence of their officers, employees, representatives, and agents, who, during the course and scope of their employment, allowed or failed to correct the problem which caused Hazardous Substances to physically invade the Plaintiffs' personal and real property.

126.     Defendants' recklessness entitles Plaintiffs to an award of punitive damages, because their conduct was in willful disregard for Plaintiffs and constitutes outrageous conduct.

## COUNT IV

### (Strict Liability)

127.     Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

128.     All Defendants, as the owner/operators of the Facility, engaged in abnormally dangerous activities in the manner in which they used, stored, treated and disposed of Hazardous Substances at the Facility, which permitted Hazardous Substances to migrate off-Site, thereby subjecting Plaintiffs' persons and properties to contamination by such Hazardous Substances.

129.     Defendants' activities in permitting Hazardous Substances to migrate off-Site created a high degree of risk of harm to others, and particularly to the Plaintiffs, whose persons and property have been adversely affected by the migrating contamination; created a risk involving a likelihood that the harm threatened by the Defendants' activities would be great; created a risk of harm that could not be eliminated by reasonable care.

130.     Defendants' activities in permitting Hazardous Substances to migrate off-Site were not activities of common usage; and were inappropriate to the place that they were being carried on, in that they constituted a non-natural use of Defendants' land which imposed an unusual and extraordinary risk of harm to Plaintiffs' properties and persons, as well as to other property in the vicinity.

26

131.    The risks posed by the Defendants' activities in permitting Hazardous Substances to migrate off-Site created are such as give rise to an absolute duty on the part of Defendants to make their conduct safe for the Plaintiffs and others affected by their activities.

132.    The harm sustained by the Plaintiffs is exactly the kind of harm posed by the Defendants' conduct in permitting Hazardous Substances generated and stored at the Facility to escape, leak and seep on, under and around the Plaintiffs' properties, the possibility of which made Defendants' activities abnormally dangerous.

133.    By reason of the Defendants' conduct, the Plaintiffs are entitled to recover for damages to their real and personal property, personal injury, wrongful death, injury arising from an increased risk of personal injury and sickness in the future, mental anguish, suffering, anxiety, embarrassment, humiliation, distress, agony, and other related nervous conditions and emotional trauma.

134.    All Defendants' recklessness entitles Plaintiffs to an award of punitive damages, because such conduct was in willful disregard for Plaintiffs' rights and safety and constitutes outrageous conduct.

## COUNT V

### (Battery)

135.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully restated herein.

136.    All Defendants acted with knowledge that they were illegally and tortiously permitting Hazardous Substances generated and stored at the Facility to escape, leak and seep on, under and around the Plaintiffs' properties, and furthermore acted with the knowledge that such activities were substantially likely and were in fact causing personal injury to persons, including Plaintiffs Bowen and Lemons, were touched by or exposed to such Hazardous Substances.

137.    The Defendants actions in intentionally allowing the discharge of Hazardous Substances off-Site, intentionally and willfully caused a direct, harmful and/or offensive contact with the Plaintiffs and thereby committed battery upon such Plaintiffs.  Separate and apart from acting negligently or with gross negligence, at all relevant times, the Defendants caused personal injury to the Plaintiffs, and/or an increased risk of serious latent disease and damages, through acts and omissions accompanied by malice and/or accompanied by a wanton, reckless, and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

138.    As a direct and proximate result of Defendants' misconduct as set forth herein, the Plaintiffs have suffered and continue to suffer personal injury, wrongful death, injury arising from an enhanced risk of serious future latent disease, economic losses, the loss of value to their property, the loss of use and enjoyment of their property, and the need for the establishment of a medical monitoring program for those exposed to the Hazardous Substances.

## COUNT VI

## (Fraudulent Concealment)

139.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

140.    Defendants had, and continue to have, a duty to disclose to local, state and federal authorities, and to Plaintiffs, the nature and extent of Hazardous Substances generated by the Facility which have either migrated off-Site, or been intentionally dumped off-Site by Defendants.

