**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| **MODERN HOLDINGS, LLC, ROSETTA FORD, GARY FORD, CHARLES FORD, OTIS FORD, BOBBIE LEMONS, AND SELLERS AND SELLERS COMPANY**<br><br>  **Plaintiffs,**<br><br>**V.**<br><br>**CORNING INCORPORATED, a New York Corporation**<br><br>**AND**<br><br>**PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, a Delaware Corporation**<br><br>  **Defendants.** | **Civil Action No. 5: 13-cv-00405-GFVT**<br><br><br><br>**FOURTH AMENDED**<br>**CLASS ACTION COMPLAINT** |

Plaintiffs Modern Holdings, LLC ("Modern Holdings"), Rosetta Ford, Gary Ford,

Charles Ford, Otis Ford, Bobbie Lemons ("Lemons"), Sellers and Sellers Company ("Sellers and

Sellers"), on behalf of themselves and others similarly situated (collectively the "Plaintiffs"), for

their Fourth Amended Class Action Complaint against Philips Electronics North America

Corporation ("Philips North America"), and Corning Incorporated ("Corning") (collectively

"Defendants"), respectfully state as follows:

I.      **PARTIES, JURISDICTION AND VENUE**

        A.      **The Parties.**

        1.      Plaintiff Modern Holdings, LLC, is a Kentucky Limited Liability Company

organized and doing business in the Commonwealth of Kentucky that owns property located at

1200 Lebanon Road, with an office address of 725 Maple Avenue, Danville, Kentucky.  Modern

Holdings brings this action on behalf of itself and similarly situated individuals who have, between 1952 and the present date (the "Relevant Time Period"), owned property or resided within a five-mile radius of the glass manufacturing facility (the "Facility") located at 200 and 320 Vaksdahl Avenue (the "Site") in Danville, Kentucky.  The Facility and Site was owned and operated by Corning, Inc. between 1952 and 1983, and then Philips North America between 1983 and 2013.  Modern Holdings' property at 1200 Lebanon Road is located across the street from the Facility.  Modern Holdings has been damaged by the Defendants' tortious activities – Hazardous Substances from the Facility have migrated onto Modern Holding's property, and have interfered with Modern Holding's use and enjoyment of the property.  Both the presence of Hazardous Substances on Modern Holding's property and the stigma associated with the proximity of Modern Holdings' property to the Facility have decreased the market value of the property located at 1200 Lebanon Road.

2.      Plaintiff Rosetta Ford owns property located at 1310 West Walnut Street, Danville, Kentucky.  The property was deeded to her in 1996 by her son, Plaintiff Gary Ford, who purchased the property in 1977 and has lived there since that time.  Gary and Rosetta Ford bring this action on behalf of themselves and similarly situated individuals who have owned property or resided within a five-mile radius of the Facility between 1952 and the present day.  Rosetta Ford's property at 1310 West Walnut Street is a quarter-mile away from the Site.  Rosetta  Ford has been damaged by the Defendants' tortious activities – Hazardous Substances from the Facility have migrated onto Rosetta Ford's property, and have interfered with Rosetta and Gary Ford's use and enjoyment of the property.  Both the presence of Hazardous Substances on Rosetta Ford's property and the stigma associated with the proximity of Rosetta Ford's property to the Facility have decreased the market value of the property located at 1310 West Walnut Street.  Rosetta Ford's house is partially constructed of furnace brick from the Facility

2

that Defendants left on the side of the road for people to take and use as they saw fit.  The house is also decorated with lead glass in the mortar work.  Rosetta and Gary Ford have also been injured as a result of their exposure to the Hazardous Substances/contamination generated by the Facility – Rosetta Ford suffers from diabetes, a bleeding ulcer, gout, chronic bronchitis, and afib due to a heart valve problem.  Gary Ford has trouble breathing and nerve problems in his extremities.  The entire Ford family picked and ate watercress from Clark's Run Creek up until the 1990s.  One or more of Rosetta and Gary Ford's health problems have been causally scientifically linked with one or more of the Hazardous Substances that Defendants wrongfully permitted or caused to escape from the Facility and the Site.  Rosetta and Gary Ford did not discover, and could not have discovered by exercise of reasonable diligence, that their injuries were caused by the Defendants until less than a year prior to the filing of the instant lawsuit.

3.      Plaintiffs Otis and Charles Ford own property located at 308 Fairview Street, Danville, Kentucky, which was deeded to them by Rosetta Ford in 2008.  Rosetta Ford received the property from her parents in 1978 after her father died.  She deeded it to her sons in case something happened to her since she is now 89 years old. Rosetta Ford continues to reside in the house located on this property.  Charles and Otis Ford bring this action on behalf of themselves and similarly situated individuals who have owned property or resided within a five-mile radius of the Facility between 1952 and the present day.  Charles and Otis Ford's property at 308 Fairview Street is approximately a quarter-mile away from the Site.  Charles and Otis Ford have been damaged by the Defendants' tortious activities – Hazardous Substances from the Facility have migrated onto their property, and have interfered with their use and enjoyment of the property.  Both the presence of Hazardous Substances on Charles and Otis Ford's property and the stigma associated with the proximity of the property to the Facility have decreased the market value of the property located at 308 Fairview Street.  Charles and Otis Ford have also been

injured as a result of their exposure to the Hazardous Substances/contamination generated by the Facility.  Charles Ford was diagnosed with a brain tumor on his pituitary gland in 2006.  The tumor was removed and he lost sight in his right eye.  Otis Ford was diagnosed with prostate cancer in 2005 and had surgery in 2006 to remove his prostate.  One or more of Charles and Otis Ford's health problems have been causally scientifically linked with one or more of the Hazardous Substances that Defendants wrongfully permitted or caused to escape from the Facility and the Site.  Charles and Otis Ford did not discover, and could not have discovered by exercise of reasonable diligence, that their injuries were caused by the Defendants until less than a year prior to the filing of the instant lawsuit.

4.     Plaintiff Bobbie Lemons is an individual who has lived in Danville since she was a child.  Lemons owns property at 117 John W.D. Bowling Ct., Danville, Kentucky.   Plaintiff Lemons likewise brings this action on behalf of herself and all similarly situated Plaintiffs who have owned property or resided within a five-mile radius of the Site between 1952 and 2013.  Lemons was injured as a result of her exposure to the contamination generated at the Facility – she was diagnosed with multiple sclerosis in 2008 at the age of 40.  Lemons does not have a family history of multiple sclerosis.  Multiple sclerosis has been causally scientifically linked with one or more of the Hazardous Substances that Defendants wrongfully permitted or caused to escape the Site.  Lemons did not discover, and could not have discovered by exercise of reasonable diligence, that her injuries were caused by the Defendants until less than a year prior to the filing of the instant lawsuit.  Lemons has been additionally injured in that Hazardous Substances from the Facility have migrated onto her property, and have interfered with her use and enjoyment of the property.  Both the presence of Hazardous Substances on Lemons' property and the stigma associated with the proximity of the property to the Facility have decreased the market value of the property located at 117 John W.D. Bowling Ct.

5.      The Plaintiff, Sellers and Sellers, is a Kentucky corporation organized and doing business in the Commonwealth of Kentucky that owns the property located at 916 W. Walnut Street, Danville, Kentucky, adjacent to the Site.  Sellers and Sellers brings this action on behalf of itself and similarly situated individuals who have, between 1952 and the present day, owned property or resided within a five-mile radius of the Facility in Danville, Kentucky.  Sellers and Sellers have been damaged by the Defendants' tortious activities.  Hazardous Substances from the Facility have migrated onto the property at 916 W. Walnut Street, and have interfered with the continued use and enjoyment of the property.  Both the presence of Hazardous Substances on the property and the stigma associated with the proximity of the property to the Facility have decreased the market value of the property located at 916 W. Walnut.

6.      Defendant Philips Electronics North America Corporation is a Delaware foreign business corporation doing business in the Commonwealth of Kentucky with its corporate headquarters located at 3000 Minute Man Road, Andover, Massachusetts that owned and operated, through its agents and/or employees, the glass manufacturing Facility and Site at 320 Vaksdahl Avenue that is the subject of this lawsuit.

7.      Defendant Corning Incorporated is a corporation duly organized and existing under the laws of New York, with its corporate headquarters located at 1 Riverfront Plaza, Corning, New York.  On information and belief, Corning is now the owner of the Site and the Facility and is and has been physically in control of any removal of contaminated materials from the Facility or the remediation and removal of soil from the Site.

**B.      Jurisdiction And Venue.**

8.      Jurisdiction is proper in this Court pursuant to 28 U.S.C.  § 1332(d)(2); § 1332(d)(5)(B), as this is a class action in which (1) plaintiffs are citizens of a state different

from defendants; (2) the proposed plaintiff class contains at least 100 members in the aggregate; and (3) the amount in controversy exceeds five million dollars.

9.      Venue is proper in this Court because the acts complained of occurred in this district.

## II.      <u>CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 23</u>

10.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, as members of the proposed Plaintiffs' Class.  The Proposed Class is initially defined as all persons who between 1952 and 2013 have owned property or resided within a five-mile radius of the Site.  Plaintiffs propose that the class be certified as four subclasses to be defined as follows:

    a)     Individuals or legal entities who have owned property within a five-mile radius of the Site between 1952 and 1983 ("Subclass A");

    b)     Individuals or legal entities who have owned property within a five-mile radius of the Site between 1983 and 2013 ("Subclass B");

    c)     Individuals who have resided within a five-mile radius of the Site between 1952 and 1983 ("Subclass C"); and

    d)     Individuals who have resided within a five-mile radius of the Site between 1983 and 2013 ("Subclass D").

11.     Subclasses A and B collectively include Plaintiffs similarly situated to Modern Holdings, Lemons, Rosetta Ford, Gary Ford, Charles Ford, Otis Ford, and Sellers and Sellers, who owned property within a five-mile radius of the Site between 1952 and 2013.

12.     Subclasses C and D collectively includes Plaintiffs similarly situated to Lemons, Rosetta Ford, Gary Ford, Charles Ford, and Otis Ford, who resided within a five-mile radius of the Site between 1952 and 2013.

13.     Furthermore, the Proposed Class includes Plaintiffs (such as several of the named Plaintiffs) who have both owned property and resided within a five-mile radius of the Site between 1952 and 2013 and will therefore qualify as members of multiple subclasses described above.

14.     The Proposed Class is so numerous that joinder of all members is impracticable.

15.     There are questions of law and fact common to the Proposed Class. These common questions include, but are not limited to, the nature, causes and effects, and toxicity of the Hazardous Substances to which all Plaintiffs and Plaintiffs' properties were exposed,  all factual issues relating to Defendants' operation of the Facility, including its generation, storage, and use of materials, products and Hazardous Substances at the Facility; the migration of Hazardous Substances off-Site; citations for violations of federal and/or state laws relating to the generation, use, storage and disposal of Hazardous Substances that were received by Defendants; the liability of Defendants; common affirmative defenses raised by the Defendants; remedies available under Kentucky law and the appropriate measure of damages; and questions related to the claim for punitive damages and expenses of litigation.

16.     The claims of each of the representative parties are typical of the claims of the Class – all Plaintiffs seek damages resulting from the Hazardous Substances emitted from the Facility by the Defendants, which Defendants tortiously permitted to escape the Site. The common proof would show the same unlawful acts by Defendants in the same method against the entire class.

17.     The representative Plaintiffs will fairly and adequately assert and protect the interests of the Class because the interests of the class representatives and the unnamed class members are exactly the same and no antagonism exists between them.  The class representatives have been informed of and are willing to participate in this litigation and perform the duties of

7

class representatives.  Adequate representation is also guaranteed as experienced class counsel have undertaken representation of the class representatives and the yet to be certified class.

18.     This class action provides a fair and efficient method for the adjudication of the controversy because common questions of law regarding whether the Defendants committed the torts alleged in the operation of the Facility thereby causing property damage and personal injury predominate.

19.     The common questions of law and/or fact predominate over any question involving only individual members of the Class.

20.     The size of the Proposed Class is conducive to class action management.  A class action would clearly be more manageable than dozens of separate lawsuits or mass joinder of over 100 named Plaintiffs in a single action.  The use of experts giving testimony relevant to the claims of all class members is far more efficient and manageable than numerous trials for each Plaintiff of the proposed class.

21.     The prosecution of separate civil actions by individual members of the Proposed Class would create a risk of varying adjudications with respect to individual members of each class which would confront the Defendants with potentially incompatible standards of conduct, and which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

22.     In addition, the cost to hire experts, to conduct discovery, and to present the case for trial for an individual Plaintiff would be essentially the same as preparing and presenting the case for all class members.  The cost of preparation of an individual claim could well exceed the potential recovery of actual damages and would be cost prohibitive for individual actions.  In view of the complexities of the issues and/or the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate claims involving any of

the same issues, and efficiencies of preparation and presentation on a class-wide basis therefore outweigh any interest of class members proceeding on an individual basis.

23.     Moreover, anyone who wishes to opt out will be given the opportunity to opt out of this class action.

24.     There is no known litigation already commenced by or against the members of the Proposed Class involving any of the same issues.

25.     It is not likely that the amount which may be recovered by the individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

26.     The Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

## III.     __INTRODUCTION__

27.     This Complaint alleges Counts against Philips North America and Corning on behalf of the Plaintiffs as follows: (I) Nuisance; (II) Trespass; (III) Negligence, Gross Negligence, and Recklessness;  (IV) Negligence Per Se; (V) Battery; (VI) Fraudulent Concealment;  (VII) and Negligent Infliction of Emotional Distress.

28.     This action arises from the negligent, reckless, and/or intentional contamination of the Plaintiffs' properties and injury to persons with Hazardous Substances.  Such substances were caused to be released and leave Defendants' property and enter onto the properties of the Plaintiffs, and have contaminated the Plaintiffs' water, soil, vegetation, air, water, land, and dwellings, thereby causing Plaintiffs to suffer personal injury or an increased risk of serious latent diseases, damage to their properties and personal finances, interference with their exclusive possession of their property, loss of the use and enjoyment of their properties, and

destruction of their community.  Plaintiffs seek an injunction requiring Defendants to promptly and completely remove all Hazardous Substances from their properties, and to prevent future migration of Hazardous Substances onto their properties.  The Plaintiffs also seek damages for the diminution in the value of their properties, additional compensatory and punitive damages, and the establishment of a Court supervised medical monitoring program.

