Affidavit Regarding Class Certification for

Modern Holdings, LLC, et al. v. Corning Incorporated, et al.

United States District Court Eastern District of Kentucky

Central Division at Lexington

January 31, 2017

Prepared at the request of:

Richard A. Getty

The Getty Law Group, PLLC

1900 Lexington Financial Center

250 West Main Street

Lexington, KY 40507

Prepared by:

John A. Kilpatrick, PhD, MAI, FRICS

Greenfield Advisors

2101 Fourth Avenue, Suite 820

Seattle, WA 98121

# Table of Contents

Qualifications ................................................................................................................................ 1

Summary of Events Leading to This Case .................................................................................. 5

Description of the Proposed Class ............................................................................................. 6

Mass Treatment in Determination of Damages to Real Estate ................................................ 8

USPAP Requirements for Mass Appraisal Methods ............................................................... 10

Mass Appraisal and Automated Valuation .............................................................................. 12

Relevant Literature Review ....................................................................................................... 19

    Property Rights and Homeowners' Perceptions of Impairment .......................................... 19

    How Markets React to Contamination ................................................................................. 21

    Environmental Impairment Causes Value Diminution ......................................................... 23

    Stigma .................................................................................................................................... 25

    Summary of Scholarly Research ........................................................................................... 30

Automated Valuation Model ..................................................................................................... 30

Data Sources .............................................................................................................................. 30

Data Collection .......................................................................................................................... 31

Model Design and AVM Testing ............................................................................................... 33

    Proper Use of an AVM for Valuing Residential Properties .................................................. 33

    AVM Design ........................................................................................................................... 34

    AVM Results ........................................................................................................................... 37

    Model Validation .................................................................................................................. 39

Methods for Determining Value Impairment .......................................................................... 39

    Case Studies ........................................................................................................................... 40

    Contingent Valuation and Focus Groups ............................................................................. 43

    Meta-Analysis ....................................................................................................................... 44

Conclusions ............................................................................................................................... 44

Certification .............................................................................................................................. 46

# List of Exhibits

A       Professional Qualifications and Recent Trial Testimony

## List of Tables

Table 1. Variables and Their Definitions ........................................................................32

Table 2. Summary Statistics...........................................................................................38

Table 3. Variables Used in Model...................................................................................38

Table 4. Final Model Summary.......................................................................................39

## List of Figures

Figure 1. Location of the Corning/ Philips Facility and Proposed Class Area .......................7

Figure 2. Map of the Comparable Properties Utilized .........................................................35

Figure 3. Greenfield AVM Flowchart................................................................................36

Figure 4. Sales Correlation Matrix ...................................................................................37

## QUALIFICATIONS

1.     I am Dr. John A. Kilpatrick. I hold a PhD degree in real estate finance and am a state-certified (general) real estate appraiser in all 50 states and the District of Columbia.[1] I am the Chairman and Co-Managing Director of Greenfield Advisors, a real estate appraisal and consulting firm with offices in Seattle, Washington, and suburban Atlanta, Georgia. For 40 years, our firm has been a leading authority on difficult real estate appraisal problems, specializing in the valuation of impaired sites. We are unusual, if not unique, in the high level of educational and professional qualifications of our staff (which includes two PhDs); the rigor of our quantitative techniques; and our articles on appraisal techniques, which have been published in both academic and professional journals. In this matter, Greenfield Advisors is being compensated at a rate of $600 per hour for analysis, $750 per hour for testimony, and $300 per hour for travel. Others at Greenfield Advisors, who work under my direct supervision, have hourly rates for analysis between $90 and $500. These are our standard and customary rates for work of this nature.

2.     I am an MAI-designated member of the Appraisal Institute, and the author or editor of four books on real estate and a contributing author to four others, such as *Brownfields: A Comprehensive Guide to Redeveloping Contaminated Property* (American Bar Association, 3rd ed. 2010) and *Private Real Estate Markets and Investments* (Oxford University Press, 2014). I have served as a consultant on environmentally impaired property to the U.S. General Services Administration, the U.S. Army, and many other organizations. At the invitation of the Japan Real Estate Institute, I co-authored the authoritative guide on the appraisal of environmentally impaired properties for appraisers in that nation, published in the October 2003 issue of the *Journal of the Japan Real Estate Institute* (JJREI). I am a former member of the Editorial Board of *The Appraisal Journal*, the official, peer-reviewed journal of the Appraisal Institute, and currently a member of its Review Board. In 2004, I became one of a handful of appraisers in the United States to be designated as a nationally certified appraisal standards instructor by the Appraisal Standards Board in Washington, D.C. Also in 2004, my peers in the industry honored me by nominating me for a seat on the Appraisal Qualifications Board and by naming me a Member of the Faculty of Valuation of the British Royal Institution of Chartered Surveyors; I was later named a Fellow of that organization in 2011. I am currently a reviewer for the *Journal of Sustainable Real Estate*, and a past member of its Editorial Board. I have been professionally engaged in real estate finance, appraisal, development, and teaching for over 30 years. I have been accepted as an expert witness in various state and federal courts throughout the United States on matters relating to real estate valuation, contaminated or otherwise impaired property values, construction defects, and statistical analysis. A more complete and current set of my professional qualifications along with a listing of my trial testimony for the past 4 years is attached to this affidavit as Exhibit A.

3.     I am the lead author of "The Aftermath of Katrina: Recommendations for Real Estate Research," a peer-reviewed article written at the invitation of the *Journal of Real Estate Literature* (Kilpatrick and Dermisi, 2007) to provide authoritative guidance to academics

---

[1] In the State of Kentucky, my Certified General state license number is 004449.

and real estate practitioners conducting scholarly research into the real estate impacts in New Orleans following the 2005 hurricane. The article, among others I have written, recognizes that holistic, market-wide analytical methods are necessary to understand the economic and property value issues in the affected areas.

4. I am the author of over 100 journal articles, monographs, and working papers. For example, my paper, "Appraisal Error Terms and Confidence Intervals," presented at the American Real Estate Society's 2010 annual meeting, was named the Best Paper on Real Estate Appraisal, an award sponsored by the Appraisal Institute. I have been featured in articles in the *New York Times*, CNBC, the *Wall Street Journal,* the British journal *Modus*, and other national and global publications. Most recently, I was awarded the Bernard L. Barnard Outstanding Technical Essay Award by the International Association of Assessing Officers for an article published in the *Journal of Real Estate Literature* that relates to mass appraisal techniques.[2] Also recently, a paper I co-authored on contaminated property, published in the *Journal of Property Investment and Finance,* was named a "Highly Commended Award Winner" by the Emerald Publishing Literati Network Awards for Excellence.

5. Greenfield Advisors is widely regarded as one of the leading firms in the world in the valuation of environmentally impaired property. This is evident by our 2003 JJREI invitation, requests for me to lecture on this topic to the Asian Real Estate Society (2007 and 2008) and the Technical University of Eindhoven in the Netherlands (2007), and our ongoing legacy of peer-reviewed articles that appear in refereed journals and presentations at scholarly conferences. Greenfield Advisors first introduced many of the advanced tools and techniques that appraisers use to evaluate environmentally impaired property, such as *stigma analysis*, *underground rent*, and *survey research*. We have written and lectured extensively on the application of mass appraisal and statistical methods in class actions, and Greenfield Advisors' 2007 white paper, *Certifying the Real Estate Damages Class – An Appraiser's Perspective*, is widely considered the authoritative outline on the subject.

6. I have testified or consulted on numerous situations utilizing mass appraisal methods, and I have testified or consulted on property valuation using automated valuation models (AVMs) in federal court cases. Examples include, but are not limited to, the following:

- 2015, District of Massachusetts:  I was offered as an expert witness in *Massachusetts Mutual v. Deutsche Bank*, United States District Court, District of Massachusetts, in which my mass appraisal model would be used to retrospectively value properties throughout the United States.  My model and testimony were admitted, and the case settled for an undisclosed sum.

- 2015, Southern District of New York:  I testified in *FHFA v. Nomura* in Federal District Court for the Southern District of New York, in which my mass appraisal model (using an AVM) and an automated appraisal review model were admitted.

- 2015, District of Missouri:  I testified on behalf of a class of claimants in *Barfield, et al., v. Sho-Me Power Electric, et al. (USDC, Western District of Missouri)* regarding the value

---

[2] Lipscomb, Clifford A., Abigail S. Mooney, and John A. Kilpatrick. 2013. "Do Survey Results Systematically Differ from Hedonic Regression Results? Evidence from a Residential Property Meta-Analysis." *Journal of Real Estate Literature* 21(2):233–253.

of a state-wide fiber optic cable easement. My mass-appraisal model, utilizing a corridor valuation, has been accepted by the Court, and my clients prevailed in a jury trial.

- 2014, Southern District of New York: I consulted on *American International Group Inc. et al. v. Bank of America Corp. et al.,* utilizing an AVM to determine retrospective property values of homes underlying residential mortgage-backed securities. This case settled in July 2014 for $650 million.

- 2014, Southern District of New York: I was a testifying expert in *FHFA v. Goldman Sachs & Co., et al.*, a federal court case focused on the valuation of properties underlying residential mortgage-backed securities. This case settled for $1.2 billion.

- 2014, Southern District of New York: I also testified in the matter of *FHFA v. Ally Financial Inc., et al., F/K/A GMAC, Inc.*, regarding the use of AVM, mass appraisal, and appraisal reviews for evaluating appraisals underlying residential mortgage-backed securities. This case recently settled.

- 2014, Southern District of New York: Also in the federal court system, I was the testifying expert in *FHFA v. Merrill Lynch & Co., Inc.* This matter also involved my expertise on AVMs, mass appraisal, and appraisal reviews as means for evaluating appraisals underlying residential mortgage-backed securities. This case settled.

- 2010–2012, South Carolina: I consulted and testified on a series of cases versus AVX Corporation stemming from volatile organic compound (VOC) contamination.

- 2011, Maryland: I was the testifying expert in *Michael Allison, et al. v. Exxon Mobil Corporation, et al.*, a Maryland state court matter involving contaminated drinking water for 154 properties. In this matter, I utilized a mass appraisal model to determine unimpaired property values.

- 2011, Tennessee: I consulted with several attorneys who represent property owners in the affected areas surrounding the Tennessee Valley Authority (TVA) coal ash spill site in Kingston, Tennessee. These cases settled.

- 2010, Gulf Oil Spill: I have lectured frequently on the topic at Continuing Legal Education (CLE) meetings, I am cited in numerous national publications as well as video appearances on LexisNexis, and I am consulting to numerous attorneys representing property owners, business owners, and taxing authorities in the affected areas, including the State of Louisiana. In July 2010, I was invited to speak to a gathering of banking regulators in Washington, DC, regarding the collateral impacts of the oil spill. I am currently on retainer to the State of Louisiana to assist with their state-owned property damages.

- 2009, Chinese Drywall Multidistrict Litigation: I was retained by several attorneys to consult on settlement matters, I inspected affected properties in both Louisiana and Florida, and I delivered invited lectures to CLE conferences in New Orleans.

- 2009, Georgia: I consulted on a large class action regarding airborne contaminants emanating from an animal processing plant. Our involvement in the case led to a rapid settlement.

- 2009, Louisiana: I am consulting and occasionally testifying on a series of oil field contamination cases regarding toxic wastes left over from drilling activities.

- 2009, Illinois: I am consulting on a mass tort involving an oil plume emanating from a leaky pipeline running through a small, rural village. Affected properties include several different categories of residences as well as nonresidential properties (improved and unimproved) owned by the village and county governments.

- 2009, Maryland: I consulted on a nitrate contamination matter affecting drinking water wells of about a dozen rural residences, and I aided the claimants in achieving a successful settlement of the case.

- 2009, Missouri: I testified in the bellwether trial in *Ogg v. Mediacom*, a state class action regarding fiber optic cable easement values.

- 2008, Oklahoma: I opined on behalf of the plaintiffs in *Bob Coffey et al. v. Freeport-McMoRan* on the question of whether or not, from a real estate analysis and appraisal perspective, the matters at hand in this case could best be analyzed with a mass appraisal model consistent with class certification. Our involvement in the case led to a rapid settlement.

- 2008, California: I consulted on a pair of cases, both on class certification issues as well as loss in value, in the town of Merced involving a variety of contaminants, including heavy metals, carried by flood waters from a nearby manufacturing site. Affected properties total over 500 and include a variety of residences.

- 2007, West Virginia: I testified in the successful class certification of *Perrine v. DuPont*, involving airborne contaminants emanating from a former zinc smelter and affecting thousands of varying property types (including residential, commercial, and farm land).

- 2006, Michigan: I consulted on, and offered an affidavit in support of, the successful state court certification of the *Henry v. Dow* class action, involving water-borne contaminants emanating from a plant on one of the tributaries of the Saginaw River.

- 2005, Louisiana: I am continuing to consult and testify on a variety of cases stemming from Hurricane Katrina. Most notable among these was *Turner v. Murphy Oil*, a class action involving 6,700 properties (residences, mixed-use, and commercial) that suffered an oil spill from a nearby refinery occurring 3 days after Katrina. After demonstrating that Greenfield Advisors could successfully separate the oil damage from the flood damage, our clients were able to successfully negotiate a settlement with the responsible parties. I also consulted on the various Corps of Engineers levee breach cases, and I am currently testifying on a Parish-maintained levee breach case.

- 2003, Louisiana: I testified in the class certification of *Guillory et al. v. Union Pacific*, a case involving PCE contamination from a leaking tanker car. Affected properties totaled in the hundreds and included a variety of residences and some nonresidential properties.

7. I have also used variants of hedonic regression modeling, on which the Greenfield AVM is based, in my academic and scholarly pursuits. For example, regression modeling was used in my 2013 article entitled "Do Survey Results Systematically Differ from Hedonic

Regression Results? Evidence from a Residential Property Meta-Analysis," which was published in the *Journal of Real Estate Literature*.[3]

8.  I have been asked by my clients, the plaintiffs' counsel, to opine on behalf of the plaintiffs in the referenced case (*Modern Holdings, LLC, et al. v. Corning Incorporated, et al.*) on the question of whether or not, from a real estate analysis and appraisal perspective, the matters at hand in this case, related to the alleged diminution of value of residential properties, can be best analyzed with a mass appraisal model. The materials I have relied upon to formulate my opinions are referenced herein, or are referenced within the exhibits to this report.

## SUMMARY OF EVENTS LEADING TO THIS CASE

9.  The following is a brief summary of events related to the litigation. These events are gathered from documents produced in this litigation. I visited and inspected the areas of concern on January 23, 2017. I have reviewed location maps and photographs as part of my preparation for developing this report. Upon my inspection of the area and reviewing pertinent documents, maps, and photographs, I understand the general circumstances to be as follows:

10. The Corning/Philips glass and bulb manufacturing facility, hereinafter referred to as the Facility, was constructed by Corning in 1952. The Facility operated as a glass manufacturing facility until 1983. Philips purchased the Facility in 1983, using the plant for the manufacturing, packaging, and shipping of components for parabolic aluminized reflector (PAR) lamps. The Facility remained in operation until 2011.

11. The Facility is located on the Site, an approximately 32-acre parcel at 320 Vaksdahl Avenue, in the southwestern portion of Danville, Kentucky (see Figure 1.) The Site consists or consisted of an approximately 335,000 square foot building with office, manufacturing, and warehouse space. Other structures separate from the main building include or included a hazardous waste storage building, a general purpose storage building, gas cylinder storage building, and a pump house.

12. The Facility opened in 1952 and was operated by Corning as a glass plant, which included diode glass production. Trichloroethylene (TCE) was used in the diode glass production process until 1977. The diode glass manufacturing operation was moved to another Corning plant in 1983, prior to Philips North America's acquisition of the Site in 1983.

13. From 1983 through 2011, Philips North America operated the Site as a glass manufacturing facility that mixed and melted various basic raw materials to form blown and drawn glass products for the lighting industry. The materials were mixed in a specialized area of the Facility called, "the Mix House."

14. Three settling ponds were also located at the Site. Wastewaters from contact cooling of hot lead glass, precipitation runoff from glass cullet storage piles, and a small volume of

---

[3] Lipscomb et al., 2013, *op. cit.*

rinse water from electroplating operations were discharged into a surface impoundment on the eastern portion of the Site.

15. According to the fourth amended complaint, many toxic substances including, but not limited to, arsenic and lead migrated from the Site into the proposed class area by various means, including air dispersion of particulate, overflowing settling ponds and illegal dumping. Expert testimony and testing of the soil and groundwater detected hazardous substances in the air, soil and groundwater, including the Clarks Run Watershed. The Clarks Run Watershed flows through Danville and empties into Herrington Lake, the source of drinking water for many thousands of people in the region.

16. Contamination of the area surrounding the Site by the Toxins of Concern (lead, arsenic, and TCE) is alleged to have affected properties in the areas of concern. As a real estate appraiser with significant experience in matters such as this one, I would anticipate that these effects should best be modeled in a systematic fashion, consistent with class treatment.

17. An additional common factor in this case is the effect on the local real estate market, and in particular a degree of stigma in market perceptions of the affected properties. Stigma is an adverse public perception regarding a property; the identification of a property with a condition (e.g., environmental contamination, a grisly crime) that exacts a penalty on the marketability of the property and may result in a diminution in value.[4] It is likely that buyers of property in the proposed class area will be or have been aware of the ongoing risk of soil and groundwater contamination because of the Corning/Philips operations. Stigma has been well documented as a common factor in peer-reviewed real estate literature (Mundy, 1992; Kilpatrick and Kummerow, 2006).[5]

## DESCRIPTION OF THE PROPOSED CLASS

18. The preliminary boundary of alleged airborne contamination, and thus the preliminary proposed class boundary, have been determined by other experts employed by plaintiffs' counsel. This area contains approximately 3,049 parcels. (See Figure 1.)

19. I am also informed by my clients that a potential subclass has been proposed which would include those properties affected by groundwater migration of the TCE plume. This plume has not yet been modeled, but I would expect, as a result of my prior work in similar cases, that the affected properties would be a smaller subset of the approximately 3,049 parcels in the larger airborne class. Nonetheless, for accurate and systematic modeling of real estate value impacts, I would recommend that modeling of this plume proceed immediately, and I would reserve the right to amend my findings when the TCE plume is accurately modeled.

---

[4] Appraisal Institute. 2010. *The Dictionary of Real Estate Appraisal, 5th Edition*. Appraisal Institute, Chicago.

[5] Mundy, Bill. 1992. "Stigma and Value." *The Appraisal Journal* (January 1992) 60(1):7–13.
Kilpatrick, John, and Max Kummerow. 2006. "Stigma Revisited Again." Presented at the 2006 American Real Estate Society (ARES) conference.

**Figure 1. Location of the Corning/ Philips Facility and Proposed Class Area**



## MASS TREATMENT IN DETERMINATION OF DAMAGES TO REAL ESTATE

20.    It is my opinion (based on my education, training, and experience, as well as evidence throughout this affidavit) that considering the diminution to individual properties without reference to the pattern of diminution across the proposed class would result in haphazard and inconsistent estimates of damages if these cases were adjudicated on an individual basis. Mass treatment allows for the assessment of damages through a coherent mapping of effects across the proposed class; thus, mass treatment leads to more consistent and reliable estimates of damages. In addition, the administrative costs of valuing the properties and estimating the damages would be greatly reduced in a mass appraisal exercise rather than property-by-property appraisals that utilize different appraisers.

21.    A major factor in favor of mass treatment of the properties in this case is the difficulty of assembling, analyzing, and interpreting sufficient data for credible and unbiased damages. Later in this affidavit, I outline sources of data regarding property characteristics that I believe are sufficient, in combination, to value the properties in the proposed class in a fair, accurate, and consistent manner.

22.    The process of comprehensively gathering, compiling, and geo-referencing data is complex but necessary when simultaneously valuing thousands of properties either individually or en-masse. Furthermore, extensive data cleaning and checking processes are required to eliminate the errors and omissions that naturally occur in even the best data sets. This quality control process requires time and expertise. It would be burdensome or impossible for individual owners to pay for this work and cumbersome for the Court(s) to adjudicate these cases. Moreover, if this work was performed independently for numerous owners by different analysts in individual cases, there would be severe challenges to ensure consistency of data, appraisal methods, and valuation conclusions across the many properties in the proposed class. Consolidation of properties into a class allows for a consistent method of value, which can be applied across the proposed class in a fair and equitable way, in both the impaired and unimpaired conditions.