141.    As set forth in detail in Section IV, supra, during the Relevant Time Period, all Defendants intentionally concealed and failed to disclose to the Plaintiffs, and to the public authorities and/or agencies, material facts concerning the nature, extent, magnitude, and effects of the exposure of the Plaintiffs and their properties to the Hazardous Substances emitted,

28

released, stored, handled, generated, processed and/or disposed of in and around the Facility and the surrounding environment.

142.    Defendants continue to intentionally conceal and fail to disclose to the Plaintiffs, and to the public authorities and/or agencies, material facts concerning the nature, extent, magnitude, and effects of the exposure of Plaintiffs and their properties to the Hazardous Substances emitted, released, stored, handled, generated, processed and/or disposed of in and around the Facility and the surrounding environment.

143.    All Defendants intentionally concealed such material information. Defendants knew or should have known that the Plaintiffs and their properties would be exposed to the Hazardous Substances.

144.    All Defendants knew that their concealment of such information would subject and continue to subject the Plaintiffs to continued exposure to the Hazardous Substances indefinitely, up to and including today.

145.    If the Plaintiffs, who were residents of and/or owned property in Danville, Kentucky, had known of the material information intentionally concealed by Defendants, the Plaintiffs would not have consented to being exposed to the Hazardous Substances and would not have continued to reside or own property within the affected area.

146.    Plaintiffs reasonably believed that the groundwater, air, soil, and natural resources in and around the Facility and their surrounding community did not pose any potential health hazard, and thus reasonably relied upon such belief in continuing to reside or own property within the affected area, thereby sustaining injuries.

147.    Plaintiffs reasonably believed that the groundwater, air, soil, and natural resources in and around the Facility and their surrounding community did not pose any potential health

29

hazard, and thus reasonably relied upon such belief in refraining, until the filing of this suit, from

seeking redress or taking precautions.

148.    Separate and apart from acting negligently or with gross negligence, at all times,

the Defendants caused serious personal injury, property damage and/or an increased risk of

serious latent disease to the Plaintiffs through acts and omissions actuated by malice and/or

accompanied by a wanton, reckless and willful disregard for the persons who might foreseeably

be harmed by such acts or omissions.

149.    As a direct and proximate result of Defendants' misconduct as set forth herein,

Plaintiffs have suffered and continue to suffer personal injury, injury arising from an enhanced

risk of serious future latent disease, economic losses, the loss of value to their property, the loss

of use and enjoyment of their property, and the need for the establishment of a medical

monitoring program for those exposed to the Hazardous Substances.

## COUNT VII

## (Negligent Misrepresentation)

150.    Plaintiffs incorporate herein by reference the allegations set forth in each

Paragraph above as if fully stated herein.

151.    Defendants had, and continue to have, statutory and common law duties to

disclose to local, state and federal authorities, and to Plaintiffs, the nature and extent of

Hazardous Substances generated by the Facility which have either migrated off-Site, or been

intentionally dumped off-Site by Defendants.

152.    All Defendants through misrepresentations, mislead Plaintiffs, public authorities

and/or agencies, regarding the nature, extent, magnitude, and effects of the exposure of the

Plaintiffs and their properties to the Hazardous Substances emitted, released, stored, handled,

generated, processed and/or disposed of in and around the Facility and the surrounding environment.

153.     All Defendants continue to negligently misrepresent material facts concerning the nature, extent, magnitude, and effects of the exposure of Plaintiffs and their properties to the Hazardous Substances emitted, released, stored, handled, generated, processed and/or disposed of in and around the Facility and the surrounding environment.

154.     All Defendants misrepresented such material information. Defendants knew or should have known that the Plaintiffs and their properties would be exposed to the Hazardous Substances.

155.     All Defendants knew that their misrepresentation of such information would subject and continue to subject the Plaintiffs to continued exposure to the Hazardous Substances indefinitely, up to and including today.