## IV.   **FACTUAL ALLEGATIONS**

### A.   **Defendants Utilize And/Or Generate Hazardous Substances At The Facility.**

29.     This controversy relates to a glass and bulb manufacturing facility in Danville, Kentucky.  Corning constructed and operated the glass manufacturing facility (the "Facility") located at 320 Vaksdahl Avenue (the "Site") in 1952.  Prior to 1952, the property was undeveloped.

30.     Philips North America purchased the Site and Facility in 1983, and operated the Facility as a plant for manufacturing, packaging, and shipping of components for parabolic aluminized reflector (PAR) lamps.  Manufacturing operations by Philips North America continued at the Site until early 2011.

31.     Philips North America owned the Facility and Site until at least April, 2013, when, upon information and belief, Philips North America sold portions of the Site, including the Facility, back to Corning.

32.     The Site is approximately 32 acres, roughly rectangular shaped, and is located on the southwest side of Danville, Kentucky.  The Site consists of an approximately 335,000 square foot building with office, manufacturing, and warehouse space.  Other structures around the main building include a hazardous waste storage building, a general purpose storage building, gas cylinder storage building, and a pump house.  The Site is surrounded by a chain link fence.

33.     The property is located in a mixed commercial and industrial area.  The Site is bounded to the east by a rail yard owned by the Cincinnati, New Orleans and Texas Pacific Railway Company (Norfolk Southern Corporation [NS Line]) (the "Railroad"), to the west by Vaksdahl Avenue, to the north by property owned by Sellers and Sellers, and to the south by the property at 410 Vaksdahl Avenue, formerly owned by Greenleaf Plant Food Wholesale, Inc.

34.     The Facility opened in 1952, and was operated by Corning as a glass plant, which included diode glass production.  Trichloroethylene (TCE) was used in the diode glass production process until 1977.  The diode glass manufacturing operation was moved to another Corning plant in 1983, prior to Philips North America's acquisition of the Site in 1983.

35.     Since 1983, Philips North America operated the Site as a glass manufacturing facility that mixed and melted various basic raw materials to form blown and drawn glass products for the lighting industry.  The materials were mixed in a specialized portion of the Facility called "the Mix House."

36.     Three basic types of glass were produced: a soda-lime glass which was drawn into tubing or blown into various types and sizes of glass envelopes for light bulbs; an alkali-lead glass which was drawn into tubing for other glass components used in the lighting industry; and borosilicate glass for manufacturing pressed glass components (reflectors and lenses) for the subsequent assembly into sealed-beam type lighting products.  Philips North America discontinued the bulb acid etching operation around 1999.  Fluorescent tubing and incandescent bulb production ceased in 2005 and 2008, respectively, and the borosilicate hard glass furnace and its pressing operation were the only ongoing operations at the time the plant operations ceased in early 2011.

37.     Until 2014, there were three settling ponds at the Site.  Wastewaters resulting from contact cooling of hot lead glass, precipitation runoff from glass cullet storage piles, and a

small volume of rinse water from electroplating operations were discharged into a surface impoundment on the eastern side of the Site.

38.     Since 1952, Defendants' Facility has generated hazardous and other solid wastes within and around the facility itself.  These Hazardous Substances negatively impacted the health and well-being of not only the workers at the Facility but also of non-employee Danville residents.  During its peak operation, there were approximately 400 employees working full time on the Site.

39.     Hazardous Substances were used or generated by the Defendants during their manufacturing process, and were spread throughout the Site and throughout Danville by virtue of the Defendants' negligent and/or intentional actions. These Hazardous Substances include but are not limited to asbestos, mercury, antimony, arsenic, beryllium, cadmium, chromium, lead, tin, zinc oxide and other heavy metals, thallium, percholoroethene (PCE), 1, 1, 1-Trichloroethane (TCA), methylene chloride, PCB compounds, benzene, toluene, vanadium, benzo(b)flouranthene, benzo(a)pyrene, ethylbenzene, silica, and chlorinated fluorocarbons (CFC), 2-Butanone (MEK), trichloroethylene, and ethanolamine (collectively the "Hazardous Substances").

40.     The Hazardous Substances include but are not limited to those substances that have been defined as hazardous by federal and state legislation, including but not limited to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A)]; section 102 of CERCLA  [42 USCS § 9602]; (C) section 3001 of the Solid Waste Disposal Act [42 USCS § 6921];  (D) section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a)]; (E) section 112 of the Clean Air Act [42 USCS § 7412]; (F) section 7 of the Toxic Substances Control Act [15 USCS § 2606];(G) 40 CFR 261.311 and 40 CFR 261.32; (H) Kentucky Revised Statutes (KRS) 224.46-012 to 224.46-870, and regulations at 401

12

Kentucky Administrative Regulations (KAR) 30:005 to 40:060 and 401 KAR 43:005 to 44:080; and (I) state and federal permitting regulations.

41.    The Environmental Protection Agency's ("EPA") Integrated Risk Information System ("IRIS") is a human health assessment program that evaluates information on health effects that may result from exposure to environmental contaminants.  Through the IRIS Program, EPA provides science-based human health assessments to support the Agency's regulatory activities.  The Hazardous Substances have been identified by IRIS as being associated with one or more illnesses, and several of the Hazardous Substances are known or suspected carcinogens, which are believed to be the proximate cause of a number of neuromuscular or cancer related illnesses which have affected the Plaintiff Lemons, as well as members of the Ford family and other Danville area residents who are members of the putative Class and of Subclasses C and D.

42.    The Hazardous Substances which harmed the Plaintiffs as described herein are used in and attributable to the manufacturing processes that occurred within the Facility.

43.    Established human toxicological effects associated with some or all of the Hazardous Substances include the following:  lung cancer, chronic obstructive pulmonary disease, nose and throat bleeds, nervous conditions, bladder cancer, leukemia, esophageal cancer, pancreatic cancer, renal cancer, brain cancer, liver cancer, Hodgkin's Lymphoma, multiple myeloma, prostate cancer, renal damage/failure; peripheral neuropathy; Multiple Sclerosis; painful bone disorders, cardiovascular disease and hypertension; cognitive defects; personality changes; memory deficits; peripheral neurotoxicity; and damage to the central nervous system. Unfortunately, this list is not exhaustive.  These and other established toxicological effects are described in the publications of the U.S. Department of Health and Human Services Public Health Agency for Toxic Substances and Disease Registry, as well as multiple scientific

journals, including, but not limited to, Biological Trace Element Research[1] and the Journal of the American Medical Association.[2]

44.     The effects of lead exposure, the effects of low-level lead exposure in children, have recently come into the spotlight following the publicity surrounding the Flint Michigan water crisis.  Dr. Mona Hanna-Attisha, the pediatrician who first published the Flint, Michigan lead data, has stated: "Lead is a potent neurotoxin, and childhood lead poisoning has an impact on many developmental and biological processes, most notably intelligence, behavior, and overall life achievement.  With estimated societal costs in the billion, lead poisoning has a disproportionate impact on low income and minority children."  See Hanna-Attisha, Mona, "Elevated Blood Lead Levels In Children Associated With the Flint Drinking Water Crisis: A Spatial Analysis Of Risk and Public Health Response," Research and Practice (Dec. 2015).  Dr. Hanna-Attisha commented in a recent news story that the multi-generational effects of lead poisoning can be devastating to communities:  "If you were to put something in a population to keep them down for generation and generations to come, it would be lead," Hanna-Attisha said. "It's a well-known, potent neurotoxin. There's tons of evidence on what lead does to a child, and it is one of the most damning things that you can do to a population. It drops your IQ, it affects your behavior, it's been linked to criminality, it has multigenerational impacts. There is no safe level of lead in a child."  See "How Tap Water Became Toxic In Flint Michigan," Sara Ganim and Linh Tran, CNN (available at http://edition.cnn.com/2016/01/11/health/toxic-tap-water-flint-michigan/index.html).

---

[1]     See generally Yousefi, B. et al., Serum Arsenic and Lipid Peroxidation Levels in Patients with Multiple Sclerosis., 2014 Jun; 158(3):276-9.

[2]     See generally, Chen, Chi-Ling PhD et al., Ingested Arsenic, Cigarette Smoking, and Lung Cancer Risk, JAMA 2004:292(24), December 22/29, 2004.

**B.**      **Defendants Corning And Philips North America Intentionally Or Recklessly Caused The Pollution Of Surrounding Properties.**

45.      Defendants illegally, recklessly or negligently dumped Hazardous Substances onto properties outside the boundaries of the Site.

46.      These properties include but are not limited to property owned by Sellers and Sellers, and the Railroad adjacent to the north, east, and south of the property.

47.      The Defendants also dumped Hazardous Substances onto fields that were later leased by Defendants to the City of Danville for proposed use as playgrounds and sports fields by children.  Upon information and belief the City of Danville was informed by Corning that the leased property was free of Hazardous Substances.  The dumping by Defendants was done without proper authorization or permits.  Furthermore, in providing the properties containing some of the dump sites in question to the City of Danville, Defendants affirmatively misrepresented and/or failed to disclose the nature of the substances being dumped and the health risks associated with utilizing the properties in question and/or failed in their duty to inform the City or the community at large regarding same.  Defendants likewise affirmatively misrepresented and/or failed in their duty to disclose the inherent dangers associated with the Hazardous Substances that had been dumped onto the properties by Defendants – all to the detriment of the Plaintiffs who reside in or around these dump sites or have utilized the City facilities subsequently located thereon and have been adversely affected thereby.

48.      Defendants also used property owned by the City of Danville located near Clarks Run to dump Hazardous Substances despite knowing that there was, at minimum, a substantial likelihood that these Hazardous Substances would pollute Clarks Run and contaminate other properties in the community.

15

49.     Upon information and belief, Defendants also illegally dumped Hazardous Substances at various additional sites throughout Danville that are now owned by putative class members and used for commercial or residential purposes.  Whether or not this dumping was done with the permission of the property owners, the dumping by Defendants was done without proper authorization or permits.  Furthermore, Defendants affirmatively misrepresented and/or failed to disclose to the City, the owners of the properties upon which the Hazardous Substances were dumped, or the community at large the nature of the substances being dumped or the health risks associated with dumping the Hazardous Substances in question, all to the detriment of the Plaintiffs who reside in or around these dump sites and have been adversely affected thereby.

50.     Upon information and belief, to the extent the dumping in question was done with the permission of property owners who are putative class members in this litigation, these property owners would not have permitted Defendants to dump the Hazardous Substances in question had the nature of the materials or the adverse health effects associated with the Hazardous Substances been disclosed to them.

51.     Defendants furthermore routinely either negligently or intentionally allowed Hazardous Substances, including arsenic and lead, to be expelled from the Facility and the Site into the air in violation of state and federal law.  Expert testimony and testing of the soil and groundwater in the area encompassed by the Proposed Class demonstrate that these Hazardous Substances have migrated, and have likely polluted the area surrounding the Facility in at least a five-mile radius.

52.     Expert testimony and testing of the soil and groundwater in the area encompassed by the Proposed Class demonstrate that lead expelled into the air, soil and groundwater by Defendants did enter and settle upon the property of Plaintiffs, and did cause damage to Plaintiffs' properties and persons in at least a five-mile radius of the Facility.  The Hazardous

Substances were disseminated by the Defendants within the five mile radius of the Facility and such exposure proximately caused both Lemons and members of the Putative Class and Subclasses C and D to suffer personal injuries.

53.     Defendants furthermore routinely either negligently or intentionally allowed Hazardous Substances, including arsenic and lead, to be expelled from the Facility and the Site into the Clarks Run Watershed, which runs parallel to the Site and throughout Danville, without proper permits and in violation of state and federal law.  Expert testimony and testing of the soil and groundwater in the area encompassed by the Proposed Class demonstrate that these Hazardous Substances have migrated, and have likely polluted the area surrounding the Facility in at least a five-mile radius.

54.     The settling ponds on the Site were not properly maintained, and regularly overflowed when it rained, with the overflow running directly into the Clarks Run Watershed.

55.     Defendants have also knowingly or recklessly caused the lead dust and other Hazardous Substances throughout the Site and on the roof of the Facility to wash into the Clarks Run Watershed, thereby polluting an area of at least five miles in each direction radiating from the Site.  Based on levels of contamination with Hazardous Substances reported at outfalls located on the Site, it is reasonably likely that adjacent properties have likewise been contaminated with Hazardous Substances through the groundwater and other sources.

56.     Several Outfalls located on the Site discharged water directly into Clarks Run. Defendants were under a statutory obligation to notify state and/or federal regulatory agencies of all Hazardous Substances being discharged through these Outfalls, and to obtain permits regarding same.  Defendants were furthermore under a statutory obligation to test the discharge flowing from these Outfalls for the presence of Hazardous Substances and to employ remedial measures to ensure that the discharge at the Outfalls did not exceed regulatory levels.

17

57.     Defendants failed in their statutory duties to inform state and/or federal regulatory agencies of the existence of Hazardous Substances being discharged into Clarks Run. Defendants furthermore either did not obtain the required permits for discharging Hazardous Substances, including lead and arsenic, and even where permits were obtained, the Defendants knowingly allowed the levels of Hazardous Substance discharged through the Outfalls to exceed applicable statutory limits.

58.     The Clarks Run Watershed flows through Danville and empties into Herrington Lake, the source of drinking water for many thousands of people in the region.  The groundwater pollution caused by the Defendants has impacted the Clarks Run Watershed and at least those residents and property owners within a five-mile radius of the Facility.

59.     In addition, this contamination has injured Plaintiffs to the extent that they have ingested water taken from the Clarks Run Watershed, creeks, or tributaries or have harvested and ingested vegetation growing in or around these areas.

60.     Defendants were aware that Hazardous Substances could migrate from the Site and spread into surrounding properties.  This is at least partially demonstrated by the fact that Corning and Philips floor workers were routinely assigned the task of walking the Clarks Run Watershed to check for dead animals.

61.     Defendants have knowingly or recklessly caused contamination in the soil on the Site to migrate through the soil and contaminate the soil and groundwater in surrounding properties at least within a five-mile radius of the Site.

62.     Defendants have knowingly or recklessly caused Hazardous Substances to spread from the Facility under and onto the Plaintiffs' properties.

18

63.     Defendants knew or should have known that the Hazardous Substances from the Facility continued to migrate onto the surrounding Plaintiffs' properties in an uncontrolled manner.