23.    Handling valuation efforts through a mass appraisal process[6] allows for the achievement of significant economies of scale. That is, creating a single database for the entire class is far more efficient and less costly than obtaining data necessary for performing thousands of individual appraisals. From a real estate appraisal perspective, mass treatment provides a better and more efficient means of valuation. I will discuss valuation methods appropriate to this case more fully below.

24.    Various sources of data will allow determination of before and after—or unimpaired and impaired—values on the properties within the class, thus allowing me to assess damages according to the methods provided for by the *Uniform Standards of Professional Appraisal Practice* (USPAP) of The Appraisal Foundation. Specifically, USPAP guidance recommends

---

[6] Throughout this document I will refer to mass appraisal, hedonic and multiple regression models, automated valuation models (AVMs), and statistical analysis. For clarity, mass appraisal is a method approved by the *Uniform Standards of Professional Appraisal Practice* (USPAP) to systematically value a large number of properties simultaneously. Hedonic regression models are the most common techniques for accomplishing mass appraisal.

in Advisory Opinion 9[7] that damages to property values be determined by calculating the difference between the impaired and unimpaired values.

25.    To separate the effects caused by the contamination from the general market trends, carefully chosen control areas in the vicinity of the affected area can be used to differentiate between these two market variables. These tentative control areas will allow the valuation of the subject properties as if the contamination had not occurred, as well as provide a baseline for the overall property value trends in the greater metropolitan region. Separating the larger market trends from the "noise" of individual transactions and contamination effects requires a holistic approach best accomplished with a class-wide, mass appraisal method.

26.    Particularly in determining the impaired values, specialized expertise is required. As noted, Greenfield Advisors has several decades of experience in similar cases and has contributed substantially to the published literature, valuation theory, precedent cases, and valuation techniques required for determination of impaired values. This specialized study is beyond the scope of conventional appraisal. The requirement for more in-depth analysis of impairment effects argues for mass appraisal methods to obtain the efficiencies inherent in valuing many properties at once. These mass appraisal methods are well accepted in the appraisal community.

27.    Given my more than 30 years of professional appraisal experience, I expect to find within the proposed class instances where alternative appraisal methods and additional data collection may be helpful to determine values for other unusual or unique properties (in terms of uses, physical structures, size, title issues, or unusual location)  the affected properties, identifiable during the analysis of the non-residential and residential properties in the area.

28.    Non-residential properties will be valued within the same overall model. First, outliers will be addressed using a hybrid model based on modeled value with manual adjustments. This is specifically tailored for nonresidential properties. Second, submarket analysis will be conducted for the various property types. The number of nonresidential properties within the affected area will necessitate some specific data, but can be integrated into the broader mass appraisal model.

29.    I would note that throughout the United States, both residential and non-residential properties are valued via mass appraisal techniques. In Kentucky, for example, tax assessments are conducted via standards set forth by the IAAO, and indeed the Property Valuation Administrators ("PVA") in Kentucky, including Boyle County, are trained using the mass appraisal coursework proffered and administered by the IAAO.[8] Hence, mass appraisal of real property is a widely accepted and efficient method of appraising a large number of properties similarly situated or impacted.

---

[7] USPAP 2016-2017 at A-92 to A-96.

[8] Student Manual, Education and Professional Designation Program, Education and Research Section, Office of Property Valuation, Kentucky Department of Revenue, 2013.

30. As I move forward into the damages phase of this case, I may find hybrid appraisal methods and additional data collection helpful in finalizing values for properties with unusual features, title issues, etc., often thought of as outliers that fall within a specified stratum. In my experience as a real estate appraiser, I have found that properties best appraised with such hybrid methods have accounted for a small fraction, often less than 1%, of all properties in the mass appraisal set. Once these unique properties are included in the mass appraisal system, the consistency of the impaired valuation conclusions would be enhanced relative to one-property-at-a-time appraisal methods.

31. Individualized appraisals rely on untested personal judgments about the effects on value of various property characteristics; these judgments can vary between appraisers. AVMs allow for statistical testing of the significances of a characteristic through use of possibly hundreds of sales data points. Therefore, AVMs allow for more-consistent valuation across a large number of properties.

32. Therefore, I propose a mass appraisal approach involving the use of data sources that I have used, tested, and validated in previous cases, as well as data sourced from the Boyle County Tax Assessors office. This methodology has proven successful in many other similar situations, is fully consistent with applicable appraisal standards, has repeatedly been found to be applicable in Kentucky, and will provide an efficient, effective, and accurate means for determining property values.

## USPAP REQUIREMENTS FOR MASS APPRAISAL METHODS

33. USPAP defines a mass appraisal as "the process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing."[9] In addition, USPAP Standards Rule 6-1 comments: "Mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of value that allow for statistical review and analysis of results." This uniformity of approach in ascertaining damages to multiple properties is consistent with the objectives of fairness in the calculation of damages in litigation. Obviously, this mass appraisal approach is far more efficiently applied in a class treatment and is highly consistent with the objectives of class treatment. An automated valuation approach also provides a means for ensuring consistency of treatment across a large group of properties.

34. In carrying out a mass appraisal, the appraiser must "employ recognized techniques" for specifying and calibrating property valuation models.[10] USPAP Standard 6 on mass appraisal recognizes that available information may vary in local circumstances and allows for variation in methods due to variations in available data. The comment accompanying Standards Rule 6-5 includes the phrase "where applicable and feasible" regarding systems for collecting and maintaining "ownership, geographic [i.e., location], sales, income and expense, cost, and property characteristics data." The comment to Standards Rule 6-5 also suggests that data collection programs incorporate "a quality control program, including

---

[9] The Appraisal Foundation. *Uniform Standards of Professional Appraisal Practice* 2016–2017 Edition. Definitions p. U-4.

[10] USPAP Standards Rule 6-4 a, b, and c.

checks and audits of the data to ensure current and consistent records." These requirements clearly argue for mass appraisal treatment to ensure consistency and quality control with respect to both data and valuation models across the members of the class.

35.    An individual approach, on the other hand, would probably mean a large number of individual appraisers separately and independently valuing possibly thousands of properties in the proposed class area. Under such circumstances, structural, temporal, and locational adjustments are likely to vary widely across the set of class properties based on each appraiser's subjective analysis. Further confounding the issue are the different skill sets and market biases held by each of the large number of appraisers that would need to be employed to handle this valuation assignment. In this situation, it is difficult, if not impossible, to see how consistency of valuations, and hence damage assessments, could be achieved.

36.    USPAP Standards Rule 6-7 mandates "testing procedures and techniques to ensure that standards of accuracy are maintained." The comment appended to Standards Rule 6-7 states that:

> … appraisers engaged in mass appraisal have a professional responsibility to ensure that, on an overall basis, models produce value conclusions that meet attainable standards of accuracy. This responsibility requires appraisers to evaluate the performance of models, using techniques that may include but are not limited to, goodness-of-fit statistics, and model performance statistics such as appraisal-to-sale ratio studies, evaluation of hold-out samples, or analysis of residuals.

37.    This monitoring and evaluation of results implicitly recognizes the importance of consistency across a study area, such as a class area. Implementation of such quality control measures is well documented in the mass appraisal literature.

38.    Regarding mass appraisal quality control and appraisal error analysis, Greenfield Advisors has performed evaluation studies on mass appraisal AVMs using the ratio statistics referred to in USPAP Standards Rule 6-7 and by the International Association of Assessing Officers (IAAO) Technical Standards Committee.[11] Implicit in ratio statistics analysis is that a large number of appraisals are performed utilizing a single model and results are available for comparison to sales prices.

39.    In addition to a valuation team with both local market knowledge and statistical skills, I believe that methods I will employ for estimating values will result in accuracy, reliability, and consistency across the proposed class. The process that I have currently employed in this case includes the following steps:

- Conducting limited data sampling and verification under careful supervision to ensure accuracy, consistency, and completeness.

---

[11] International Association of Assessing Officers. "Ratio Study Practices in the United States and Canada: Results of 2011 Survey." *Journal of Property Tax Assessment & Administration* 9, issue 1 (2011).

- USPAP requires that mass appraisal reports must "describe the sources of data and data collection and validation processes."

- Classifying the affected properties into appropriate submarkets by areas and property types and testing candidate price-affecting variables by the criteria suggested in USPAP Standards Rule 6-7.

- Locating and analyzing sources of data on property characteristics and values for properties within the proposed class (see the "Data Sources" section later in this document). Data checking and verification will achieve the level of quality control required by USPAP and will exceed the IAAO standards for accuracy.

40.    Individual property valuation methods typically rely on small samples of comparable sales [e.g., three in the case of the widely used Uniform Residential Appraisal Report (URAR)].[12] Estimates from small samples are subject to random and significant statistical variation (Kilpatrick, 2010).[13] The artful appraiser senses which data are suitable for analysis using experience, local market knowledge, and conversations with persons familiar with the sale, thereby reducing random error within the sample but at the expense of introducing bias in the sample selection process.

41.    A mass appraisal method that looks at the broader geographical pattern and incorporates spatial analysis techniques will result in more stable, scientifically valid estimates of value impacts. Mass appraisal is better suited than individual valuations to sorting out the "signal" from the "noise" with respect to value changes while accounting for the effects of other property characteristics.

## MASS APPRAISAL AND AUTOMATED VALUATION

42.    USPAP is the governing paradigm for real estate valuation in Kentucky and other states, as I have cited above. Kilpatrick et al. (2005)[14] summarized mass appraisal methods as they are used in the appraisal of contaminated property and as they are applicable under USPAP. Kilpatrick (2004, 2005, 2007)[15] specifically applied the use of these techniques in class actions.  See 201 KAR 30:040, Sec. 4(1) (a).

---

[12] A standard form for reporting the appraisal of a dwelling; required by the major secondary mortgage purchasers. Also known as Form 1004.

[13] Kilpatrick, John A. 2010. "Appraisal Error Terms and Confidence Intervals." Presented at the 2010 annual meeting of the American Real Estate Society. Note: This paper won the 2010 award for Best Paper in Real Estate Appraisal from the Appraisal Institute.

[14] Kilpatrick, John A., Ron Throupe, Bill Mundy, and Will Spiess. 2005. "Valuation of Impaired Property." Chapter 6 in Simons, Robert, ed., *When Bad Things Happen to Good Property*. Washington, DC: Environmental Law Center.

[15] Kilpatrick, John A. 2004. "Real Estate Issues in Class Certification." *Class Action Litigation* 5(19):712–715.

Kilpatrick, John A. 2005. "Appraising Real Estate in Complex Environmental Class Actions: An Expert's View." *Toxic Law Reporter*, January 13, 2005.

Kilpatrick, John A. 2007. "Certifying the Real Estate Damages Class – An Appraiser's Perspective." A Greenfield Advisors White Paper.

43.     Multiple regression analysis is a statistical method used to explore the relationships between several independent variables and a dependent variable. For example, a real estate agent might record for each listing the size of the house, the number of bedrooms, the average income in the neighborhood, and a subjective rating of the appeal of the house. Once this information has been compiled for various houses, multiple regression analysis can be used to see whether and how these measures relate to the sales price for a house. For example, one might learn that the number of bathrooms is a better predictor of the sales price in a particular neighborhood than the subjective rating of "how pretty the house is."[16]

44.     An article in *The Appraisal Journal* by Colwell et al. (2009) highlighted favorable comments made by Judge Frank Easterbrook regarding the use of multiple regression analysis in litigation cases.[17] In *Guardian Pipeline, LLC v. 950.80 Acres of Land et al.*, Judge Easterbrook suggested that both parties could have produced value estimates using multiple regression analysis, a method that "has the potential to be faster, less expensive, and more accurate than a parade of witnesses offering estimates that cannot be verified."[18] Judge Easterbrook continued by citing the *Reference Manual on Scientific Evidence*, specifically Rubinfeld's *Reference Guide on Multiple Regression*.[19] The guide, published by the Federal Judicial Center,[20] thoroughly outlines the components of multiple regression analysis. Multiple regression analysis is characterized as a statistical tool for understanding the relationship between two or more variables. It is particularly useful in determining whether a particular effect is present, measuring a particular effect, and forecasting what a particular effect would be, but for an intervening event. Colwell et al. also noted that the admissibility was governed by Federal Rule of Evidence 702 and that a significant implication from the decision was that there is a preference for systematic and defensible analysis. In my professional appraisal opinion, it is impossible to read Judge Easterbrook's opinion and Colwell et al. without recognizing that their findings regarding the preference of mass appraisal are wholly relevant to this case.

45.     The overwhelming weight of prevailing valuation methodology and USPAP make it difficult, if not impossible, to consider the valuation issues associated with this case without resorting, at least de facto, to an AVM. Prevailing thought among academic researchers is that large-scale valuation issues can be best described using large-scale

---

[16] StatSoft, Inc. 2010. *Statistics Textbook*. Tulsa, OK: StatSoft. http://www.statsoft.com/textbook/multiple-regression/.

[17] Colwell, P., J. Heller, and J. Trefzger. 2009. "Expert Testimony: Regression Analysis and Other Systematic Methodologies." *The Appraisal Journal* (Summer 2009) 77(3):253–262.

[18] Guardian Pipeline, LLC v. Acres of Land, 525 F.3d 554, 559 (7th Cir. 2008).

[19] Rubinfeld, Daniel L. 2000. "Reference Guide on Multiple Regression." In *Reference Manual on Scientific Evidence*, Second Edition. Federal Judicial Center.

*See also* Rubinfeld, Daniel L. 2011. "Reference Guide on Multiple Regression." pp. 303–358 in *Reference Manual on Scientific Evidence*, Third Edition. Federal Judicial Center. Washington, DC: National Academies Press.

[20] http://www.fjc.gov/.

statistical models, and those models meet the criteria outlined in Daubert.[21] Quoting from USPAP Standards Rule 6-1(a), "Mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of value that allow for statistical review and analysis of results."[22]

46.    In the case of complex goods such as houses or other real estate assets, economic theorists have shown that the prices buyers are willing to pay can be thought of as the sum of what they are willing to pay for particular property characteristics (Lancaster, 1968; Rosen, 1974).[23] These property attributes are called "hedonic characteristics" or variables, from a Greek word meaning "pertaining to pleasure" or "relating to like or dislike." Real estate prices can therefore be represented and explained through hedonic models (a type of multiple regression analysis) in the following form:

Price = sum of values of individual property characteristics

47.    A multiple regression analysis applied to housing markets is often called a hedonic pricing model. This model uses data on actual sales transactions to estimate buyers' marginal willingness to pay for certain home characteristics, such as an additional bathroom, or other variables which help explain value in a statistically significant fashion, such as location, sale date, or tax assessed value. The following equation is often used to convey the general form of the hedonic pricing model in statistical terms[24]:

$$P_i = \beta_0 + \beta_1 X_1 + \beta_2 X_2 + \ldots + \beta_N X_N + \varepsilon_i$$

48.    In this equation, $P_i$ is the price the buyer pays for a property $i$; $\beta_0$ is the y-intercept of the equation; $\beta_1$ is the marginal willingness to pay (expressed in dollars) for home characteristic $X_1$; $\beta_2$ is the marginal willingness to pay (expressed in dollars) for home characteristic $X_2$; $\beta_N$ reflects the marginal willingness to pay (expressed in dollars) for any other characteristic ($X_N$) that influences the sales price of a home; and $\varepsilon_i$ is the error term associated with the equation.

49.    Hundreds of peer-reviewed academic and professional journal papers have been published reporting statistically significant estimates of the price effects of a wide variety of hedonic characteristics in various markets.[25] Not all property characteristics affect prices positively.

---

[21] For an authoritative view of the real estate analysis perspective on appropriate methods under Daubert, see McLean, Dave, Bill Mundy, and John A. Kilpatrick. 1999. "Summation of Evidentiary Rules for Real Estate Experts Mandated by Daubert v. Merrell Dow Pharmaceuticals, Inc." *Real Estate Issues* (Fall 1999) 24(3):24–33.

[22] *Uniform Standards of Professional Appraisal Practice* (2016-2017) SR 6-1(a) pp. U-39.

[23] Lancaster, K.J.A. 1966. "A New Approach to Consumer Theory." *Journal of Political Economy* 74(2):132–157.

Rosen, S. 1974. "Hedonic Prices and Implicit Markets: Price Differentiation in Pure Competition." *Journal of Political Economy* 82(1):34–35.

[24] In practice, a weighting or transformation is applied, such as a logarithmic transformation, to address non-normalities in the data. See Box, G.E.P., and D.R. Cox. 1964. "An Analysis of Transformations." *Journal of the Royal Statistical Society, Series B*, 26:211–252.

[25] Sirmans, G. Stacy, Lynn McDonald, David A. MacPherson, and Emily Zietz. 2006. "The Value of Housing Characteristics: A Meta Analysis." *Journal of Real Estate Finance and Economics* 33(3):215–40.

Negative characteristics such as age or physical deterioration reduce prices in hedonic models.

50.   Our firm has a unique and longstanding record as analysts of real estate values. The Greenfield Advisors staff includes PhDs with extensive price modeling experience, and we have been pioneers in developing new methods for more fairly and accurately assessing damages to property values due to contamination and other factors. Greenfield Advisors has, in many cases, produced results deemed by courts to be fair, equitable, and the best that can reasonably be achieved to reflect a standard of justice between the parties within the limits of human knowledge and abilities. We aim to use best practices or state-of-the-art methods for estimating fair and reasonable damages.

51.   Econometricians use a statistical method called *regression* to find the best-fitting coefficients (β's) to multiply by the amounts of each characteristic to derive a price estimate. The coefficients are estimated from the data by minimizing the total of squared errors in the prediction of price from the hedonic variables. It is important to point out that this is a relatively objective method involving mathematical algorithms. In comparison to conventional appraisal methods based on ad hoc judgment and experience for estimating price impacts of property coefficients, this statistical estimation technique offers far more consistency, objectivity, and transparency. This consistency and objectivity are extremely desirable features of a valuation method whose purpose is to assess damages equitably across a large sample of properties. Transparency is desirable because it allows others to replicate our work.

52.   Consistent with USPAP Standard 6, which sets forth mass appraisal standards, academics have found that multivariate statistical methods, such as the hedonic pricing model, overcome the shortcomings of one-at-a-time appraisals. Hedonic models have been widely used in the valuation field for at least three-quarters of a century. Bruce and Sundell (1977) showed that such models were used as early as 1924 for appraising rural land and in 1935 for appraising forestland in New Hampshire.[26] Lentz and Wang (1998) stated that "Most appraisal textbooks advocate this method as an essential tool for mass appraisal."[27]

53.   The application of such models to the appraisal process in cases such as this one has strong foundations in the peer-reviewed economics and real estate literature. The early development of theory and methods included studies by Tiebout (1956),[28] Lancaster (1966),[29] Muth (1966),[30] Oates (1969),[31] and Rosen (1974).[32] Subsequent studies have

---

[26] Bruce, R.W., and D.J. Sundell. 1977. "Multiple Regression Analysis: History and Applications in the Appraisal Profession." *Real Estate Appraisal and Analyst* 43(1):37–44.

[27] Lentz, George H., and Ko Wang. 1988. "Residential Appraisal and the Lending Process: A Survey of Issues." *Journal of Real Estate Research* 1988 15(1/2):11–39.

[28] Tiebout, C.M. 1956. "A Pure Theory of Local Expenditure." *Journal of Political Economy* 64(October 1956):416–424.

[29] Lancaster, 1966. "A New Approach to Consumer Theory." *Journal of Political Economy* 74(2):132–157.

[30] Muth, R.F. 1966. "Household Production and Consumer Demand Functions." *Econometrica* 34(3):699–708.

[31] Oates, W.E. 1969. "The Effects of property Taxes and local Public Spending on Property Values: An Empirical Study of Tax Capitalization and the Tiebout Hypothesis." *Journal of Political Economy* 77(6):957–71.

[32] Rosen, 1974. "Hedonic Prices and Implicit Markets." *Journal of Political Economy* 82(1):34–55.

advanced the development work. Randolph (1988)[33] reviewed the statistical properties of residuals. Dubin (1988)[34] examined spatial autocorrelation. Halversen and Pollakowski (1981),[35] Dubin and Sung (1990),[36] and Burgess and Harmon (1991)[37] discussed the functional form of the valuation model. Gau and Kohlhepp (1978)[38] examined collinearity among the variables in the valuation model used in a mass appraisal.