156.     If the Plaintiffs, who were residents of and/or owned property in Danville, Kentucky, had known of the material information misrepresented by Defendants, the Plaintiffs would not have consented to being exposed to the Hazardous Substances and would have either taken necessary precautions to protect themselves and their property, or would not have continued to reside or own property within the affected area.

157.     Plaintiffs reasonably believed that the groundwater, air, soil, and natural resources in and around the Facility and their surrounding community did not pose any potential health hazard, and thus reasonably relied upon such belief in continuing to reside or own property within the affected area, and/or refraining to take necessary precautions to protect themselves and their property, thereby sustaining injuries.

158.     Plaintiffs reasonably believed that the groundwater, air, soil, and natural resources in and around the Facility and their surrounding community did not pose any potential health

hazard, and thus reasonably relied upon such belief in refraining, until the filing of this suit, from seeking redress or taking precautions.

159.    As a direct and proximate result of Defendants' misconduct as set forth herein, the Plaintiffs have suffered and continue to suffer personal injury, injury arising from an enhanced risk of serious future latent disease, economic losses, and loss of value to their property, the loss of use and enjoyment of their property, and the need for the establishment of a medical monitoring program for those exposed to the Hazardous Substances.

## COUNT VIII

### (Negligent Infliction Of Emotional Distress)

160.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully restated herein.

161.    The Defendants failed to act with reasonable care by failing to adequately or fully warn Plaintiffs Bowen and Lemons or others of their exposure to or the risks associated with exposure to various Hazardous Substances.  Such conduct placed the Plaintiffs, their unborn children, and members of their households at a significantly increased risk of developing physical injuries and health related problems in the future.

162.    By failing to warn the Plaintiffs or others, despite subjectively realizing the specific unsafe and hazardous nature of the pollution Defendants permitted to escape off-Site, and by taking actions that deliberately misled Plaintiffs and concealed from them the true hazards and risks associated with the nature and extent to which Hazardous Substances have migrated off-Site, the Defendants acted wantonly, willfully, recklessly, and with malice and oppression.

163.    As set forth herein, all Plaintiffs residing within a five-mile radius of the Facility between 1952 and 1982, including Plaintiffs Bowen and Lemons, have alleged that they suffered

a physical injury or health related problems proximately resulting from their exposure to Hazardous Substances emitted by Defendants.  In the alternative, the Plaintiffs allege that, to the extent they have not yet suffered any physical injury or health related problems from such exposure, some or all of Plaintiffs have suffered serious emotional distress proximately resulting from their significantly increased risk of developing future disease, which in turn resulted from the Defendants' negligent and reckless conduct.

<u>**COUNT IX**</u>

<u>**(Medical Monitoring)**</u>

164.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

165.    As set forth herein, Plaintiffs have alleged that they suffered a physical injury or health related problems proximately resulting from their exposure to Hazardous Substances.  In the alterative, the Plaintiffs allege that, to the extent they have not yet suffered any physical injury or health related problems from such exposures, the Defendants' tortious misconduct, as alleged herein, proximately caused some or all of the Plaintiffs to require medical monitoring and/or medical surveillance.

166.    As a proximate result of Defendants' misconduct as alleged herein, all Plaintiffs have had long-term, chronic exposure to the Hazardous Substances, which are known to cause significant and deadly medical conditions.  Given this long-term exposure, to the extent that the Plaintiffs do not already suffer from a physical injury or health related problems resulting from such exposure, those Plaintiffs are at a significantly increased risk for developing physical injuries or health related problems in the future.

167.    The increased risk of disease makes it reasonably necessary for those Plaintiffs to undergo periodic diagnostic medical examinations different from medical examinations that

33

would be medically necessary in the absence of their exposures, and such examinations will allow for early detection of disease.  The Plaintiffs therefore seek such medical assistance by Order of this Court to be carried out under the supervision of this Court.