64.     Defendants have been utilizing the Plaintiffs' properties as de facto storage and disposal facilities without the permission of the Plaintiffs.

65.     These de facto storage and disposal facilities lack suitable siting and the extensive safeguards that are required of a permitted facility containing the nature and volume of Hazardous Substances released by all Defendants.

66.     Because of the action of each Defendant, the Plaintiffs currently suffer or are reasonably certain to suffer serious, severe, and permanent emotional and physical injuries including, but not limited to, cancer, autoimmune problems, respiratory problems, dermatitis, central nervous system problems and other severe medical ailments for which medical attention has been or will be required.

67.     Because of the actions of each Defendant, the Plaintiffs have suffered damages as a result of toxic exposure, which will be established at trial by expert and other evidence.  The Plaintiffs are entitled to compensation for current and past illnesses, for past and future medical and hospital expenses, for past and future lost wages and employment benefits, for the increased risk of illness, for medical monitoring, for diminution in quality of life, for infliction of emotional distress, and for all other allowed compensation according to proof.

68.     In addition, the contamination of the Plaintiffs' properties at the hands of all Defendants has resulted in significant damage to the value of the properties, which has economically harmed the Plaintiffs.  The diminution in the value of Plaintiffs' properties will be established at trial by expert evidence, and arises from not only the actual contamination of

Plaintiffs' Properties by Hazardous Substances originating from the Site, but also from the stigma associated with being located in the vicinity of the Site.

69.     Because of the Defendants' concealment and evasive actions, certain Plaintiffs' decedents suffered wrongful death.  These Plaintiffs or their estates must be compensated for their sorrow, mental anguish, expenses, and the pain and suffering of their loved ones.

70.     Because of the Defendants' actions, remaining Plaintiffs are reasonably likely to develop physical injuries in the future and, as such, those Plaintiffs require special medical monitoring.

71.     Throughout the Relevant Time Period, in an effort to limit their liability and their expenses associated with proper containment of the Hazardous Substances, the Defendants have knowingly permitted discharges of Hazardous Substances off-site, through outfalls or discharges into the air, in violation of Local, State, and Federal regulations and without the proper permits.

72.     Defendants discharged multiple Hazardous Substances for which they held no discharge permit.  With respect to other Hazardous Substances, Defendants exceeded emissions limits.

73.     Defendants  engaged in a conspiracy and concerted course of action to perpetrate a fraud on the public by failing to disclose these illegal discharges of Hazardous Substances despite having a duty to do so.

74.     Because of these efforts, the local, state and federal agencies responsible for monitoring the Defendants' conduct have not had full and complete knowledge regarding the Defendants' operations or the nature or extent of the Hazardous Substances that have migrated off-Site.

75.     To the extent that local, federal, and state agencies became aware of some of the Defendants' illegal actions, Defendants have received numerous citations for knowing violations of federal and state regulations.

76.     The Defendants engaged in a further conspiracy and concerted course of action to perpetrate a fraud upon the public by paying for or "funding" illegitimate or incomplete "studies" and making material misrepresentations regarding the character of their operations, their remediation efforts, and of the risks posed to human health as a result of exposure to the Hazardous Substances.

77.     Defendants have therefore misled the public by fraudulently, negligently, and/or knowingly suppressing the true nature and extent of the Hazardous Substances that have migrated off the Site, all at the expense of the health and well-being of the Plaintiffs.

78.     Defendants knew or should have known of the hazards, never informed the Plaintiffs that their health and their very lives were at risk, and never instructed the Plaintiffs on how to avoid the risks to their health.

79.     Defendants violated commonly accepted and well-known safety standards within their industry by allowing and continuing such improper disposal of Hazardous Substances. Further, disposal methods were violations of specific environmental statutes, although not cited.

80.     The Plaintiffs neither knew nor had reason to suspect that they and their properties had been exposed to such Hazardous Substances as a result of Defendants' conduct.  In fact, while studies have recently been conducted establishing significant off-Site pollution, the extent of the off-Site pollution remains unknown.

81.     Because of each of the Defendants' actions, Plaintiffs who represent decedent property owners or residents discovered less than one year prior to the filing of this Complaint the connection between the deaths of the decedents and the Defendants' negligent or intentional

actions.  Even with the exercise of reasonable diligence, Plaintiffs could not have discovered the connection between the death of their decedents and Defendants' negligent or deliberate actions until less than one year prior to the filing of this Complaint.

82.     Because of the Defendants' concealment and misrepresentation, the Plaintiffs discovered less than one year prior to the filing of this Complaint that they have been exposed to Hazardous Substances, pollutants, and contaminants and that their exposure to these Hazardous Substances had caused personal injury to them and their properties.  Even with the exercise of reasonable diligence, the Plaintiffs could not have discovered more than one year prior to the filing of this Complaint both the existence of the aforementioned injuries and damages, and their connection to Defendants' negligent or deliberate actions.

83.     Defendants have shown a reckless indifference to the impact of their grossly negligent and/or reckless behavior on the Danville community and the Plaintiffs.  Defendants have engaged in grossly negligent and/or reckless, oppressive and fraudulent behavior over the course of many years.

**C.     The Plaintiffs Continue To Suffer Damages As A Result Of The Defendants' Tortious Activities.**

**1.     Plaintiff Bobbie Lemons**

84.     Plaintiff Lemons owns the property located at 117 John WD Bowling Court, Danville, Kentucky, Parcel Number D08-021-019, and lives in the house located on that Property.  Lemons purchased this property in 2002.

85.     Lemons' property is located .96 miles from the Facility.

86.     Lemons was born on June 14, 1968 in Danville, Kentucky.  Lemons grew up in her family home at 221 Duncan Hill in Danville.  Her family maintained a vegetable garden each summer, and she routinely ate the vegetables grown in that garden.  Her father raised cows on

the property, which were slaughtered and eaten by Lemons and her family on a regular basis. The home where Lemons grew up is located 1.3 miles from the Facility.

87.    As a child, Lemons spent a significant amount of time at her Grandmother's house at 321 Cowan Street (.20 miles from the Facility).  Her grandmother always maintained a vegetable garden at her property on Cowan Street, and Lemons routinely ate the vegetables raised in that garden.  In addition, her Grandfather raised livestock, including pigs, on a plot near her Grandmother's house, and she ate the meat from those animals as well on a routine basis.

88.    Lemons' father worked for many years at the railroad yard adjacent to Facility.

89.    As a child, Lemons played on a regular basis on the ball-field located on the Facility premises.

90.    Lemons observed dark clouds of smoke emanating from the Facility smokestacks on a regular basis during the entire time the Facility operated.

91.    Lemons has lived in Danville her entire life, with the exception of a five-year period between 1986 and 1991, when she left to attend college at Kentucky State University, and then moved to Washington State with her then-husband, where she lived for 1 year.

92.    Lemons was diagnosed with Multiple Sclerosis in 2007.  She has no family history of this disease.

93.    On December 22, 2015, Lemons reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Lemons has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Lemons has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins.

94.    On August 18, 2015, Alpha-Omega Environmental, LLC sampled Lemons' property to determine whether it had been contaminated by lead, arsenic, or other heavy metals

generated and dispersed by the Facility.  The soil from the property was sampled using a soil core probe to extract samples of the upper 15 inches of soil on an approximate 30 foot by 30 foot grid pattern.  The samples were field screened and several analyzed for metals utilizing United States Environmental Protection Agency (USEPA) SW 846 protocols.

95.     The typical mean background concentration of lead in soil in Kentucky is 30 mg/kg as published by the Kentucky Division of Waste Management (KDWM).  The typical mean background concentration of arsenic in soil in Kentucky is 8.9 mg/kg as published by the KDWM.

96.     The lab results for lead in the surface soil samples taken from the property were all above the mean background level for lead described above, with a high reading of 251 mg/kg.  The lab results for one of the surface soil samples reflects arsenic at 11.1 mg/kg – an amount exceeding the background level for arsenic described above.

97.     Vapor intrusion generally occurs when there is a migration of volatile chemicals from contaminated groundwater or soil into an overlying building. Volatile chemicals can emit vapors that may migrate through subsurface soils and into indoor air spaces of overlying buildings in ways similar to that of radon gas seeping into homes.  On January 19, 2016, a vapor intrusion (VI) screening was conducted at Lemons' property.  Wilcox Environmental Engineering of Indianapolis, Indiana provided a FROG-4000 portable GC PID (gas chromatograph with photoionization detector) to obtain real-time results while at the Property.  A GC PID is typically used for analyzing a wide variety of volatile organic compounds (VOCs), including chlorinated solvents.  The screening was specifically conducted for TCE due to the presence of TCE and its degradation products in local groundwater.  Groundwater impacts and complex karst geology can result in potential preferential pathways for vapor intrusion as discussed in USEPA's Vapor Intrusion Guidance released in June 2015.  Following field

calibration, the VI screening was conducted within the crawl space of the property by inserting the GC PID probe into the open cavity of a utility line trench entering through the front wall. Ambient air from around the opening was collected for approximately one minute and analyzed by the GC PID.  The results were inconclusive in that chlorinated vapors were not detected, but seasonal variations can vary greatly.  Alpha Omega has recommended that additional vapor screening be performed on a quarterly basis to incorporate a full year's worth of data including when the weather is warmer**.**

98.     The results from the sampling conducted on the property demonstrate that the property has been invaded by the heavy metals generated and dispersed by the Facility.

99.     Lemons' use and enjoyment of her property has been adversely impacted by the pollution generated and dispersed onto her property by the Defendants.  Because of the existence of elevated levels of lead, arsenic, and other Hazardous Substances in the soil of her property and the existence of TCE in the groundwater, she is afraid to drink the tap water at her home. Instead, she drinks bottled water and even uses bottled water for cooking.  The rest of her family living in Danville does the same.

100.     In addition, Lemons will not be able to utilize the groundwater under her property for any purpose.  She also can no longer garden on her property.  She has always enjoyed planting and maintaining flowerbeds on her property.  Lemons won't be able to engage in this activity because, based on the soil sample test results, disturbing the soil will expose her to lead, arsenic, and/or other Hazardous Substances generated and dispersed by the Facility in amounts over and above the exposure she has already suffered.  She is also unable to have a vegetable garden or eat vegetables grown on her property.  In fact, Lemons is now limited from engaging in any activity that disturbs the soil on her property because of the presence of the Hazardous Substances at issue.  The types of activities that would cause such disturbance are multiple in

nature, and include building additional structures on the property or playing yard games in her backyard with family members or others.  Lemons' use and enjoyment of the property is furthermore adversely impacted by virtue of the fact that when and if she decides to sell the property she will have to disclose the existence of contamination that has been determined to exist on the property.

101.    Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $286,120.

102.    Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of Lemons' property by 20 percent – from $40,000 to $32,000 – since the contamination became publicly known.

### 2.    Plaintiff Rosetta Ford

103.    Plaintiff Rosetta Ford owns the property located at 1310 W. Walnut Street, Danville, Kentucky, Parcel Number D06-010-021.

104.    The property is located .195 miles from the Facility.

105.    Rosetta Ford was born on July 6, 1926, in Danville, Kentucky.  She grew up in her family home at 308 Fairview Street.  The property at 308 Fairview is located .369 miles from the Facility.  She has not lived anywhere else – she currently lives in the home located at 308 Fairview Street.

106.    Rosetta Ford's family used well water until the mid-1960s, and the well they used still exists at 308 Fairview.  Her family, along with other neighborhood families, maintained a vegetable garden each summer, and she routinely ate the vegetables grown in that garden.  She also maintained fruit trees on our property, and she ate the fruit from these trees regularly.

107.    Throughout her life, Rosetta Ford has eaten watercress from the waterway running behind the Facility.  For many years she used a wood burning stove, and burned wood harvested from that area.

108.    Rosetta Ford has a bleeding ulcer, and for many years she has suffered from chronic headaches and dizziness.  In 1975, she was diagnosed with diabetes.

109.    On December 22, 2015, Rosetta Ford reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Rosetta Ford has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Rosetta Ford has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins.

110.    On August 18, 2015, Alpha-Omega Environmental, LLC sampled the property to determine whether it had been contaminated by lead, arsenic, or other heavy metals generated and dispersed by the Facility.  The soil from the property was sampled using a soil core probe to extract samples of the upper 15inches of soil on an approximate 30 foot by 30 foot grid pattern. The samples were field screened and several analyzed for metals utilizing United States Environmental Protection Agency (USEPA) SW 846 protocols.

111.    On August 25, 2015, soil from the property was sampled in one location using a direct-push drilling apparatus that advanced stainless steel rods to refusal.  The samples from various depths were field screened and one was analyzed for metals utilizing USEPA SW 846 protocols.

112.    The typical mean background concentration of lead in soil in Kentucky is 30 mg/kg as published by the KDWM.  The typical mean background concentration of arsenic in soil in Kentucky is 8.9 mg/kg as published by the KDWM.

113.    The lab results for lead in the surface soil samples taken from the property were all above the mean background level described above, with a high reading of 157 mg/kg.

114.    The lab result for the borehole sample taken from the property reflected a high reading of 31.8 mg/kg for lead at a depth of six to eight feet below grade surface.

115.    On January 19, 2016, a vapor intrusion (VI) screening was conducted at Rosetta Ford's property.  Following field calibration, the VI screening was conducted within the crawl space of the property by inserting the GC PID probe into the open cavity of a utility line trench entering through the front wall.  Ambient air from around the opening was collected for approximately one minute and analyzed by the GC PID.  The results were inconclusive in that chlorinated vapors were not detected, but seasonal variations can vary greatly.  Alpha Omega has recommended that additional vapor screening be performed on a quarterly basis to incorporate a full year's worth of data including when the weather is warmer**.**

116.    The results from the sampling conducted on the property demonstrate that Rosetta Ford's property has been invaded by the heavy metals generated and dispersed by the Facility.

117.    Rosetta Ford's use and enjoyment of her property has been adversely impacted by the pollution generated and dispersed onto the property by the Defendants.  Because of the existence of elevated levels of lead, arsenic, and other Hazardous Substances in the soil of her property and the existence of TCE in the groundwater, she is afraid to drink the tap water at her home.  Instead, she drinks bottled water and even uses bottled water for cooking.  The rest of her family living in Danville does the same.