54.    Both Butler (1980)[39] and Bajic (1985)[40] discussed the market homogeneity issues. Mark (1983)[41] looked at the time-stability of the coefficients in a mass appraisal model. Parsons (1990)[42] and Smith and Huang (1994)[43] examined market conditions within a mass appraisal model. Atkinson and Crocker (1987)[44] investigated the optimum number of variables in a model. Most recently, research by Ross et al. (2011)[45] showed that bias can be cleared out of the hedonic regression coefficients by using the quadratic form of the X- and Y-coordinates to control for the absolute location of properties.

55.    Recent improvements in computing power, spatial statistics, and modeling theory have greatly increased the reliability and accuracy of regression-based mass appraisal techniques. The biggest gains have come from two major methodological changes. The first is the recognition of the importance of submarkets and the associated techniques used to

---

[33] Randolph, R. 1988. "Estimation of Housing Depreciation: Short Term Quality Change and Long Term Effects." *Journal of Urban Economics* 23:162–78.

[34] Dubin, R.A. 1988. "Estimation of Regression Coefficients in the Presence of Spatially Autocorrelated Error Terms." *Review of Economics and Statistics* 70(3):466–474.

[35] Halversen, R., and H.O. Pollakowski. 1981. "Choice of Functional Form for Hedonic Price Equations." *Journal of Urban Economics* 10:37–49.

[36] Dubin, R.A., and C. Sung. 1990. "Specifications of Hedonic Regressions: Non-nested Tests on Measures of Neighborhood Quality." *Journal of Urban Economics* 27:97–110.

[37] Burgess Jr., J.F., and O.R. Harmon. 1991. "Specification Tests in Hedonic Models." *Journal of Real Estate Finance and Economics* 4:375–93.

[38] Gau, G.W., and D.B. Kohlhepp. 1978. "Multicollinearity and Reduced-Form Price Equations for Residential Markets: An Evaluation of Alternative Estimation Methods." *Journal of the American Real Estate and Urban Economics Association* 6(1):50–69.

[39] Butler, R.V. 1980. "Cross-Sectional Variation in the Hedonic Relationship for Urban Housing Markets." *Journal of Regional Science* 20(4):439–54.

[40] Bajic, V. 1985. "Housing Market Segmentation and Demand for Housing Attributes: Some Empirical Findings." *Journal of the American Real Estate and Urban Economics Association* 13(1):58–75.

[41] Mark, J.H. 1983. "An Empirical Examination of the Stability of Price Equations over Time." *Journal of the American Real Estate and Urban Economics Association* 11(3):397–415.

[42] Parsons, G.R. 1990. "Hedonic Prices and Public Goods: An Argument for Weighting Locational Attributes in Hedonic Regressions by Lot Size." *Journal of Urban Economics* 27:308–21.

[43] Smith, V.K., and J. Huang. 1994. "Can Markets Value Air Quality? A Meta-Analysis of Hedonic Property Value Models." *Journal of Political Economy* 103(1):209–227.

[44] Atkinson, S.E., and T.D. Crocker. 1987. "A Bayesian Approach to Assessing the Robustness of Hedonic Property." *Journal of Applied Econometrics* 2(1):27–45.

[45] Ross, J.M., M.C. Farmer, and C.A. Lipscomb. 2011. "Inconsistency in Welfare Inferences from Distance Variables in Hedonic Regressions." *Journal of Real Estate Finance and Economics* 43(3):385–400.

delineate them. The second is the use of spatial modeling techniques to better capture the influence of location on housing prices.

56.     The acknowledgement of housing submarkets within a larger geographic area can be traced back to Straszheim (1974).[46] Since that time, a considerable amount of research has been applied to finding the optimum process for delineating local submarkets. The collection of techniques ranges from simple use of pre-existing political boundaries such as ZIP codes (Goodman and Thibodeau, 2003)[47] to complex statistical methods such as k-means clustering (Bourassa et al., 1999; Day, 2003),[48] principal component analysis (MacLennan and Tu, 1996),[49] factor analysis (Dale-Johnson, 1982),[50] or iterative sorting algorithms that combine multiple statistical methods (Lipscomb and Farmer, 2005).[51]

57.     The second recent major improvement in hedonic modeling is spatial econometrics. The basic premise of these new methods is that location affects pricing structure—an axiom to seasoned appraisal veterans, but a problem that requires complex mathematics to solve econometrically. Notably, statistically robust locational adjustments can best be developed using a large data set, consistent with mass appraisal techniques. In recent years, numerous software packages have been developed to aid in analyzing spatially cognizant models.

58.     Li and Brown (1980)[52] offered an early attempt at classifying spatial effects with a micro-neighborhood approach based on proximity to nonresidential uses. Pace and Gilley (1998)[53] used spatial autoregressive techniques in combination with grid estimators to outperform a traditional non-spatial OLS regression. Brasington and Hite (2005)[54] employed a spatial lag[55] model, while Case et al. (2004)[56] and Boxall et al. (2005)[57] used

---

[46] Straszheim, M. 1974. "Hedonic Estimation of Housing Market Prices: A Further Comment." *Review of Economics and Statistics* 56:404–406.

[47] Goodman, A., and T. Thibodeau. 2003. "Housing Market Segmentation and Hedonic Prediction Accuracy." *Journal of Housing Economics* 12(3):181–201.

[48] Bourassa, S., F. Hamelink, M. Hoesli, and B. MacGregor. 1999. "Defining Housing Submarkets." *Journal of Housing Economics* 8:160–183.

Day, B. 2003. "Submarket Identification in Property Markets: A Hedonic Housing Price Model for Glasgow." University of East Anglia CSERGE Working Paper.

[49] MacLennan, D., and Y. Tu. 1996. "Economic Perspectives on the Structure of Local Housing Systems." *Housing Studies* 11:387–406.

[50] Dale-Johnson, D. 1982. "An Alternative Approach to Housing Market Segmentation." *Journal of Urban Economics* 27:311–332.

[51] Lipscomb, C.A., and M.C. Farmer. 2005. "Household diversity and market segmentation within a single neighborhood." *Annals of Regional Science* 39:791–810.

[52] Li, M.M., and H.J. Brown. 1980. "Micro-Neighborhood Externalities and Hedonic Housing Prices." *Land Economics* 56(2):125–141.

[53] Pace, R.K., and O.W. Gilley. 1998. "Generalizing the OLS and Grid Estimators." *Real Estate Economics* 26(2):331–346.

[54] Brasington, D., and D. Hite. 2005. "Demand for Environmental Quality: A Spatial Hedonic Analysis." *Regional Science and Urban Economics* 35:57–82.

[55] A spatial lag is a measure of a geographically proximate property. For example, the price of the nearest sold property can be added to the model as a predictor variable.

spatial error correction to predict prices. Subsequent work by Cohen and Coughlin (2006)[58] combined both the lag and error models to value properties near the Atlanta airport. Both Bitter et al. (2007)[59] and Carruthers and Clark (2009)[60] used geographically weighted regression, a technique first laid out by Fotheringham et al. (2002).[61]

59. USPAP admonishes real estate appraisers to focus on valuation issues and not stray into the practice of law in litigation matters. Nonetheless, it is helpful for appraisers to be aware of and discuss the legal context in which a particular appraisal assignment will be used (USPAP Standards Rule 2-2). Jackson (2010)[62] provided helpful guidance for appraisers in the class certification context, and it is clear that the *Modern Holdings, LLC, et al. v. Corning Incorporated, et al.* case, from an appraisal perspective, is ripe for valuation in a manner consistent with class certification.

60. Jackson (2010) referred to the predominance requirement and stated that in a class action, questions of law or fact must predominate over any questions affecting individual members. In these situations, class action is the superior method for fair and efficient adjudication. Second, the issue of merits can sometimes overshadow considerations related to class certification. The implications for the analyst may be that the valuation problem may be undefined prior to certification. This can set the stage for the analyst to address merit issues on a pre-certification basis, a task that requires great care to communicate results in a manner that is not misleading. Lastly, the diminution framework should consider the three effects (cost, use, and risk) per the guidance of USPAP Advisory Opinion 9. Within this framework, it can be challenging, if not impossible, to accurately measure environmental effects without systematically analyzing the properties, consistent with a mass appraisal.

61. AVMs are based on regression, neural networks, expert systems, and any number of combinations of the above, and other mass appraisal techniques. AVMs are routinely used by lenders in both the primary and secondary mortgage markets to detect fraud, incompetence, or bias in conventional appraisals. This major change in underwriting methods provides strong evidence that lenders believe that AVM accuracy is sufficiently

---

[56] Case, B., J. Clapp, R. Dubin, and M. Rodriguez. 2004. "Modeling Spatial and Temporal House Price Patterns: A Comparison of Four Models." *Journal of Real Estate Finance and Economics* 29(2):167–192.

[57] Boxall, P, W. Chan, and M. McMillan. 2005. "The Impact of oil and natural gas facilities on rural residential property values: a spatial hedonic analysis." *Resource and Energy Economics* 27:248–269.

[58] Cohen, J., and C. Coughlin. 2006. "Spatial Hedonic Modeling of Airport Noise, Proximity, and Housing Prices." *Federal Reserve Bank of St. Louis Working Paper.*

[59] Bitter, C., G. Mulligan, and S. Dall'erba. 2007. "Incorporating Spatial Variation in Housing Attribute Prices: A Comparison of Geographically Weighted Regression and the Spatial Expansion Method." *Journal of Geographic Systems* 9:7–27.

[60] Carruthers, J., and D. Clark. 2009. "Valuing Environmental Quality: A Space-based Strategy." U.S. Department of Housing and Urban Development working paper #REP 07-01.

[61] Fotheringham, A., C. Brunsdon, and M. Charlton. 2002. *Geographically Weighted Regression: The Analysis of Spatially Varying Relationships.* Chichester, UK: John Wiley.

[62] Jackson, Thomas O. 2010. "Real Property Valuation Issues in Environmental Class Actions." *The Appraisal Journal* (Spring 2010) 78(2):141–149.

good so that they can improve their risk and return results by relying on mass appraisal methods as their primary means for documenting property values.

62.   Numerous AVM products are now available for purchase by lenders or by consumers on-line. These important developments prove that those who rely on appraisals as part of their fiduciary responsibilities in real estate lending businesses have chosen in many cases to rely on AVMs in preference to conventional appraisals. This is market evidence of the growing competitiveness and accuracy of these commercially available AVMs. Anecdotal evidence suggests that recent problems in the sub-prime mortgage market may be due more to bias in conventional appraisals than the inaccuracy of AVM methods. As *Daubert* requires, statistically based, objective mass appraisal methods move appraisal practice toward a more scientific approach based on objective inference from empirical data.

63.   For example, from 2007 through 2010, Greenfield Advisors provided annual evaluations of AVM products to First American Commercial Due Diligence Services of First American Professional Real Estate Services. First American, a Fortune 500 company, marketed two AVM products to lender clients (including major banks) for use in underwriting loans or tracking portfolio performance on small commercial properties selling for less than $5 million. Our evaluation reports calculated statistics such as valuation to sales price ratios, mean absolute errors, coefficients of dispersion (CODs), and portfolio exposures to potential loan losses at various loan to value ratios from a national sample of sales prices and valuations. First American used this independent analysis of their automated valuation products' performance to inform their clients and help clients manage risks associated with differences between valuations and sales prices.

## RELEVANT LITERATURE REVIEW

64.   In this literature review, we focus on studies specific to the contamination of real estate and when possible focus on contamination of soil, surface water, and groundwater. These studies provide a range of economic effects, including property value diminution and reduced marketability of one's home. Physical repairs are an additional matter for consideration, though we were not asked to opine specifically on the cost-to-cure.

### Property Rights and Homeowners' Perceptions of Impairment

65.   The rights of ownership are a bundle of rights that every property owner possesses in the real estate they own. These rights are what make property worth owning, and they have both intrinsic value and market value. When these rights are usurped by impairment, property values are affected.

66.   Edelstein (1986) specifically stressed the investment diminution aspect of his "inversion of home principle," when a home changes from a place of security and identity to one of danger and defilement.[63] Citing case studies from the Legler section of Jackson Township, New Jersey, where there was toxic chemical contamination of groundwater, he showed

---

[63] Edelstein, Michael R. 1986. "Toxic Exposure and the Inversion of the Home." *Journal of Architectural Planning and Research* 3:237–251.

that residents could not separate the psychological pride in home ownership from the question of economic value. Surveys of the population revealed a generally uniform opinion that property values had diminished because of the problem.

67.    Lunz (1989) noted that owners with contaminated groundwater underlying their properties have had their bundle of rights diminished.[64] As a result, the properties lose both their preservation and value creation potential. For owners of properties with contamination such as in this case, the bundle of rights may in fact be reduced to the single right of owner occupancy, and given potential health factors, even the right of occupancy may be limited.

68.    Market value is generally established on the basis of sales of similar goods or property in the same locality, but where there have been no such prior sales, there is no single measure of value, and other evidence of value must be looked to. Market value is generally regarded as synonymous with actual value, cash value, and fair market value.

69.    Local transactional evidence after the contamination, as such exists, will be carefully examined to determine if in fact such transactions are indeed evidence of market value. Page and Rabinowitz (1993), for example, found three disconnects in value perceptions by homeowners which may affect post-event transactions:

- Residential property owners often are not informed, and buyers are not aware of the contamination. Real estate agents and brokers avoid discussing environmental issues with prospective buyers, and residential appraisers often fail to address the issue of hazardous materials or contamination, even though a fair market presumes a knowledgeable, prudent buyer.

- Residential property owners fail to perceive the risks associated with the ownership of property near toxic contamination.

- Due to the high value society places on home ownership, homebuyers feel that they will be protected from contamination problems, again failing the "knowledgeable, prudent buyer" test.[65]

70.    McClelland et al. (1990) examined landfill effects and perceptions of risk by nearby residential property owners.[66] They found that a significant number of property owners do not fully know or understand the health risks associated with nearby contamination, even when they are fully aware of the source. The authors used surveys to explore the relationship between risk perception and property values. Their findings highlighted the fact that off-site contamination causes many issues similar to on-site contamination. However, if off-site contamination negatively affects property, this effect must diminish as

---

[64] Lunz, Robert. 1989. "Groundwater contamination and real estate value: How what is below affects what is above." *U.S. Water News*, October 1989, p. 13.

[65] Page, G. William, and Harvey Rabinowitz. 1993. "Groundwater Contamination: Its Effects on Property Values and Cities." *APA Journal*, Autumn, pp. 473–481.

[66] McClelland, George, W.D. Schulze, and B. Hurd. 1990. "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site." *Risk Analysis* 10(4):485–497.

a function of distance, or else all property would suffer identical results from off-site contamination.

## How Markets React to Contamination

71.     Before exploring the consequences of toxic chemical exposure on property value, we must first examine the major factors that influence how the market reacts to the environmental contamination or impairment. Several empirical studies have examined this relationship; they indicate that proximity (physical closeness) to environmental contamination and the spread of information about the contamination play key roles in determining the nature and degree of the effect on the market.

72.     Even though his work builds on the works of 18th and 19th century economists, particularly the German economist von Thünen, Muth (1969) is probably the best-known proponent of the spatial gradient theory of real estate demand, which states that demand increases (decreases) the closer one is to a positive (negative) influence.[67] For example, the positive effect of a park is greater the closer you are to it; similarly, the negative effect of contamination is less the farther you are from it. Jackson (1979), Li and Brown (1980), Reichert et al. (1992), and many others have empirically confirmed negative demand gradients due to proximity to environmental contamination.[68]

73.     The release of public information about contamination triggers a decrease in nearby property prices. However, the effect can vary widely from community to community, from among what Fessenden-Raden et al. (1987) called "…various publics within the community," and through time.[69] The authors showed that the public perception of the value effects can vary, depending on independent factors. For example, a family with small children may pay more attention to the threat and react more quickly than an elderly retiree. Further, the authors cited a specific case of water supply pollution caused by a manufacturing plant to demonstrate that an entire population may be slow to react to a threat.

74.     By contrast, Kiel (1995) illustrated a market wary of contamination and slow to react positively, even after remediation.[70] She examined housing values in Woburn, Massachusetts, a community with two Superfund sites, one of which was a source of trichloroethylene (TCE) groundwater contamination. Kiel reviewed the values of more than 2,000 houses from 1975 to 1992, using regression techniques with specified time

---

[67] Muth, R. 1969. *Cities and Housing.* Chicago: University of Chicago Press.

[68] Jackson, Jerry R. 1979. "Intraurban Variation in the Price of Housing." *Journal of Urban Economics* 6:464–479.

Li, Mingche M., and H. James Brown. 1980. "Micro-Neighborhood Externalities and Hedonic Housing Prices." *Land Economics* 56(2):125–141.

Reichert, Alan K., Michael Small, and Sunil Mohanty. 1992. "The Impact of Landfills on Residential Property Values." *Journal of Real Estate Research* 7(3):297–314.

[69] Fessenden-Raden, June, Janet M. Fitchen, and Jenifer S. Heath. 1987. "Providing Risk Information in Communities: Factors Influencing What is Heard and Accepted." *Science, Technology, and Human Values*, Summer/Fall, 12(3&4):94–101.

[70] Kiel, Katherine A. 1995. "Measuring the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on Housing Values." *Land Economics* 71(4):428–435.

periods: pre-announcement phase, discovery phase, announcement phase, and cleanup-identified phase. She also analyzed the effects of distance from the sites and discounted values of future rents that would be earned on the residences. Her study indicated that information made public on the toxicity of sites affects housing prices, and that the public does not necessarily believe official announcements that contaminated sites will be cleaned up.

75.    Zabel (2007) examined the effect of imperfect information on the transaction of contaminated property and demonstrated (theoretically) that imperfect information can deter socially optimal transactions.[71] The author noted that the deterrence effect of liability appears to contradict the economic theory that a properly functioning market should capitalize or include the costs associated with environmental liabilities into the selling price and thus not deter transactions or sales. Assuming the seller and buyer have full information about the environmental impairment, transactions involving impaired properties should proceed similarly to those of unimpaired properties. Zabel noted that several factors could influence transactions, including uncertainty regarding liability, differences in seller and buyer risk aversion, differences in buyer and seller default rate, externalities, property characteristics, and incomplete information about the level of contamination. Factors also include different types of asymmetric information, such as when one party has more information than the other, or when both buyer and seller have the same information but the actual level of contamination is greater (this is referred to as "partial information"). Lastly, there are circumstances where sellers refuse to sell properties because they believe conventional environmental inspections could reveal additional contamination, and the additional costs they would then incur would be greater than the benefits from a sale. Thus, these properties are not sold, which the author referred to as "mothballing."

76.    Simons (2002) captured several longitudinal trends that characterize the real estate market after a contamination announcement:[72]

- It often takes years for information about contamination to fully diffuse or spread in a market place. As a result, many transactions occur that otherwise might not have been completed, or they occur at prices or within time frames that are not indicative of a market at equilibrium—one where sales occur regularly and prices are determined by an equal number of knowledgeable sellers and buyers. Notably, the definition of market value that appraisers most commonly use, and that federally insured mortgage appraisals require, includes a requirement that comparable transactions used for appraisals represent *"… buyer and seller each acting prudently, knowledgeably…."*

- In the short run, buyers often have few alternatives, and this truncated supply of properties results in a disequilibrium. Our research bears this out, and as such, transactions in the market are constrained by supply.

---

[71] Zabel, Jeffrey. 2007. "The Impact of Imperfect Information on the Transactions of Contaminated Properties." *National Center for Environmental Economics*, Working Paper Series, January.

[72] Simons, Robert. 2002. "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Technique Approach." *The Appraisal Journal* 70(4):388–400.

- In the short run, sellers have reservation prices below which they cannot transact a sale; these set prices are often due to outstanding liens, mortgage loans, and selling costs. Kinnard (1992) suggested that there is more information in sales that do not occur than in sales that did.[73]

- In the long run, buyers find alternatives, and sellers reduce their reservation prices (at least in real terms). This affects long-term price trends: these trends can be reduced compared to trends for otherwise unaffected properties, or they can be negative in real terms for a time until a new market equilibrium emerges at a lower range of values.

77.  Bell (1998) presented a framework for analyzing a variety of detrimental conditions, including environmental contamination.[74] The framework requires the analyst to value the property as if there were no contamination (referred to as a benchmark), then compare this result to the "as is" value of the property in its actual contaminated state. Bell distinguished between value effects due to remediation costs and the effects of additional risk attributable to contamination. He referred to these additional risks as either "project incentive" or "market resistance."