WHEREFORE, the Plaintiffs respectfully request Judgment on their First Amended Class Action Complaint against Corning Incorporated, Koninklijke Philips, N.V., and Philips Electronics North America Corporation as follows:

A.      A trial by jury on all Counts so triable;

B.      Joint and several liability as to all Defendants;

C.      The entry of an Order pursuant to Federal Rule 23 permitting this action to be maintained as a class action, appointing Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class as defined herein.

D.      The creation of a program for the Plaintiffs for medical monitoring, to be paid for by Defendants, under Court supervision, to provide medical monitoring services, including but not limited to, testing, examination, preventative and diagnostic screening for conditions that can result from or potentially result from exposure to the Hazardous Substances;

E.      The entry of an Order requiring the Defendants to bear the cost of publication to the respective Plaintiffs and members of the Class of approved guidelines and procedures for medical screening and monitoring of Plaintiffs, the content, form and manner of such publication to be approved by the Court;

F.      Judgment on Count I joint and severally against all Defendants for both compensatory and punitive damages for nuisance in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

G.      Judgment on Count II joint and severally against all Defendants for both compensatory and punitive damages for trespass in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

H.      Judgment on Count III joint and severally against all Defendants for both compensatory and punitive damages for negligence, gross negligence and recklessness in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

I.      Judgment on Count IV joint and severally against all Defendants for both compensatory and punitive damages for strict liability in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

J.      Judgment on Count V joint and severally against all Defendants for both compensatory and punitive damages for battery in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

K.      Judgment on Count VI joint and severally against all Defendants for both compensatory and punitive damages for fraudulent concealment in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

L.      Judgment on Count VII joint and severally against all Defendants for compensatory damages for negligent misrepresentation in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

M.      Judgment on Count VIII joint and severally against all Defendants for compensatory damages for negligent infliction of emotional distress in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

N.      Judgment on Count IX joint and severally against all Defendants for medical monitoring;

O.      Award the Plaintiffs' reasonable costs incurred herein;

P.      Award Reasonable attorneys' fees;

Q.      Award prejudgment and post-judgment interest as provided by law;

R.      Award compensatory damages;

S.      Award punitive and exemplary damages; and

T.      An Order requiring Defendants to promptly and completely remove all Hazardous

Substances from the Plaintiffs' properties to prevent further migration of such Hazardous

Substances and to preserve portions of the Facility and top soil at or near the Facility for

subsequent testing and analysis on behalf of Plaintiffs herein.

Respectfully submitted,


 /s/ Richard A. Getty
RICHARD A. GETTY
JESSICA WINTERS
        and
EVAN M. RICE

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 259-1900
Facsimile:   (859) 259-1909
E-Mail:  rgetty@gettylawgroup.com
E-Mail:  jwinters@gettylawgroup.com
E-Mail:  erice@gettylawgroup.com

COUNSEL FOR PLAINTIFFS
MODERN HOLDINGS, LLC,
GREENLEAF PLANT FOOD
WHOLESALE, INC., BOBBIE LEMONS
AND GAY BOWEN, On Behalf Of
Themselves And Others Similarly Situated

## CERTIFICATE OF SERVICE

I hereby certify that on this the 27th day of February, 2014, the foregoing First Amended Class Action Complaint was served electronically through this Court's CM/ECF system and by mail, postage pre-paid upon the following:

Brian M. Johnson, Esq.
Bingham Greenebaum Doll LLP
300 West Vine Street, Ste. 1100
Lexington, Kentucky  40507
Counsel for Philips Electronics North America Corporation

and

M. Stephen Pitt, Esq.
George J. Miller, Esq.
George L.Seay, Jr., Esq.
Wyatt, Tarrant & Combs, LLP
250 West Main Street, Suite 1600
Lexington, Kentucky  40507-1746
Counsel for Corning Incorporated


/s/ Richard A. Getty
COUNSEL FOR PLAINTIFFS

jkcpld0792