118.    In addition, Rosetta Ford will not be able to utilize the groundwater under her property for any purpose.  She also can no longer garden on her property.   She won't be able to engage in this activity because, based on the soil sample test results, disturbing the soil will expose her to lead, arsenic, and/or other Hazardous Substances generated and dispersed by the

28

Facility in amounts over and above the exposure she has already suffered.  She is also unable to have a vegetable garden or eat vegetables grown on her property.  In fact, she is now limited from engaging in any activity that disturbs the soil on her property because of the presence of the Hazardous Substances at issue.  The types of activities that would cause such disturbance are multiple in nature, and include building additional structures on the property or playing yard games in her backyard with family members or others.  Her use and enjoyment of the property is furthermore adversely impacted by virtue of the fact that when and if she decides to sell the property, she will have to disclose the existence of contamination that has been determined to exist on the property.

119.    Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $278,435.

120.    Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of her property by 20 percent – from $28,000 to $22,400 – since the contamination became publicly known.

### 3.    Plaintiff Gary Ford

121.    Plaintiff Gary Ford was born on November 2, 1946 in Danville, Kentucky.  He grew up in his family home at 308 Fairview Street.  The property at 308 Fairview is located .369 miles from the Facility.   Gary Ford has also lived since 1977, and continues to maintain a residence, at 1310 W. Walnut, which is located .195 miles from the Facility.  Gary Ford has not lived anywhere other than this area, with the exception of a two-year period between in 1966-1968, when he was drafted into service for the Army and stationed in Germany.  He currently lives in the home located at 308 Fairview and assists in caring for his Mother, Rosetta Ford.

122.    Gary Ford's family used well water until the mid-1960's, and the well his family used still exists at 308 Fairview.  His family, along with other neighborhood families, maintained a vegetable garden each summer, and he routinely ate the vegetables grown in that garden.  His family also maintained fruit trees on their property, and he ate the fruit from these trees regularly.

123.    As a child, Gary Ford played on a regular basis on the ball-field located on the Facility premises.

124.    As a child, he played in and gathered watercress from the waterway running behind the Facility, and hunted and ate game in that same area.

125.    Gary Ford suffers from degenerative bone disease, which was diagnosed in or around 1994.  Gary Ford also has a degenerative disc in his neck, which was discovered about that time.

126.    On December 22, 2015, Gary Ford reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Gary Ford has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Gary Ford has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins.

127.    Gary Ford has recently learned that the property at 308 Fairview and the property at 1310 W. Walnut are contaminated with heavy metals and other Hazardous Substances generated and dispersed by the Facility.

128.    Gary Ford's use and enjoyment of his home at 1310 W. Walnut and also his place of current residence at 308 Fairview has been adversely impacted by the pollution generated and dispersed onto the properties by the Defendants.  Because of the existence of elevated levels of lead, arsenic, and other Hazardous Substances in the soil of the properties and the existence of TCE in the groundwater, Gary Ford is afraid to drink the tap water at either location.  Instead, he

30

drinks bottled water and even uses bottled water for cooking. The rest of his family living in Danville does the same.

129.    In addition, Gary Ford will not be able to utilize the groundwater under the properties for any purpose. He also can no longer garden on the properties. He won't be able to engage in this activity because, based on the soil sample test results, disturbing the soil will expose him to lead, arsenic, and/or other Hazardous Substances generated and dispersed by the Facility in amounts over and above the exposure he has already suffered. Gary Ford is also unable to have a vegetable garden or eat vegetables grown on the properties. In fact, Gary Ford is now limited from engaging in any activity that disturbs the soil on the properties because of the presence of the Hazardous Substances at issue. The types of activities that would cause such disturbance are multiple in nature, and include building additional structures on the properties or playing yard games in his backyard with family members or others.

### 4.    Plaintiff Charles Ford

130.    Plaintiff Charles Ford jointly owns, with his brother Otis Ford, property located at 308 Fairview Street, in Danville Kentucky, D08-021-019.

131.    The property is located .369 miles from the Facility.

132.    Charles Ford was born on October 20, 1947, in Danville, Kentucky. He grew up in his family home at 308 Fairview Street. He graduated high school in 1965, and left Danville for college at Kentucky State University. Charles Ford enlisted in the Air Force in 1966. He was stationed in Germany for three years and then Michigan and then Vietnam. He came back to Danville in 1970, and lived at 308 Fairview Street before buying a home on Lebanon Road, approximately two miles away.

133.    In November 1999, Charles Ford moved to Louisiana, and he hasn't lived in Danville since that time.

134.    Charles Ford's family used well water until the mid-1960's, and the well they used still exists, at 308 Fairview, although it has been capped.  His family, along with other neighborhood families, maintained a vegetable garden each summer, and he routinely ate the vegetables grown in that garden.  Charles Ford's family also maintained fruit trees on their property, and he ate the fruit from those trees regularly.

135.    As a child, Charles Ford played on a regular basis on the ball-field located on the Facility premises.

136.    As a child, he played in and gathered watercress from the waterway running behind the Facility, and ate game that was hunted and killed in that same area.

137.    Charles Ford has suffered from short-term memory loss, headaches, dizziness, and balance difficulties his entire life.  In 2006, he underwent surgery to remove a pituitary tumor.  He has been blind in his left eye since that time.

138.    On January 12, 2016, Charles Ford reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Charles Ford has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Charles Ford has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins. Dr. Changaris noted his pituitary tumor.

139.    On August 19, 2015, Alpha-Omega Environmental, LLC sampled Charles and Otis Ford's property to determine whether it had been contaminated by lead, arsenic, or other heavy metals generated and dispersed by the Facility.  The soil from the property was sampled using a soil core probe to extract samples of the upper 15 inches of soil on an approximate 30 foot by 30 foot grid pattern.  The samples were field screened and several analyzed for metals utilizing United States Environmental Protection Agency (USEPA) SW 846 protocols.

140.     On August 25, 2015, soil from the property was sampled in one location using a direct-push drilling apparatus that advanced stainless steel rods to refusal.  The samples from various depths were field screened and one was analyzed for metals utilizing USEPA SW 846 protocols.

141.     The typical mean background concentration of lead in soil in Kentucky is 30 mg/kg as published by the KDWM.  The typical mean background concentration of arsenic in soil in Kentucky is 8.9 mg/kg as published by the KDWM.

142.     The lab results for lead in the surface soil samples taken from the property were all above the mean background level described above, with a high concentration of 167 mg/kg. The lab results for one of the surface soil samples taken from the property reflected a concentration for arsenic above the mean background level described above, with a concentration of 10.2 mg/kg.

143.     The lab result for the borehole sample taken from the property reflected a high concentration of 116 mg/kg for lead at a depth of zero to two feet below grade surface.

144.     On January 19, 2016, a vapor intrusion (VI) screening was conducted at the property.  Following field calibration, the VI screening was conducted within the crawl space of the property by inserting the GC PID probe into the open cavity of a utility line trench entering through the front wall.  Ambient air from around the opening was collected for approximately one minute and analyzed by the GC PID.  The results were inconclusive in that chlorinated vapors were not detected, but seasonal variations can vary greatly.  It is the opinion of Alpha Omega that additional vapor screening should be performed on a quarterly basis to incorporate a full year's worth of data including when the weather is warmer.

145.     The results from the sampling conducted on the property demonstrate that Charles and Otis Ford's property has been invaded by the heavy metals generated and dispersed by the Facility.

146.     Charles Ford's use and enjoyment of his property has been adversely impacted by the pollution generated and dispersed onto his property by the Defendants.  Because of the existence of elevated levels of lead, arsenic, and other Hazardous Substances in the soil of his property and the existence of TCE in the groundwater, he will not be able to utilize the groundwater under his property for any purpose.  He is also constrained from engaging in any type of activity that disturbs the soil on the property because, based on the soil sample test results, disturbing the soil will expose him to lead, arsenic, and/or other Hazardous Substances generated and dispersed by the Facility in amounts over and above the exposure he has already suffered.  His use and enjoyment of the property is furthermore adversely impacted by virtue of the fact that when and if he decides to sell the property he will have to disclose the existence of contamination that has been determined to exist on the property.

147.     Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $225,100.

148.     Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of the property by 20 percent – from $50,000 to $40,000 – since the contamination became publicly known.

### 5.   Plaintiff Otis Ford

149.     Otis Ford jointly owns, with his brother Charles Ford, property located at 308 Fairview Street, in Danville Kentucky, D08-021-019.

150.    As described, _supra_, the property is located .369 miles from the Facility.

151.    Otis Ford was born on November 6, 1948 in Danville, Kentucky.  He grew up in his family home at 308 Fairview Street.  He graduated high school in 1966, and left Danville to attend Western Kentucky University.  He was drafted into the Army in 1969.  He returned to Danville in 1971 and has lived here since that time.  Otis Ford lived at 304 Fairview after he returned to Danville.  304 Fairview is next door to 308 Fairview, and he lived there to care for his aging Grandmother.  Otis Ford bought his current residence at 1005 Lexington Avenue, which is .49 miles from the Facility, in 1995.  He has lived at this address continuously since 1995.

152.    Otis Ford's family used well water until the mid-1960s, and the well they used still exists at 308 Fairview.  His family, along with other neighborhood families, maintained a vegetable garden each summer, and he routinely ate the vegetables grown in that garden.  Otis Ford's family also maintained fruit trees on their property, and he ate the fruit from these trees regularly.

153.    As a child, Otis Ford played on a regular basis on the ball-field located on the Facility premises.

154.    Otis Ford worked across the street from the Facility from 1986 until 2012 at the Caldwell Body Shop.  He remembers observing clouds of smoke emanating from the Facility smokestacks on a regular basis and also observed a strong chemical odor coming from the Facility.

155.    As a child, Otis Ford played in and gathered watercress from the waterway running behind the Facility, and ate game that was hunted and killed in that same area.

156.    Otis Ford suffers from a degenerative bone disease, and has had two knee replacements.  He was diagnosed with prostate cancer in 2012.  He has suffered from a skin disorder involving itchy raised bumps for which he uses a medicinal cream since 2014.

157.     On December 22, 2015, Otis Ford reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Otis Ford has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Otis Ford has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins. Dr. Changaris noted Otis Ford's skin lesions and prostate cancer in relation to his exposure.

158.    On August 19, 2015, Alpha-Omega Environmental, LLC sampled his property to determine whether it had been contaminated by lead, arsenic, or other heavy metals generated and dispersed by the Facility.  Drill sampling was conducted on August 25, 2015.  On January 19, 2016, a vapor intrusion screening was conducted at the property.

159.    The results from the sampling conducted on the property, as described in detail, supra, demonstrate that the property has been invaded by the heavy metals generated and dispersed by the Facility.

160.    Otis Ford's use and enjoyment of his property has been adversely impacted by the pollution generated and dispersed onto his property by the Defendants.  Because of the existence of elevated levels of lead, arsenic, and other Hazardous Substances in the soil of his property and the existence of TCE in the groundwater, Otis Ford is afraid to drink the tap water at his home. Instead, he drinks bottled water and even uses bottled water for cooking.  The rest of his family living in Danville does the same.

161.    In addition, Otis Ford will not be able to utilize the groundwater under his property for any purpose.  He also can no longer garden on his property.   He won't be able to

36

engage in this activity because, based on the soil sample test results, disturbing the soil will expose him to lead, arsenic, and/or other Hazardous Substances generated and dispersed by the Facility in amounts over and above the exposure he has already suffered.  He is also unable to have a vegetable garden or eat vegetables grown on his property.  In fact, Otis Ford is now limited from engaging in any activity that disturbs the soil on his property because of the presence of the Hazardous Substances at issue.  The types of activities that would cause such disturbance are multiple in nature, and include building additional structures on the Property or playing yard games in his backyard with family members or others.  Otis Ford's use and enjoyment of the property is furthermore adversely impacted by virtue of the fact that when and if he decides to sell the property he will have to disclose the existence of contamination that has been determined to exist on the property.

162.    Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $225,100.

163.    Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of the property by 20 percent – from $50,000 to $40,000 – since the contamination became publicly known.

### 6.    Plaintiff Modern Holdings, LLC

164.    Modern Holdings owns the property located at 1200 Lebanon Road, Danville, Kentucky, Parcel Number D12-003-013.

165.    The property is located .107 miles from the Facility.

166.    On August 18, 2015, Alpha-Omega Environmental, LLC sampled the property to determine whether it had been contaminated by lead, arsenic, or other heavy metals generated

and dispersed by the Facility.  The soil from the property was sampled using a soil core probe to extract samples of the upper 15 inches of soil on an approximate 30 foot by 30 foot grid pattern. The samples were field screened and several analyzed for metals utilizing United States Environmental Protection Agency (USEPA) SW 846 protocols.

167.    The typical mean background concentration of lead in soil in Kentucky is 30 mg/kg as published by the KDWM.  The typical mean background concentration of arsenic in soil in Kentucky is 8.9 mg/kg as published by the KDWM.

168.    The lab results for lead in the surface soil samples taken from the property were all above the mean background level for lead described above, with a high reading of 452 mg/kg.

169.    On January 19, 2016, a vapor intrusion (VI) screening was conducted at the property.  Following field calibration, the VI screening was conducted under the concrete slab of the easternmost building on the Property.  The GC PID probe was inserted into the open cavity of a utility line opening entering through the floor along the eastern wall.  Positive air pressure was noted coming from below the slab into the building.  Ambient air from under the slab was collected for approximately one minute and analyzed by the GC PID.  The results indicated that chlorinated vapors (TCE) were present at 5.1 $\mu$g/m$^3$, just slightly below USEPA's screening level for commercial properties of 8.8 $\mu$g/m$^3$.  The northernmost building on the property also had a detection of TCE at 1.7 $\mu$g/m$^3$.  Because seasonal variations can vary greatly, it is Alpha Omega's opinion that additional vapor screening should be performed on a quarterly basis to incorporate a full year's worth of data including when the weather is warmer.

170.    The results from the sampling and screening conducted on the property, demonstrate that Modern Holdings' property has been invaded by the heavy metals generated and dispersed by the Facility.  As a result, Modern Holdings' use and enjoyment of the property has been adversely impacted and limited.

171.    Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $669,635.

172.    Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of the property by 20 percent – from $400,000 to $320,000 – since the contamination became publicly known.