78.  From this brief review of contamination in housing markets, we can see market reactions may vary, but usually react based on available information, or even misinformation. As such, when a market area becomes contaminated or has an impairment event occur, there is usually a negative market reaction towards the properties involved. We discuss the effects of environmental impairment on property values in the section to follow.

## Environmental Impairment Causes Value Diminution

79.  The effects of contamination on property value have been documented in the academic literature for decades. Empirical studies quantify (or express the quantity of) the loss in property value that results from toxic exposure in a variety of contamination contexts.

80.  About 27 years ago, two seminal articles by Patchin (1988) and Mundy (1991) brought contaminated property valuation issues to the attention of the appraisal profession. Since that time, hundreds if not thousands of additional studies have been conducted on the impacts of contamination and other negative factors on property values.[75]

81.  Kinnard and Beron (1998)[76] considered 10 classifications of detrimental conditions and the temporal patterns of property price loss. In the eighth category, which included groundwater contamination and leaking underground storage tanks (LUSTs), property values dropped significantly upon the discovery of a detrimental condition.

---

[73] Kinnard, William. 1992. "Measuring the Effects of Contamination on Property Values." *Environmental Watch* (published by the Appraisal Institute), Winter, 4(4):1–4.

[74] Bell, Randall. 1998. "The Impact of Detrimental Conditions on Property Values." *The Appraisal Journal* 66(4):380–391.

[75] For a list of studies, see Simons, R., and J. Saginor. 2006. "A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Real Estate Values." *Journal of Real Estate Research* 28:71–104.

[76] Kinnard, William, and Gail Beron. 1998. "The Persistence of Memory: A Study of Pre- and Post-Remediation Stigma." American Real Estate National Conference, Monterey, California. Presented on April 18, 1998.

82.    Simons et al. (2001) studied an oil pipeline rupture in Prince Georges County, Maryland. The authors found a range of post-spill discounting from 10.9% to 40%. Additionally, nearby recreational trustees report a 10% reduction in visitation for the first year after the spill.[77]

83.    In a series of studies, Brasington and Hite (2005) focused on the six major metropolitan areas in Ohio: Akron, Cincinnati, Cleveland, Columbus, Dayton, and Toledo.[78] They estimated the relationship between house prices and environmental disamenities in 44,255 transactions. While the results varied between communities, the study confirmed that environmental disamenities depress housing prices. On average, taking a house that is slightly farther than ½ mile from a hazard and moving it ½ mile closer would result in a mean welfare loss (lost value) of $3,278, or about 6% of the value of the house.

84.    Empirical studies of the effects of soil contamination on property values have demonstrated a negative relationship. For example, Berrens (2002, 2003)[79,80] found that properties located adjacent to former smelters in Corpus Christi and El Paso, Texas, experienced significant decreases in property values.

85.    Analyses of larger affected areas led to similar findings. Ho and Hite (2004)[81] used a hedonic price model to estimate the tradeoff between environmental and health risks and home values in a large data set of 755 counties in Arkansas, Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee. As proxies for health and environmental risks, the authors used environmental disamenities such as toxic chemical releases and Superfund sites. The mean value of houses in the study area was $70,684, and the mean release was 4,500 pounds of chemical per person. The authors found that a reduction in total release of 1 pound per person lead to an estimated increase of $3.15 in house value. Likewise, a county that is classified as high release could expect to see its average house value decrease by $16,660, or 23.6% of the mean value.

86.    In a similar study, Decker et al. (2005)[82] examined Douglas County, Nebraska, the most populated of the five counties in the Omaha metropolitan statistical reporting area. The authors used Toxics Release Inventory (TRI) data as a proxy for environmental hazard and

---

[77] Simons, Robert A., Kimberly Winson-Geideman, and Brian A. Mikelbank. 2001. "The Effects of an Oil Pipeline Rupture on Single-Family House Prices." *The Appraisal Journal* 69(4):410–418.

[78] Brasington, David M., and Diane Hite. 2005. "Demand for Environmental Quality: A Spatial Hedonic Analysis." *Regional Science and Urban Economics* 35:57–82.

[79] Berrens, Robert P., Hank C. Jenkins-Smith, Carol L. Silva, and Alok Bohara. 2002. "Information Disclosure Requirements and the Effect of Soil Contamination on Property Values." *Journal of Environmental Planning and Management* 45(3):323–339.

[80] Berrens, Robert P., Hank C. Jenkins-Smith, Carol L. Silva, and Alok Bohara. 2003. "The Effect of Environmental Disclosure Requirements on Willingness to Pay for Residential Properties in Borderlands Community." *Social Science Quarterly* 84(2):359–378.

[81] Ho, Sau Chau, and Diane Hite. 2004. "Economic Impact of Environmental Health Risks on House Values in Southeast Region: a County-Level Analysis." Presented at the American Agricultural Economics Association Annual Meeting, Denver, Colorado, August 1, 2004.

[82] Decker, Christopher S., Donald A. Nielsen, and Roger P. Sindt. 2005. "Residential Property Values and Community Right-to-Know Laws: Has Toxics Release Inventory Had an Impact?" *Growth and Change* (Winter 2005) 36(1):113–133.

found a significant link between release information and housing values. Of note is their finding that properties located within 3 miles of a former ASARCO smelter (which is now on the National Priorities List) were reduced in value 24% to 25%.

## Stigma

87. A common term in appraisal and real estate economics literature, *stigma* refers to a very specific quantitative mechanism by which value is affected by either nearby or previous negative externalities. Many states have defined stigma with respect to the valuation of contaminated property as "a perception that property value is negatively affected despite contamination clean-up."[83]

88. The concept of stigma partially explains the negative market effects related to environmental impairment. A large portion of the prominent literature on the valuation of environmentally impaired property defines, explores, and quantifies stigma.

89. The process of stigmatizing something (originally, a person, but now also applied to real estate) applies a label to mark its deviant status. This marking typically has devastating consequences on emotions, thoughts, and behaviors. Many characteristics are applied to the perceived deviant person or thing: they are flawed, blemished, discredited, spoiled, or stigmatized. The mark may or may not be physical; it may be embedded in behavior, biography, ancestry, or group membership.[84]

90. Environmental stigma results from an undesirable event that disrupts the balance of an environmental system.[85] Blame is associated with this disruption. When environmental features are perceived as repellent, upsetting, or disruptive, they are stigmatized as undesirable. Environmental stigma can result from a number of causes. Technologies, such as petroleum processing, nuclear power plants, waste processing, and high-voltage transmission lines, may be a source of environmental stigma. Activities, such as the transportation of hazardous materials, the development of hazardous storage sites, or the underground storage of petroleum products, may be another source. A third source may be the character of products themselves, such as petroleum-based products, chemicals, solvents, and agricultural products associated with health risks.

91. The consequences of an environmental stigma can be direct or indirect. Direct consequences of various stigmas include decreased occupancy, a lower market price, reduced sales volume, less favorable terms of lending or sale, and increased marketing time for single-family residences. Indirect consequences include the general exodus of residents from an area affected by contamination, regardless of whether their homes are directly affected by the contamination (e.g., Love Canal, New York, and Times Beach, Missouri).

---

[83] Mundy, Bill. 1992. "Stigma and Value." *The Appraisal Journal* 60(1):7–13.

[84] Jones, Edward E., A. Farina, A.H. Hastorf, Hazel Markus, Dale T. Miller, and Robert A. Scott. 1984. *Social Stigma: The Psychology of Marked Relationships.* New York: W.H. Freeman and Co. pp. 4–7.

[85] Edelstein, Michael R. 1988. *Contaminated Communities: The Social and Psychological Impacts of Residential Toxic Exposure.* Boulder, Colorado: Westview Press. p. 6.

92.   Stigma contributes to the fact that real property market behavior is often influenced as much by perceptions as it is by reality. Richard Roddewig, an instructor of the Appraisal Institute who created its environmental seminar, has stated, "perceptions in the marketplace may be as important as the reality of whether the contamination or substance is actually physically affecting surrounding property."[86]

93.   Stigma underscores the disconnection between *actual* contamination or risk and *perceived* contamination or risk. Toxicologists have identified cause and effect relationships between various biological substances and diseases; however, human behavior often is not based on these causal relationships. As Roddewig noted, perceptions can have a substantial effect on real estate market behavior, and therefore, on price and value.[87]

*94.*   The mechanism for environmental stigma is embedded in culture. For example, Mauss (1950) described a belief, widespread in many cultures, that things in contact with each other influence each other through the transfer of some of their properties via an "essence."[88] Thus, "once in contact, always in contact," even if that contact (exposure) is brief. Nemeroff and Rozin (1994) referred to this belief as a "law of contagion" and showed that it is common in our culture.[89] The implication is that even a minute amount of a toxic substance in one's food is perceived as making the food toxic; any amount of poison makes a substance poisonous; any amount of a carcinogen imparts carcinogenicity, and so on. The "essence of harm" that is contagious is typically referred to as a contamination. Erickson (1990, p. 122) explained:

> Being contaminated has an all-or-none quality to it, similar to being alive, or pregnant. When a young child drops a sucker on the floor, the brief contact with "dirt" may be seen as contaminating the candy, causing the parent to throw it away rather than washing it off and returning it to the child's mouth.[90]

95.   This all-or-none quality, irrespective of the degree of exposure, is evident in Erickson's observation that "to be exposed to radiation or other toxins…is to be contaminated in some deep and lasting way, to feel dirtied, tainted, corrupted."

---

[86] Roddewig, Richard. 1996. "Stigma, Environmental Risk and Property Value: Ten Critical Inquiries." *The Appraisal Journal* 64(4):375–387.

[87] Roddewig, Richard J. 1999. "Environment and the Appraiser – Classifying the Level of Risk and Stigma Affecting Contaminated Property." *The Appraisal Journal* 67(1):98–102.

[88] Mauss, Marcel. *The Gift*, first published in 1950.

[89] Nemeroff and Rozin overview Fraser's and Mauss's theories as a basis to develop their theory on the "law of contagion." Nemeroff, Carol, and Paul Rozin. 1994. "The Contagion Concept in Adult Thinking in the United States: Transmission of Germs and of Interpersonal Influence." *Ethos* 22(2):158–186.

[90] Erickson, Kai. 1990. "Toxic Reckoning, Business Faces a New Kind of Fear." *Harvard Business Review*, January-February, pp. 118–126.

96.     Kraus et al. (1992) explained, "A contagion or contamination model is obviously very different from the scientist's model of how contact with a chemical induces carcinogenesis or other adverse effects."[91]

97.     Nemeroff and Rozin's "law of contagion" helps explain how real estate can become stigmatized even though it has not been directly contaminated. While the "law of contagion" motivates stigma, a number of factors influence the degree of stigma. These factors were first outlined by Mundy (1992),[92] and later by Kilpatrick et al. (2005).[93] Mundy noted that while he was the first to cite these factors in valuation literature, the original authorship is a sociology study. Greater stigma occurs when the levels of the factors below are high.[94]

- Disruption – would the contamination alter a given person's day-to-day behavior?

- Concealability – is the contamination noticeable or hidden?

- Aesthetic Effect – can the contamination be seen, felt, or smelled?

- Responsibility – is someone or some company specifically shouldering the blame?

- Prognosis – what is the severity and persistence of the contamination?

- Peril – can the contamination affect the health of humans?

- Fear – how is the risk perceived?

- Involuntariness – are the property owners themselves innocent in this contamination?

- Media Exposure – has media coverage affected perceptions of risk?

98.     Stigma effects can be wide-ranging. For instance, when a buyer is well versed in the present and future effect of the contamination, the price of a home will capture both the value of foregone rents and expected capital gains (financial), as well as the satisfaction and comfort of ownership (nonfinancial). At the extreme, stigma affects the nonfinancial benefits of home ownership (recall Edelstein's "inversion of home" principle in which a home goes from a place of security and identity to one of danger and defilement). Stigma can so overwhelm the financial benefits of home ownership that the property rights can be rendered worthless.

---

[91] Kraus, Nancy, Torbjorn Malmfors, and Paul Slovic. 1992. "Intuitive Toxicology: Expert and Lay Judgments of Chemical Risks." *Risk Analysis* 12(2):215–232.

[92] Mundy, Bill. 1992. "Stigma and Value." *The Appraisal Journal* (January) 60(1):7–13.

[93] Kilpatrick, John A., Ronald Throupe, Bill Mundy, and Will Spiess. 2005. "Valuation of Impaired Property." Chapter 6 in *When Bad Things Happen to Good Property*, Robert A. Simons. Washington, DC: Environmental Law Institute.

[94] See Edelstein, 1988, *Contaminated Communities*, p. 6.

99.    Perhaps the earliest references to stigma as a quantitative concept in real estate economics appear in studies by Patchin (1991) and Mundy (1992).[95] Mundy's study differentiated between the cost to cure real risks (i.e., full remediation) and the costs associated with perceived risks (i.e., stigma). The "cost-to-cure" is an out-of-pocket expense paid by the property owner or other responsible party to restore a property to its pre-contamination condition; stigma manifests in property value loss independent of the cost-to-cure. For example, a property that is restored to its pre-contamination condition may continue to suffer diminution in value due to risk perception (stigma).

100.    Patchin noted that the decline in market value of a contaminated property may exceed the cost-to-cure, even when that cost-to-cure is well defined.[96] Building on this theme, Mundy (1992a) was one of the first to outline the value paradigm for contaminated property damages: he argued that the value "before" or "clean" minus the value "after" or "dirty" is the appropriate measure.[97] From a mathematical perspective, this difference should represent the cost-to-cure. However, as he pointed out, in practice properties frequently sell for less than this cost-to-cure difference; he ascribed this disparity to the effect of stigma. In Mundy's framework, stigma is directly related to the level of uncertainty or risk associated with the contamination.

101.    Mundy (1992b) followed this theme by outlining two effects of stigma: an income effect and a marketability effect.[98] The income effect measures the lost value (or income, in the case of nonresidential properties) resulting from the contamination. The marketability effect accounts for the losses stemming from additional time-on-the-market, either to rent or to sell. Kilpatrick (1999) built on this marketability theme and showed that opportunity costs resulting from increased time on the market may in fact exceed cost-to-cure and income-effect stigma.[99]

102.    Muldowney and Harrison (1995) demonstrated that perception of value diminution (loss) can result in an actual value diminution.[100] They showed that perceptions of value diminution result from stigma, which is generated by uncertainty, and that a simple contamination problem may have an easily quantifiable cost and a short time to cure. However, they noted that, "As the complexity of the contamination increases, the level of uncertainty and perceived risk rises." This can be seen in the uncertainty of costs and duration of the remediation processes. Similar conclusions were reached by Payne et al.

---

[95] Patchin, Peter J. 1991. "Contaminated Properties — Stigma Revisited." *The Appraisal Journal* 59(2):167–172.

Mundy, Bill. 1992. "Stigma and Value." *The Appraisal Journal* 60(1):7–13.

[96] Patchin, Peter J. 1988. "Valuation of Contaminated Properties." *The Appraisal Journal* 54(1):7–16.

[97] Mundy, Bill. 1992a. "Stigma and Value." *The Appraisal Journal* 60(1):7–13.

[98] Mundy, Bill. 1992b. "The Impact of Hazardous Materials on Property Values." *The Appraisal Journal* 60(2):155–162.

[99] Kilpatrick, John A. 1999. "The Performance of Exterior Insulation Finish Systems and Property Value." *The Appraisal Journal* 67(1):83–88.

[100] Muldowney, Timothy J., and Kendall W. Harrison. 1995. "Stigma Damages: Property Damage and the Fear of Risk." *Defense Counsel Journal* 62(4):525–538.

(1987)[101] in their analysis of a former industrial site in the Chicago area. They concluded that it is the perception or fear associated with a hazardous site that is ultimately reflected in property values.

103. Gluck et al. (2000) pointed out that stigma is not a mechanical exercise of subtracting impaired value from unimpaired value and assigning a value above and beyond costs.[102] Rather, it involves consideration of legal and environmental factors in arriving at a well-reasoned and supportable opinion of stigma.

104. McCluskey and Rausser (2003) argued that both temporary and long-term stigmas are possible equilibrium outcomes after the discovery and cleanup of contamination.[103] Their study focused on the RSR smelter in Dallas, Texas, and they concluded that a long-term stigma remained around the subject area. Buyers of homes in the area continued to demand discounts for property, even though the area had been remediated. As a result, the neighborhood was becoming less attractive to higher-income buyers and more affordable to lower-income families. The authors characterized this change in neighborhood as long-term stigma.

105. Messer et al. (2006) investigated the psychology behind stigma and Superfund sites.[104] They found that actions by authorities, even those leading to clean up, tended to exacerbate risks and stigma. The authors also found that owners and residents of contaminated areas tended to "medicalize" the risk of the pollution. Their literature review revealed another interesting phenomenon, originally noted by Kunreuther and Slovic (2001), of the "social amplification of original risks" due to the informal spread of information, both factual and otherwise, throughout the community.[105]

106. Kilpatrick (1999) outlined a quantitative model for measuring the loss in value of income-producing property due to stigma effects; increases in market-driven capitalization (cap) rates reveal these stigma effects.[106] I discussed four factors that affect the value of income-producing property due to contamination: (1) reduction in net operating income, (2) actual cost-to-cure, (3) ongoing increases in maintenance, and (4) stigma (increases in cap rates). In my model, slight increases in cap rates actually overwhelm the other three factors as a

---

[101] Payne, B.A., S. Jay Olshansky, and T.E. Segel. 1987. "The Effects on Property Value of Proximity to a Site Contaminated with Radioactive Waste." *Natural Resources Journal* 27:579–590.

[102] Gluck, Allan, Donald Nanney, and Wayne Lusvardi. 2000. "Mitigation Factors in Appraisal and Valuation of Contaminated Real Property." *Real Estate Issues*, Vol. 25, No. 2, Summer 2000.

[103] McCluskey, Jill J., and Gordon C. Rausser. 2003. "Stigmatized Asset Value: Is it Temporary or Long-Term?" *The Review of Economics and Statistics* 85(2):276–285.

[104] Messer, Kent D., William D. Schulze, Katherine F. Hackett, Trudy A. Cameron, and Gary H. McClelland. 2006. "Can Stigma Explain Large Property Value Losses? The Psychology and Economics of Superfund." *Environmental and Resource Economics* 33:299–324.

[105] Kunreuther, Howard, and Paul Slovic. 2001. "Coping with Stigma: Challenges and Opportunities." pp. 269–280 in *Risk, Media and Stigma – Understanding Public Challenges to Modern Science and Technology,* edited by J. Flynn, P. Slovic, and H. Kunreuther. London: Earthscan.

[106] Kilpatrick, John A. 1999. "The Performance of Exterior Insulation Finish Systems and Property Value." *The Appraisal Journal* 67(1):83–88.

component of value diminution or loss. I concluded that under many circumstances, stigma effects are actually the greater portion of value losses to property owners.

### Summary of Scholarly Research

107.    As set forth in detail in paragraphs 64-106, homeownership comes with a bundle of rights that may be usurped or impaired due to environmental contamination. The prominent literature indicates that markets usually react negatively to contamination or impairment events. Environmental impairment itself consists of cost-to-cure (remediation costs) and stigma. A variety of empirical studies confirms that a contamination event can lead to diminution (loss) in value, reduced liquidity, and lower sales volume. The consensus among the academic literature is that stigma has both an income component and a marketability component. The impact of stigma is real. However, the basis of stigma has more to do with the marketplace's perception of the contamination than with the actual contamination itself. Experts note that the effects of stigma can vary through time as well. The degree of property value diminution caused by stigma can range from a minimal amount to a total loss of value.

## AUTOMATED VALUATION MODEL

## DATA SOURCES

108.    The proposed class includes residential and commercial properties within Boyle County, Kentucky. Development of a database for an AVM involves gathering property characteristic data, transaction data, and geographic information systems (GIS) data. As a result, acquiring and combining various types of data for multiple jurisdictions can be a laborious and expensive process. However, by combining data from these sources, credible, consistent, and accurate unimpaired values on the real estate within the proposed class can be accurately calculated. For this matter, property characteristic and transaction data was obtained from the Boyle County Property Valuation Administration (PVA) and supplemented with data from Zillow. Zillow specializes in the aggregation of real estate data.[107]

109.    I utilized two data sets for my analysis: recorder (or deed/sales) data from the PVA and property characteristics data from Zillow. For purposes of this report, I utilized data for only Boyle County, Kentucky. The data include information on the most recent sale prices and dates for properties across the county, property characteristics (e.g., square footage, bathrooms, age, lot size), and location on a county-by-county basis. Prior to utilizing these data, my staff and I ensured that it was both comprehensive and representative. I concluded that it is expeditious to use property characteristic data provided by Zillow rather than gathering data from multiple listing services (MLSs). I address the representativeness of the data in the model validation process.