### 7.    Plaintiffs Sellers and Sellers

173.    The property at 916 W. Walnut Street Danville, has been owned by the Sellers family and now Sellers and Sellers Company since 1946.  During their operation of the Facility, Defendants continuously polluted this property with the Hazardous Substances they generated and dispersed.   Soil samples taken in 2012 and 2013 from this property establish lead levels ranging as high as 5,400 mg/kg and arsenic ranging as high as 130 mg/kg.

174.    These results demonstrate that the property belonging to Sellers and Sellers was invaded by the Hazardous Substances generated and dispersed by the Facility.  As a result, Plaintiffs' use and enjoyment of the property has been adversely impacted and limited.

175.    The property belonging to Sellers and Sellers was appraised on August 21, 2016, for $1,060,000.00.  At the time, a corporate entity then leasing the property was interested in buying it.  The entity's lease of the property was expiring, and the entity and the property owner were in negotiations regarding a possible sale of the property.   The entity expressed strong interest in buying the property.  Sellers and Sellers offered to sell the property to the entity for $750,000.

176.    The Article published in the Danville Advocate Messenger discussing the contamination generated and dispersed by the Facility was published on August 31, 2015, and

the entity thereafter rejected the offer of sale and indicated that it was no longer interested in buying – only leasing – the Property.  The lease that was subsequently negotiated was for a shorter duration than is typical, and reflects several unfavorable lease terms that are directly related to the fact that the property was contaminated and to the stigma arising from the property's location vis-avis the Facility.   The value of the Property has been diminished in an amount of at least $310,000, or approximately 29 percent.

177.    The Defendants' tortious conduct with regard to this property continued into 2014 and 2015, when Defendants performed work on the property without the knowledge or approval of the Plaintiff Sellers and Sellers.  In the course of performing this work, Defendants in fact caused further damage to the Plaintiff's property.

**D.      Philips North America Knew The Level Of Hazardous Substances Escaping From The Site Exceeded Applicable Regulatory Levels But Concealed The Extent Of The Contamination From Governmental Authorities.**

178.    The deposition of Dr. Scott Harris was taken in Nashville on March 3, 2015.

179.    Dr. Harris' doctorate is in environmental science and he has extensive experience in the areas of disaster and emergency management and employee health and safety.  Dr. Harris worked for a time with the EPA leading emergency response groups before joining IESO, LLC in Lexington, Kentucky.  He is presently the Director of a Division of Underwriters Laboratory in the Nashville, Tennessee area.

180.    In 2011, at or around the time that the Facility was closed, IESO was engaged by NeoStar Glass, LLC ("NeoStar"), an entity owned by Anna Broughton.  Dr. Harris' role was to advise NeoStar as to the potential environmental liability issues associated with the Facility and Site – which she was considering purchasing for use as a glass manufacturing facility.

181.    As he was investigating environmental issues at the Site, Dr. Harris was provided with an environmental report prepared by ARCADIS in August 2011 at the behest of Philips

North America.  The 2011 ARCADIS report reflected that a significant amount of Hazardous Substances generated at the Facility had been allowed to escape the Site.

182.    Specifically, the 2011 ARCADIS report provided to Dr. Harris indicated that the lead levels at an Outfall on the Site known as "Outfall 2" were so high as to be considered an immediate emergency and "hazardous waste" that Philips North America was under a duty to immediately report to state regulatory authorities, including the Kentucky Division of Water and the Waste Management, Hazardous Waste Branch.  The levels of lead detected at this Outfall, as reflected on the 2011 ARCADIS report, were eight and a half times the hazardous waste level established by RCRA.  In addition, Dr. Harris discovered that Outfall 2 was not even permitted for the discharge of lead, which meant that no lead whatsoever was supposed to be discharged from this Outfall.

183.    Dr. Harris was concerned that the 2011 ARCADIS report did not sufficiently describe or explore the extent of contamination by Hazardous Substances, both on-Site and off-Site.  For instance, Dr. Harris was concerned that despite evidence of Hazardous Substances migrating off-Site, of which Philips North America was aware, no off-Site testing had been performed by ARCADIS to determine the extent to which the Hazardous Substances had contaminated surrounding properties.

184.    In addition, Dr. Harris was concerned that the soil sampling performed by ARCADIS was not sufficiently deep – the testing only sampled the top 12 inches of soil.  Dr. Harris is of the opinion that if testing at 12 inches reveals elevated levels of Hazardous Substances, testing at deeper levels should have been done to determine the depth of the contamination.

185.    Based on the information provided to Dr. Harris, he was furthermore able to conclude that lead and other Hazardous Substances had been carried off-Site by prevailing winds, yet no testing of adjacent properties had been performed by ARCADIS.

186.    ARCADIS furthermore failed to test for Hazardous Substances at an off-Site dumping area located on an adjacent property, and provided only a cursory analysis of a RCRA Hazardous Substances dumping area located on-Site in its report.

187.    Dr. Harris was later provided with a disclosure document provided by Philips North America to the KDEP, Division of Waste Management dated February, 2012 (the "2012 ARCADIS Report").  Based on his review of the document, Dr. Harris was of the opinion that the hazardous levels of lead contamination previously identified by ARCADIS in the 2011 ARCADIS Report as existing at one or more Outfalls were not sufficiently described in the 2012 ARCADIS Report so as to alert the KDEP to the existence of "hazardous waste" in those locations.  The document was provided to KDEP instead of the Division of Water – the appropriate state agency in control of water pollution.  The document furthermore did not include any information regarding arsenic levels, despite the fact that arsenic was utilized in their manufacturing processes at the Facility.  As a result, Philips North America utterly failed in its statutory duty to report the existence of hazardous waste to appropriate regulatory bodies.

188.    During the negotiation process, Dr. Harris participated in at least one meeting with Philips North America agents in which Dr. Harris learned that Philips North America was aware that Hazardous Substances had been permitted to escape the Site in levels that were in excess of regulatory limits which were dangerous to human health and safety, and yet did nothing to remediate these issues or alert the governmental authorities of the pollution. Documents produced by Dr. Harris pursuant to Subpoena confirm such knowledge on the part of Philips North America, both before and after the time of closure of the Danville Facility.

189.     Dr. Harris voiced his concerns regarding the extent to which Hazardous Substances had migrated off-Site.  Dr. Harris informed those involved in the negotiations that he was of the opinion that the levels of Hazardous Substances detected in the soil on-Site and in the areas surrounding the Outfalls was of such degree as to qualify as a "hazardous spill," thereby triggering a statutory duty to alert state regulatory authorities.

190.     Dr. Harris also voiced his concern that additional testing for Hazardous Substance contamination, both on and off-Site, needed to be performed.

191.     Throughout the negotiation process between NeoStar and Philips North America, Dr. Harris continued to express his concern, both verbally and in writing, that Hazardous Substances had migrated off-Site onto properties not owned by the Defendant, and that additional testing on those properties, as well as the Danville Facility Site, needed to be performed to determine the extent of the contamination.  Dr. Harris urged that an environmental assessment be performed to determine the extent to which the contamination might adversely affect the Danville community.

192.     Despite having knowledge of the degree to which Hazardous Substances had migrated off-Site, during the year-long negotiation process between Ms. Broughton and Philips North America, Philips North America did not comply with Dr. Harris' request.

193.     The concerns of Dr. Harris and NeoStar regarding the degree to which Hazardous Substances generated at the Facility had escaped the Site through Outfalls and groundwater contamination, and their additional concerns that this contamination needed to be reported to applicable regulatory authorities, abated, and remediated, were also expressed to Philips North America in writing by letter dated September 21, 2011.  The letter specifically informed Philips North America that:  "The Danville Glass Factory property is severely contaminated with arsenic, lead, and asbestos.  Based on Kentucky Division of Waste Management requirements,

43

the level of contamination is significantly higher than both state and federal standards and warrants an immediate disclosure and corrective action, remediation."

194.    The September 21, 2011 letter to Philips North America further specifically addresses the dissemination of Hazardous Substances that was then occurring as a result of the significant lead deposits on the roof of the Facility.  The letter referred to roof remediation as a priority because the lead on the roof was being dispersed through downspout discharge into the Outfalls, through adjacent water sewers and the sewers of Danville.

195.    Despite having knowledge of the degree to which Hazardous Substances had migrated off-Site, during the year-long negotiation process between NeoStar and Philips North America, Philips North America refused to fulfill its legal obligation to alert the state regulatory authorities.  Dr. Harris repeatedly voiced his opinion to agents of Philips North America that the state regulatory authorities should be notified, and he personally confirmed that no such report had been made.

196.    Furthermore, during this time period Philips North America did not take any measures to stop the illegal discharges or to remediate the known off-Site contamination.  This means that every time it rained, additional Hazardous Substances were being illegally discharged directly into Clarks Run Creek.

**E.      Recent Testing Of The Facility Revealed Excessive Levels Of Hazardous Substances.**

197.    In December 2013, Plaintiffs were permitted to access the Facility for the purpose of conducting preliminary sampling to test for the presence of metals and other compounds that may have adversely impacted air quality and the health of employees working in the Facility while it was operational.

198.    When the sampling was performed, substantial cleaning of the Facility had already occurred, and it is therefore impossible to determine exactly the air quality or

44

environmental problems that may have existed inside the Facility while it was operational from the testing results obtained.  The results establish the presence of heavy metals throughout the Facility in amounts that remain elevated, despite the cleaning that had already occurred.

199.    Plaintiffs' consultants obtained over 40 wipe and bulk samples from locations throughout production areas inside the Facility, which were then tested for the presence of arsenic, manganese, nickel, cadmium, chromium, barium, beryllium, silver, zinc, lead, mercury, and selenium.

200.    The sampling indoors was performed at the direction and under the supervision of Bruce Fergusson, the President of Air Source Technology, Inc. ("ASTI").  ASTI is an environmental, health, and safety consulting firm, which has operated for over 20 years in a variety of environments.  A retired professional engineer, Mr. Fergusson is a Certified Industrial Hygienist (CIH # 10354 - Comprehensive Practice) who has been actively practicing industrial hygiene since 2003. Mr. Fergusson has personally provided industrial hygiene services in a glass manufacturing plant setting, as well as in a number of industrial, medical, and commercial environments.  In addition to his day-to-day industrial hygiene experience, Mr. Fergusson has presented peer-reviewed technical papers related to the testing and diagnostic methods for air quality at national conferences.

201.    Donald Gary Brown, Dr. PH, CIH, Associate Professor; EHS Graduate Program Coordinator for Eastern Kentucky University (EKU), Department of Environmental Health, Richmond, Kentucky provided personal support during this project.  Mr. Brown has over twenty years' industrial hygiene experience in a variety of environments, in addition to his education duties at EKU.

202.    The sample lab results demonstrate the continued presence of these heavy metals throughout the Facility in elevated levels.

203.    Lead (Pb), Manganese (Mn) and Zinc(Zn) were found in every wipe sample.  Mn fumes are a known hazard with a ACGIH Threshold limit Value (TLV) of 0.02 mg/m$^3$(TWA) (20 micrograms per cubic meter).

204.    Recent studies indicate neurological and neurobehavioral deficits may occur when workers are exposed to low levels of manganese (<0.2 mg/m$^3$) in welding fumes. These effects include changes in mood and short-term memory, altered reaction time, and reduced hand-eye coordination. Affected workers frequently show abnormal accumulations of manganese in a region of the brain known as the globus pallidus. The globus pallidus plays an important role in movement regulation.

205.    Several Lead wipe samples were at the following notably elevated surface levels: three samples @ >10,000ug/100cm$^2$ (micrograms per square centimeter); 12 samples @ >800 ug/100cm$^2$.  The EPA lead surface clearance limits for a residence are 0.043ug/100cm$^2$(floor) and 0.861ug/100cm$^2$(exterior surfaces), as expressed in the same units as the lab samples – several orders of magnitude lower than the sample results at the Facility.

206.    Mercury was recovered in five wipe samples, Arsenic (As) was recovered in 14 wipe samples, and Cadmium (Cd) was recovered in 17 wipe samples.  Health hazards associated with exposure to these substances are well known.

207.    Based on a preliminary review of the testing results, Mr. Fergusson has concluded that in several places throughout the Facility, surface levels of the heavy metals are in amounts shown to be hazardous for health and safety.

208.    Mr. Fergusson has furthermore concluded that, based on the lab results and the fact that substantial cleaning had taken place before the samples were collected, the results obtained were consistent with a working environment that was pervasively polluted with Hazardous Substances while operational.

46

209.    Mercury vapor screening was also performed during the Site visits.  This testing reflected the presence of mercury vapor in numerous places throughout the Facility.  Mr. Fergusson has concluded that the mercury vapor readings would most likely have been much higher when the Facility was operational because the Facility had been cleaned and also because mercury vapor pressure rises with temperature, and the Facility was unheated and cold (approximately 25F to 30F) at the time the readings in question were obtained.

210.    Plaintiffs also obtained bulk samples from two air filters found inside the Facility, and are awaiting the lab results with respect to these samples.  Assuming the filters were not changed since the operations ceased, the results of this testing may provide additional insight into the air quality as it was at the time the Facility was operational.

211.    A quick review of peer-reviewed studies, NIOSH, CDC, ATSDR, and other recognized sources yields much information about the toxicity of metals.

212.    Briefly, heavy metals "can bind to vital cellular components, such as structural proteins, enzymes, and nucleic acids, and interfere with their functioning." Symptoms and effects can vary according to the metal or metal compound, and the dose involved. Broadly, long-term exposure to heavy metals can have carcinogenic, central and peripheral nervous system and circulatory effects. For humans, typical presentations associated with exposure to any of the "classical" heavy metals, or chromium (another heavy metal) or arsenic (a metalloid), are shown in the table that follows:

| Element | Acute exposure | Chronic exposure | Main article |
|---------|----------------|------------------|--------------|
| Cadmium | Pneumonitis (lung inflammation) | Lung cancer<br>Osteomalacia (softening of bones)<br>Proteinuria (excess protein in urine; possible kidney damage) | Cadmium poisoning |

| Mercury | Diarrhea<br>Fever<br>Vomiting | Stomatitis (inflammation of gums and mouth)<br>Nausea<br>Nephrotic syndrome (nonspecific kidney disorder)<br>Neurasthenia (neurotic disorder)<br>Parageusia (metallic taste)<br>Pink Disease (pain and pink discoloration of hands and feet)<br>Tremor | Mercury poisoning |
|---|---|---|---|
| Lead | Encephalopathy (brain dysfunction)<br>Nausea<br>Vomiting | Anemia<br>Encephalopathy<br>Foot drop/wrist drop (palsy)<br>Nephropathy (kidney disease) | Lead poisoning |
| Chromium | Gastrointestinal hemorrhage (bleeding)<br>Hemolysis (red blood cell destruction)<br>Acute renal failure | Pulmonary fibrosis (lung scarring)<br>Lung cancer | Chromium toxicity |
| Arsenic | Nausea<br>Vomiting<br>Diarrhea<br>Encephalopathy<br>Multi-organ effects<br>Arrhythmia<br>Painful neuropathy | Diabetes<br>Hypopigmentation/Hyperkeratosis<br>Cancer | Arsenic poisoning |

**F.      Preliminary Expert Reports Support The Plaintiffs' Allegations Regarding The Extent To Which Hazardous Substances Escaped From The Site.**

213.    As previously indicated, Plaintiffs have been able to obtain limited information regarding the extent to which Defendants have permitted Hazardous Substances to migrate off-Site and contaminate surrounding properties through documents obtain via open records requests.