---

[107]    *See* Zillow.com, About http://www.zillow.com/corp/About.htm, last visited on January 18, 2017.

110.    ESRI ArcMap can be used to geocode locations to obtain latitude and longitude coordinates for the properties being analyzed. These coordinates can be used to precisely measure the location of the plaintiff properties and their proximity to comparable homes.

111.    The Boyle County sales transaction data provided me with information on previous sales prices and previous sales dates on a county-by-county basis.  Zillow provided me with property characteristics (e.g., square footage, baths, age, lot size).  The Greenfield AVM combines these two data sources into a single "sales data" data set for each county.

112.    This sales observation data was available for the period January 1, 2014 through 2016.[108] In all, Boyle county PVA provided me with over 1,000 sales transactions throughout the county for this period.

113.    After a preliminary round of valuation testing, "on the ground" verification and collection of additional data may be warranted. I anticipate collection of these data through use of a trained group of individuals under the supervision of Greenfield Advisors staff and with additional input and guidance from local appraisers experienced within the State of Kentucky.

114.    Additionally, GIS data was sourced through DynamoSpatial, a data vendor and GIS consulting company. Parcel data and parcel GIS layers were utilized from this data set.

115.    Analyzing these data across the class will provide a more consistent and cost-effective means of determining damages than if many appraisers were to inspect, record characteristics of, and produce a standard appraisal analysis and report for each property individually.

## DATA COLLECTION

116.    After assessing the accuracy of the data, I then performed a data coverage assessment. This assessment found that 375 of the 1,050 sales transactions in Boyle County for which the PVA and Zillow provided information had sufficient data to run a mass appraisal model. These transactions represents those that are reasonably indicated as being arm's-length transactions (and excluding property transfers that are non-valid sales). Transactions were eliminated if the grantor and grantee was not indicative of a valid transaction.  Other transactions were eliminated if longitude, latitude, or the measure of living area was missing.

117.    Table 1 outlines the data fields that I used to establish the set of sales transactions for Boyle County.

---

[108]   These data are the full range of available sales observations.  The sales selected from the Boyle County PVA were residential improved sales. The sale type indicated was valid sale and the sale prices was complete

**Table 1. Variables and Their Definitions**

| Variable Name | Original Data Name | Description |
|---|---|---|
| Sales Price | Sale Price | Sale Price in dollars. |
| Tax Assessed Value | TOTAL VALUE CALCULATED | |
| Last Sales Price | PRIOR SALE AMOUNT | Sale Price of the most recent sale |
| Living Area | LIVING SQUARE FEET | The total square footage of the living area of all structures on the property. |
| Longitude | LONGITUDE | Longitude of the property |
| Latitude | LATITUDE | Latitude of the property |
| Owner Name | Owner1 | The name of the property owner |
| Property Type | Property Indicator Code | The code indicating property type (SF, Condo, etc..) |
| Sales Date | Sale Date | Equivalent to the DocumentDate when available, otherwise the RecordingDate is used. |
| Year Built | YearBuilt | The year the primary structure was built |
| Sales Date | DocumentDate RecordingDate | Equivalent to the DocumentDate when available, otherwise the RecordingDate is used. |

*Source: Greenfield Advisors.*

118.    I found that county assessor offices frequently rely on and report similar core information as the Zillow data. In fact, most of the data obtained from Zillow comes directly from the local tax assessors. Information most often relied upon is living area, effective age of the home, and location. Additional indicators, such as the number of bedrooms, bathrooms, as well as the presence of a garage, basement, or attic may be utilized. Additional property characteristics may not be utilized within the mass appraisal model if I determine that there is low correlation between the property characteristic and the sale price or a high correlation with a different property characteristic.

119.    I determined that incorporating other variables, such as number of bedrooms, basement size, attic size, and fireplace characteristics, would depend on the property type and ownership.  The mass appraisal model presented is developed for an average single-family residence, and variable incorporation may change if other property types are modeled. Many of the possible property characteristics were not necessary because of the high statistical correlations with the variables I had already chosen—i.e., the variables I have chosen allow precise modeling of value (as demonstrated by forecast standard deviation and other metrics) because these variables strongly control value.[109,110]

---

[109] In regression modeling, parsimonious modeling is generally preferred. *See* Ruder, Teague, Mick Silver, and Ted To. 2004. *Quantity Versus Quality of Characteristic Data in Hedonic Regressions.* Bureau of Labor Statistics Working Paper. Also, Hubbard noted, "most of the variables in a business case had an information value of zero… something like one to four variables were both uncertain enough and had enough bearing on the outcome of the decision to merit deliberate

## MODEL DESIGN AND AVM TESTING

120.   Automated valuation models, or AVMs, are computer programs that employ statistical models to ascertain objective and accurate estimates of the market value of real property.[111] The Appraisal Standards Board describes an AVM as "a computer software program that analyzes data using an automated process."[112] AVMs have been used in the industry since the early 1990s to value residential property and, when properly designed, validated, and applied, AVMs can provide a statistically accurate measure of property value when sufficient reference data are available.[113] The Appraisal Standards Board recognizes AVMs, when used competently by a trained and knowledgeable appraiser, as an appropriate tool for performing appraisals.[114] AVMs can be designed or tailored to accommodate different property types (e.g., single-family residences, condominiums, townhouses, and commercial properties), at different locations (e.g., regions of the country, regions within a state, and even individual neighborhoods), and at different points in time (e.g., present or retrospective). For this assignment, I tailored the Greenfield AVM to be able to establish unimpaired values for single-family properties in the vicinity of the contamination.

### Proper Use of an AVM for Valuing Residential Properties

121.   Lenders and appraisers alike utilize AVMs to value subject properties. AVMs are addressed in USPAP through the Competency Rule, which applies to all appraisals under USPAP generally,[115] as well as Advisory Opinion 18 and Standard 6, which apply more specifically.

122.   USPAP Standard 6 addresses mass appraisals, which include hedonic AVMs. Conceptually, hedonic price modeling in an AVM is a more statistically rigorous extension of the sales comparison method embodied in a mass appraisal, and it has a long history of use in the

---

measurement efforts." Hubbard, Douglas W. 2010. *How to Measure Anything: Finding the Value of Intangibles in Business.* Wiley Publications. pp. 35–36.

[110] While suitable non-redundant variables are appropriate for a nuanced model such as the AVM, driving a model to fit too many variables erodes its predictive power. *See* J. Wooldridge, *Econometric Analysis of Cross Section and Panel Data*, 63 (Cambridge: MIT Press, 2002); Michael R. Wickens, *A Note on the Use of Proxy Variables*, 40 Econometrica 759 (1972). Wickens, for example, showed that the inclusion of proxy variables is econometrically preferred to exclusion of the variables proxied. Goodman and Thibodeau (2003) demonstrated the use of proxy variables in a real estate hedonic pricing model. *See* Allen C. Goodman & Thomas G. Thibodeau, *Housing Market Segmentation and Hedonic Prediction Accuracy*, 12 J. of Housing Econ. 181 (2003). Clapp et al. (1996) used assessed value as a proxy to control for variations in value between properties within the same jurisdiction. *See* John M. Clapp, C. Giaccotto, and G. Richo, *Estimating Time Adjustments with Sales Prices and Assessed Values*, 64 Appraisal J. 319–327 (1996).

[111] USPAP 2016-2017, 121 – 127 (Advisory Opinion 18).

[112] *Id.*

[113] Kirchmeyer, James, and Peter Staas. 2008. *AVMs 201: A Practical Guide to the Implementation of Automated Valuation Models* at 24–25.

[114] USPAP 2016-2017, 121 – 127 (Advisory Opinion 18).

[115] The Competency Rule requires appraisers to possess the knowledge and experience necessary to complete an assignment competently. USPAP 2016-2017, at 12-13 and 17, Standards Rule 1-1.

appraisal profession.[116] Standard 6 requires that "in developing a mass appraisal, an appraiser must be aware of, understand, and correctly employ those recognized methods and techniques necessary to produce a credible mass appraisals."[117]

123.  USPAP Advisory Opinion 18 directly addresses the type of AVM I used in this engagement. USPAP recognizes that appraisers may appropriately utilize AVMs not only for appraisals, but also for appraisal reviews.[118] When using an AVM as an appraisal tool, appraisers must understand how the AVM works, be able to use the AVM properly, determine that use of the AVM is appropriate for the intended use of the assignment results, and believe that the AVM output is credible and sufficiently reliable for the appraisal assignment.[119]

124.  Consistent with other parts of USPAP, Advisory Opinion 18 requires that appraisers utilize AVMs in accordance with their professional judgment and expertise. Advisory Opinion 18 cautions that while an appraiser can use an AVM as a tool in the development of an appraisal, appraisal review, or appraisal consulting assignment, the appropriate use of an AVM is, like any tool, dependent upon the skill of the user and the tool's suitability to the task at hand.[120] However, when properly deployed it can reliably and credibly provide estimates of the market value of real property.

## AVM Design

125.  In this matter, I have tailored the Greenfield AVM to a geographic scope for valuing homes in Boyle County, Kentucky. When a subject property is valued using the AVM, the characteristics of nearby sales are used to determine the coefficients of the underlying hedonic models. Put simply, the property value of the subject is determined by analyzing sales of proximate properties. All of the sales observations used in the model are from the same county as the subject property, and the model includes an indicator for transactions that occurred in the cities with the (geographically) nearest sales. In addition, the model is also highly localized around the time of the contamination event.

126.  To determine a model for unimpaired market value of contaminated properties, I utilized 117 of the 1,050 valid sales transactions in Boyle County in the AVM. These comparable properties were selected based on the ownership and structure description—in this case, a residential single-family home where the primary owner is an individual. More specifically, the AVM comparables only included properties in which the sale price was greater than $10,000. An additional filter to remove the upper and lower 1% of sales prices was applied to limit transactions to comparable observations in a reasonable range for sale price. Figure

---

[116] *See* Miller, Norm G., & Sergey Markosyan. 2003. "The Academic Roots and Evolution of Real Estate Appraisal." *The Appraisal Journal* (April 2003) 71(2):172–184 at 181.

[117] USPAP 2016-2017, at 39.

[118] *Id.* at 121.

[119] *Id.* at 123.

[120] *Id.* at 121.

2 is a map of the comparable sales used by my AVM. The data were also checked against county assessment data by a Greenfield Advisors analyst for duplicate transactions.

127. The manner in which the Greenfield AVM works is graphically represented in the flowchart presented in Figure 3.

**Figure 2. Map of the Comparable Properties Utilized**



**Figure 3. Greenfield AVM Flowchart**



## AVM Results

128.   My exploratory data analysis for Boyle County involved looking at the correlation plots for each set of sales data to determine if any unusual or particularly interesting relationships existed between the variables (see Figure 4). I found moderate to high correlation between the bedroom count, bathrooms, and living area. Most of these relationships were expected; however, they do indicate relationships of which the modeler must be aware when specifying a hedonic regression model. The variables indicating the lot size, for example, had weak correlation with the sales price relative to the other variables that were utilized, indicating it may not be advantageous in the model.

**Figure 4. Sales Correlation Matrix**



129.   After determining a sufficient baseline model, I then examined the errors or residuals from the hedonic regression models. This first round of residual analysis helped to identify necessary transformations and helped to inform the exploratory data analysis processes. Then I was able to estimate a baseline hedonic regression model with a spatial component.

130.   This baseline model performed well, as shown in Table 2. The Adjusted R-squared statistic for the model was 0.73 with a standard error of 0.31 and a mean absolute error (MAE) of 0.18. This suggests that the baseline model explained approximately 73% of the variation in the dependent variable (natural log of sales price).

**Table 2. Summary Statistics**

| Statistic | Value |
|---|---|
| Comparables Used | 1117 |
| COD | 16.68 |
| R-squared | 0.73 |
| Adjusted R-squared | 0.72 |
| Residual Standard Error | 0.31 |
| Fitted MAE | 0.18 |
| Cross Validated MAE | 0.21 |
| F-Statistic | 49.72 on 6 and 110 DF |

*Source: Greenfield Advisors*

131.   Simple spatial models include the longitude and latitude or some form of indicator variable to account for neighborhood location. Because the data were obtained from all of Boyle County, the simple longitude and latitude was applicable in this case.

132.   Finally, although USPAP set no specific targets for model fitting ability, IAAO maintains guidelines for model development. The IAAO standards suggest that models for older homes in more heterogeneous subdivisions, the COD requirement is around 15. My model has a COD of 16.68, which is consistent with these IAAO model fitting standards. Table 3 presents the full definition of the variables used in the following equation, and Table 4 presents the model summary.

**Table 3. Variables Used in Model**

| Variable | RealtyTrac Name | Description | Model Term |
|---|---|---|---|
| Log(Sales Price) | SalePrice | Log transformation of Sale Price | $P_i$ |
| Log(Tax Assessed Value) | TaxAssessedValue | Log transformation of Tax Assessed Value | $X_1$ |
| Latitude | Latitude | Latitude | $X_2$ |
| Longitude | Longitude | Longitude | $X_3$ |
| Latitude2 | Latitude | Latitude | $X_4$ |
| Longitude2 | Longitude | Longitude | $X_5$ |
| Living Area | SquareFootage | Total square footage of the living area of all structures on the property | $X_6$ |

*Source: Greenfield Advisors*

**Table 4. Final Model Summary**

| Variable | Coefficient | Standard Error |
|---|---|---|
| Intercept | 277330 | 114051.40 |
| Log(Tax Assessed Value) | 0.93 | 0.083 |
| Latitude | -486.66 | 1814.10 |
| Longitude | -6321.99 | 2491.04 |
| Latitude2 | 6.49 | 24.08 |
| Longitude2 | 37.26 | 14.69 |
| Living Area | 0.0000083 | 0.000052 |

*Source: Greenfield Advisors*

## Model Validation

133.    Up to this point, the error statistics reported speak to the ability of the mass appraisal model to fit relationships between price and property characteristics (independent variables) of known property sales. However, the appraisal assignment is to determine the values of homes that have not sold recently. While these two exercises are closely related, they are not the same thing, and reporting fitted errors as if they were predicted errors leads to an overestimation of a model's accuracy. While the differences are often small, models may be "over-fitted" in the sense that they fit the existing data very well but do not fit non-sample data. To determine the accuracy of the models, I used a technique known as cross-validation, also known as a hold-out analysis. Cross-validation required the removal of a random set of sales from the dataset to be set aside as a test (or hold-out) group. I then recalibrated the model with the remaining sales and used those coefficients to predict the sales values of the test group. I compared these predictions to the known sales prices of the test group to determine the level of predictive error in the model. Since any random draw may be biased, this cross-validation procedure was computed many times, and the average of the average errors is taken to be the predictive accuracy of the mass appraisal models.

134.    I conducted 1,000 iterations of a cross-validation model for my hedonic model. In each iteration, I used 20% of the sales as the test or hold-out and 80% as the calibration set. Using this method, I reported an MAE of 21%, compared to the fitting accuracy MAE of 18%.

## METHODS FOR DETERMINING VALUE IMPAIRMENT

135.    Several additional techniques can be employed to determine impaired values; that is, the fair market value of the properties in the "after" state. Additional methods I will employ to determine impaired values may include but are not limited to (a) case studies, (b) surveys, and (c) meta-analysis.

136. I have also already begun a preliminary analysis of transactions in the neighborhoods closest to the facility and contamination site as they compare to transactions in the unaffected portions of the Boyle County area. While this analysis is currently at a very early stage, certain issues are evident and strongly suggest further lines of investigation in preparation for the merits phase of this case.

137. At least initially, it appears that there was a systematic failure of market participants to make reasonably expected disclosures about the contamination issues. This factor alone strongly indicates the possible need for additional alternative valuation methods such as survey research, since lack of disclosure suggests a breakdown in the transactional market. Specifically, the lack of disclosure negates the "knowledgeable buyer" requirement, which is required for specific transactions to accurately measure market value.

138. In summary, my early-stage analysis of transactions in this market supports the use of holistic, mass-appraisal modeling consistent with class certification. The transactions in affected areas are best analyzed systematically, rather than individually, as any pricing trends are best understood on a broad, systematic basis, and the availability of both assessor and transactional data certainly supports the use of efficient mass-valuation methods.

139. Based on my experience valuing contaminated properties and subject to final analysis provided the class is certified, it is my opinion that a class-wide diminution in value has occurred within the proposed class area.

140. Plaintiffs' counsel has provided me with affidavits submitted to the court by Vance Mosely and Aubrey Edwards regarding the before and after valuation of the named plaintiffs' properties. Edwards opined that the Sellers' property located at 918 W. Walnut diminished in value at a minimum of 29%. Mosely concluded that the properties located at 1310 W. Walnut Street, 117 John WD Bowling Court, 1200 Lebanon Road, and 308 Fairview Street diminished in value by 20%. These opinions are consistent with my experience in valuing contaminated properties.

## Case Studies

141. I also intend to review case studies for this matter. Case studies are typically summaries of similar situations from around the country. Generally, these are situations for which Greenfield Advisors may have directly performed empirical research, or they are derived from published literature or other sources that I deem reliable. This method generally will assist in providing a percentage of diminution in value that can be applied to the unimpaired values determined by the AVM.

142. The use of case studies is a common method in the social sciences and particularly in real estate analysis. Economic analysis—or specifically in the case of this analysis, property valuation—is a fundamental exercise in market behavior and how a market responds to change. Because the market is composed of individuals interacting in their own best interest, both qualitative and quantitative conclusions are essential to forming overall conclusions.

143. As an example of a case study, Greenfield Advisors recently examined a TCE spill in a neighborhood in Wyoming, Michigan. The extent of the plume was well defined, and

property owners were informed by the responsible parties of the existence of the plume. In that case, there was no allegation of vapor intrusion, and no other known contamination affecting any of the properties. Greenfield examined sales of homes affected by the plume as compared to nearby homes not affected, and found that in a two-year study period, homes affected by the contamination stagnated in price by 25% as compared to unaffected nearby homes. Given the facts of the case in Danville, as we have come to understand them, this 25% price diminution from the Wyoming, Michigan, case study would indicate a probably low end of the diminution range.

144.    Case studies also have long been an analytical technique used in business and real estate valuation. Case studies are a derivative of the sales comparison approach to valuation. They differ from simple sales transactions in that they are more in-depth and they focus on a contamination event and how it has affected market behavior, price, and value. Case studies rely on empirical information drawn from a variety of sources, and they provide a range of conclusions. Because there is seldom a perfectly comparable case study, the analyst must consider the characteristics of each study and its relevance to the subject. When each case study is considered individually, its merits and conclusions must be judged relative to other studies and its similarity to the subject. Valuation guidelines recommend that the analyst consider cost, use, and risk effects of contamination on value. While case studies are considered a derivative of the sales comparison approach to value, they more broadly address these three issues.

145.    Our primary research question for the merits phase of this engagement would be "How has contamination affected value?" We will examine a geographically diverse group of similar situations. Specifically, our analysis will seek to determine how contamination has influenced value by analyzing its impacts from different perspectives. The focus will be to determine the effect of contamination on property value, specifically in a quantifiable way.

146.    We will use case studies, including legal cases, as additional evidence to support conclusions derived from other methods. Legal cases provide appraisers with a wealth of information on a variety of appraisal issues, including takings, assessment disputes, and property values, among others. So important are these legal decisions to appraisers that *The Appraisal Journal* devotes its first segment to "Recent Court Decisions – Cases in Brief" to inform practicing appraisers of the most recent legal cases that affect them and their clients. In this dynamic industry of complex valuation assignments, appraisers must constantly seek to update their knowledge and skills:

> To keep abreast of these changes and developments, the appraisal profession is constantly reviewing and revising appraisal methods and techniques and devising new methods and techniques to meet new circumstances. For this reason, it is not sufficient for appraisers to simply maintain the skills and the knowledge they possess when they become appraisers. Each appraiser must continuously improve his or her skill to remain proficient in real property appraisal.[121]

---

[121] USPAP, 2014–2015, Comment to USPAP Standards Rule 1-1(a), p. U-16. The same is true for mass appraisal; see the Comment to USPAP Standards Rule 6-1(a), p. U-37.