214.     Plaintiffs engaged Maurice Lloyd, President of Alpha-Omega Environmental, and provided these documents to him for review and assessment. Mr. Maurice Lloyd, PE, has over 25 years' experience with industrial permitting and corrective action and has provided regulatory consulting for dozens of industrial remediation projects throughout the United States and abroad. He has worked in municipal government, state government, and the private sector. These experiences allow him to view situations as a regulator as well as from the perspective of the regulated community.  His private sector experience has included consulting for companies such as DuPont, Dow Corning, and Alcoa at many of their facilities nationwide.  These projects have included both state and federally led investigations and corrective actions including many through the Kentucky Division of Waste Management. Federal programs involved include: the Resource Conservation and Recovery Act (RCRA); the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as the Superfund Act; the Superfund Amendments Reauthorization Act (SARA); and the Emergency Planning and Community Right-to-Know Act (EPCRA) among others.

215.     Mr. Lloyd's firm was also engaged to conduct an assessment of contamination and to gather samples from the properties belonging to the named Plaintiffs to establish the absence or presence and concentration of certain chemicals and pollutants on their properties.

216.     Mr. Lloyd has reviewed extensive documentation, spoken with numerous individuals, and conducted various environmental assessments at the Facility, on the Site, on the Plaintiffs' properties, and on various other properties in the vicinity.

217.     The analytical results of the sampling performed on the soil samples taken by Mr. Lloyd from the Plaintiffs' properties are discussed, supra.

218.     Mr. Lloyd's preliminary findings are set forth here for the Court's reference:

a.      There are 26 known solid waste management units ("SWMUs") on and off the Site. Twelve other investigative areas have also been identified at the Facility. The exact location for some of these areas is not known.  Reports of liquid wastes (waste oil, solvent containing residue, paint, mineral spirits and paint thinner) routinely being disposed directly onto the ground by employees in and around the SWMUs in an uncontrolled manner are indicative of the environmental mismanagement at the Site. The Kentucky Department for Environmental Protection ("KDEP") has had to assert virtually continuous regulatory oversight at the Facility since 1987 because of the volume and myriad sources of contamination present. Many hundreds and possibly thousands of samples have been collected from soil, stream sediment, surface water, groundwater and bulk materials as part of efforts to investigate contaminant sources throughout the Facility and the surrounding area.  Despite the number of sampling events and various corrective actions conducted at and around the Site, it does not appear that the horizontal and vertical extents of contamination have been fully determined, contained, or remedied.

b.      Three primary contaminants of concern have been consistently detected and been the focus of historic investigations: arsenic, lead, and trichloroethylene ("TCE").  Corning discontinued the use of TCE in 1981, and Philips discontinued the use of arsenic in 1991.  The continued presence of these substances in the soil and water of the area is therefore even more troubling than it would be had these substances continued to be used through the Facility's closing in 2011.  As the previous investigations have focused on regulatory concerns rather than the impact on human health, the documentation reflects regulatory screening levels, and it should be noted that other contaminants that were detected below regulatory standards may still be present in concentrations that are in fact harmful to human health.  It has been Mr. Lloyd's

experience that the cumulative effect of multiple contaminants will usually further enhance the harmful impacts to human health.

c.      Off-Site Investigations beyond the Site boundaries have shown a clear pattern of contaminant migration from the Site into the surrounding soil, sediment, surface water and groundwater.

d.      The documents reviewed have been obtained from the Plaintiffs through Open Records Requests, and that because of the procedural posture of this case, the Plaintiffs have not yet been able to request or obtain additional documents from the files of the Defendants.  Documents from the Defendants' own files will contain information necessary to any further evaluation.

e.      The primary concern for off-Site contaminants has been lead and arsenic, although volatile organic compounds such as TCE and its degradation products have also been detected in concentrations above regulatory limits.

f.      People who are exposed to moderate amounts of TCE may experience headaches, dizziness, and sleepiness; large amounts of TCE may cause coma and even death. Some people who breathe high levels of TCE may develop damage to some of the nerves in the face. Other effects seen in people exposed to high levels of TCE include evidence of nervous system effects related to hearing, seeing, and balance, changes in the rhythm of the heartbeat, liver damage, and evidence of kidney damage. Some people who get concentrated solutions of TCE on their skin develop rashes. Also, TCE breaks down over time into degradation products that can be even more toxic than TCE, such as vinyl chloride.  The soil screening level (SSL) to protect groundwater for TCE is 0.18 µg/kg and only 0.0065 µg/kg for vinyl chloride according to the United States Environmental Protection Agency's (USEPA's) Risk-Based Generic Screening Tables (Nov. 2015).  Of

note, the toxicity of TCE has been recognized by USEPA to be greater than in recent years (SSL of 3.0 µg/kg in Oct. 2004), so previous regulatory screening levels may not have accurately assessed the risk associated with the TCE.

g.      Typical background concentrations of lead in soil in Kentucky are below 50 mg/kg, with a mean concentration of 30 mg/kg. Lead is harmful because it can cause high blood pressure, digestive problems, nerve disorders, memory and concentration problems, and muscle and joint pain. Exposure to lead is particularly dangerous for pregnant women, as lead can cause premature birth, low birth weight, or miscarriage. Children are especially at risk because they are more likely than adults to ingest soil that contains lead, and they are more sensitive to the effects of lead. Lead exposure in children has been shown to decrease IQ scores, slow growth, and cause hearing problems. The World Health Organization has stated that "Children are particularly vulnerable to the neurotoxic effects of lead, and even relatively low levels of exposure can cause serious and in some cases irreversible neurological damage."

h.      The USEPA RSL for arsenic is 0.67 mg/kg. However, the mean concentration of arsenic in Kentucky is higher, at 8.9 mg/kg. Ingestion of toxic quantities of arsenic usually has effects within 30–60 min, and severe toxicity has been reported with as little as 1 mg of $As_2O_3$ (arsenic trioxide). Arsenic trioxide is typically used in glass manufacturing to improve the clarity of glass. Exposure to low levels of arsenic can cause nausea and vomiting, damage to blood vessels, and a sensation of "pins and needles" in hands and feet. Ingesting or breathing low levels of arsenic for a long time can cause a darkening of the skin and the appearance of small corns or warts on the palms, soles, and torso. Skin contact with arsenic may cause redness and swelling.

52

Exposure to elevated levels of arsenic can increase the risk of several types of cancer including: skin, bladder, lung, kidney, liver, and prostate cancer.

i.      While USEPA's generic soil screening level for lead in residential soil is 400 mg/kg that does not suggest that this level is safe or desirable, particularly when the presence of other hazardous substances is detected. This is because there is no "safe" level of lead exposure, particularly when an individual is exposed to multiple contaminants, including lead.  It should be noted that many cities and some states have established hazard levels for lead that are significantly lower than the levels established by USEPA.

j.      Testing performed off-Site along the Clarks Run Watershed after manufacturing operations at the Facility ceased in 2011 show that significant concentrations of Hazardous Substances, including lead and arsenic, have in fact migrated off-Site onto adjacent properties and into the Clarks Run Watershed.  The analyses for off-Site lead from one study alone conducted for Philips indicated 118 soil and stream sediment samples above the ARCADIS project remediation goal of 400 mg/kg with a high of 160,000 mg/kg. The same study indicated arsenic soil and sediment levels above Kentucky's mean arsenic concentration of 8.9 mg/kg in 183 samples with a high concentration of 180 mg/kg. Elevated concentrations for both lead and arsenic have been detected over ½-mile downstream from the Facility.

k.      The KDEP has noted that the detected levels of lead (as much as 160,000 mg/kg) off-Site in the downstream drainage represent an uncontrolled hazard to human health and the environment.

l.       January 2013 correspondence from DEP directs Philips **to** immediately begin interim measures to mitigate the release in the Clarks Run Watershed**.  The KDEP**

53

states that the extent of lead and arsenic in Clarks Run is not yet defined, and that the

KDEP is seeking to gain access to downstream property to continue defining the extent of

the contamination.  In fact, the KDEP proposes, in this correspondence, that the sampling

be extended to include additional samples from Clarks Run down to the 4th Street

Bridge, approximately one mile away from the Site.  The correspondence also notes that

the KDEP has concluded that additional investigation into surface contamination of off-

Site properties caused by Defendants is necessary because of the high concentration of

lead on nearby properties.  The letter further notes that the KDEP investigation results

demonstrate that the full extent to which Defendants' activities have resulted in

contamination of off-Site properties is still unknown, and is both ongoing and at levels

that are hazardous to human health.

     m.     The contamination along the Clark's Run Watershed is so significant that

the KDEP has required the posting of signage in the area that reads: "WARNING:

SEDIMENTS & SOILS CONTAIN LEAD & ARSENIC AVOID CONTACTING

AND/OR DISTURBING SEDIMENTS & SOILS." The signs direct individuals to

contact the Kentucky Division of Waste Management Hazardous Waste Branch for

additional details.

     n.     Soil samples were taken in 2012 and 2013 from property belonging to the

Railroad and Sellers and Sellers.  The results establish lead levels ranging as high as

5,400 mg/kg and arsenic ranging as high as 130 mg/kg on property owned by Sellers

(SD-35), and lead levels ranging as high as 8,300 mg/kg and arsenic as high as 99 mg/kg

on property owned by the Railroad (SD-69).  Sample point SD-77 reflects samples with

lead levels at 62,000 mg/kg.  The sample taken at SD-77 is located approximately 300

feet from the home in which local resident John Raines and his family lived for more than

54

twenty years – a location well within the radius of the Class proposed in this action.  The home was recently demolished.

      o.      The Second Phase Arcadis Report, discusses that Corning used the Hazardous Substance TCE during its pre-1977 diode glass operations at the Facility.

      p.      Agreed Order DWM 90001 establishes that in 1990 TCE had been detected in several ground water monitoring wells, and corrective action had been mandated by the KDEP.  The corrective action plan dictated by the KDEP included a requirement that Philips develop a work plan "designed to determine the presence, magnitude, extent, direction, and rates of movement of any hazardous waste and hazardous constituents both within and beyond the Facility boundary," and "evaluate the risk to human health and the environment" posed by the migration of the Hazardous Substances.

      q.      A 1992 Preliminary Assessment prepared for Philips by GEI Consultants, Inc. ("GEI"), discusses GEI's investigation into the manner in which both Corning and Philips disposed of Hazardous Substances, including trichloroethylene, throughout the history of the Site.

      r.      The Preliminary Assessment establishes that until at least 1981, 25 gallons of TCE was washed down floor pipes every three to four months when the substance was used to clean the floors inside the Facility.  These pipes discharged the untreated substance through a non-municipal sewer drain directly into a tributary of Clark's Run. In addition, the sewer pipe carrying this discharge was deteriorated such that significant underground erosion had occurred, and the TCE carried by the pipe was in fact being discharged directly into the ground under the Facility.  With respect to pollution migration pathways, the report states as follows: "[T]he section of pipe from

55

approximately 30 feet inside the north end of the plant to approximately 250 feet west of outfall 001 is deteriorated.  The concrete is missing from the bottom of the pipe and only the reinforcing steel remains.  Between the north end of the building and the mix house, the bottom half of the pipe along a 30-foot-long section is missing and significant soil erosion has occurred resulting in a large void beneath the pipe.  The erosion in this area appears to have been severe for a long time.  About twenty years ago, a lift truck fell through in this area when the concrete and ground collapsed beneath it . . . In 1991, a crane foot broke through the surface approximately 10-20 feet to the north from the first collapse in 1970."

s.      KDEP follow-up correspondence to Philips dated July 7, 1993, notes that documentation submitted by Philips "establishes that there is a plume of solvent contaminated groundwater at the Philips Facility that is directly connected to 'Spring 6' in the upper reaches of Clarks Run.  The levels of solvents being detected at and below Spring 6 are significantly above their established Maximum Concentration Limit (MCLs) and therefore could pose a threat to human health and the Clark's Run Environment."  Id. The letter goes on to inform Philips that Danville was considering the creation of a park along Clark's Run downstream from the Facility, and directs Philips to conduct additional downstream sampling and install additional off-Site groundwater monitoring wells.  Id.

t.      In 2007, 17 years after the Agreed Order and 15 years after the 1992 Preliminary Assessment, the United States Environmental Protection Agency found that the TCE pollution emanating from the Defendants' operations continued to contaminate not only the shallow aquifer, but also the deep bedrock aquifer.   Correspondence from the EPA to Philips references the remedial efforts of Philips to remove contaminants,

including TCE, from the shallow aquifer, but notes that the efforts had not been successful: "The current system is not effective in controlling migration of groundwater in the deep bedrock aquifer. The Facility has not defined the scope and extent of groundwater contamination in the deep bedrock aquifer. The scope and extent of the TCE contamination should be defined. In all likelihood, groundwater migration is not controlled from leaving the Facility boundary in the deep aquifer." The letter goes on to discuss conversations between Philips and the EPA. The EPA concludes that additional groundwater monitoring is necessary to "define the scope of groundwater contamination in the deep bedrock aquifer."