147.  In markets unsettled by real property contamination, appraisers normally rely on market information and transactions to assist them in determining market value. Legal cases are an additional type of information, readily available to the public and the appraiser. Informed judgments where disinterested parties with full knowledge make determinations about valuation disagreements should be considered. In short, similar issues should reach similar conclusions. Where other market information is in short supply, legal cases can be especially helpful. In an appraisal report for litigation, consideration of legal cases can help inform the intended users (clients, reviewing appraisers, and the jury) of "apples to apples" situations, providing facts about property value loss, and displaying additional avenues for appraisers to explore in making their market value determinations. That is not to say that legal cases must be included in every appraisal report, but they are useful to demonstrate precedent and to provide information. Rulings and settlements are, in effect, normative evidence and data for the appraiser to consider in what is generally a difficult valuation assignment.

148.  The use of litigation outcomes has also been discussed in appraisal literature. One such example of the use of legal case studies is from Simons and Throupe (2005).[122] They examined the effects of toxic mold on housing values, presenting empirical results from litigation outcomes, contingent valuation surveys, and a public health study. With little data available, Simons and Throupe expanded their market research to provide the appraisal community with an exhaustive list of empirical results, including legal cases. Aalberts and Hoyt (2006)[123] also discussed mold cases, the appraiser's role, and appropriate guidelines, expanding on the Simons and Throupe article. In Boykin (1996),[124] various court rulings[125] indicated that it is an unacceptable valuation practice to use widely different parcel sizes to estimate land values, and also demonstrated parameters that are useful in choosing comparable sales for land parcels. Robinson and Lucas (2005)[126] used court decisions to

---

[122] Simons, Robert A., and Ron Throupe. 2005. "An Exploratory Review of the Effect of Toxic Mold on Real Estate Values." *The Appraisal Journal* 73(2):156–166.

[123] Aalberts, Robert J., and Richard W. Hoyt. 2006. "Toxic Mold Liability Update: Implications of *Kilian v. Equity Residential Trust.*" *The Appraisal Journal* 74(2):134–139.

[124] Boykin, James H. 1996. "Impropriety of Using Dissimilar Size Comparable Land Sales." *The Appraisal Journal* 64(3):310–318.

[125] From Boykin (1996), see Duke Power Company v. Smith, 282 SE. 2d564 (NC. 1981); Pearl River Valley Water Supply Districts v. Wright, 203 So. 2d 296 (Miss. 1967); Yoder v. Iowa Power and Light Company, 215 N. W. 2d 328 (IA 1974); Hoeft v. State, 221 Iowa 694,697-698,266 NW. 571. 573,104 A.L.R. 1008; Welton v. State Highway Commission, 211 Iowa 625, Loc. Cit. 632,233 NW. 876,881; State v. Johnson, 191 SE. 2d641 (NC. 1972); Teele v. City of Boston, 165 N.E. 506 (Mass. 1896); McCarthy v. City of Amarillo, 307 S.W 2d 595 (Texas 1957); Morgan v. State of Texas, 343 SW. 2d 738 (Texas 1961). Note: In Boykin, *Redevelopment Commission of Winston-Salem v. Weaihennan, 208 S.E. 2d 412 (S.C. 1974)* was the only case where the appellate court did not uphold the impropriety of using different-sized comparable sales properties.

[126] Robinson, Rudy R., III, and Scott R. Lucas. 2005. "Seller Disclosure and Buyer Knowledge: How They Affect Market Value." *The Appraisal Journal* 73(2):156–166.

---

define the general concepts of buyer's knowledge in arm's-length transactions.[127] Likewise, we use legal case studies to demonstrate additional market information.

149.    Using case studies in the valuation analysis of properties provides important insight into how the market has behaved in situations similar to the environmental contamination conditions in the areas affected by the contamination.

## Contingent Valuation and Focus Groups

150.    Surveys and focus groups are two methods that can be used for interpreting individuals' perceptions and beliefs on a given subject. These methods, when employed properly, allow market participants to directly inform researchers of their opinions and beliefs on a given topic.

151.    Contingent valuation (CV) is a survey-based technique sometimes used by researchers to directly measure individuals' stated preferences and values for environmental goods. Peer-reviewed research has used this method to value real property resources.[128] The technique is used to analyze market participants' willingness to pay for a positive amenity or willingness to accept a negative amenity through compensation.

152.    Debate on the usefulness of the CV survey took center stage following the 1989 *Exxon Valdez* oil spill, as the government attempted to value all losses due to the incident. As the investigation of damages proceeded, the National Oceanic and Atmospheric Administration (NOAA) commissioned a panel of experts consisting of Nobel laureates and economists to analyze the merits of the CV method. These experts, known as the Blue Ribbon NOAA Panel, concluded that "CV studies can produce estimates reliable enough to be a starting point of a judicial process of damage assessment,"[129] and that it "contains information that judges and juries will wish to use, in combination with other evidence, including the testimony of expert witnesses."[130] The Blue Ribbon NOAA Panel acknowledged at the time that CV studies must follow strict guidelines to produce reliable results, stating that respondents must "be carefully informed about particular environmental damage to be valued, … the full extent of substitutes and undamaged alternatives available, … the payment vehicle should be presented fully and clearly, …[and] with the relevant budget constraint emphasized."[131] The panel also listed many technical guidelines to follow while preparing CV surveys,[132] though it concluded "as in all cases, the more closely the guidelines are followed, the more reliable the results will be. It is not

---

[127] From Robinson and Lucas (2005), see Reservation Eleven Associates v. District of Columbia, 420 F2d 153, 155 (CADC 1969); Sacramento, etc., R.R. Co. v. Heilbron, 156 Cal. 408, 409, 104 P 979,980 (1909).

[128] Lipscomb, C.A., M. Kummerow, W. Spiess, S. Kilpatrick, and J.A. Kilpatrick. 2011. "Contingent Valuation and Real Estate Damage Estimation." *Journal of Real Estate Literature* 19(2):283–305.

[129] Arrow, Kenneth, Robert Solow, Paul R. Portney, Edward E. Leamer, Ray Radner, Howard Schuman. 1993. *The Report of the NOAA Panel on Contingent Valuation.* January 11, 1993. p. 44. Accessed September 11, 2014 at http://www.darrp.noaa.gov/library/pdf/cvblue.pdf.

[130] *Id.,* p. 45.

[131] *Id.*, p. 43.

[132] *Id.*, Section III.

necessary, however, that every single injunction be completely obeyed; inferences accepted in other contexts are not perfect either."[133] It is clear that the United States government accepts the CV method as a way to measure economic damages.

## Meta-Analysis

153.    Meta-analysis includes the synthesis of a wide body of academic literature into quantitative data that can be analyzed using regression techniques. Meta-analysis is defined by Stanley (2001, p. 131) as "a body of statistical methods that have been found useful in reviewing and evaluating empirical research results."[134] In essence, a meta-analysis is an analysis of a series of analyses conducted by other researchers. The advantage of this approach is that I can use a meta-analysis to look for general patterns in the findings of other researchers' works to provide empirical support for my valuation opinions. In fact, meta-analysis "has become the accepted practice for evaluating the current flood of conflicting scientific evidence. It is 'how science takes stock' (Hunt, 1997)."[135] This technique is widely accepted in the social sciences, medical sciences, and education fields and is increasingly being used in real estate valuation.[136] In our research, the purpose of a meta-analysis is to provide an empirical summary of the literature related to a particular kind of environmental contamination situation.

## CONCLUSIONS

154.    In my experience, circumstances like those alleged to be found in *Modern Holdings, LLC, et al. v. Corning Incorporated, et al* necessitate class treatment. The environmental conditions predominate over all properties in an indiscriminant manner. The valuation task will be more challenging and require considerably more time and effort if it is not performed on a class-wide basis using mass appraisal methods. As explained above, if these thousands of properties were valued individually, the valuation task would not only be more expensive, time-consuming, and difficult to implement, it would also be subject to a greater risk of inconsistency and bias.

155.    The following is a summary of my opinions:

- Based on my experience valuing contaminated property and subject to final analysis provided the class is certified, the information available suggests that class-wide diminution in value has occurred within the proposed class area, and that, the impacts to properties within the proposed class will be similar. Although we will explore variances attributable to locations and water sources, this fact argues for the approaches discussed in this affidavit.

---

[133] *Id.*, p. 44.

[134] Stanley, T.D. 2001. "Wheat From Chaff: Meta-Analysis As Quantitative Literature Review." *Journal of Economic Perspectives* 15(3):131–150.

[135] Stanley (Ibid.), quoting Hunt, M. 1997. *How Science Takes Stock: The Story of Meta-Analysis*. New York: Russell Sage Foundation.

[136] See, for example, Lipscomb et al., (2013).

- My expertise and experience in dealing with the valuation of contaminated properties has shown that mass treatment of the issue using mass appraisal methods is more accurate, less expensive, and faster than approaching the valuation of thousands of proposed class properties through individual appraisals by a large set of human appraisers.

- USPAP, the governing paradigm of the appraisal profession, recognizes mass appraisal as an accepted method for valuing a large collection of properties. In that same regard, USPAP Standards Rule 6-7 requires an appraiser to evaluate the performance of their mass appraisal methods, to ensure that his or her model meets attainable standards of accuracy. The peer-reviewed appraisal literature overwhelmingly supports the use of multiple regression analysis as a method for valuing large collections of properties.

- The data necessary for a current mass appraisal analysis have been gathered and compiled by my staff. If a future mass appraisal is needed, we have the ability to gather and compile data for that as well.

- I have confirmed that the necessary data exists in good quality and quantity to produce unimpaired value estimates for the proposed class. Data necessary for a current mass appraisal analysis has been obtained and compiled by my staff. If a future mass appraisal is needed, my staff has the ability to obtain the necessary data.

- In sum, given the facts of the case, the proposed composition of the class plaintiffs, the availability of data, and the professional standards and wealth of academic studies that support the mass appraisal of the properties in this situation, it is my opinion, to a reasonable degree of scientific certainty based on the above factors as well as my expertise and experience, that the matter at hand should be treated as a class action or mass tort for valuation and damage assessment purposes.

- I reserve the right to update and alter my opinions in this matter based on the availability of any new or unknown information.

156.    Attachments: Professional qualifications and recent trial testimony.

## CERTIFICATION

I certify to the best of my knowledge and belief that:

- The statements of fact contained in this report are true and correct;

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions;

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions;

- I have no (or the specified) present or prospective interest in the property that is the subject of this report, and no (or the specified) personal interest with respect to the parties involved;

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment;

- My engagement in and compensation for this assignment were not contingent upon developing or reporting predetermined results, the amount of the value estimate, or a conclusion favoring the client;

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal;

- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice;*

- I made a personal inspection of the properties that may be defined within the proposed class on January 23, 2017;

- Clifford Lipscomb, PhD; Jessica Flood; Holly Selby; Gabriel Bolden; Jonathon Hirschi; and Jessica Kenyon provided significant professional assistance to me, but the opinions contained in this report are my opinions;

- The reported analysis, opinions, and conclusions were developed and this report has been prepared in conformity with the Code of Professional Ethics and Standards of the Professional Appraisal Practice of the Appraisal Institute, of which I am an MAI Designated Member;

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives; and

- As of the date of this report, I have completed the continuing education program of the Appraisal Institute.

Respectfully submitted,

GREENFIELD ADVISORS LLC

John A. Kilpatrick, PhD, MAI, FRICS

Kentucky Certified General Appraiser # 004449

Sworn to and subscribed before me, this 31st day of January, 2017

Notary: Lisa Mc Sherry



WEST COAST OFFICE

2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON 98121
PHONE 206-623-2935
FAX 206-623-2985

EAST COAST OFFICE

106 N. BARTOW STREET
CARTERSVILLE, GEORGIA 30120
PHONE 770-334-3952



Greenfield Advisors

*Economic, Market and Valuation Analysts*

---

## JOHN A. KILPATRICK, PhD, MAI, FRICS

## PROFESSIONAL QUALIFICATIONS

John Kilpatrick is the Chairman and Co Managing Director of Greenfield Advisors, formerly Mundy Associates. He has over 35 years of experience in finance and financial analysis, real estate, business development, statistical analysis, consulting, and teaching, including the following:

- Greenfield Advisors (1998–present)

- Kilpatrick Research Group (1994–1998), Principal conducting economic, financial, and market analyses for governments and private firms in the Southeast

- University of South Carolina: Lecturer in Real Estate (1992–1998), Researcher in the Center for Applied Real Estate (1997–1998), Administrator of the South Carolina Supercomputer Network (1994–1996), Project Coordinator of the Washington, DC, based Academic Coalition for Intelligent Manufacturing Systems (1994–1995), Assistant to the Senior Vice President for Research (1990–1994)

- Kilpatrick and Associates Realty (1987–1990), Broker-in-Charge, and Vice President of Sand Creek Development Company

- The Shumaker Company (1978–1981 and 1984–1987), CFO of a large-scale residential subdivision development, homebuilding, and brokerage company

- Dean Witter Reynolds (now Morgan Stanley, 1981–1984), Account Executive and S.C. Municipal Bond Coordinator

He has published extensively, including *Financing Development and Construction in the 90s* and *Understanding Home Construction*, published by the National Association of Home Builders, *The Complete Real Estate Financing Desk Reference* by M.E. Sharpe, and *Subdivision Development* for the National Association of Realtors. His invited presentations have included members of the U.S. Senate (on advanced manufacturing R&D), *Institutional Investor's* Integrated Wealth Management Forum, the American Real Estate Society, the annual Applied Geography Conference of the American Association of Geographers, the Southeastern Builders Conference, the American Real Estate and Urban Economics Association, the National Trust for Historic Preservation, and the National Association of Homebuilders annual Executive Officers Conference. Dr. Kilpatrick is a regular participant and speaker at the famed *Renaissance Weekend* in Charleston, S.C. He is a frequent contributor and reviewer for numerous scholarly and practitioner journals, having served on the editorial boards of *The Appraisal Journal* and the *Journal of Sustainable Real Estate*, and on the review board for the *Journal of Real Estate Research* among others. In 2003, his industry peers in Western Washington honored him by naming him Editor of the semi-annual *Central Puget Sound Real Estate Research Report*.

His consulting and academic research activities include work for the National Science Foundation; the U.S. Departments of Energy, Interior, Defense, and Commerce; Oak Ridge National Lab; Southeastern Universities Research Association; Oak Ridge Associated Universities; SC Budget and Control Board; SC Department of Archives and History; SC Downtown Development Association; SC Housing Finance and Development Authority; and many city and county governments and private corporations. He has been featured in *The Wall Street Journal*, the *Boston Globe*, *The New York Times*, and other national publications. Dr. Kilpatrick served on the Working Group of the Data Consortium, which set the agenda for real estate information in 21st century technology. In 2000, the State of South Carolina and the U.S. Department of the Interior published a monograph honoring his research. In 2002, following the terrorist attacks on the World Trade Center, Dr. Kilpatrick was a consulting expert on real estate for Bloomberg Network News. In 2003, he became a Fellow of the American Real Estate Society. In 2004, Dr. Kilpatrick was elected to be a Member of the Faculty on Valuation of the Royal Institution of Chartered Surveyors, and he was named a Fellow of that organization in 2011. Also in 2004, the Appraisal Qualifications Board in Washington, DC, designated Dr. Kilpatrick a Nationally Certified Instructor for the *Uniform Standards of Professional Appraisal Practice*. In 2006, Dr. Kilpatrick was named a *Visiting Scholar in Real Estate Finance* at the Zicklin School of Business, Baruch College, City University of New York. Dr. Kilpatrick is featured in the 2006 and later editions of *Who's Who in America.* He is an MAI-Designated Member of the Appraisal Institute.

John Kilpatrick has been qualified as an expert witness on finance, real estate, economics, construction matters, and statistical research in various state and federal courts throughout the United States.

**EDUCATION**

Bachelor of Science in Business Administration (Accounting), University of South Carolina

Master of Business Administration, University of South Carolina

Doctor of Philosophy, Finance, University of South Carolina
Dissertation: *Agency Costs and the Determinants of the Capital Structure of REITs*

**HONORS AND AWARDS**

Review Panel, *The Appraisal Journal*, (2015–)

Visiting Scholar in Real Estate, Zicklin School of Business, Baruch College, New York (2006-2015)

International Association of Assessing Officers' Bernard L. Barnard Outstanding Technical Essay Award, 2014

Keynote address, Darla Moore School of Business Graduate Hooding Ceremony, Spring 2014

MAI-Designated Member, Appraisal Institute

Invited Participant, *Renaissance Weekend*

*Fellow*, Royal Institution of Chartered Surveyors, Faculty of Valuation

Editorial Board, *The Appraisal Journal* (2013–2014)

Editorial Board, *Journal of Sustainable Real Estate* (2010-2015)

Reviewer, *Journal of Real Estate Research*

Editorial Board (U.S.), *Modus* (2011–2013)

National Board of Advisors, Washington State University College of Business Administration

*Who's Who in American Business and Finance*

*Who's Who in America*

*Journal of Property Investment and Finance* Highly Commended Paper award (2013)

American Real Estate Society annual meetings, Best Paper on Valuation award sponsored by the Appraisal Institute (2010)

Editorial Board, *Brownfield News* (2005–2006)

*Principal Member*, Real Estate Counseling Group of America

Nationally Certified Instructor, Uniform Standards of Professional Appraisal Practice, designated by the Appraisal Qualifications Board, Washington, DC

*Fellow*, American Real Estate Society

    Strategic Planning Committee Vice Chair (2013–)

    Education Committee (2008–09)

    Technology Committee Vice Chair (2010–11)

Professional Member, International Code Council

American Real Estate and Urban Economics Association 1994 Doctoral Seminar Honoree (1993)

Omicron Delta Epsilon Economics Honor Society (elected, 1993)

*National Graduate Scholar*, The Appraisal Institute (1992–1993)

*Arthur Warner Scholar,* The S.C. Association of Realtors (1991–1992)

*National University Scholar*, Commercial Investment Real Estate Council of the National Association of Realtors (1990–1991)

*Who's Who in the South and Southwest* (1984–1991 editions)

*Who's Who Among Students in American Universities and Colleges* (1976 edition)

Omicron Delta Kappa Leadership Honor Society (elected, 1975)

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON 98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA 30120
Phone 770-334-3952

## PUBLICATIONS AND WORKING PAPERS

"Valuation of Brownfield Properties," with Clifford A. Lipscomb, Chapter 29 in *Brownfields Law and Practice: The Cleanup and Redevelopment of Contaminated Land* (LexisNexis Matthew Bender Publications, 2015).

"Using a Random Forest Process in an Automated Valuation Model," with Clifford A. Lipscomb, Jessica Kenyon, and Daniel Tetrick, accepted for presentation at the 2015 annual meetings of the American Real Estate Society, April 2015.

"The Impact of the NAREIT Light Awards on REIT Performance," with Clifford A. Lipscomb, accepted for presentation at the 2015 annual meetings of the American Real Estate Society, April 2015.

"Can We Forecast the Next Bubble?," with Clifford A. Lipscomb, accepted for presentation at the 2015 annual meetings of the American Real Estate Society, April 2015.

"Animal Operations and Residential Appraisal," *Appraisal Journal,* Winter 2015.

"Appraisal and Valuation," Chapter 12 in *Private Real Estate Markets and Investments*, Peter Chinloy and Kent Baker, eds. (New York: Oxford U. Press, 2014).

"Do Survey Results Systematically Differ from Hedonic Regression Results? Evidence from a Residential Property Meta-Analysis," with Clifford Lipscomb and Abigail Mooney, *Journal of Real Estate Literature* 21-1, Fall 2013, 233–254. ***International Association of Assessing Officers' Bernard L. Barnard Outstanding Technical Essay Award, 2014.***

"The Impact of Institutional Controls on Property Values," with Clifford Lipscomb and Abigail Mooney, accepted for presentation at the 2013 American Real Estate Society annual meetings.

"Using Contingent Valuation to Estimate the Impact of a Feed Contamination Disclosure on Alpaca Values," with Clifford A. Lipscomb and Abigail Mooney, under Review at *Applied Economic Perspectives & Policy*.

"The U.S. Valuation Reconciliation is Still Ongoing," *Modus (Americas Edition)*, May 2012, p. 8.

"USPAP vs. International Valuation Standards – Compare and Contrast," *Greenfield Advisors working paper* presented at the 2012 American Real Estate Society annual meetings.

"Integration of Sector Analysis into a Hedonic Pricing Model," with Clifford A. Lipscomb and Andy Krause, *Greenfield Advisors working paper* presented at the 2012 American Real Estate Society annual meetings.