u.     The USEPA Comments on Philips' Groundwater Corrective Measures Status Report state that the fluctuation in concentrations of contaminants in well MW-111 "indicates plume movement." "Plume movement" is a term used to describe the manner in which pollutants travel through groundwater. Movement of water and dispersion within an aquifer spreads pollutants over a wider area. Its advancing boundary, often called a plume edge, can intersect with groundwater wells or surface water such as springs, making the water supplies unsafe for humans and wildlife. Although not mentioned in USEPA's comments, in addition to exposure through direct contact with contaminated water, off-site residents and workers above the contaminated plume can be exposed to the TCE through vapor intrusion. The movement of the plume, called a plume front, may be analyzed through a hydrological transport model or groundwater model. The Report goes on to say that "[s]ince MW-111 is the most down gradient well, the Facility should continue delineating the scope and extent of the plume. The Facility needs to submit a work plan to install off-Site groundwater monitoring wells in the deep bedrock aquifer to assess the scope and extent of groundwater contamination in the deep

aquifer." The comments further explain that the remediation efforts have had little impact on the TCE concentrations in the shallow aquifer, and that "[t]he source areas for TCE near RW-& and RW-8 will continue to be a source of groundwater contamination for Spring 6 and for TCE in the deep aquifer." The comments also note that Philips "should propose a remediation strategy capable of destroying the TCE source areas near RW-7 and RW-8."

v.      The Second Phase Arcadis Report further reflects that in 2012, TCE was still be found in the groundwater at the Site. A more recent Ground Water Corrective Measures Status Report dated July 30, 2014, which demonstrates the continued presence of TCE and its related products in the groundwater.

w.      In 2007, the Facility was also one of 3,880 facilities nationwide placed by USEPA onto the 2020 Corrective Action Universe. As a result of this placement, "the KDWM and the U.S. EPA expect that a final remedy will be in place (i.e. remedy construction completed) at your Facility by 2020, although actual attainment of clean up goals through remedy implementation may take a while longer."

x.      A review of analytical results from soil samples taken in 2012 and 2013 from an area of the Facility Premises used in the 1970s and 1980s as a little league baseball field by area residents, showed lead levels of up to 26,000 mg/kg (SS-01I), and arsenic levels of up to 160 mg/kg (SS-02D). All of the lead and the vast majority of the arsenic analyses are above their KDWM established background concentrations.

y.      Numerous pathways are available to transport contaminants off-Site from their source including; air, surface water, groundwater, and possibly vapor intrusion.

z.      One of the primary contaminant transport methods at similar smelting facilities is airborne dust and particulate. Flue dust coming from the stacks was deposited

directly onto the roof of the Facility, as demonstrated by bulk samples collected from the roof of the Facility in 2013 – well after the Facility ceased operations. Even after the passing of two years, with the attendant rainfall washing roof sediment away, bulk samples collected from the roof of the Facility reflected the presence of lead at levels of up to 73,000 mg/kg and 290 mg/kg for arsenic.

aa.     The flue dust from the emissions stacks was easily carried off-Site by wind, as demonstrated by the Anaconda, Montana smelter Superfund Site study, which included an area encompassing communities up to 10 miles away from the smelter due to windblown contaminants, primarily arsenic.

bb.     The nearest KY Mesonet weather station in Lincoln County indicates the prevailing wind is generally from west to east. It is clear, however, that the winds shift frequently with the prevailing wind being to the south eight days, to the north five days and to the west two days.

cc.     The soil sample results obtained from the Plaintiffs' properties support the conclusion that lead and other particulate matter generated and dispersed by the Facility escaped the bounds of the Facility's premises through air dispersion and adversely impacted surrounding properties.

dd.     As part of his investigation, Mr. Lloyd spoke with the Plaintiffs and others who lived or worked in the vicinity of the Facility, reports that their statements corroborate the dispersion of lead and other particulate generated by the Facility through the air. For instance, Ronald Hawkins, who worked in the adjacent rail yard from 1977 through 1999, stated that dust fallout from the Facility emission stacks coated the tops of the rail cars each day. Another railroad employee, John Raines, worked in a watch tower approximately 30 feet high and reported that the plume of emissions emanating from the

59

stacks was routinely opaque and dark in color.  James Jones, who lived from the late 1950s until the early 1970s in a house West of the Facility on Lebanon Road, stated that he remembered his family receiving checks from Lloyds of London to compensate them for the corrosion of the paint on their cars due to the dust emanating from the Facility stacks.

ee.     Soil samples from one residential class member's property to the East of the Facility and very nearby, in the direction of the prevailing winds reflect the presence of lead with a high concentration of 752 mg/kg – well above the EPA Hazard level of 400 mg/kg.  These samples were taken from property belonging to Michael Johnson at 501 Russell Street, which is approximately 3,000 feet from the former emission stacks at the Facility, in a heavily populated neighborhood area of Danville.  Mercury was detected in all samples, with a high concentration of 4.25 mg/kg, which is well above KDWM's ambient background concentration of 0.06 mg/kg.

ff.     Surface Water and Groundwater has and will continue to be a catalyst for transporting inorganic materials as they become soluble in nearby streams. The concentrations of lead (1800 mg/kg) and arsenic (44 mg/kg) recently detected along creek banks and in stream sediments over ½-mile downstream of the Facility, as discussed supra, will continue to create potential adverse human exposure.

gg.     Also, groundwater contaminants such as TCE and dichloroethene ("DCE") are continuing to impact surface water through discharge from springs and directly into nearby streams. The karst geology underlying the area makes groundwater flow and contaminant transport unpredictable. Shallow, intermediate, and deep aquifers have been identified under the Site. From numerous groundwater studies conducted at the Site, the shallow and intermediate aquifers reportedly travel southeasterly while the deep

aquifer flows north and west. This is consistent with groundwater studies completed throughout the Bluegrass region as groundwater finds preferential pathways through fractures and solution channels within the rock.

hh.    Numerous groundwater studies have detected TCE and its degradation product DCE in groundwater and springs. Groundwater corrective measures to address Volatile Organic Compounds (VOCs) have been ongoing since 1995, with multiple injections of an oxidizing compound to expedite removal. Unremarkable progress has been made in reducing the VOC concentrations. Therefore, it is likely that VOCs will continue to discharge into nearby springs and streams.

ii.    Because of the presence of TCE and its degradation products in local groundwater, it is Mr. Lloyd's opinion that the properties of the named Plaintiffs are at potential risk for harmful impact due to vapor intrusion.  Vapor intrusion generally occurs when there is a migration of volatile chemicals from contaminated groundwater or soil into an overlying building. Volatile chemicals can emit vapors that may migrate through subsurface soils and into indoor air spaces of overlying buildings in ways similar to that of radon gas seeping into homes.  Additional testing of the Plaintiffs' properties is necessary to account for seasonal fluctuations is necessary and warranted.

jj.    It is evident that during the facility's operation, environmental neglect was encountered in many forms as indicated by the tens of thousands of pages of environmental studies/investigations and subsequent regulatory enforcement actions. Despite the large volume of data, it does not appear that the horizontal or vertical extent of contamination has been completely identified.

kk.    There is evidence that contaminants detected on-Site are not bound by the property boundaries and have migrated and may continue to migrate off-Site via surface

61

water, groundwater, and air. Recent corrective measures do not appear to have sufficiently removed the contaminants.

ll.     Site cleanup goals should be based upon a detailed toxicological evaluation and not generic screening levels because of the presence of multiple contaminants and the media affected.

mm.     There may be a cumulative affect for human exposure to multiple contaminants that needs to be accounted for.

nn.     Off-Site waste impoundments have been reported but not yet identified or investigated. Testing performed at these Sites may in fact reveal contamination to such a degree as to adversely impact soil, surface water, and groundwater throughout the City of Danville.

oo.     The shallow, intermediate, and deep groundwater aquifers all show elevated concentrations of TCE and its degradation product DCE. These chemicals will continue to degrade and will eventually become vinyl chloride, which is even more toxic than its parent products.

pp.     Surface samples along the northeast border of the Site show over 5000 mg/kg lead, which would be expected to be carried off-Site as surface water travels downgradient toward a tributary of Clark's Run Creek. This is confirmed by elevated lead concentrations (>3000 mg/kg) immediately downgradient on the tributary's creek bank.  Additionally, lead and arsenic can be carried into the local groundwater as water percolates through contaminated soil.

qq.     Specific valences of materials such as arsenic and chromium are more toxic than others. Specific valences of arsenic (trivalent vs, pentavalent) and chromium (trivalent vs. hexavalent) should be identified rather than just total concentrations.

rr.     Properties located nearby to the Facility have been detrimentally impacted by the contaminants generated and dispersed by the Defendants.

ss.     The Defendants have dispersed Hazardous Substances, including lead, arsenic, and TCE, in amounts that are hazardous to human health and the environment.

## COUNT I
## (Nuisance)

219.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

220.    In the operation of the Facility, all Defendants utilized and generated Hazardous Substances, including but not limited to asbestos, mercury, arsenic, beryllium, cadmium, chromium, lead, tin, zinc oxide and other heavy metals, thallium, percholoroethene (PCE), 1, 1, 1-Trichloroethane (TCA), methylene chloride, PCB compounds, benzene, toluene, vanadium, benzo(b)flouranthene, benzo(a)pyrene, ethylbenzene, and chlorinated fluorocarbons (CFC), 2-Butanone (MEK), silica, and ethanolamine (the "Hazardous Substances").

221.    In the operation of its facility, all Defendants discharged fallout, odors, chemicals, and Hazardous Substances into the air and groundwater, and thereby into the Plaintiffs' neighborhoods, encompassing those properties falling within at least a five-mile radius.  These Hazardous Substances are invasive and have caused and continue to cause damage to Plaintiffs' who own property within this radius.

222.    The nuisance described, supra, is ongoing, the full extent of which is yet unknown.

223.    All Defendants had a duty to prevent the discharge of Hazardous Substances onto the Plaintiffs' properties, and to prevent the Hazardous Substances from escaping from the Site onto the Plaintiffs' property.

224. A condition or activity that unreasonably interferes with the use of property is a nuisance.

225. Plaintiffs did not consent for the Hazardous Substances to physically invade their personal and real property.

226. By causing Hazardous Substances accumulated and controlled by Defendants to physically invade the Plaintiff's personal and real property, all Defendants substantially and unreasonably interfered with the Plaintiffs' use and enjoyment of their property.

227. Plaintiffs who own or owned property within a five-mile radius of the Site, including but not limited to Modern Holdings, Rosetta Ford, Charles Ford, Otis Ford, Lemons, and Sellers and Sellers, have been damaged as a result of Defendants' tortious conduct in that the fair market value of their properties has been materially reduced.

228. Upon information and belief, the Hazardous Substances emitted by Defendants have contaminated property belonging to Modern Holdings, Rosetta Ford, Charles Ford, Otis Ford, Lemons, and Sellers and Sellers in more than a minute quantity, the extent of which is presently unknown, thereby causing a material reduction in the value of the Plaintiffs' properties.

229. Plaintiffs Modern Holdings, Rosetta Ford, Charles Ford, Otis Ford, Lemons, and Sellers and Sellers are furthermore harmed by the contamination that has invaded their properties as a result of the Defendants' tortious activities because such contamination exposes Plaintiffs to potential legal and environmental liabilities.

230. Finally, the Defendants' tortious activities in permitting Hazardous Substances to migrate off-Site and contaminate surrounding properties has damaged Plaintiffs Modern Holdings, Rosetta Ford, Charles Ford, Otis Ford, Lemons, and Sellers and Sellers in that the value of their properties has suffered from the stigma of being closely situated to the Site.

231.    The Defendants' tortious activities have furthermore interfered with the Plaintiffs' use and enjoyment of their properties, because the presence of contamination and Hazardous Substances on these properties has and will continue to impair the ability of Plaintiffs to dispose of their properties through sale or lease, or to otherwise utilize their properties for the purpose for which they are best suited.

232.    Defendants' substantial and unreasonable interference with Plaintiffs' use and enjoyment of their properties constitutes a nuisance for which all Defendants are liable to Plaintiffs for all damages arising from such nuisance, including compensatory and exemplary relief.  Each of the Plaintiffs is entitled to recover damages for the following, including but not limited to:  the loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the value of property; damages arising from the stigma of being closely situated to the Site, costs associated with determining the nature and extent of the pollution of their properties and the method by which the properties could be remediated, restoration costs; consequential and incidental damages; disgorgement of profits realized; unjust enrichment; and punitive damages.

## COUNT II
### (Trespass)

233.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

234.    All Defendants engaged in extra-hazardous activities in permitting Hazardous Substances to escape the Site and pollute surrounding properties.

235.    All Defendants intentionally, recklessly, willfully, wantonly, maliciously, and negligently failed to properly construct, maintain, and/or operate the Facility, which caused the

invasion and damage of Plaintiffs' personal and real property by particulates, air contaminants, and other Hazardous Substances on dates too numerous to mention.

236.    The trespass described, <u>supra</u>, is ongoing, the full extent of which is yet unknown.

237.    As a direct and proximate result of the foregoing conduct of all Defendants, Hazardous Substances accumulated upon, entered upon, settled upon, seeped onto, and otherwise physically invaded the Plaintiffs' personal and real property.

238.    It was reasonably foreseeable that all Defendants' failure to properly construct, maintain, and/or operate the Facility could result in an invasion of Plaintiffs' possessory interests through the emissions of Hazardous Substances.

239.    The Hazardous Substances that entered, settled, physically invaded, and damaged Plaintiffs' personal and real property interfered with and continue to damage the Plaintiffs' interests in the exclusive possession of the Plaintiffs' land and property and constitute a continuous trespass upon the Plaintiffs' property.

240.    Plaintiffs did not consent for the Hazardous Substances to physically invade their land and property.

241.    The Hazardous Substances that Defendants have caused to invade Plaintiffs' properties have in fact contaminated the subject properties owned by Plaintiffs and other members of the Proposed Class to the extent that the levels of Hazardous Substances pose a hazard to human health.

242.    The Hazardous Substances that have invaded the properties of Plaintiffs, have harmed the properties in that the contamination has and will continue to impair the ability of Plaintiffs to dispose of their properties through sale or lease, or to otherwise utilize their properties for the purposes for which they are best suited.

243.    Upon information and belief, the Hazardous Substances emitted by Defendants have contaminated the properties of Plaintiffs in more than a minute quantity, the extent of which is presently unknown, thereby causing a material reduction in the value of the Plaintiffs' properties.

244.    Plaintiffs are furthermore harmed by the contamination that has invaded their properties as a result of the Defendants' tortious activities because such contamination exposes Plaintiffs to potential legal and environmental liabilities.