"Deconstructing the Housing Price Bubble," accepted for presentation at the 2012 American Real Estate Society annual meetings.

"Willingness to Pay Convergence Between Contingent Valuation and Hedonic Methods," with Clifford A. Lipscomb, Andy Krause, and Michael C. Farmer, *Greenfield Advisors working paper* presented at the 2012 American Real Estate Society annual meetings. Under review at *Real Estate Economics.*

"Contaminated Properties, Trespass, and Underground Rent," with Andy Krause, Ron Throupe, and Will Spiess, *Journal of Property Investment and Finance* 30-3, 2012, pp. 304–320. ***Designated as a "Highly Commended Award Winner" at the Emerald Publishing Literati Network Awards for Excellence, 2013.***

"Expert Systems and Mass Appraisal," a Greenfield Advisors Working Paper, presented at the 2010 Valuation Colloquium; *Journal of Property Investment and Finance*, 2011.

"Contingent Valuation and Real Estate Damage Estimation," with Cliff Lipscomb, Max Kummerow, Will Spiess, and Sarah Kilpatrick, *Journal of Real Estate Literature* 19-2, 2011, pp. 235–282.

"Valuing Brownfields" with Bill Mundy, Chapter 10 in *Brownfields: A Comprehensive Guide to Redeveloping Contaminated Property, Third Edition.* Todd S. Davis and Scott A. Sherman, editors. (American Bar Association, 2010).

"What Is the Error Rate of a Commercial Appraisal?" a Greenfield Advisors Working Paper, winner of the ***Appraisal Institute's Best Appraisal Paper*** award at the 2010 meetings of the American Real Estate Society.

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON  98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA  30120
Phone 770-334-3952

**PUBLICATIONS AND WORKING PAPERS (continued)**

"The Gulf Oil Spill Updated," a Greenfield Advisors White Paper, with Cliff Lipscomb and Chris Miner, October 2010.

"The Gulf Oil Spill," a Greenfield Advisors White Paper, with Cliff Lipscomb, June 2010.

"Chinese Drywall," with Chris Miner, a Greenfield Advisors Working Paper, presented at the 2010 meetings of the American Real Estate Society.

"Can We Trust Market Values?" with Max Kummerow, a *Greenfield Advisors Working Paper,* presented at the 2009 meetings of the American Real Estate Society.

"Residential Real Estate Pricing Disequilibrium," presented at the 2008 annual meetings of the American Real Estate Society.

"Valuing Historic Preservation Easements in Regulated Historic Districts – An Empirical Study," presented at the 2008 annual meetings of the American Real Estate Society.

"Liquidation Value: The Valuation of Real Estate in Distress," presented at the 2008 annual meetings of the American Real Estate Society.

"From Brownfields to Greenfields – Case Studies in Environmentally Sensitive Development," *Greenfield Advisors Working Paper,* presented at the 2008 annual meetings of the Asian Real Estate Society, July 2008.

"Preservation Easements," with Vicki Adams, *Journal of Wealth Management*, Summer 2008.

*Central Puget Sound Real Estate Research Report* (Editor), published semi-annually by the Central Puget Sound Real Estate Research Committee, Inc., 2003–2007.

"Certifying the Real Estate Damages Class – An Appraisal Perspective," a Greenfield Advisors Working Paper.

"Real Estate in the High Net Worth Portfolio," presented to the Integrated Wealth Management Forum, sponsored by *Institutional Investor*, New York, September 2007.

"Foreign Direct Real Estate Investment in the U.S. – Opportunities and Cautions," presented at the annual meetings of the Asian Real Estate Society, Macao, China, July 2007.

"Economic Feasibility – the Challenge for Eminent Domain Appraisers under *Lucas,*" a Greenfield Advisors Working Paper

"Real Estate Investments of the Rich and Famous," *Journal of Wealth Management,* Spring 2007.

"When is a Taking 'Fair'?, a Repeat Sales Analysis," presented at the American Real Estate Society annual meetings, April 2007; presented at the Eminent Domain Institute annual meeting, April 2007.

"Valuing Multiple Contemporaneous Events: The Case of the Murphy Oil Spill," presented to the American Real Estate Society annual meetings, April 2007.

"The Impact of Transit Corridors on Residential Property Values," with Ron Throupe, John Carruthers, and Andy Krause, *Journal of Real Estate Research*, Spring 2007.

"The Aftermath of Katrina – Recommendations for Real Estate Research," with Sofia Dermisi, *Journal of Real Estate Literature*, 15-2, Spring 2007.

"Valuation of Impaired Land: Greenfield Advisors Experience with Contaminated Sites", with Vicki Adams, Max Kummerow, Bill Mundy, and Ron Throupe, *Proceedings of the 13th Pacific-Rim Real Estate Society Conference,* January 2007.

"Highlights from 'Valuation of Brownfield Properties,'" American Bar Association's *Section on Environmental Transactions and Brownfields Newsletter*, November 2006.

"Non-Parametric Methods and the Appraisal Process," a working paper in progress.

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON 98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA 30120
Phone 770-334-3952

**PUBLICATIONS AND WORKING PAPERS (continued)**

"Stigma Revisited Again," with Max Kummerow, a working paper in progress presented at the American Real Estate Society annual meetings, Key West, FL, April 2006.

"Application of Repeat Sales Analysis to Determine the Impact of a Contamination Event," *Journal of Housing Research,* Fall 2006.

"Redevelopment Brings Developers, Conservationists Together," with Nina Marshtein, *Charleston (SC) Business Journal*, March 2, 2006.

"Valuation of Impaired Property" with Ron Throupe, Bill Mundy, and Will Spiess, Chapter 6 in *When Bad Things Happen to Good Property*, Robert A. Simons, ed., (Washington, DC: National Environmental Law Center, 2005).

"5 mega-trends for Puget Sound Real Estate," *Daily Journal of Commerce* (Seattle, WA), October 6, 2005.

"Brownfields Let Texans Do Well While Doing Good," with David I. Mayes, *Dallas Business Journal*, October 28, 2005.

"Recycling Land Around D.C. Offers Field of Dreams," with John E. Tabella, *The Washington Construction News*, September 2005.

"Brownfields Offer Chance for Urban Redevelopment," with Steven Lamb, *Charlotte Business Journal*, July 29, 2005.

"Find Creative New Ways to Develop Land in Tampa Bay," with Mark Tumlin, *Tampa Bay Business Journal,* July 25, 2005.

"Contamination Needn't Be Barrier to Developing Site," with Helen Swenson, *Greater Cincinnati Area Business Courier*, July 15, 2005.

"Creative Redevelopment Can Turn Brownfields to Gold," with David Brewer, *Kansas City Business Journal*, June 10, 2005.

"Provide More Housing, While Cleaning Up Our Environment," with Brad Anderer, *Arizona Journal of Business and Real Estate*, May 2005.

"Multiple Regression Models and Diminishing Marginal Returns in Land Values," with John I. Carruthers, working paper in progress. Presented at the American Real Estate Society annual meetings, April 2005.

"Geotechnical Problems and Property Values: Market Evidence from the Pacific Northwest," a working paper in progress.

"Appraising Real Estate in Complex Environmental Class Actions: An Expert's View," *Toxic Law Reporter*, January 13, 2005.

"Agency Costs and REIT Debt Announcements," with Ronald C. Rogers, a working paper in progress (presented at the American Real Estate Society meetings in 2004).

"Brownfields Offer Optimism as Options Dissipate," with Joseph Kesling, *Puget Sound Business Journal*, December 10, 2004, pg. 41.

"Real Estate Issues in Class Certification," *Class Action Litigation Report,* October 8, 2004.

"Terrorism Impacts on the Value of Major Downtown Office Buildings," Mundy Associates LLC working paper series.

"Agency Costs and REIT IPO's," with Ronald C. Rogers, a working paper in progress, presented at the American Real Estate and Urban Economics Association meetings in January 2004.

"Windfall Lien Guidance," *Newsletter of the Environmental Transactions and Brownfields Committee*, American Bar Association Section on Energy, Natural Resources, and the Environment, January 2004.

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON  98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA  30120
Phone 770-334-3952

**PUBLICATIONS AND WORKING PAPERS (continued)**

"Looking Backward and Forward: Economic Restructuring and United States Real Estate Markets," with John Carruthers, Bill Mundy, and Ron Throupe, *Real Estate Issues*, Fall 2003.

"Appraisal of Contaminated Real Estate in the United States," with Bill Mundy, prepared by invitation of and for publication in the *Journal of the Japan Real Estate Institute*, October 2003.

"Construction Defects and Stigma," *Mealey's Construction Defects*, July 2003.

"*Daubert* Raises Its Ugly Head Again," *In-House Counsel Committee Newsletter*, American Bar Association, February 2003.

"Concentrated Animal Feeding Operations and Proximate Property Values," *Appraisal Journal,* July 2001.

"The Future of Real Estate Information," *Real Estate Issues,* Spring 2001.

"Valuation Implications of EIFS," *Mealey's Construction Defects,* January 2001.

"Factors Influencing CBD Land Prices," with Bill Mundy, *Real Estate Issues*, Fall 2000.

"Lead Contamination Impact on Property Values Significant," *Real Estate Environmental Liability News*, March 2000.

*The Economic Impact of Historic Designation* (monograph reviewing research done over several years, published by the S.C. Department of Archives and History, January 2000).

"Summation of Evidentiary Rules for Real Estate Experts Mandated by Daubert v. Merrell Dow Pharmaceuticals, Inc." with Bill Mundy and Dave McLean, *Real Estate Issues*, Fall 1999.

"Valuing Brownfields," *Valuation Insights and Perspectives*, February 1999, with Bill Mundy and Dave McLean.

"Performance of Exterior Insulation Finish Systems," with Douglas C. Brown and Ronald C. Rogers, *Appraisal Journal,* January 1999.

*The Economic Impact of Local Preservation Ordinances on Small Towns in South Carolina* (1998), research monograph funded by the South Carolina Downtown Development Association and the U.S. Department of the Interior – National Park Service.

*House Price Impacts of School District Choice* (1998), with Frank J. Hefner, research monograph funded by the South Carolina Center for Applied Real Estate Education and Research.

*CAREER News* (semi-annual publication of the USC Center for Applied Real Estate Education and Research), editor, 1997–1998.

"Appraisal of Contaminated Properties," *CAREER News*, August 1998.

"Real Estate Law Means Major Changes," *Business and Economic Review*, April–June 1998.

"Economic Value Added for Real Estate," *CAREER News*, February 1998.

*Complete Real Estate Finance Desk Reference (Armouk, NY:  M.E. Sharpe Publishing, 1998)*

*Subdivision Development* (Chicago: Realtors Land Institute of the National Association of Realtors, 1998), John A. Kilpatrick, editor.

"Historic Designation and House Prices," *CAREER News*, August 1997.

The Five Critical C's of Credit," *Florida Home Builder Monthly*, May 1997.

"Managing the Shrinking Margins," *Florida Homebuilder*, April 1997.

*The Impact of Historic District Designation in Beaufort, South Carolina* (1997), research monograph funded by the Historic Beaufort Foundation, the S.C. Dept. of Archives and History, and the U.S. Department of the Interior – National Park Service.

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON  98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA  30120
Phone 770-334-3952

**PUBLICATIONS AND WORKING PAPERS (continued)**

*The Economic Impact of Local Preservation Ordinances in Greenville, South Carolina* (1997), research monograph funded by the Historic Greenville Foundation, the City of Greenville, South Carolina, the S.C. Department of Archives and History, and the U.S. Department of the Interior – National Park Service.

*Analysis of the Columbia Owens Downtown Airport Commercial Corridor* (1996), research monograph funded by the South Columbia Development Corp. and the City of Columbia.

"Impact of Historic District Designation on House Prices in Columbia, South Carolina," (1995), research monograph prepared for the S.C. Department of Archives & History.

*Understanding Home Construction*, (Washington, DC: Homebuilder Press, 1993). **Honorable Mention**, 1993 Washington, DC, EdPress Association Awards and **Top Honors**, 1994, Society for Technical Communication Awards.

"A Study into the Risk of Sales Variability and its Effect on the Success of Strip Shopping Centers," (1992). *Papers and Proceedings of Applied Geography Conferences* Volume 15, J. Frazier, B. Epstein, and F. Schoolmaster, editors.

"Development and Construction Financing: Where Do We Go From Here?" *Maryland Builder*, Baltimore, MD, February 1992.

*Sample Letters and Memos* (Washington, DC: Homebuilder Press, 1992).

*Financing Development and Construction in the Nineties* (Washington, DC: Homebuilder Press, 1991).

## INVITED TALKS

*In addition to the invited talks listed below, John Kilpatrick is a frequent guest speaker at civic clubs and events throughout the United States.*

"The Economy of Cuba – a 2016 update", presented at the Real Estate Counseling Group of America, West Palm Beach, Florida, April, 2016

"Appraisal Litigation," presented at the University of Southern California in conjunction with the annual meeting of the Southern California Appraisal chapter, November 2015.

"Practical Statistics for Practicing Appraisers," presented at the invitation of the Appraisal Institute at the 2015 annual meetings, Dallas, TX, July 2015.

"The Impact of the NAREIT Light Awards on REIT Performance," with Clifford A. Lipscomb, accepted for presentation at the 2015 annual meetings of the American Real Estate Society, April 2015.

"Can We Forecast the Next Bubble?," with Clifford A. Lipscomb, accepted for presentation at the 2015 annual meetings of the American Real Estate Society, April 2015.

"Mentoring," Keynote Address, Graduate Hooding Ceremony, Darla Moore School of Business, University of South Carolina, May 2014.

"Computational Modeling in Real Estate," Panel Chair, American Real Estate Society annual meetings, San Diego, CA, April 2014.

"Professional Real Estate Education," invited panelist on "The Importance of Teaching: Engaging Different Learning Styles," presented at the American Real Estate Society annual meetings, Kona, HI, April 2013.

"Appraisal Implications of Proximity to Feedlots," presented at the American Real Estate Society annual meetings, Kona, HI, April 2013.

"Advanced Statistical Methods in Real Estate Appraisal," presented at the Appraisal Institute annual meetings, San Diego, CA, August 2012.

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON 98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA 30120
Phone 770-334-3952

**INVITED TALKS (continued)**

"Real Estate Failure – BRAKING the Cycle," panel discussion presented at the American Real Estate Society annual meetings, St. Petersburg, FL, April 2012.

"Integration of Sector Analysis into a Hedonic Pricing Model," presented at the American Real Estate Society Annual Meetings, St. Petersburg, FL, April 2012.

"Deconstructing the Housing Price Bubble," presented at the American Real Estate Society Annual Meetings, St. Petersburg, FL, April 2012.

"USPAP versus the International Valuation Standards," presented at the American Real Estate Society Annual Meetings, St. Petersburg, FL, April 2012.

"Property Valuation Issues in Fracking Cases," Fracking Litigation Conference, Philadelphia, PA, September 2011.

"Valuation of Construction Defects," presented at the Construction Defects and Insurance Coverage Conference, March 2011.

"Expert Systems and Mass Appraisal," Valuation Colloquium sponsored by Clemson University, November 2010.

"Valuation Impacts of the Gulf Oil Spill," the BP Oil Spill Litigation Conference, Miami Beach, FL, November 2010.

"The Gulf Oil Spill," presented to the Real Estate Counseling Group of America, Washington, DC, September 2010.

"Impact of the Gulf Oil Spill on Bank Collateral Portfolios," presented to the Collateral Risk Network, Washington, DC, July 2010.

"Valuation Impacts of the BP Oil Spill," presented at the BP Oil Spill Litigation Conference, Atlanta, GA, June 2010.

"The Grove Farm Project," presented to the Real Estate Counseling Group of America, Las Vegas, NV, April 2010.

"Real Estate Education," panel presentation at the 2010 annual meetings of the American Real Estate Society, Naples, FL, April 2010.

"Valuation Impact of Chinese Drywall," presented at two Chinese Drywall Litigation Conferences in New Orleans, LA, June 2009 and November 2009.

"Appraisal Error Terms," presented to faculty and students at Valdosta State University, October 2009.

"Real Estate Investment," panel chair for the Seattle Hedge Fund Society, May 2009.

"Environmental Valuation in the United States," panel chair for the 2008 annual meetings of the Asian Real Estate Society.

"Liquidation Valuation," presented to the 2008 annual meetings of the American Real Estate Society.

"Residential Real Estate Market Disequilibrium," presented to the 2008 annual meetings of the American Real Estate Society.

"Market Demand Factors for Master's Degree Students in Real Estate," panel discussion presentation at the 2008 annual meetings of the American Real Estate Society.

"Market Factors Affecting Redevelopment of Residential and Mixed-Use Contaminated Property," presented to the Brownfield CLE meetings, Seattle, WA, March 2008.

"Complex Valuation," presented to graduate students in the Zicklin School of Business, Baruch College, New York, September 2007.

"Real Estate in the High Net Worth Portfolio," Integrated Wealth Management Conference, sponsored by *Institutional Investor* magazine, September 12, 2007.

"Dollars and Sense of Real Estate Investments," Chair of Continuing Education Program, Seattle, Washington, June 2007. Presentations: "What's Working and What's Not" and "The Future of Real Estate Financing."

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON 98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA 30120
Phone 770-334-3952

## INVITED TALKS (continued)

"Land Valuation," session chair, Asian Real Estate Society Annual Meetings, Macao, China, July 2007.

"Foreign Real Estate Investment in the U.S.: Pitfalls and Opportunities," Asian Real Estate Society annual meetings, Macao, China, July 2007.

"When is a Taking Fair?" Eminent Domain Institute, Las Vegas, NV, April 2007.

"Real Estate Investments of the Rich and Famous," American Real Estate Society annual meetings, San Francisco, CA, April 2007.

"Consistency and Bias in Eminent Domain Appraisals," American Real Estate Society annual meetings, San Francisco, CA, April 2007.

"Real Estate Investments of the Rich and Famous," American Real Estate Society annual meetings, San Francisco, CA, April 2007.

"Scope of Work Updates to the 2006 Uniform Standards of Professional Appraisal Practice, presented to the Real Estate Counseling Group of America, Philadelphia, PA, October 2006.

"Valuation of Contaminated Property in the United States," seminar presented to the faculty and students of the University of Endhoven, the Netherlands, June 2006.

"Stigma Revisited Again," working paper in progress with Max Kummerow, presented at the American Real Estate Society annual meetings, Key West, FL, April 2006.

"Application of a Repeat Sales Methodology to Evaluate Property Value Damages from Contamination," presented at the American Real Estate Society annual meetings, Key West, FL, April 2006, subsequently published in the *Journal of Housing Research.*

"The Impact of Transit Corridors on Residential Property Values," with Ron Throupe, John Carruthers, and Andy Krause, presented at the American Real Estate Society annual meetings, Key West, FL, April 2006, accepted for publication in the *Journal of Real Estate Research.*

"Real Estate Investing," Seattle Society of Chartered Financial Analysts, December 14, 2005.

"Valuation," Session Chair for the American Real Estate Society meetings, Santa Fe, NM, April 2005.

"History of Valuation" Panelist for the American Real Estate Society meetings, Santa Fe, NM, April 2005.

"Regression Analysis and Diminishing Marginal Returns – An Appraisal Case Study" with John Carruthers, accepted for presentation at the 2005 Annual Meeting of the American Real Estate Society, Santa Fe, NM, April 2005.

"The USPAP Scope of Work Proposal," presented to the Real Estate Counseling Group of America, Savannah, GA, March 2005.

"Valuation of Brownfields," presentation to officials of the City of Greensboro, NC, January 2005.

"Trophy Property," presentation at the annual meetings of the American Society of Auctioneers, Madison, WI, July 2004.

"Environmental Valuation Issues," Session Chair for the American Real Estate Society meetings, Captiva Island, FL, April 2004.

"Agency Costs and REIT Debt Announcements," presented at the American Real Estate Society meetings, Captiva Island, FL, April 2004.

"The Future of Real Estate," presented at the invitation of the Real Estate Counseling Group of America, Half Moon Bay, CA, March 2004.

"Property Tax Appraisal," presented at a seminar in Tacoma, WA, February 2004.

"Agency Costs and REIT IPOs," presented at the invitation of the American Real Estate and Urban Economics Association, San Diego, CA, January 2004.