245.    Finally, the Defendants' tortious activities in permitting Hazardous Substances to migrate off-Site and contaminate surrounding properties has damaged Plaintiffs in that the value of their properties has suffered from the stigma of being closely situated to the Site.

246.    As a further direct and proximate result of the foregoing conduct of all Defendants, Plaintiffs suffered substantial damages to their personal and real property as alleged herein.  Each of the Plaintiffs is entitled to recover damages for the following, including but not limited to:  the loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the value of property; costs associated with determining the nature and extent of the pollution of their properties and the method by which the properties could be remediated, restoration costs; consequential and incidental damages; disgorgement of profits realized; and unjust enrichment; and punitive damages.

247.    By reason of all Defendants' trespass on the Plaintiffs' properties, the Plaintiffs are entitled to injunctive relief requiring the Defendants to promptly and completely remove all Hazardous Substances from the Plaintiffs' land, and prevent the future migration of Hazardous Substances onto the Plaintiffs' land.

248.    All Defendants' actions, which resulted in the trespass upon the Plaintiffs' land and property were, and continue to be, intentional, willful, and malicious and made with a

conscious disregard for the rights and safety of the Plaintiffs, entitling the Plaintiffs to compensatory, exemplary, injunctive, and punitive relief.

## COUNT III
### (Negligence, Gross Negligence And Recklessness)

249.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

250.    In constructing, maintaining, operating, controlling, engineering and/or designing the Facility, all Defendants had a duty to exercise ordinary care and diligence so that Hazardous Substances did not invade the Plaintiffs' personal and real property.

251.    All Defendants knowingly or recklessly breached their duty to exercise ordinary care and diligence when they improperly constructed, maintained, operated, engineered, and/or designed the Facility, and when they disposed of or dispersed the Hazardous Substances into the environment., they knew or should have known, that such actions would cause Plaintiffs' real property to be invaded by Hazardous Substances and that exposure to such substances would likely cause physical injury and/or property damages to those residing and/or owning property within at least a five mile radius of the Facility.

252.    As a direct and proximate result of the failure of all Defendants to exercise ordinary care, thereby causing contamination of the Plaintiffs' properties in amounts that are hazardous to human health and which interfere with the Plaintiffs' use and enjoyment of the property, Plaintiffs owning property within a five-mile radius of the Facility between 1952 and the present date have been damaged and are entitled to recover damages arising from the loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the value of property; costs associated with determining the nature and extent of the pollution of their

properties and the method by which the properties could be remediated, restoration costs; consequential and incidental damages.

253.    As a direct and proximate result of all Defendants' failure to exercise ordinary care, Plaintiffs residing within a five-mile radius of the Facility between 1952 and the present date have suffered personal injury, wrongful death, injury arising from an increased risk of personal injury and sickness in the future, mental anguish, suffering, anxiety, embarrassment, humiliation, distress, agony, and other related nervous conditions and emotional trauma.

254.    The conduct of all Defendants in knowingly allowing conditions to exist that caused or permitted the Hazardous Substances to physically invade the Plaintiffs' personal and real property, constitutes gross negligence, as Defendants' conduct demonstrates a substantial lack of concern for whether an injury resulted to the Plaintiffs, and at least constitutes recklessness.

255.    All Defendants are vicariously liable for the negligence and/or gross negligence of their officers, employees, representatives, and agents, who, during the course and scope of their employment, allowed or failed to correct the problem which caused Hazardous Substances to physically invade the Plaintiffs' personal and real property.

256.    Defendants' recklessness entitles Plaintiffs to an award of punitive damages, because their conduct was in willful disregard for Plaintiffs and constitutes outrageous conduct.

## COUNT IV
### (Negligence Per Se)

257.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

258.    In constructing, maintaining, operating, controlling, engineering and/or designing the Facility, all Defendants had a duty to abide by the various state and federal regulations

governing the use and disposal of Hazardous Substances, including but not limited to those statutes listed, <u>supra</u> (the "Statutes").

259.    The Statutes were intended to protect the Plaintiffs from the harm of the type they have suffered.

260.    All Defendants breached their duties under one or more of the statutes when they improperly constructed, maintained, operated, engineered, and/or designed the Facility and when they disposed of or dispersed the Hazardous Substances into the environment.

261.    As a direct and proximate result of the failure of all Defendants to comply with the Statutes, the Plaintiffs' properties have become contaminated in amounts that are hazardous to human health and which interfere with the Plaintiffs' use and enjoyment of the property, Plaintiffs owning property within a five-mile radius of the Facility between 1952 and the present date have been damaged and are entitled to recover damages arising from the loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the value of property; costs associated with determining the nature and extent of the pollution of their properties and the method by which the properties could be remediated, restoration costs; consequential and incidental damages.

262.    As a direct and proximate result of all Defendants' failure to comply with the Statutes, Plaintiffs residing within a five-mile radius of the Facility between 1952 and the present date have suffered personal injury, wrongful death, injury arising from an increased risk of personal injury and sickness in the future, mental anguish, suffering, anxiety, embarrassment, humiliation, distress, agony, and other related nervous conditions and emotional trauma.

263.    All Defendants are vicariously liable for the negligence and/or gross negligence of their officers, employees, representatives, and agents, who, during the course and scope of their employment, failed to comply with the Statutes.

## COUNT V
### (Battery)

264.     Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully restated herein.

265.     All Defendants acted with knowledge that they were illegally and tortiously permitting Hazardous Substances generated and stored at the Facility to escape, leak and seep on, under and around the Plaintiffs' properties, and furthermore acted with the knowledge that such activities were substantially likely and were in fact causing personal injury to persons who were touched by or exposed to such Hazardous Substances.

266.     The Defendants' actions in intentionally allowing the discharge of Hazardous Substances off-Site, intentionally and willfully caused a direct, harmful and/or offensive contact with the Plaintiffs and thereby committed battery upon such Plaintiffs.  Separate and apart from acting negligently or with gross negligence, at all relevant times, the Defendants caused personal injury to the Plaintiffs, and/or an increased risk of serious latent disease and damages, through acts and omissions accompanied by malice and/or accompanied by a wanton, reckless, and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

267.     As a direct and proximate result of Defendants' misconduct as set forth herein, the Plaintiffs have suffered and continue to suffer personal injury, wrongful death, injury arising from an enhanced risk of serious future latent disease, economic losses, the loss of value to their property, the loss of use and enjoyment of their property, and the need for the establishment of a medical monitoring program for those exposed to the Hazardous Substances.

## COUNT VI
## (Fraudulent Concealment)

268.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

269.    Defendants had, and continue to have, a duty to disclose to local, state and federal authorities, and to Plaintiffs, the nature and extent of Hazardous Substances generated by the Facility that have either migrated off-Site or been intentionally dumped off-Site by Defendants.

270.    As set forth in detail, supra, during the Relevant Time Period, all Defendants intentionally concealed and failed to disclose to the Plaintiffs, and to the public authorities and/or agencies, material facts concerning the nature, extent, magnitude, and effects of the exposure of the Plaintiffs and their properties to the Hazardous Substances emitted, released, stored, handled, generated, processed and/or disposed of in and around the Facility and the surrounding environment.

271.    Defendants continue to intentionally conceal and fail to disclose to the Plaintiffs, and to the public authorities and/or agencies, material facts concerning the nature, extent, magnitude, and effects of the exposure of Plaintiffs and their properties to the Hazardous Substances emitted, released, stored, handled, generated, processed and/or disposed of in and around the Facility and the surrounding environment.

272.    All Defendants intentionally concealed such material information. Defendants knew or should have known that the Plaintiffs and their properties would be exposed to the Hazardous Substances.

273.    All Defendants knew that their concealment of such information would subject and continue to subject the Plaintiffs to continued exposure to the Hazardous Substances indefinitely, up to and including today.

274.     If the Plaintiffs, who were residents of and/or owned property in Danville, Kentucky, had known of the material information intentionally concealed by Defendants, the Plaintiffs would not have consented to being exposed to the Hazardous Substances and would not have continued to reside or own property within the affected area.

275.     Plaintiffs reasonably believed that the groundwater, air, soil, and natural resources in and around the Facility and their surrounding community did not pose any potential health hazard, and thus reasonably relied upon such belief in continuing to reside or own property within the affected area, thereby sustaining injuries.

276.     Plaintiffs reasonably believed that the groundwater, air, soil, and natural resources in and around the Facility and their surrounding community did not pose any potential health hazard, and thus reasonably relied upon such belief in refraining, until the filing of this suit, from seeking redress or taking precautions.

277.     Separate and apart from acting negligently or with gross negligence, at all times, the Defendants caused serious personal injury, property damage and/or an increased risk of serious latent disease to the Plaintiffs through acts and omissions actuated by malice and/or accompanied by a wanton, reckless and willful disregard for the persons who might foreseeably be harmed by such acts or omissions.

278.     As a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs have suffered and continue to suffer personal injury, injury arising from an enhanced risk of serious future latent disease, economic losses, the loss of value to their property, the loss of use and enjoyment of their property, and the need for the establishment of a medical monitoring program for those exposed to the Hazardous Substances.

## COUNT VII
### (Negligent Infliction Of Emotional Distress)

279.     Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully restated herein.

280.     The Defendants failed to act with reasonable care by failing to adequately or fully warn Plaintiffs of their exposure to or the risks associated with exposure to various Hazardous Substances.  Such conduct placed the Plaintiffs, their unborn children, and members of their households at a significantly increased risk of developing physical injuries and health related problems in the future.

281.     By failing to warn the Plaintiffs or others, despite subjectively realizing the specific unsafe and hazardous nature of the pollution Defendants permitted to escape off-Site, and by taking actions that deliberately misled Plaintiffs and concealed from them the true hazards and risks associated with the nature and extent to which Hazardous Substances have migrated off-Site, the Defendants acted wantonly, willfully, recklessly, and with malice and oppression.

282.     As set forth herein, all Plaintiffs residing within a five-mile radius of the Facility between 1952 and 1982 have alleged that they suffered a physical injury or health related problems proximately resulting from their exposure to Hazardous Substances emitted by Defendants.  In the alternative, the Plaintiffs allege that, to the extent they have not yet suffered any physical injury or health related problems from such exposure, some or all of Plaintiffs have suffered serious emotional distress proximately resulting from their significantly increased risk of developing future disease, which in turn resulted from the Defendants' negligent and reckless conduct.

WHEREFORE, the Plaintiffs respectfully request Judgment on their Fourth Amended Class Action Complaint against Corning Incorporated and Philips Electronics North America Corporation as follows:

a.      A trial by jury on all Counts so triable;

b.      Joint and several liability as to all Defendants;

c.      The entry of an Order pursuant to Federal Rule 23 permitting this action to be maintained as a class action, appointing Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class as defined herein.

d.      Determination of the Defendants' liability on a class-wide basis, with the question of damages being bifurcated and subject to further proceedings, provided that the Court believes bifurcation is necessary in its discretion and in the interests of justice.

e.      The creation of a program for the Plaintiffs for medical monitoring, to be paid for by Defendants, under Court supervision, to provide medical monitoring services, including but not limited to, testing, examination, preventative and diagnostic screening for conditions that can result from or potentially result from exposure to the Hazardous Substances;

f.      The entry of an Order requiring the Defendants to bear the cost of publication to the respective Plaintiffs and members of the Class of approved guidelines and procedures for medical screening and monitoring of Plaintiffs, the content, form and manner of such publication to be approved by the Court;

g.      Judgment on Count I joint and severally against all Defendants for both compensatory and punitive damages for nuisance in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

h.       Judgment on Count II joint and severally against all Defendants for both compensatory and punitive damages for trespass in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

i.        Judgment on Count III joint and severally against all Defendants for both compensatory and punitive damages for negligence, gross negligence and recklessness in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

j.        Judgment on Count IV joint and severally against all Defendants for both compensatory and punitive damages for negligence per se in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

k.       Judgment on Count V joint and severally against all Defendants for both compensatory and punitive damages for battery in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

l.        Judgment on Count VI joint and severally against all Defendants for both compensatory and punitive damages for fraudulent concealment in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

m.      Judgment on Count VII joint and severally against all Defendants for compensatory damages for negligent infliction of emotional distress in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

n.       Award the Plaintiffs' reasonable costs incurred herein;

o.       Award Reasonable attorneys' fees;

p.       Award prejudgment and post-judgment interest as provided by law;

q.       Award compensatory damages;

r.        Award punitive and exemplary damages; and

s.      An Order requiring Defendants to pay the costs associated with determining the nature and extent of the pollution of the Plaintiffs' properties and the method by which the properties could be remediated, and to thereafter promptly and completely remove all Hazardous Substances from the Plaintiffs' and class members' properties to prevent further migration of such Hazardous Substances and to preserve portions of the Facility and top soil at or near the Facility for subsequent testing and analysis on behalf of Plaintiffs herein.

Respectfully submitted,

 /s/ Richard A. Getty
RICHARD A. GETTY
JESSICA WINTERS
       and
EVAN M. RICE

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 259-1900
Facsimile:   (859) 259-1909
E-Mail:  rgetty@gettylawgroup.com
E-Mail:  jwinters@gettylawgroup.com
E-Mail:  erice@gettylawgroup.com

COUNSEL FOR PLAINTIFFS
MODERN HOLDINGS, LLC,
ROSETTA FORD, GARY FORD,
CHARLES FORD, OTIS FORD,
BOBBIE LEMONS AND SELLERS
AND SELLERS COMPANY ON
BEHALF OF THEMSELVES AND
OTHERS SIMILARLY SITUATED

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on this the ___day of _____, 2016, the foregoing Fourth Amended Class Action Complaint was served electronically through this Court's CM/ECF system upon the following:

Brian K. Johnson, Esq.
Dickinson Wright, PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky  40507
Counsel for Philips Electronics North America Corporation

M. Stephen Pitt, Esq.
George J. Miller, Esq.
      and
George L. Seay, Jr., Esq.
Wyatt, Tarrant & Combs, LLP
250 West Main Street, Suite 1600
Lexington, Kentucky  40507-1746

and

Mark L. Durbin, Esq.
Barnes & Thornburg LLP
1 North Wacker Drive, Suite 4400
Chicago, Illinois  60606

Counsel for Corning Incorporated

                    /s/ Richard A. Getty_____
                    COUNSEL FOR PLAINTIFFS

Jkcpld1052