**INVITED TALKS (continued)**

"Updates on the EPA's New Windfall Lien Provisions," presented at the invitation of the U.S. EPA at the Brownfields Conference, Portland, OR, October 29, 2003.

"Updates on the EPA's New Windfall Lien Provisions," presented in a nationwide teleconference sponsored by the American Bar Association's Section on Energy, Environment, and Natural Resources, August 20, 2003.

"Can a Tribal Utility Pay for Itself," presented at the Tribal Utilities Conference, Seattle, WA, June 9 & 10, 2003.

"Financing Residential Development," Master Builders Association of Olympia, WA, April 2003.

"Agency Costs and REIT Mergers," American Real Estate Society annual meetings, Monterrey, CA, April 2003.

"Economics of Brownfield Redevelopment," presented at the Advanced Brownfields Redevelopment Workshop, Anchorage, AK, January 27, 2003.

"Appraisal of Contaminated Property," International Association of Assessing Officials, West Puget Sound Chapter, Olympia, WA, April 26, 2002.

"Market Value(s)," presented to the Seattle Chapter of the Appraisal Institute, Seattle, WA, November 2001.

"Loss Profits and Damages from an Economist's Point of View," presented at the Washington State CPA's Association Litigation Services Seminar, May 4, 2001.

"Appraisal of EIFS Residences," presented at a Symposium on emerging litigation areas sponsored by Mealy Publications, Marina del Mar, CA, November 2000.

"The Puget Sound Economy," guest speaker for KIRO-TV (Seattle CBS affiliate) at client breakfast, September 21, 2000.

"Public Interest Value," presented at the conference Valuation 2000, jointly sponsored by the Appraisal Institute, the American Society of Appraisers, and the American Farm Managers and Rural Appraisers, Las Vegas, NV, July 6–7, 2000.

"An Economic Model of Downtown Seattle Land Prices," presented to the Pacific Northwest Regional Economic Conference, Western Washington U., April 2000.

"Deposing the Real Estate Expert Witness," presented to participants in the Trial Advocacy classes, U. of Washington School of Law, March 2000.

"Economic Impact of Real Estate Development," presented to the Seattle Economists Club, December 1999.

"Appraisal of Contaminated Property," presented to the International Association of Assessing Officials, Evergreen Chapter, Woodinville, WA, November 1999.

"Appraisal of EIFS Residences," presented at a Symposium on EIFS sponsored by U.S. Inspect, Washington, DC, June 1999.

"House Price Implications of School District Choice," presented at the American Real Estate and Urban Economics Association, New York City, January 1999.

"Economic Impact Studies for Homebuilding," presented to the National Assn. of Homebuilders annual Governmental Affairs, St. Louis, MO, November 7, 1998.

"Economic Assessment of Historic Properties," presented to the 52nd annual Preservation Conference, National Trust for Historic Preservation, Savannah, GA, October 23, 1998.

"Current Topics in Financial Management for Homebuilders and Developers," presented to the South Eastern Builders Conference, Orlando, FL, August 17, 1998.

"Valuation of Contaminated Property," presented to the Quarterly Meeting of the South Carolina Appraisal Institute, Columbia, SC, July 23, 1998.

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON 98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA 30120
Phone 770-334-3952

**INVITED TALKS (continued)**

Panel discussion on Land Use, Regulation, and House Prices, presented at the American Real Estate and Urban Economics Association Mid-Year Meeting, held at the National Association of Homebuilders, Washington, DC, May 26, 1998.

"Accounting and Financial Management for Homebuilders," presented to the Southeastern Builders Conference, Orlando, FL, July 1997.

"Impact of Historic District Designation in Beaufort, South Carolina," presented to the American Real Estate Society, Sarasota, FL, April 1997.

"The Value of History to Real Estate," presented to the Lovable Communities Conference sponsored by the South Carolina Downtown Development Association, Charleston, SC, October 1996.

"Valuation of Historic Residences," presented to Appraisal Institute members, Savannah, GA, May 1996.

"House Price Implications of Historic District Designation," presented to the American Real Estate Society, Lake Tahoe, CA, March 29, 1996.

"Economics of Historic Districts," presented to the Georgia Trust for Historic Preservation, Atlanta, GA, February 16, 1996.

"Accounting and Financial Management for Homebuilders," presented to the South Eastern Builders Conference, Orlando, FL, July 1995.

Panel chair, "Appraisal of Historic Properties," presented at "Historic Preservation for Realtors," sponsored by the S.C. Department of Archives and History, Columbia, SC, January 13, 1995.

Presentation on Advanced Manufacturing Capabilities made to members of the U.S. Senate, Washington, DC, July 1993.

"A Study into the Risk of Sales Variability and its Effect on the Success of Strip Shopping Centers," presented at the Applied Geography Conference, Denton, TX, October 20, 1992.

**TEACHING**

From 1992 through 1998, John Kilpatrick taught corporate finance and real estate in the Moore School of Business at the University of South Carolina. Courses developed and taught included the following:

- Principles of Real Estate (FINA 366 – certified as a pre-licensing course by the S.C. Real Estate Commission)
- Real Estate Market Analysis (FINA 367 – certified as a pre-licensing course by the S.C. Real Estate Commission)
- Principles of Finance (FINA 363 – required of all undergraduate business majors)
- Commercial and Central Banking (ECON 301)

John Kilpatrick's students won many of USC's top undergraduate Business scholarships, and his courses were consistently oversubscribed months in advance. Additionally, John Kilpatrick was a featured speaker for the Daniel Management Center of the University of South Carolina, teaching Executive Education courses on Real Estate (1995–96) and Corporate Budgeting (1997–98). He was the first person in South Carolina certified by the Real Estate Commission to teach continuing education courses via statewide closed circuit broadcast. As a Lecturer in Finance, Kilpatrick has taught Appraisal or Real Estate Continuing Education in South Carolina (1995–1998), Georgia (1996), Florida (1995–1998), and Washington (1999–present), and he has recently taught appraisal continuing education for the Seattle chapter of the Appraisal Institute, Bellevue College, and various chapters of the International Association of Assessing Officials.

Dr. Kilpatrick is a frequent lecturer on Real Estate Appraisal Standards and Methods, and in 2004 he was appointed by the Appraisal Standards Board (Washington, DC) as a Nationally Certified instructor of the *Uniform Standards of Professional Appraisal Practice*. He occasionally teaches the pre-licensing course for Bellevue

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON 98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA 30120
Phone 770-334-3952

College, Bellevue, Washington. Also in 2004, he was nominated for a seat on the Appraisal Qualifications Board. From 2006-2015, Dr. Kilpatrick was a Visiting Scholar in Real Estate Finance at the Zicklin School of Business, Baruch College, New York City, New York,  Dr. Kilpatrick also serves on the National Board of Advisors for the Washington State University College of Business.

## PROFESSIONAL ASSOCIATIONS

John Kilpatrick is an active member of various academic and professional organizations, including the Royal Institution of Chartered Surveyors (Fellow, Faculty of Valuation), the Appraisal Institute (MAI-Designated Member), the American Bar Association (Associate Member), the American Real Estate Society (Fellow), the American Real Estate and Urban Economics Association, the Financial Management Association, the American Finance Association, the American Statistical Association, the Econometric Society, the International Right of Way Association, the International Association of Assessing Officials, the International Code Council (Professional Member), the National Association of Realtors, and the Washington State Bar Association (Associate Member).

West Coast Office
2101 FOURTH AVENUE, SUITE 820
SEATTLE, WASHINGTON 98121
Phone 206-623-2935
Fax 206-623-2985

East Coast Office
106 N. BARTOW STREET
CARTERSVILLE, GEORGIA 30120
Phone 770-334-3952

# Trial and Deposition Testimony, John A. Kilpatrick, Ph.D., MAI, FRICS
# Greenfield Advisors LLC

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 12-1102 | Federal Housing Finance Agency, etc., v. The Royal Bank of Scotland Group PLC, et al. | securities action, AVM, mass appraisal, appraisal review | USDC, Dist of Conn. | Quinn Emanuel, New York, NY | Simpson Thatcher, NYC | Quinn Emanuel | | X | 11 Civ. 01383 (AWT) |
| 10-0602B | Richard Cotromano, et al., v. United Technologies Corp, d/b/a Pratt & Whitney | Environmental contamination & stigma; class certification | UDC, Southern District of FL, West Palm Beach Div. | Searcy Denney Scarola Barhart & Shipley, West Palm Beach, FL | Bartlit Beck, Chicago, IL | Searcy | | X | 9:13-80928-C(V-MARRA |
| 15-0703 | U.S. Bank National Association, as trustee for Citigroup Mortgage Loan Trust 2007-AHL2, v. Citigroup Global Markets Realty Corp. | Securities action, mass appraisal, AVM, appraisal review | Supreme Court of the State of NY, County of New York, Commercial Div. | McKool Smith, New York, NY | Paul Weiss, New York, NY | McKool Smith | | X | Index 653816/2013 |
| 10-0602 | Joseph Adinolfe, et al., v. United Technologies Corp, d/b/a Pratt & Whitney | Environmental contamination & stigma; class certification | UDC, Southern District of FL, West Palm Beach Div. | Craig Zobel, Palm Beach Gardens, FL | Bartlit Beck, Chicago, IL | Zobel | | X | 10-80840-CIV-KLR |
| 15-0706 | Susan Raymond v. Edwin Hostetler, Eileen Hostetler, and Western Slope Layers, LLC | CAFO | District Court, Delta County, Colorado | Hannon Law Firm LLC, Denver, CO | Budd-Falen Law Offices LLC, Cheyenne, WY | Hannon | | X | 2014CV030062 |
| 15-1201 | Sound/Nyssen-Maule v. Buffelen Pipe and Creosote Co. | Contaminated Property | Pierce Cnty (WA) Superior Court | John Spencer, Spencer & Assoc., Tacoma, WA | Coastline Law Group, Tacoma, WA | Spencer | | X | 14-2-15266-9 |
| 14-0602 | John Thompson, et al., v. State Farm Fire and Casualty Insurance Co. | Class action, water damages, insurance issues | USDC, Middle District of GA, Macon Division | Richardson, Patrick, Westbrook, & Brickman, LLC, Mt. Pleasant, SC | Sutherland Asbill & Brennan, LLP, Atlanta, GA | Richardson, Patrick, Westbrook, & Brickman | | X | 5:14-cv-000320MTT |


Greenfield Advisors
Economic, Market and Valuation Analysts

# TRIAL AND DEPOSITION TESTIMONY,  JOHN A. KILPATRICK, PH.D., MAI, FRICS
# GREENFIELD ADVISORS LLC

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 15-0203 | Lisa Lee-Bolton, et al., v. Koppers, Inc. | Class action, contaminated property | USDC, Northern District of FL, Gainesville Div | Paul Rothstein, Gainesville, FL; Parker Waichman LLP, Bonita Springs, FL; William Dubanevich, New York, NY, The Calwell Practice, Charleston WV | Hill, Ward, & Henderson, PA, Tampa, FL; Steptoe & Johnson, Chicago, IL | Calwell Practice | | X | 1:10-cv-253-MCR-GRJ |
| 15-0202 | Donna NeCaise, as Administratrix of the Estate of Betty Joyce Ladner, et al., v. Eagle Energy, et al. | contaminated property | Circuit Court of Harrison County, MS | Burns, Cunningham, & Mackey, PC, Mobile, AL | David W. Crane, Gulfport, MS | Burns, Cunningham, & Mackey | | X | 10-03254(2) |
| 12-0902 | Barfield, et al, v. Sho-Me Power, et al. | easement dispute, class action | USDC, Western District of Missouri | Cook, Vetter, Cdoerhoff, & Landwehr (Jefferson City, MO); Ackerson Kauffman Fex (Washington, DC); Price Waicukauski & Riley (Indiapolis, IN) | Thompson Coburn (St. Louis, MO); Lathrop & Gage (Kansas City, MO) | Price Waicukauski & Riley | X | X | 2:11-cv-04321-NKL |
| 12-1102 | Federal Housing Finance Agency, etc., v. Nomura Holdings America, Inc., et al. | securities action, AVM, mass appraisal, appraisal review | USDC, S. Dist NY | Quinn Emanuel, New York, NY | Sullivan & Cromwell, NYC | Quinn Emanuel | X | X | 11 Civ. 6201 (DLC) |
| 13-1102 | Massachusetts Mutual Life Insurance Company v. Countrywide Financial Corporation, et al. | securities action, AVM, mass appraisal, appraisal review | USDC, District of Mass | Quinn Emanuel, Los Angeles, CA | Williams, Cutler, Pickering, Hale, and Dore LLP, New York, NY | Quinn Emanuel | | X | 3:11-cv-30215-MAP |
| 13-1102 | Massachusetts Mutual Life Insurance Company v. DB Structured Products, et al. | securities action, AVM, mass appraisal, appraisal review | USDC, District of Mass | Quinn Emanuel, Los Angeles, CA | Simpson, Thatcher, & Bartlett LLP, New York, NY | Quinn Emanuel | | X | 3:11-cv-30039-MAP |



Greenfield Advisors

*Economic, Market and Valuation Analysts*

# TRIAL AND DEPOSITION TESTIMONY,  JOHN A. KILPATRICK, PH.D., MAI, FRICS
# GREENFIELD ADVISORS LLC

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 14-0701 | John Hughes, et al. v. Steve Garvin, et al. | negative externalities issues | Superior Court of WA for King Cnty | Veris Law Group PLLC, Seattle | Helsell Fetterman LLP, Seattle; Betts Patterson & Mines, Seattle | Veris | | X | 13-2-23355-0 SEA |
| 13-1102 | Massachusetts Mutual Life Insurance Company v. Countrywide Financial Corporation, et al. | securities action, AVM, mass appraisal, appraisal review | USDC, Central Dist. CA | Quinn Emanuel, Los Angeles, CA | Shearman & Sterling LLP, New York, NY | Quinn Emanuel | | X | 11 ml-2265-MRP (MANx) |
| 12-1102 | FHFA v. Goldman Sachs & Co., et al | securities action, AVM, mass appraisal, appraisal review | USDC, S. Dist. NY | Quinn Emanuel, New York, NY | Sullivan & Cromwell, NYC | Quinn Emanuel | | X | 11 Civ. 6198 (DLC) |
| 12-1102 | FHFA v. HSBC North America Holdings, et al. | securities action, AVM, mass appraisal, appraisal review | USDC, S. Dist. NY | Quinn Emanuel, New York, NY | Boies, Schiller & Flexner, LLP, NYC | Quinn Emanuel | | X | 11 Civ. 6189 (DLC) |
| 12-1102 | FHFA v. Ally Financial Inc., et al., F/K/A GMAC, Inc. | securities action, AVM, mass appraisal, appraisal review | USDC, S. Dist. NY | Quinn Emanuel, NYC, Kasowitz Benson, NYC | Mayer Brown, NYC | Quinn Emanuel, NYC; Kasowitz Benson, NYC | | X | 11 Civ. 7010 (DLC) |
| 12-1102 | FHFA v. Merrill Lynch & Co., Inc. | securities action, AVM, mass appraisal, appraisal review | USDC, S. Dist. NY | Quinn Emanuel, NYC, Kasowitz Benson, NYC | Williams & Connolly, Washington, DC | Quinn Emanuel, NYC, Kasowitz Benson, NYC | | X | 11 Civ. 6202 (DLC) |



Greenfield Advisors

*Economic, Market and Valuation Analysts*

# TRIAL AND DEPOSITION TESTIMONY,  JOHN A. KILPATRICK, PH.D., MAI, FRICS
# GREENFIELD ADVISORS LLC

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 11-0204 | Tillman, et al., v. Chevron USA, et al. | underground storage | Concordia Parish, Louisiana | Talbot, Carmouche, and Marcello, Baton Rouge, LA | Keen Miller LLC, Baton Rouge, LA | Talbot, Carmouche, and Marcello | | X | 44096-B |
| 13-0701 | Ladd, et al., v. United States | categorical taking | U.S. Court of Federal Claims | Arent Fox, Los Angeles, CA | U.S. DOJ | Arent Fox | | X | 07-271L |
| 13-0201 | Thundering Herd Development LLC and THD Investors 7 LLC v. S&M E, Inc., and J.A. Street & Associates, Inc. | Construction defects and geotechnical issues | Circuit Court of Cabell County, WV | Damron Law Office PLLC, Huntington, WV, and Huddleston Bolen PLLC, Huntington WV | McQueen Davis PLLC, Huntington, WV | Damron | | X | 03-C-0490 |
| 13-0601 | Microstrategy, Inc., v. Zillow, Inc. | Patent and Intellectual Property Issues | U.S. Patent Trial and Appeal Board | Fish & Richardson, PC, Minneapolis, MN | Perkins Coie, LLP, Seattle, WA | Perkins Coie | | X | IPR2013-00034 (JL) |
| 11-0602 | Sleeping Tiger LLC v. City of Tukwilla | Inverse condemnation | USDC, Western District of Washington | Rachel L.Hong | Keating Bucklin & McCormack, Seattle, WA | Keating Bucklin | | X | 2:12-cv-01621-RSL |
| 11-0502 | Nance, et al., v. AVX Corporation | Contaminated property | State of South Carolina, Court of Common Pleas for Horry County | Aiken Bridges, Florence, SC | Parker Poe, Charlotte, NC | Aiken Bridges | X | X | 2008-CP-26-0436 |
| 13-0301 | McHugh, et al., v. Madison-Kipp Corporation, et al. | contaminated property class action | USDC, Western District of Wisconsin | Varga Berger Ledsky Hayes & Casey, Chicago; Whyte Hirschboeck Dudek, Madison; Collins Law Firm, Naperville, OH | Michael Best & Friedrich, Madison; Deutch & Weiss, Milwaukee; Hale & Wagner, Mulwaukee; Troutman Sanders, Chicago; Brennan Steil, Janesville, WI; Meissner Tierney Fisher & Nichols, Milwaukee | Collins | | X | 11-cv-724-bbc |
| 11-0802 | Parr, et al., v. Aruba Petroleum, Inc., et al. | contaminated property | County Court at Law No. 5 of Dallas County, TX | Gilde Law Firm, Houston TX; Capshaw & Associates, Dallas, TX; Freese & Goss, Dallas, TX; | Hayes & Boone, Houston, TX; Ben Barron PC; Dallas, TX; Lillard Wise Szygenda; Dallas, TX | Gilde | | X | 11-101650-E |



Greenfield Advisors

Economic, Market and Valuation Analysts

# TRIAL AND DEPOSITION TESTIMONY, JOHN A. KILPATRICK, PH.D., MAI, FRICS
# GREENFIELD ADVISORS LLC

| Greenfield Case No. | CASE NAME | PROJECT | COURT NAME | PLAINTIFF ATTORNEY | DEFENSE ATTORNEY | RETAINED BY | TRIAL | DEP | CASE NO. |
|---|---|---|---|---|---|---|---|---|---|
| 09-1002 | Patrick, et al., v. FirstEnergy Generation Corp. | Contamination, class action | USDC, Western District Penn. | Villari Brandes, Conshohocken, PA | Babst Calland, Pittsburg, PA | Villari Brandes | X | X | 2:08:cv-01019-JCF; 01025-JCF; 01030-JCF |
| 12-0502 | Wagner et al. v. Tammany Holding Company LLC, et al. | contaminated property | Civil District Court, Parish of Orleans, Louisiana | Smith Stag, New Orleans, LA | Jones Walker; Waits, Emmett, & Popp; Plauche Maselli Parkerson; Gieger Laborde & Laperouse; Deutsch, Kerrigan & Stiles (all of New Orleans); Duplechain & Assoc (Slidell, LA); Reich, Album & Plunkett (Metarie, LA) | Smith Stag | | X | 12-0453 |
| 12-1104 | Michael Coker, et al., v. Bray & Gillespie, LLC, et al. | personal injury & business losses | Circuit Court, 7th Judicial Circuit, Volusia County, FL | Murphy Falcon, Baltimore, MD | Weinberg Wheeler, Atlanta, GA | Murphy Falcon | | X | 2008-31467 CICI |
| 12-0601 | BBM Associates v. Apex First Development | Business Dispute & Professional Liability | Superior Court, State of N.C., County of Wake | Burnes, Day, & Presnell, Raleigh, NC; Allen Moore & Rogers, Raleigh, NC | Vann & Sheridan, Raleigh, NC; Ortiz & Schick, Raleigh, NC | Vann & Sheridan; Ortiz & Schick | X | X | 09 CVS 25025 |


Greenfield Advisors
Economic, Market and Valuation Analysts