## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| MODERN HOLDINGS, LLC, SELLERS AND SELLERS COMPANY, ROSETTA FORD, GARY FORD, OTIS FORD, CHARLES FORD, BOBBIE LEMONS, GLEN BALL, VIVIAN TROXLER, RODNEY JOHNSON, RITA BOWMAN, DANIEL BARTLESON, DAVID CALDWELL, MARGO CALDWELL, GEORGE CHENAULT, MARTHETTA CLARK, SADIE GAMBREL, JAMES HUNN, ETHEL HUNN, BRENDA CARTER, WILLIE HARRIS, MELVIN HARRIS, JOSETTA HAYS, DARREN HAYS, GLORIA LEWIS, SHARON PRICE, CHESTER KAVANAUGH, MARGRET PEEBLES, BETHEL WADE, DAVID CHENAULT, JR., ANITA ROSS, CONNIE MULLINS, CELIA WILKINSON, THE ESTATE OF BETTY JOHNSON, ERICA FORD, GLORIA FRYE, BONITA RAMZY, JUSTINE RAMIREZ, LATRESE BARBOUR, CHRISTOPHER JOHNSON, JOSEPH JOHNSON, JOHN RAINES, JR., CLYDE SIMPSON, DEBORAH STEVENSON, DANETTA OWSLEY, CHANTEE NOLAN, LONNIE JOHNSON, HARVEY CHENAULT, KATHERINE DOTY, TYRONE JOHNSON, ANN HAWKINS, RONALD HAWKINS, THE ESTATE OF RICHARD MANNING, ANTHONY MANNING, FANNY WALKER, CHENICE GAANS, JAMES DOLLINS, THE ESTATE OF FRANK WALKER, WILLIAM GALBREATH, KELVIN GALBREATH, STEVEN COFFMAN, SONYA COFFMAN, CESIRELY COFFMAN, MICHELLE (COFFMAN) MORTON, CHARLES LAWSON, THE ESTATE OF MIKE ORBERSON, WILLIAM TRUMBO, DEJUANNA TRUMBO, BARBARA TRUMBO, BRIHANA TRUMBO, DEWAYNE TRUMBO, DEMMONTRELL TRUMBO, DEMAYA TRUMBO, CHANTEE NOLAN, As Next Friend And Guardian Of D.T., D.T.(2), D.D., S.N., E.N., and M.N., JANET MITCHEL, WANDA BEASLEY, DONNA SMITH, WALTER SMITH and MARY EMILY ORBERSON | Civil Action No. 5:13-cv-00405-GFVT<br><br><br><br>**FIFTH AMENDED COMPLAINT** |

|  |  |
|---|---|
| **Plaintiffs,** | |
| **V.** | |
| **CORNING INCORPORATED, a** **New York Corporation** | |
| **AND** | |
| **PHILIPS ELECTRONICS, NORTH** **AMERICA CORPORATION, a** **Delaware Corporation** | |
| **Defendants.** | |

Plaintiffs Modern Holdings, LLC, Sellers and Sellers Company, Rosetta Ford, Gary Ford,

Otis Ford, Charles Ford, Bobbie Lemons, Glen Ball, Vivian Troxler, Rodney Johnson, Rita

Bowman, Daniel Bartleson, David Caldwell, Margo Caldwell, George Chenault, Marthetta

Clark, Sadie Gambrel, James Hunn, Ethel Hunn, Brenda Carter, Willie Harris, Melvin Harris,

Josetta Hays, Darren Hays, Gloria Lewis, Sharon Price, Chester Kavanaugh, Margret Peebles,

Bethel Wade, David Chenault, Jr., Anita Ross, Connie Mullins, Celia Wilkinson, the Estate of

Betty Johnson, Erica Ford, Gloria Frye, Bonita Ramzy, Justine Ramirez, Latrese Barbour,

Christopher Johnson, Joseph Johnson, John Raines, Jr., Clyde Simpson, Deborah Stevenson,

Danetta Owsley, Chantee Nolan, Lonnie Johnson, Harvey Chenault, Katherine Doty, Tyrone

Johnson, Ann Hawkins, Ronald Hawkins, the Estate of Richard Manning, Anthony Manning,

Fanny Walker, Chenice Gaans, James Dollins, the Estate of Frank Walker, William Galbreath,

Kelvin Galbreath, Steven Coffman, Sonya Coffman, Cesirely Coffman, Michelle (Coffman)

Morton, Charles Lawson, the Estate of Mike Orberson, William Trumbo, Dejuanna Trumbo,

Barbara Trumbo, Brihana Trumbo, Dewayne Trumbo, Demmontrell Trumbo, Demaya Trumbo,

Janet Mitchel, Wanda Beasley, Donna Smith, Walter Smith and Mary Emily Orberson, and

Chantee Nolan, As Next Friend And Guardian Of D. T., D. T. (2), D. D., S.N., E. N., and M. N.,

2

(collectively the "Plaintiffs"), for their Fifth Amended Complaint against Philips Electronics North America Corporation ("Philips"), and Corning Incorporated ("Corning") (collectively "Defendants"), respectfully state as follows:

## I.    <u>INTRODUCTION</u>

1.    This controversy relates to a glass and bulb manufacturing facility in Danville, Kentucky.  Corning constructed and operated the glass manufacturing facility (the "Facility") located at 320 Vaksdahl Avenue (the "Site") in 1952.

2.    This Complaint alleges Counts against Philips and Corning on behalf of the Plaintiffs as follows: (I) Nuisance; (II) Trespass; (III) Negligence, Gross Negligence, and Recklessness; (IV) Negligence Per Se; (V) Battery; (VI) Fraudulent Concealment; (VII) and Negligent Infliction of Emotional Distress.

3.    This action arises from the negligent, reckless, and/or intentional contamination of the Plaintiffs' properties and injury to persons with lead, arsenic and Trichlorethylene ("TCE"). Such substances were caused to be released and leave Defendants' property and enter onto the properties of the Plaintiffs, and have contaminated the Plaintiffs' water, soil, vegetation, air, water, land, and dwellings, thereby causing Plaintiffs to suffer personal injury or an increased risk of serious latent diseases, damage to their properties and personal finances, interference with their exclusive possession of their property, loss of the use and enjoyment of their properties, and destruction of their community.  Plaintiffs seek an injunction requiring Defendants to promptly and completely remove all lead, arsenic and TCE from their properties, and to prevent future migration of these substances onto their properties.  The Plaintiffs also seek damages for the diminution in the value of their properties, additional compensatory and punitive damages, and the establishment of a Court supervised medical monitoring program.

3

## II.   PARTIES, JURISDICTION AND VENUE

### A.   The Plaintiffs.

4.      A majority of the Plaintiffs[1] currently live or lived for much of their lives in the neighborhood directly across the street from the Facility.  This neighborhood (hereinafter referred to as the "Cowan Neighborhood") was originally farmland.  It was developed by several African American families, who built small houses and lived partially off the land – growing vegetables and raising livestock, and utilizing well water from four shared wells placed throughout the community.  The Neighborhood initially consisted of a network of dirt roads connecting several homes.  The homes originally had no electricity, sewer services, or city water.

5.      The Cowan Neighborhood is comprised of Lebanon Road, West Walnut, Fairview, McCowan Street, Kilby Lane, and Caulters Lane, (reflected in the highlighted area map, attached as Exhibit A).  The homes within the Cowan Neighborhood are between .1 and .3 miles from the Facility, and are all within the Affected Area.[2]

6.      A poor, predominantly African American community occupied the Cowan Neighborhood for a number of years before the construction of the Facility, which Corning constructed and began operating in 1952.  Even after the Facility was constructed and Corning began polluting the area by expelling lead, arsenic, and TCE into the air and water, the families in the Cowan Neighborhood continued to use well water, eat vegetables raised on their properties, and hunt for small game and harvest watercress in the waterway running directly

---

[1]      The Ford, Johnson, Clark, and Chenault families lived on Fairview Street; the McCowan and Simpson families lived on McCowan Street, and the Ball, Raines, Jones, Hays, and Manning families lived on Lebanon Road.

[2]      "McCowan Street" is actually referred to as "Cowan Street" when used as a local address.  Maps still list the name as "McCowan."

behind the Facility (the "Clark's Run Watershed") the Defendants having failed to warn of the possible harm from such activities and use. The community also collected spring water from a natural spring near the Facility – referred to herein as "Spring 6." As will be explained in greater detail herein, Spring 6 was severely impacted by TCE contamination emanating from the Facility. Unfortunately, the community did not know that continuing its everyday existence had become a hazardous activity because of the contamination dispersed by Corning.

7. Corning, and later Philips, further exposed the community to lead, arsenic, and TCE by allowing the development of a little league ballfield on top of a dumping area for slag and glass pellets located on the Facility's grounds (hereinafter the "Corning/Philips Ballfield"). This Ballfield is contaminated by excessively high levels of lead and arsenic to this day. Sampling conducted in 2012 and 2013 reflects lead levels of up to 26,000 mg/kg and arsenic levels of up to 160 mg/kg. A summary of these sampling results is attached as Exhibit B. The children of the Cowan Neighborhood, and many others throughout the Danville community, played baseball on this field for years – all suffering exposure to damaging levels of these Hazardous Substances.

8. Incredibly, Corning also developed multiple dump sites in and around the Cowan Neighborhood. Upon information and belief, Corning dumped waste containing numerous Hazardous Substances (including lead, arsenic, and TCE) in the area now known as Cowan Park for many years. Numerous Named Plaintiffs also recall seeing Defendants dump barrels of sludge and other waste at unregulated sites on Lebanon Road and Redryer Lane. In the mid-to-late 1950s, a program called "Urban Renewal" came to the Cowan Neighborhood, bringing with it city services such as sanitation, water, and electricity, and facilitating the construction of roads and additional homes throughout the Neighborhood. Cowan Park, reflected on the map attached

5

as <u>Exhibit</u> <u>A</u> was constructed at this time on top of a dumping ground formerly used by Defendants.  The Park was used by children in the Cowan Neighborhood for years after.  It was closed to the public several years ago for unknown reasons.

9.      The Plaintiffs in this action suffer from myriad ailments as a result of exposure to the lead, arsenic, and TCE generated and recklessly dispersed throughout the community by Defendants.  These ailments include: asthma, hypertension, high blood pressure, cancer, and disorders of the thyroid, kidney, colon, skin, and digestive, cardiovascular, respiratory, and neurological systems. Several suffer from diabetes, degenerative bone disease, balance disorders, memory loss, and learning disabilities.

10.     The following Plaintiffs, described in additional detail, <u>infra</u>, assert personal injury claims in this action:  Erica Ford, Gloria Frye, Bonita Ramzy, Justine Ramirez, Latrese Barbour, Christopher Johnson, Joseph Johnson, John Raines, Jr., Clyde Simpson, Deborah Stevenson, Danetta Owsley, Chantee Nolan, Lonnie Johnson, Harvey Chenault, Katherine Doty, Tyrone Johnson, Ann Hawkins, Ronald Hawkins, the Estate of Richard Manning, Anthony Manning, Fanny Walker, Chenice Gaans, James Dollins, the Estate of Frank Walker, William Galbreath, Kelvin Galbreath, Steven Coffman, Sonya Coffman, Cesirely Coffman, Michelle (Coffman) Morton, Charles Lawson, the Estate of Mike Orberson, William Trumbo, Dejuanna Trumbo, Barbara Trumbo, Brihana Trumbo, Dewayne Trumbo, Demmontrell Trumbo, Demaya Trumbo, and Chantee Nolan, As Next Friend And Guardian Of D. T., D. T. (2), D. D., S.N., E. N., and M. N..

11.     The following Plaintiffs, described in additional detail, <u>infra</u>, assert property damage claims in this action:  Janet Mitchel, Wanda Beasley, Donna Smith, Walter Smith, Mary Emily Orberson, Sellers & Sellers Engineering Company, and Modern Holdings, LLC.

6

12.     The following Plaintiffs, described in additional detail, <u>infra</u>, assert both property damage and personal injury claims: Rosetta Ford, Gary Ford, Otis Ford, Charles Ford, Bobbie Lemons, Glen Ball, Vivian Troxler, Rodney Johnson, Rita Bowman, Daniel Bartleson, David Caldwell, Margo Caldwell, George Chenault, Marthetta Clark, Sadie Gambrel, James Hunn, Ethel Hunn, Brenda Carter, Willie Harris, Melvin Harris, Josetta Hays, Darren Hays, Gloria Lewis, Sharon Price, Chester Kavanaugh, Margret Peebles, Bethel Wade, David Chenault, Jr., Anita Ross, Connie Mullins, Celia Wilkinson and the Estate of Betty Johnson.

13.     Because of the nature of the Defendants' conduct, none of the listed Plaintiffs discovered, nor could they have discovered by exercise of reasonable diligence, that their injuries were caused by the Defendants until less than a year prior to the filing of the instant lawsuit.

**The Ford Family**

14.     **Rosetta Ford.**  Ms. Ford is a Danville resident who owns property at 1310 West Walnut Street, Danville, Kentucky.  Ms. Ford's property on West Walnut is within the Cowan Neighborhood and is approximately .2 miles from the Facility. The property was deeded to her in 1996 by her son, Plaintiff Gary Ford, who purchased the property in 1977.  Ms. Ford, who was born in 1926 and is 92 years old, has lived in the Cowan Neighborhood her entire life.  She grew up at 308 Fairview Street, and raised her children in the neighborhood.  Otis, Charles, and Gary Ford, her sons, are also Named Plaintiffs in this litigation.  Ms. Ford currently lives at 308 Fairview Street in the Cowan Neighborhood.  Like other children raised in the Cowan Neighborhood, Ms. Ford drank water from the wells throughout the neighborhood and ate fruit, vegetables, and livestock raised in the area. She harvested and ate watercress from the Clark's Run Watershed behind the Facility.  She also used wood harvested from this area in her home's wood burning stove.  Rosetta Ford suffers from diabetes, chronic bronchitis, a heart

7

valve problem, chronic headaches and dizziness.  As the collected scientific references attached as Exhibit C demonstrate, diabetes, bronchitis, unexplained headaches, cardiovascular and balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.[3] In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Ms. Ford asserts property damage and personal injury claims in this action.

15.   **Gary Ford.**  Mr. Ford is a Danville resident who resides at 1310 West Walnut Street, Danville, Kentucky. He purchased the property, which is in the Cowan Neighborhood and approximately .2 miles from the Facility, in 1977, but deeded it to his mother in 1996.  Mr. Ford's house is partially constructed of furnace brick from the Facility that Defendants left on the side of the road for people to take and use as they saw fit.  The house is also decorated with lead glass in the mortar work. Mr. Ford, who was born in 1946, has lived in the Cowan Neighborhood his entire life, with the exception of a two-year period when he was drafted into the service for the Army and stationed in Germany.  Mr. Ford grew up in a home at 308 Fairview, and lives there now caring for his elderly mother, Rosetta Ford.  Mr. Ford's family used well water until the mid-1960s, and the well used still exists at 308 Fairview.  Like other children raised in the Cowan Neighborhood, Mr. Ford ate fruit, vegetables, and livestock raised in the area. He harvested and ate watercress from the Clark's Run Watershed behind the Facility.

---

[3]     The attached scientific references are representative only.  Plaintiffs have previously provided the Court with expert reports further supporting the causal connection between exposure to lead, arsenic and TCE and the medical conditions suffered by Plaintiffs.  The Plaintiffs' expert reports filed throughout the record of this action are incorporated herein by reference.  The health effects of long-term exposure to lead, arsenic and TCE are further discussed infra, at Section IV(A).  Importantly, medical research consistently states that many of the adverse health effects do not manifest until decades after the exposure occurs.

He also played on the Corning/Philips Ballfield.  Mr. Ford suffers from degenerative bone disease.  He has also been diagnosed with a balance disorder, has trouble breathing, and experiences numbness and tingling in his extremities. As the collected scientific references attached as Exhibit C demonstrate, degenerative bone disease, respiratory problems, balance disorders and dysfunction of the nervous system can result from exposure to excessive amounts of lead, arsenic, and/or TCE. In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. Ford asserts property damage and personal injury claims in this action.

16.    **Otis Ford.**  Mr. Ford is a Danville resident who owns property and resides at 1005 Lexington Avenue – a property located approximately .5 miles from the Facility and within the Affected Area. Mr. Ford also owns 308 Fairview Street (within the Cowan Neighborhood) jointly with his brother Charles Ford.  Mr. Ford's mother Rosetta Ford and his brother Gary Ford live at the Fairview Street property.  Mr. Ford, who was born in 1948, grew up in the family home at 308 Fairview Street.  He graduated from high school and left Danville in 1966 to attend Western Kentucky University.  He was drafted into the Army in 1969.  Mr. Ford returned to Danville in 1971 and has lived in Danville since that time.  Mr. Ford has lived within the Affected Area for all but five of his 70 years.  Mr. Ford's family used well water until the mid-1960s, and the well used still exists at 308 Fairview.  Like other children raised in the Cowan Neighborhood, Mr. Ford ate fruit, vegetables, and livestock raised in the area. He harvested and ate watercress from the Clark's Run Watershed behind the Facility. He also played on the Corning/Philips Ballfield.  Mr. Ford suffers from degenerative bone disease.  He has also been diagnosed with a balance disorder, has had two knee replacements, and was diagnosed with

9

prostate cancer in 2004.  He also suffers from a skin disorder involving itchy raised bumps for which he has used a medicinal cream since 2014.   As the collected scientific references attached as <u>Exhibit</u> <u>C</u> demonstrate, degenerative bone disease, cancer, and balance and skin disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE. In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. Ford asserts property damage and personal injury claims in this action.

17.     **Charles Ford.**  Mr. Ford is a Louisiana resident who owns property at 308 Fairview Street in Danville, Kentucky jointly with his brother Otis Ford.  Mr. Ford, who was born in 1947, grew up in the family home at 308 Fairview Street, where he lived for the first 18 years of his life.  Mr. Ford graduated high school in 1965, and left Danville for college at Kentucky State University.  He enlisted in the Air Force in 1966, and was stationed in Germany and Vietnam.  He returned to Danville in 1970, and purchased a home on Lebanon Road.  In November, 1999, Mr. Ford moved to Louisiana and he hasn't lived in Danville since that time.  Mr. Ford's family used well water until the mid-1960s, and the well used still exists at 308 Fairview.  Like other children raised in the Cowan Neighborhood, Mr. Ford ate fruit, vegetables, and livestock raised in the area. He harvested and ate watercress from the Clark's Run Watershed behind the Facility. He also played on the Corning/Philips Ballfield.  Mr. Ford has been diagnosed with a balance disorder.  He has suffered from short-term memory loss, headaches, dizziness, and balance difficulties his entire life.  In 2006, he underwent surgery to remove a pituitary tumor.  He has been blind in his left eye since that time. As the collected scientific references attached as <u>Exhibit</u> <u>C</u> demonstrate, balance disorders and dysfunction of the cognitive and nervous systems can result from exposure to excessive amounts of lead, arsenic, and/or TCE.

In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. Ford asserts property damage and personal injury claims in this action.

18.     **Erica Ford-Utrera.**  Ms. Ford-Utrera is a resident of Hustonville, Kentucky, with an address of 13 Sunset Drive.  Ms. Ford-Utrera, who was born in 1971, is the daughter of Plaintiff Otis Ford.  She was born and raised in Danville, and lived in Batewood Homes off South 2nd Street in Danville (approximately one mile from the facility and within the Affected Area) for more than eighteen years.  Many members of Ms. Ford-Utrera's family lived in the Cowan Neighborhood, and she spent a substantial amount of time there as a child.  Ms. Ford-Utrera recalls playing on the Corning/Philips Ballfields, and eating vegetables grown in the area.  Ms. Ford-Utrera is currently battling breast cancer.  As the collected scientific references attached as Exhibit C demonstrate, various forms of cancer, including breast cancer, can result from exposure to excessive amounts of lead, arsenic, and/or TCE. Ms. Ford-Utrera asserts personal injury claims in this action.

### The Johnson Family

19.     Various members of the Johnson family have lived on Fairview Street and throughout the Cowan Neighborhood for generations.  Opal and James E. Johnson, Sr. resided on Fairview Street, and raised fourteen children (ten boys and four girls) there throughout the 1940s and 1950s.  These children, in turn, raised children in the Cowan Neighborhood, living in either the family home or in additional properties purchased on nearby streets.

20.     **Gloria (Johnson) Frye.**  Mr. Frye is a Danville resident with an address of 401 South Fourth Street, Suite 610 – approximately one mile from the Facility and within the

11

Affected Area.  Ms. Frye, who was born in, 1946, is a member of the Johnson family that has

lived on Fairview Street in the Cowan Neighborhood for generations.  She is the oldest of the

fourteen children raised there by Opal and James Johnson, Sr.  Ms. Frye is seventy-two years old

and has lived in Danville within the Affected Area for all but five years of her life.  She lived on

Fairview Street with her parents and thirteen siblings for twenty years.  Like other children

growing up in the Cowan Neighborhood, Ms. Frye drank well water from wells located in the

Neighborhood.  She collected water and drank from Spring 6.  She ate vegetables grown in

family gardens in the Neighborhood and ate meat that was either raised in the neighborhood or

hunted in the area surrounding the Facility.  Ms. Frye recalls playing in the Clark's Run

Watershed as a child and making trails through the tall grasses near the creek.  She harvested

watercress from this area as well, which was eaten by her family.  Ms. Frye married and moved

to North 3rd Street in 1970.  She resided on North 3rd Street – approximately one mile from the

Facility and within the Affected Area – for thirty-six years.  She moved to Louisville for a short

period of time following a battle with breast cancer before returning to Danville in 2013.  Ms.

Frye fought and survived breast cancer.  She also suffers from high blood pressure and thyroid

problems.  As the collected scientific references attached as Exhibit C demonstrate, high blood

pressure, thyroid problems, and various cancers (including breast cancer) can result from

exposure to excessive amounts of lead, arsenic, and/or TCE. Ms. Frye asserts personal injury

claims in this action.

21.     **Bonita (Johnson) Ramzy.**  Ms. Ramzy is a Lexington, Kentucky resident with an

address of 3170 Mapleleaf Drive, #2115.  For the first sixty years of her life, however, Ms.

Ramzy lived in Danville within the Affected Area, never residing further than .6 miles from the

Facility.  Ms. Ramzy is a member of the Johnson family that has lived on Fairview Street in the

12

Cowan Neighborhood for generations.  She was born in, 1954, and lived with her parents and thirteen siblings on Fairview Street for twenty-seven years (until 1981).  Ms. Ramzy raised her children (Nathaniel and Joseph Johnson) on Fairview Street.  Ms. Ramzy then moved to 512 Russell Street, which is .6 miles from the Facility and within the Affected Area.  She resided at this address until moving to Lexington in 2014.  Like other children growing up in the Cowan Neighborhood, Ms. Ramzy drank well water from wells located in the Neighborhood.  She collected water and drank from Spring 6.  She ate vegetables grown in family gardens in the Neighborhood and ate meat that was either raised in the neighborhood or hunted in the area surrounding the Facility.  Ms. Ramzy recalls playing in the Clark's Run Watershed as a child and making trails through the tall grasses near the creek.  She harvested watercress from this area as well, which was eaten by her family.  Ms. Ramzy suffers from kidney and cardiovascular problems.  She also has undiagnosed spots on her lungs.  As the collected scientific references attached as Exhibit C demonstrate, kidney, cardiovascular, and respiratory disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE. Ms. Ramzy asserts personal injury claims in this action.

22.   **Vivian (Johnson) Troxler.**  Ms. Troxler is a Danville resident who owns property and resides at 313 Fairview Street – approximately .2 miles from the facility and in the Cowan Neighborhood.  Ms. Troxler is a member of the Johnson family that has lived on Fairview Street in the Cowan Neighborhood for generations.  She was born in, 1953, and lived with her parents and thirteen siblings on Fairview Street for eighteen years – until 1971.  She returned to Fairview Street in 1986, when she purchased her current home at 313 Fairview Street.  She has resided there since.  Like other children growing up in the Cowan Neighborhood, Ms. Troxler drank well water from wells located in the Neighborhood.  She collected water and

13

drank from Spring 6.  She ate vegetables grown in family gardens in the Neighborhood, and ate

meat raised in the neighborhood or hunted in the area surrounding the Facility.  Ms. Troxler

suffers from continual coughing spells.  As the collected scientific references attached as Exhibit

C demonstrate, unexplained coughing spells can result from exposure to excessive amounts of

lead, arsenic, and/or TCE. In addition, and as set forth more fully herein, Plaintiffs' experts have

concluded that the contamination generated and dispersed by Defendants has negatively

impacted the use and value of properties within the Affected Area.  Ms. Troxler asserts property

damage and personal injury claims in this action.

23.    **Justine (Johnson) Ramirez.**  Ms. Ramirez is a Lexington, Kentucky resident

with an address of 305 Lindenhurst Dr., #3204.  For the first fifty years of her life, however, Ms.

Ramirez lived within the Affected Area in Danville. Ms. Ramirez, who was born in 1954, grew

up on Russell Street – approximately .6 miles from the Facility and within the Affected Area.

Throughout her childhood, Ms. Ramirez drank water from the wells in the Cowan

Neighborhood.  She frequently noticed that the water was rust-colored, with a foul odor.  She ate

vegetables grown in her family's large garden but recalls that the vegetables often spoiled

quickly.  Ms. Ramirez lived on Russell Street for more than twenty years before moving to

Batewood Homes on 2nd Street – approximately one mile from the Facility and within the

Affected Area.  Ms. Ramirez married James E. Johnson, Jr., a member of the Johnson family that

has resided on Fairview Street in the Cowan Neighborhood for generations.  When she married,

she moved with her husband to Lebanon Road, in the Cowan Neighborhood and directly across

from the Facility.  She raised four children in the Cowan Neighborhood, in the shadow of the

Facility.  Ms. Ramirez suffers from high blood pressure.  As the collected scientific references

14

attached as Exhibit C demonstrate, high blood pressure can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Ramirez asserts personal injury claims in this action.

24.     **Latrese Nichole Barbour.**  Ms. Barbour is a resident of Lexington, Kentucky. She resides at 2060 Cornerstone Drive.  Ms. Barbour is a member of the Johnson Family, which has resided on Fairview Street in the Cowan Neighborhood for generations. Ms. Barbour's mother is Justine (Johnson) Ramirez.  Ms. Barbour was born in, 1980, and she grew up in the Cowan Neighborhood.  Ms. Barbour, who frequently played on Corning/Philips Ballfields, suffers from balance problems.  As the collected scientific references attached as Exhibit C demonstrate, balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Barbour asserts personal injury claims in this action.

25.     **Christopher Johnson.**  Mr. Johnson is a resident of Lexington, Kentucky.  He resides at 305 Lindenhurst Drive, Apartment 3204.  Mr. Johnson is a member of the Johnson Family, which has resided on Fairview Street in the Cowan Neighborhood for generations. Mr. Johnson's mother is Justine (Johnson) Ramirez.  He is the oldest of four children.  Mr. Johnson, who was born in, 1970, grew up in the Cowan Neighborhood.  Mr. Johnson, who frequently played on the Corning/Philips Ballfields, including a football field, located on the Facility grounds, suffers from balance problems.  Mr. Johnson specifically recalls riding motorcycles on the Facility's property.  Mr. Johnson worked in and ate from his family's vegetable garden on Fairview Street, and drank water from a well located on the property as a child.  As the collected scientific references attached as Exhibit C demonstrate, balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr. Johnson asserts personal injury claims in this action.

26.   **Joseph Johnson.**  Mr. Johnson is a Lexington, Kentucky resident with an address of 3170 Mapleleaf Drive, #2115.  Bonita Ramzy is his mother. Mr. Johnson is part of the Johnson family, which has lived on Fairview Street in the Cowan neighborhood for generations.  Mr. Johnson grew up in the Cowan Neighborhood.  Mr. Johnson, who frequently played on the Corning/Philips Ballfields, suffers from balance problems.  Mr. Johnson worked in and ate from his family's vegetable garden on Fairview Street, and drank water from a well located on the property as a child.  As the collected scientific references attached as Exhibit C demonstrate, balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr. Johnson asserts personal injury claims in this action.

27.   **Lonnie Johnson.**  Mr. Johnson is a South Carolina resident with an address of 4030 Timber Crossing, in Rock Hill.  Mr. Johnson has lived in South Carolina since 2010; however he is part of the Johnson family, which has lived on Fairview Street in the Cowan Neighborhood for generations.  Mr. Johnson, who was born in 1949, lived on Fairview Street for the first twenty-two years of his life – until 1972.  Like other children in the Neighborhood, he ate food raised in the Neighborhood, played on the Corning/Philips Ballfields, and ate watercress harvested from the Clark's Run Watershed adjacent to the Facility.  He was diagnosed with colon cancer in 2009, and with prostate cancer in 2015.   As the collected scientific references attached as Exhibit C demonstrate, both colon cancer and prostate cancer can result from exposure to excessive amounts of lead, arsenic, and/or TCE. Mr. Johnson asserts personal injury claims in this action.

28.   **Rodney Johnson.**  Mr. Johnson is a Danville resident who owns property and resides at 428 Fairview Street.  Mr. Johnson, who was born in, 1965, grew up at 428 Fairview Street in the Cowan Neighborhood.  He lived on Fairview Street for the first twenty-four years of

his life, and purchased his childhood home in 2015.  He is a member of the Johnson Family that has lived on Fairview Street for generations.  Opal and James Johnson, Sr. were his parents. Like other children in the Neighborhood, he ate food raised in the area, played on the Corning/Philips Ballfields, and ate watercress harvested from the Clark's Run Watershed adjacent to the Facility.  He suffers from a deteriorating vertebrae and breathing/coughing problems.  As the collected scientific references attached as <u>Exhibit C</u> demonstrate, bone deterioration, coughing, and breathing problems can result from exposure to excessive amounts of lead, arsenic, and/or TCE. In addition, as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area. Mr. Johnson asserts property damage and personal injury claims in this action.

29.     **Tyrone Johnson.**  Mr. Johnson is a resident of California.  For the first several years of his life, however, Mr. Johnson lived in the Cowan Neighborhood.  Mr. Johnson is a member of the Johnson family that has resided in the Cowan Neighborhood for generations.  Mr. Johnson grew up on Fairview Street, where he lived for many years.  Mr. Johnson later moved to Russell Street, which is approximately .4 miles from the Facility and within the Affected Area. Mr. Johnson played on the Corning/Philips Ballfields, drank water from wells located throughout the Neighborhood, and ate food raised in the Neighborhood.  He also hunted for small game and harvested watercress from the waterway behind the Facility.  Mr. Johnson recalls seeing nearly constant plumes of smoke billowing from the Facility's smokestacks.  He also recalls cars in the neighborhood being coated with thick layers of fallout ash from the Facility.  As a child, Mr. Johnson experienced tingling in his hands and feet and also strange scabs on his wounds.  As an adult, he suffers from vertigo, dizziness, and balance problems.  As the collected scientific

17

references attached as Exhibit C demonstrate skin disorders, vertigo, dizziness, and balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr. Johnson asserts personal injury claims in this action.

**The Hays Family**

30.  **Josetta Hays.**  Ms. Hays is a Danville resident who owns property and resides at 505 North Third Street – approximately 1.1 miles from the Facility and within the Affected Area. Josetta Hays is part of the Hays family that lived on Lebanon Road directly across from the Facility in the Cowan Neighborhood for generations.  Ms. Hays lived for 40 years – between 1961 and 2001 – in a trailer located on property belonging to Sellers Engineering with an address of 906 Lebanon Road.  This trailer was located directly next to the dumping ground on Sellers' property that was utilized for years by Defendants.  Although the dumping area was not intended for the disposition of hazardous substances, later testing revealed that Defendants dumped highly toxic substances there for many years – many of which migrated from the dumping area.  Ms. Hays' mother and father resided with her at 906 Lebanon Road.  Her Father, Ray Kettles, died of stomach, colon and gallbladder cancer.  Her mother, Mazie Hays, died of kidney failure.  Like other children growing up in the Cowan Neighborhood, Ms. Hays played on the Corning/Philips Ballfields, ate watercress harvested from the waterway behind the Facility, and also ate small game captured in the area.  Ms. Hays also drank water from wells in the area and from Spring 6. She recalls playing frequently in the waterway located behind the Facility and on refuse piles containing bits of glass that she used to make "rock gardens."  Ms. Hays suffers from a balance disorder and thyroid problems.  As the collected scientific references attached as Exhibit C demonstrate, balance disorders and thyroid problems can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs'

18

experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area. Ms. Hays asserts property damage and personal injury claims in this action.

31.    **Darren Hays.** Mr. Hays is a Danville resident who owns property and resides with his mother at 505 North Third Street – approximately 1.1 miles from the Facility and within the Affected Area. Darren Hays is Josetta Hays' son, and is part of the Hays family that lived on Lebanon Road directly across from the Facility in the Cowan Neighborhood for generations. Mr. Hays grew up at 906 Lebanon Road in his grandmother's house. He lived there for 40 years – from 1961 until 2001. Like other children growing up in the Cowan Neighborhood, Mr. Hays played on the ballfields on the Facility's grounds, ate watercress harvested from the waterway behind the Facility, and also ate small game captured in the area. Mr. Hays recalls playing on the "junk pile" on the Facility grounds, which was located next to the ballfields. Mr. Hays suffers from a learning disability. As the collected scientific references attached as Exhibit C demonstrate, learning disabilities can result from exposure to excessive amounts of lead, arsenic, and/or TCE. In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area. Mr. Hays asserts property damage and personal injury claims in this action.

19

**The Chenault Family**

32.     **Rita Bowman.**  Ms. Bowman is a Danville resident who owns property and
resides at 1404 West Walnut Street – approximately .3 miles from the Facility and in the Cowan
Neighborhood.  Ms. Bowman has lived in the Cowan Neighborhood almost her entire life.  From
the 1940s to 1971 she lived on Fairview Street.  She had various addresses throughout the
Cowan Neighborhood for the next several years before moving to West Walnut in 1993. Ms.
Bowman is part of the Chenault Family, which has lived in the Cowan Neighborhood for
generations.  Many members of Ms. Bowman's family have developed unexplained medical
conditions.  Her mother died of brain cancer, and Ms. Bowman's father died from cardiovascular
complications.  Ms. Bowman's sister, who also grew up in the Cowan Neighborhood, died from
skin cancer.  Ms. Bowman's husband, who lived with her for many years in the Cowan
Neighborhood on Lebanon Road, developed lymphoma and died in 2007.  Ms. Bowman's son,
Daniel Bartleson, was diagnosed with inflammation around his heart at the young age of eleven
years old.  Ms. Bowman played on the Corning/Philips Ballfields as a child, ate watercress
harvested from the Clark's Run Watershed and food raised on her family's property, and drank
water from the wells in the Cowan Neighborhood.  Ms. Bowman suffers from thyroid tumors
and goiters.  She has recently been diagnosed with neuropathy.  As the collected scientific
references attached as Exhibit C demonstrate, thyroid tumors, neuropathy, and goiters can result
from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth
more fully herein, Plaintiffs' experts have concluded that the contamination generated and
dispersed by Defendants has negatively impacted the use and value of properties within the
Affected Area.  Ms. Bowman asserts property damage and personal injury claims in this action.

20

33.    **Daniel Bartleson.**  Mr. Bartleson is Rita Bowman's son.  He is a Danville

resident who owns property at 303 Fairview Street, in the Cowan Neighborhood.  He lives at

1414 West Walnut Street, also in the Cowan Neighborhood, approximately .2 miles from the

Facility.  Mr. Bartleson, who was born in 1990, has lived in the Cowan Neighborhood, and

therefore the Affected Area nearest to the Facility, his entire life.  At age 11, he was diagnosed

with an inflammation around his heart, and has experienced cardiovascular problems, including

high blood pressure, since that time.  As the collected scientific references attached as <u>Exhibit</u> <u>C</u>

demonstrate, cardiovascular problems and high blood pressure can result from exposure to

excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein,

Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants

has negatively impacted the use and value of properties within the Affected Area.  Mr. Bartleson

asserts property damage and personal injury claims in this action.

34.    **Harvey Chenault.**  Mr. Chenault is a Danville resident who owns property and

resides at 150 Bonta Lane.  This property is 2.9 miles from the Facility, and is therefore outside

the Affected Area. Harvey Chenault is Rita Bowman's brother. Mr. Chenault grew up at 301

Fairview Street in the Cowan Neighborhood.  Mr. Chenault ate watercress and hunted in the

area, and recalls noticing a milky substance in the water near the Facility. Mr. Chenault, who is a

non-smoker with no history of smoking, has suffered from heart problems – he has had two

valve replacements.  Mr. Chenault has also had a piece of his colon removed due to bleeding.  As

the collected scientific references attached as <u>Exhibit</u> <u>C</u> demonstrate, cardiovascular and colon

problems can result from exposure to excessive amounts of lead, arsenic and/or TCE. Mr.

Chenault asserts personal injury claims in this action.

21

35.   **George Chenault.**  Mr. Chenault, Harvey Chenault and Rita Bowman's brother, is a Danville resident who owns property and resides at 301 Fairview Street in the Cowan Neighborhood.  The property is approximately .3 miles from the Facility, and is within the Affected Area.  The property he now owns was also his childhood home, and he has lived there most of his life.  Mr. Chenault ate watercress and hunted in the area.  He drank water from wells in the Neighborhood, and ate food raised on his family's property.  He suffers from degenerative vertebrae, memory loss, and balance problems.  As the collected scientific references attached as Exhibit C demonstrate, degenerative vertebrae, memory loss, and balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. Chenault asserts property damage and personal injury claims in this action.

36.   **Bethel Wade.**  Ms. Wade, the sister of Rita Bowman and George and Harvey Cheanult, is a Danville resident who owns property and resides at 215 Nichols Street in the Cowan Neighborhood.  Ms. Wade's property is .17 miles from the Facility, and within the Affected Area.  Ms. Wade, who was born in 1949, has lived at 215 Nichols Street for the past 24 years.  She has lived in the Cowan Neighborhood nearly her entire life.  She grew up on Fairview Street, and her father helped build the Facility.  Like other children growing up in the Cowan Neighborhood, Ms. Wade played on the Corning/Philips Ballfields, ate food grown in the Neighborhood, and ate watercress from the Clark's Run Watershed behind the Facility.  Ms. Wade has kidney problems, numbness in her hands and feet, and dizziness.  As the collected scientific references attached as Exhibit C demonstrate, kidney problems, numbness in hands and feet, and dizziness can result from exposure to excessive amounts of lead, arsenic, and/or TCE.

22

In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Ms. Wade asserts property damage and personal injury claims in this action.

37.    **David Chenault, Jr.**  Mr. Chenault is a Danville resident who owns property and resides at 349 Timothy Avenue – a property that is approximately 1.2 miles from the Facility and within the Affected Area.  Mr. Chenault, who was born in 1952, has lived within the Affected Area most of his life.  During his childhood, between 1960 and 1968, he lived on Bate Street, approximately .7 miles from the Facility. From 1988-2013, he lived at 139 Louise Street, approximately .6 miles from the Facility.  He purchased the property on Timothy Avenue in 2013.  Mr. Chenault had many family members who lived in the Cowan Neighborhood during his childhood.  As a result, he spent a substantial amount of time in the Neighborhood.  Like other children growing up in the Cowan Neighborhood, Mr. Chenault played on the Corning/Philips Ballfields, ate food grown in the Neighborhood, and ate watercress from the Clark's Run Watershed behind the Facility.  Mr. Chenault has high blood pressure and arthritis.  As the collected scientific references attached as Exhibit C demonstrate, high blood pressure and arthritis can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. Chenault asserts property damage and personal injury claims in this action.

38.    **Anita Chenault Ross.**  Ms. Ross, David Chenault, Jr.'s sister, is a Danville resident who owns property and resides at 139 Louise Street – her childhood home.  Louise

Street is approximately .6 miles from the Facility and is within the Affected Area.  Ms. Ross, who was born in 1957, has lived within the Affected Area most of her life.  During her childhood, between 1960 and 1968, she lived on Bate Street, approximately .7 miles from the Facility. The family then moved to 139 Louise Street.  Ms. Ross has owned the property at 139 Louise Street since 2013.  Ms. Ross had many family members who lived in the Cowan Neighborhood during her childhood.  As a result, she spent a substantial amount of time in the Neighborhood.  Like other children growing up in the Cowan Neighborhood, Ms. Ross played on the Corning/Philips Ballfields, ate food grown in the Neighborhood, and ate watercress from the Clark's Run Watershed behind the Facility.  Ms. Ross has high blood pressure and suffers from dizziness and numbness in her extremities.  As the collected scientific references attached as Exhibit C demonstrate, high blood pressure, numbness, and dizziness can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area. Ms. Ross asserts property damage and personal injury claims in this action.

### The Manning Family

39.    **Barbara Manning.**  Ms. Manning is a Danville resident who resides in and owns property at 148 Spring Valley Road, which is outside the Affected Area.  Between 1968 and 1980, however, Mrs. Manning and her family resided at 139 Lebanon Road, directly across from the Facility in the Cowan Neighborhood and within the Affected Area.  Mrs. Manning witnessed Corning dumping barrels of sludge onto a piece of property adjacent to her home on Lebanon Road – farmland formerly owned by John Horkey, but now owned by Patrick and Rita Clements of Springfield Kentucky.  Mrs. Manning observed sludge escaping the barrels and further

24

observed that many months passed between the time the barrels were dumped onto the property and the date upon which they were covered with dirt.  Mrs. Manning recalls large plumes of smoke billowing from the Facility's smokestacks and further recalls that her vehicle was constantly covered with a thick layer of ash fallout from the Facility.  Mrs. Manning observed hundreds of dead birds on the Facility property and surrounding areas one or more times during the years she lived across the street from the Facility.  Mrs. Manning and her family raised vegetables on their property on Lebanon Road, and also drank well water and cistern water over the years.  Mrs. Manning, who was born in 1949, suffers from high blood pressure, cardiovascular problems, rheumatoid arthritis, dizziness, numbness and tingling in her extremities.  As the collected scientific references attached as Exhibit C demonstrate, high blood pressure, cardiovascular problems, dizziness, and numbness and tingling in the extremities can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mrs. Manning asserts personal injury claims in this action.

40.    **The Estate of Richard Manning.**  The Estate of Richard Manning also asserts personal injury claims in this proceeding.  Barbara Manning, who has been appointed as the Administratrix of her late husband's Estate, has full authority to bring this action on behalf of the Estate.  Mr. Manning lived with Mrs. Manning at 1239 Lebanon Road in Danville from 1968-1980.  Mr. Manning ingested vegetables grown on his property and water from cisterns and wells in the Affected Area during the time he resided on Lebanon Road with his family. Mr. Manning, who was born in 1946, died on December 12, 2017.  The cause of Mr. Manning's death was due in part to chronic kidney failure.  As the collected scientific references attached as Exhibit C demonstrate, kidney failure can result from exposure to excessive amounts of lead, arsenic,

25

and/or TCE.  Mrs. Manning asserts personal injury claims on behalf of Mr. Manning's Estate in this action.

41.    **Anthony Manning.**  Mr. Manning is a Harrodsburg, Kentucky resident who lives at 321 Cedar Street.  He is the son of Barbara Manning and the late Richard Manning. Between 1968 and 1980, he resided with his family at 139 Lebanon Road, directly across from the Facility in the Cowan Neighborhood and within the Affected Area.  As a child, Mr. Manning played on the Corning/Philips Ballfields, ingested vegetables grown on his family's property and drank water from springs, wells and cisterns within the Affected Area.  Mr. Manning, who was born in 1966, suffers from kidney problems, kidney stones, balance issues, high blood pressure and skin disorders.  As the collected scientific references attached as Exhibit C demonstrate, kidney problems, kidney stones, balance issues, high blood pressure and skin disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr. Manning asserts personal injury claims in this action.

**The Galbreath Family**

42.    **William Galbreath, Jr.**  Mr. Galbreath is a Kentucky resident who lived for many years during his childhood on Sycamore Street, in the Cowan Neighborhood.  During his childhood, Mr. Galbreath, who was born in 1969, played on the Corning/Philips Ballfields on a daily basis.  Mr. Galbreath and his brother ate blackberries from large bushes near the Facility's boundary, and swam in the tributary near Clark's Run Watershed.  Mr. Galbreath recalls there was always a "sweet" smell in and around the tributary.  In 2016, Mr. Galbreath was diagnosed with a rare form of bone cancer.  As the collected scientific references attached as Exhibit C demonstrate, cancer, including cancers of the blood and bones, can result from exposure to

26

excessive amounts of lead, arsenic, and/or TCE.  Mr. Galbreath asserts personal injury claims in this action.

43.     **Kelvin Galbreath.**  Mr. Galbreath is an Indiana resident who grew up on Sycamore Street in the Cowan Neighborhood.  During his childhood, Mr. Galbreath, who was born in 1968, played on the Corning/Philips Ballfields on a daily basis.  Mr. Galbreath and his brother ate blackberries from large bushes near the Facility's boundary, and swam in the tributary near Clark's Run Watershed.  Mr. Galbreath and his brother William Galbreath used to play with the glass tubing left outside the Facility.  He remembers very large plumes of smoke coming out of the smoke stacks at dusk or right after dark every night.  He also recalls seeing green muck near the Clark's Run Watershed directly behind the Facility.  Mr. Galbreath suffers from dizziness, numbness and tingling in his extremities, and memory loss.  As the collected scientific references attached as <u>Exhibit C</u> demonstrate, numbness in extremities, dizziness, and memory loss can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr. Galbreath asserts personal injury claims in this action.

**The Coffman Family**

44.     **Steven Coffman.**  Mr. Coffman is a Lexington, Kentucky resident who lived with his family (including three sisters – Sonya Coffman, Cesirely Coffman, and Michelle Coffman) for approximately ten years (between 1962 and 1971) on Lebanon Road directly across the street from the Facility in the Cowan Neighborhood.  Mr. Coffman, who was born in 1962, played on the Corning/Philips Ballfields and ate vegetables raised in the area.  Mr. Coffman suffers from high blood pressure, diabetes and neuropathy.  As the collected scientific references attached as <u>Exhibit C</u> demonstrate, high blood pressure, diabetes and neuropathy can result from exposure to

excessive amounts of lead, arsenic, and/or TCE.  Mr. Coffman asserts personal injury claims in this action.

45.  **Sonya Coffman.**  Ms. Coffman is a Lexington, Kentucky resident who lived with her family for approximately ten years on Lebanon Road, directly across from the Facility and in the Cowan Neighborhood.  Ms. Coffman, who was born in 1961, played on the Corning/Philips Ballfields and ate vegetables raised in the area.  Ms. Coffman suffers from asthma, high blood pressure, diabetes and neuropathy.  As the collected scientific references attached as Exhibit C demonstrate, asthma, high blood pressure, diabetes and neuropathy can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Coffman asserts personal injury claims in this action.

46.  **Cesirely Coffman.**  Ms. Coffman is a Lexington, Kentucky resident who lived with her family for approximately seven years on Lebanon Road, directly across from the Facility and in the Cowan Neighborhood.  Ms. Coffman, who was born in 1964, played on the Corning/Philips Ballfields and ate vegetables raised in the area.  Ms. Coffman suffers from dizziness, numbness and tingling in her extremities, and memory loss. She also suffers from back problems.  As the collected scientific references attached as Exhibit C demonstrate, dizziness, numbness and tingling in extremities, and nerve damage can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Coffman asserts personal injury claims in this action.

47.  **Michelle (Coffman) Morton.**  Ms. Morton is a Lexington, Kentucky resident who lived with her family for approximately five years on Lebanon Road, directly across from the Facility and in the Cowan Neighborhood.  Ms. Coffman, who was born in 1967, played on the Corning/Philips Ballfields and ate vegetables raised in the area.  Ms. Coffman suffers from dizziness, numbness and tingling in her extremities, and memory loss. As the collected scientific

28

references attached as <u>Exhibit C</u> demonstrate, dizziness, and numbness and tingling in extremities can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Coffman asserts personal injury claims in this action.

**The Trumbo Family**

48.     **William Trumbo.**  Mr. Trumbo is a Danville resident with an address of 484 Denmark Drive, within the Affected Area, where he has lived for the last 17 years.  Mr. Trumbo, who was born in 1958, grew up in Lancaster, Kentucky, but moved to Danville in 1978 when he married Barbara Trumbo.  The couple had four children (Chantee (Trumbo) Nolan, Dejuanna Trumbo, Dewayne Trumbo, and Brihana Trumbo).  When he moved to Danville, he lived for many years in Batewood Homes, within the Affected Area.  The family then moved to Sycamore Street, directly across the street from the facility in the Cowan Neighborhood, where they lived for several years before moving to Denmark Drive.  Mr. and Mrs. Trumbo's children played for several years in Cowan Park, within the Cowan Neighborhood.  Mr. Trumbo suffers from respiratory problems, including asthma.  He fought and survived colon cancer several years ago.  As the collected scientific references attached as <u>Exhibit C</u> demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Mr.  Trumbo asserts personal injury claims in this action.

49.     **Barbara Trumbo.**  Ms. Trumbo (William Trumbo's wife) is a Danville resident with an address of 484 Denmark Drive, within the Affected Area, where she has lived for the last 17 years.  Ms. Trumbo, who was born in 1966, grew up in Batewood Homes, which is approximately a half mile from the Facility and within the Affected Area.  When her children were young, the family moved to Sycamore Street, where they lived for several years before

moving to Denmark Drive.  Ms. Trumbo has high blood pressure thyroid problems. As the collected scientific references attached as <u>Exhibit C</u> demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Ms.  Trumbo asserts personal injury claims in this action.

50.   **Dejuanna Trumbo.**  Ms. Trumbo is a Danville resident with an address of 484 Denmark Drive, within the Affected Area.  Ms. Trumbo grew up on Sycamore Street, in the Cowan Neighborhood and within the Affected Area.  Ms. Trumbo suffers from digestive disorders, dizziness, and numbness in her extremities.  As the collected scientific references attached as <u>Exhibit C</u> demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Ms.  Trumbo asserts personal injury claims in this action.

51.   **Dewayne Trumbo.**  Mr. Trumbo is a Danville resident who lives on Longview Drive, within the Affected Area.  Mr. Trumbo grew up on Sycamore Street, in the Cowan Neighborhood and within the Affected Area.  Mr. Trumbo suffers from digestive disorders, dizziness, and numbness in his extremities.  As the collected scientific references attached as <u>Exhibit C</u> demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Mr.  Trumbo asserts personal injury claims in this action.

52.   **Brihana Trumbo.**  Ms. Trumbo is a Danville resident with an address of 484 Denmark Drive, within the Affected Area.  Ms. Trumbo, who was born in 1987, lived on Sycamore Street in the Cowan Neighborhood for several years before moving to Denmark Drive.  Ms. Trumbo played in the Clark's Run Watershed directly behind the Facility.  Ms. Trumbo suffers from seizures as a result of an undiagnosed neurological disorder.  She also

suffers from balance problems, and dizziness.  As the collected scientific references attached as Exhibit C demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Ms.  Trumbo asserts personal injury claims in this action.

53.     **Chantee (Trumbo) Nolan.**  Ms. Nolan is a resident of Louisville, Kentucky, with an address of 3911 Garfield Avenue.  Ms. Nolan, who was born in 1977, grew up on Fairview Street (approximately .2 miles from the Facility) in the Cowan Neighborhood within the Affected Area.  She also lived for several years on Harding Street, which is .6 miles from the Facility and within the Affected Area.  Ms. Nolan has digestive disorders and balance issues.  As the collected scientific references attached as Exhibit C demonstrate, digestive disorders and balance problems can result from exposure to excessive amounts of lead, arsenic and/or TCE.  Ms. Nolan asserts personal injury claims in this action.  Ms. Nolan has eight children, several of whom are minors.  Ms. Nolan brings this action as guardian and next friend of her minor children.

54.     **Demaya Trumbo.**  Ms. Trumbo, Chantee Nolan's daughter, is a Danville resident with an address of 484 Denmark Drive, within the Affected Area.  Ms. Trumbo, who was born in 1999, has lived on Denmark Drive her entire life.  She played little league baseball on fields in the Cowan Neighborhood and/or the Corning/Philips ballfields.  Ms. Trumbo suffers from balance disorders, and dizziness.  As the collected scientific references attached as Exhibit C demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Ms. Trumbo asserts personal injury claims in this action.

31

55.     **Demmontrell Trumbo.**  Mr. Trumbo, Chantee Nolan's son, is a Danville resident with an address of 484 Denmark Drive, within the Affected Area.  Mr. Trumbo, who was born in 1997, has lived on Denmark Drive most of his entire life.  Mr. Trumbo suffers from behavioral and respiratory problems.  As the collected scientific references attached as Exhibit C demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Mr. Trumbo asserts personal injury claims in this action.

56.     **D. T.**  D.T., Chantee Nolan's daughter, is seventeen years old.  She has lived on Denmark Drive her entire life.  D.T. suffers from behavioral problems and a learning disability. As the collected scientific references attached as Exhibit C demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Chantee Nolan, her mother, asserts personal injury claims in this action on her behalf.

57.     **D. T. (2).**  D. T. (2), Chantee Nolan's son, is thirteen years old. He has lived on Denmark Drive his entire life.  D. T. (2) suffers from behavioral problems and a learning disability.  As the collected scientific references attached as Exhibit C demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Chantee Nolan, his mother, asserts personal injury claims in this action on his behalf.

58.     **D. D.**  D.D., Chantee Nolan's son, is ten years old. He has lived on Denmark Drive his entire life.  D.D. suffers from behavioral problems and a learning disability.  As the collected scientific references attached as Exhibit C demonstrate, these health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when

exposure occurs at a young age.  Chantee Nolan, his mother, asserts personal injury claims in this action on his behalf.

59.    **E. N.**  E.N., Chantee Nolan's daughter, is seven years old.  She has lived on Denmark Drive her entire life.  While E.N. does not yet experience any health problems, as the collected scientific references attached as Exhibit C demonstrate, significant health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Chantee Nolan, her mother, asserts personal injury claims in this action on her behalf.

60.    **S. N.**  S.N., Chantee Nolan's daughter, is three years old.  She has lived on Denmark Drive her entire life.  While S.N. does not yet experience any health problems, as the collected scientific references attached as Exhibit C demonstrate, significant health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Chantee Nolan, her mother, asserts personal injury claims in this action on her behalf.

61.    **M.N.**  M.N., Chantee Nolan's daughter, is four years old. She has lived on Denmark Drive her entire life.  While M.N. does not yet experience any health problems, as the collected scientific references attached as Exhibit C demonstrate, significant health problems can result from exposure to excessive amounts of lead, arsenic and/or TCE, particularly when exposure occurs at a young age.  Chantee Nolan, her mother, asserts personal injury claims in this action on her behalf.

### Additional Individual Plaintiffs

62.    **Bobbie Lemons.**  Ms. Lemons is a Danville resident who owns property and resides at 1117 John W.D. Bowling Ct., approximately one mile from the Facility and within the

33

Affected Area. Ms. Lemons, who was born in 1968, has lived within the Affected Area most of her life. She grew up at 221 Duncan Hill, which is approximately 1.3 miles from the Facility and within the Affected Area. Her family maintained a vegetable garden each summer, and she routinely ate vegetables grown in that garden. Ms. Lemons' father raised cows on their property, which were slaughtered and eaten by Ms. Lemons and her family on a regular basis. As a child, Ms. Lemons spent a significant amount of time at her Grandmother's house at 321 Cowan Street in the Cowan Neighborhood. Ms. Lemons' grandmother also maintained a vegetable garden on her property, and Ms. Lemons ate from this garden as well. In addition, Ms. Lemons' grandmother raised livestock, including pigs on a plot in the Cowan Neighborhood and Ms. Lemons ate this meat as well throughout her childhood. Ms. Lemons played on the Corning/Philips Ballfields throughout her childhood, and specifically recalls dark plumes of smoke billowing from the Facility's smokestacks. Ms. Lemons suffers from multiple sclerosis, which she was diagnosed with in 2007.   As the collected scientific references attached as Exhibit C demonstrate, multiple sclerosis can result from exposure to excessive amounts of lead, arsenic, and/or TCE. In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area. Ms. Lemons asserts property damage and personal injury claims in this action.

63.    **Wanda Beasley.** Ms. Beasley is a Danville resident who owns property and resides at 656 Linda Avenue – approximately one mile from the Facility and within the Affected Area. Ms. Beasley grew up in Danville on Walnut Street, which is in the Cowan Neighborhood. Ms. Beasley played on the Corning/Philips Ballfields adjacent to the Facility as a child, and ate watercress harvested from the Clark's Run Watershed. Ms. Beasley worked for Philips inside

the Facility from 1986 until 1991, performing maintenance and janitorial tasks.  Although she suffers from myriad ailments – likely as a result to her exposure to Hazardous Substances – she asserts only property damage claims in this action.[4]  As set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.

64.   **David Caldwell.**  Mr. Caldwell is a Danville resident who owns property and resides at 400 Brookhaven Drive.  From 2000 until 2018, Mr. Caldwell and his wife Margo Caldwell owned and lived in a home at 712 Logan Avenue in Danville – 1.3 miles from the Facility and within the Affected Area.  As set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. and Mrs. Caldwell sold this property in March, 2018 for a lesser price than that which they would have been able to obtain in the absence of contamination, and have therefore suffered damages as a result of the Defendants' tortious conduct.  Mr. Caldwell, who was born in 1957, grew up in the Cowan Neighborhood.  Like other children in the Neighborhood, he ate food raised in the Neighborhood, played on the Corning/Philips Ballfields and ate watercress harvested from the Clark's Run Watershed adjacent to the Facility.  He suffers from asthma and breathing problems.  As the collected scientific references attached as Exhibit C demonstrate, asthma and breathing problems can result from exposure to excessive amounts of lead, arsenic, and/or TCE. Mr. Caldwell asserts property damage and personal injury claims in this action.

---

[4]   This Court previously ruled that the personal injury claims asserted by former Corning and Philips workers were barred by Kentucky's Workers' Compensation scheme.  See Cox, et al. v. Philips Electronics North America Corp., et al., 13-CV-406 [DE 89].

65.    **Margo Caldwell.**  Ms. Caldwell is a Danville resident who owns property and resides at 400 Brookhaven Drive.  From 2000 through 2018, Mrs. Caldwell and her husband David Caldwell owned and lived in a home at 712 Logan Avenue in Danville – 1.3 miles from the Facility and within the Affected Area.  As set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. and Mrs. Caldwell sold this property in March, 2018 for a lesser price than that which they would have been able to obtain in the absence of contamination, and have therefore suffered damages as a result of the Defendants' tortious conduct.  Mrs. Caldwell, who was born in 1963, grew up within the Affected Area. She played on the Corning/Philips Ballfields and ate watercress harvested from the Clark's Run Watershed.  She suffers from breathing problems.  As the collected scientific references attached as Exhibit C demonstrate, breathing problems can result from exposure to excessive amounts of lead, arsenic, and/or TCE. Mrs. Caldwell asserts property damage and personal injury claims in this action.

66.    **Marthetta Clark.**  Ms. Marthetta Clark is a Danville resident, owns property and resides at 307 Fairview Street in the Cowan Neighborhood.  This property is approximately .3 miles from the Facility and within the Affected Area. Ms. Clark, has owned the property at 307 Fairview Street since the 1960s, and has lived on Fairview since childhood.  Like other children in the Neighborhood, she ate food raised in the Neighborhood, and ate watercress harvested from the Clark's Run Watershed adjacent to the Facility.  Ms. Clark suffers from high blood pressure, vertigo, constant congestion, nasal cavity problems, and kidney issues.  As the collected scientific references attached as Exhibit C demonstrate, high blood pressure, vertigo, congestion, nasal cavity problems and kidney issues can result from exposure to excessive amounts of lead,

arsenic, and/or TCE. In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area. Ms. Clark asserts property damage and personal injury claims in this action.

67.     **Sadie Gambrel.** Ms. Gambrel is a Danville resident, owns property and resides at 307 Fairview Street in the Cowan Neighborhood. She owns the property jointly with her mother, Marthetta Clark. Ms. Gambrel, who was born in 1960, grew up in the house at 307 Fairview. Like other children in the Neighborhood, she ate food raised in the Neighborhood, played on the ballfields located on the Facility's grounds, and ate watercress harvested from the Clark's Run Watershed adjacent to the Facility. In 1993, she built a house on West Walnut Street – also in the Cowan Neighborhood, approximately .3 miles from the Facility and within the Affected Area. When she built this home, the construction process unearthed what looked to be a former dumping ground. Ms. Gambrel lived on West Walnut with her husband for many years. He died in 1993 of an unexplained brain tumor. Ms. Gambrel owned the West Walnut property until recently, when she sold it to move in with her mother and assume a caretaking role. Ms. Gambrel sold this property for a lesser price than that which she would have been able to obtain in the absence of contamination, and has therefore suffered damages as a result of the Defendants' tortious conduct. Ms. Gambrel suffers from high blood pressure and experiences vertigo. As the collected scientific references attached as Exhibit C demonstrate, high blood pressure and vertigo can result from exposure to excessive amounts of lead, arsenic, and/or TCE. In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value

of properties within the Affected Area.  Ms. Gambrel asserts property damage and personal injury claims in this action.

68.     **James Hunn.**  Mr. Hunn is a Danville resident, owns property and resides at 1009 East Main Street.  His home, which he has owned since 1999, is approximately 2.1 miles from the Facility and is within the Affected Area.  Mr. Hunn, who was born in 1941, has lived in Danville since 1962.  Since that time, he has lived at several different locations within the Affected Area, including 2nd Street, Southern Avenue, and Circle Drive.  Mr. Hunn worked in the railyard adjacent to the Facility for nineteen years.  As he was working, he regularly noticed plumes of smoke billowing from the Facility's smoke stacks, and noticed thick layers of ash fallout on the railcars.  Mr. Hunn also witnessed Corning dumping waste at an unregulated dump site on Redryer Lane, which is located between Fourth Street and the railyard where Mr. Hunn worked.  Mr. Hunn suffers from COPD, diabetes, arthritis, and kidney disease.  As the collected scientific references attached as Exhibit C demonstrate, COPD, diabetes, arthritis, and kidney disease can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. Hunn asserts property damage and personal injury claims in this action.

69.     **Ethel Hunn.**  Ms. Hunn is a Danville resident, owns property and resides at 1009 East Main Street.  Her home, which she has owned jointly with her husband James Hunn since 1999, is approximately 2.1 miles from the Facility and is within the Affected Area. Mrs. Hunn, who was born in 1942, has lived in Danville all but seven years of her life.  She grew up on 2nd Street, which is approximately one mile from the Facility and within the Affected Area.  Mrs.

38

Hunn's childhood home was near the dumping area utilized by Defendants on Redryer Lane. Mrs. Hunn suffers from high blood pressure and dizzy spells, and she also has balance problems. As the collected scientific references attached as Exhibit C demonstrate, high blood pressure, dizziness and balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mrs. Hunn asserts property damage and personal injury claims in this action.

70.     **Brenda Carter.**  Ms. Carter is a Lexington, Kentucky resident who owns property and resides at 1138 Briarwood Drive.  She owns property in Danville at 310 Fairview Street.  Ms. Carter is a member of the Johnson family that has lived in the Cowan Neighborhood for generations.  310 Fairview Street, approximately .2 miles from the Facility and in the Cowan Neighborhood, is her childhood home.  Ms. Carter, who was born in 1954, lived at 310 Fairview Street for the first twenty-one years of her life.  Like other children growing up in the Cowan Neighborhood, Ms. Carter played on the Corning/Philips Ballfields, ate food grown in the Neighborhood, and ate watercress from the waterway behind the Facility.  Ms. Carter suffers from dizzy spells and at times has difficulty with balance.  As the collected scientific references attached as Exhibit C demonstrate, dizziness and balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Ms. Carter asserts property damage and personal injury claims in this action.

39

71.    **Katherine Doty.**  Ms. Doty is a resident of Lexington, Kentucky, with an address of 1356 Beulah Park.  Ms. Doty is a member of the Walker Family, which lived in the Cowan Neighborhood for generations on Meadows Lane, off McCowan Street.  The street has since been renamed Kilby Lane.  Ms. Doty grew up on Meadows Lane.  Like other children growing up in the Cowan Neighborhood, Ms. Doty played on the Corning/Philips Ballfields and ate watercress from the waterway behind the Facility.  Ms. Doty specifically recalls eating rabbit caught in the area.  The Walker family ate mainly from the land.  They raised hogs and chickens on their Meadows Lane property, which they consumed and also sold to other families in the Neighborhood.  The Walker family also had a large vegetable garden and grew vegetables and fruit trees.  Ms. Doty has asthma and Crohn's disease.  She has also suffered from leg cramps since childhood – she specifically remembers that she and her sister rubbed each other's legs at night to alleviate the cramping.   As the collected scientific references attached as Exhibit C demonstrate, asthma, muscle cramping, and Crohn's disease can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Ms. Doty asserts property damage and personal injury claims in this action.

72.    **Willie Harris.**  Ms. Harris is a resident of Danville who owns property and resides at 164 Bonta Lane, where she has lived for thirty-nine years.  Her home is approximately 1 mile from the Facility and is within the Affected Area.  In fact, Ms. Harris has lived within the Affected Area her entire life. Ms. Harris is a member of the Walker Family, which lived in the Cowan Neighborhood for generations on Meadows Lane, off McCowan Street.  The Street has since been renamed Kilby Lane.  Ms. Harris, who was born in 1931, grew up on Meadows Lane,

where she lived until 1952.  She thereafter moved to 1215 Lebanon Pike, directly across from the Facility.  She lived at this address for 27 years – until 1979.  Like other children growing up in the Cowan Neighborhood, Ms. Harris ate watercress harvested from the waterway behind the Facility and ate small game captured in the area.  She drank water from the various wells in the Cowan Neighborhood and also collected water from Spring 6 – the spring most heavily impacted by the TCE plume emanating from the Facility.  Ms. Harris recalls using wood scraps gathered on or near the Facility grounds to fuel the wood stove in her family's home.  She recalls that this wood was coated with a substance that caught fire quickly.  The Walker family ate mainly from the land.  They raised hogs and chickens on their Meadows Lane property, which they consumed and also sold to other families in the Neighborhood.  The Walker family also had a large vegetable garden and grew vegetables and fruit trees.  Ms. Harris has esophagus cancer.  As the collected scientific references attached as Exhibit C demonstrate, esophagus cancer can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Ms. Harris asserts property damage and personal injury claims in this action.

73.   **Melvin Harris.**  Mr. Harris is a Danville resident who owns property and resides at 845 Duncan Hill.  Mr. Harris's home, where he has resided for twenty-two years, is approximately 1.6 miles from the Facility and is within the Affected Area.  In fact, Mr. Harris, who was born in 1948, has lived within the Affected Area his entire life – he is Willie Harris's son.  He grew up on Meadows (now Kilby) Lane, and then moved to Lebanon Road.  Like other children growing up in the Cowan Neighborhood, Mr. Harris played on the ballfields on the Facility's grounds, ate watercress harvested from the waterway behind the Facility and ate small

41

game captured in the area.  Mr. Harris also recalls using wood scraps gathered on or near the

Facility grounds to fuel the wood stove in his family's home.  The Walker family ate mainly

from the land.  They raised hogs and chickens on their Meadows Lane property, which they

consumed and also sold to other families in the Neighborhood.  The Walker family also had a

large vegetable garden and grew vegetables and fruit trees.  Mr. Harris suffers from balance

problems, dizziness, and tingling in his extremities.  As the collected scientific references

attached as Exhibit C demonstrate, balance problems, dizziness, and tingling in extremities can

result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set

forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and

dispersed by Defendants has negatively impacted the use and value of properties within the

Affected Area.  Ms. Harris asserts property damage and personal injury claims in this action.

74.  **Ann Hawkins.**  Ms. Hawkins is a Danville resident who owns property and

resides at 140 Lisa Avenue.  Her home is approximately two miles from the Facility and is

outside the Affected Area.  Ms. Hawkins, who was born in 1955, lived on Lebanon Road directly

across from the Facility in the Cowan Neighborhood from her birth until she was twenty-seven

years old. Like other children growing up in the Cowan Neighborhood, Ms. Hawkins played on

the Corning/Philips Ballfields, ate watercress harvested from the waterway behind the Facility,

and ate small game captured in the area.  Ms. Hawkins specifically recalls plumes of smoke

billowing from the Facility's smokestacks daily during her childhood.  She also recalls cars in

the area being coated with thick layers of ash fallout from the Facility.  In fact, Ms. Hawkins

recalls that the ash eroded the paint on the vehicles and that her family received funds from an

insurance company to compensate them for the property damage caused by the fallout.  She

further recalls that her mother used to pick blackberries from a hedgerow near the Facility's

entrance and use them to make homemade blackberry pie for the family. Ms. Hawkins suffers from cardiovascular problems – she was diagnosed as having two bad heart valves at age thirty. Such a diagnosis was highly unusual for someone of Ms. Hawkins' age.  As the collected scientific references attached as Exhibit C reflect, cardiovascular disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Hawkins asserts personal injury claims in this action.

75.     **Ronald Hawkins.**  Mr. Hawkins, Ann Hawkins' husband, is a Danville resident who owns property and resides at 140 Lisa Avenue.  His home is approximately two miles from the Facility and is outside the Affected Area.  Mr. Hawkins who was born in 1953, grew up within the Affected Area, residing with his family on 1st Street (.9 miles from the Facility), and then 3rd Street (.9 miles from the Facility).  During his childhood, Mr. Hawkins was a serious baseball player.  He played on the Corning/Philips Ballfields up to three times per week.  After college, Mr. Hawkins began working in the railyard located adjacent to the Facility.  He recalls seeing plumes of gray smoke billowing from the Facility's smokestacks and remembers that the cars in the railyard were continuously coated in thick layers of ash fallout from the Facility.  Mr. Hawkins suffers from kidney problems.  As the collected scientific references attached as Exhibit C reflect, kidney disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr. Hawkins asserts personal injury claims in this action.

76.     **Chester Kavanaugh.**  Mr. Kavanaugh is a Danville resident who owns property and resides at 314 Brookside Drive, which is 1.8 miles from the Facility and within the Affected Area.  Mr. Kavanaugh, who was born in 1948, moved to Danville with his family in 1960.  He lived throughout his childhood on 2nd Street, which is .7 miles from the Facility and within the Affected Area. His childhood home is near the dumping area utilized by Defendants on Redryer

Lane.  Mr. Kavanaugh built a house on Swope Drive in 1974.  Swope Drive is approximately .7 miles from the Facility and within the Affected Area.  Mr. Kavanagh lived on Swope Drive until 2003, when he moved to his current home.  Mr. Kavanaugh worked in West Danville for many years as a plumber, and recalls seeing large plumes of smoke billowing from the Facility smokestacks.  He also recalls wiping thick coats of ash fallout or dark dust from his vehicle.  Mr. Kavanaugh witnessed discolored discharge into Clark's Run on several occasions and also noticed dead animals along the Clark's Run Watershed behind the Facility.  Mr. Kavanaugh has cardiovascular problems that have led to the placement of a stint.  He also has difficulty breathing, high blood pressure, and experiences dizziness, vertigo, and tingling in his hands and feet.  As the collected scientific references attached as Exhibit C demonstrate, the medical issues experienced by Mr. Kavanaugh can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr. Kavanaugh asserts property damage and personal injury claims in this action.

77.    **John Raines, Jr.**  Mr. Raines is a Danville resident who presently owns property and resides at 125 Brookshire Drive – an address that falls outside the Affected Area.  For thirty-one years, however, he lived at 1117 Lebanon Road, directly across from the Facility in the Cowan Neighborhood.  Mr. Raines, who was born in 1952, moved to Lebanon Road with his family at age nine, and spent the remainder of his childhood there.  Mr. Raines played on the Corning/Philips Ballfields, ate food grown in the Neighborhood, harvested watercress from the waterway behind the Facility, and hunted for small game in the area.  As an adult, Mr. Raines worked in the lookout tower in the railyard adjacent to the Facility.  From his post, he observed nearly continuous clouds of gray/black smoke billowing from the Facility's smokestacks.  He also observed the railcars in the yard being coated with thick layers of ash fallout from the Facility.  In February of 1994, Mr. Raines' father was diagnosed with cancer – he died in July of

44

that same year.  The home Mr. Raines grew up in has since been demolished – it was located on property now owned by Sellers Engineering Company.  Testing performed on this property in 2012 and 2013 revealed an astonishing lead level of a 62,000 mg/kg just 300 feet from the site of the Raines family home.  Mr. Raines has been diagnosed with mesothelioma, suffers from a kidney disorder, and experiences tingling in his hands and feet.  As the collected scientific references attached as Exhibit C demonstrate, mesothelioma, kidney problems, and nerve damage can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr. Raines asserts personal injury claims in this action.

78.     **Gloria Lewis.**  Ms. Lewis is a Danville resident who owns property and resides at 112 Circle Drive – a property located approximately 1.1 mile from the Facility and within the Affected Area.  Ms. Lewis is Johnny Raines Jr.'s sister, and she has lived within the Affected Area her entire life.  She was born in 1951, and lived with her family at 1117 Lebanon Road, in a home directly across the street from the Facility in the Cowan Neighborhood, for thirteen years.  She bought her current home at 112 Circle Drive forty-three years ago, and she has lived there since that time.  Like other children growing up in the Cowan Neighborhood, Ms. Lewis ate food grown in the Neighborhood, and harvested watercress from the waterway behind the Facility.  Ms. Lewis played on and near the Corning/Philips Ballfields three to four times per week during her childhood on the days she went to watch her brother play baseball.  Ms. Lewis has high blood pressure, arthritis, and balance problems.  As the collected scientific references attached as Exhibit C demonstrate, high blood pressure, arthritis, and balance problems can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed

by Defendants has negatively impacted the use and value of properties within the Affected Area. Ms. Lewis asserts property damage and personal injury claims in this action.

79.    **Clyde Simpson.** Mr. Simpson is a Danville resident who lives at 401 South Third Street.  Mr. Simpson's residence is located approximately .9 miles from the Facility, within the Affected Area.  Mr. Simpson, who was born in 1955, has lived within the Affected Area most of his life.  He grew up on McCowan Street in the Cowan Neighborhood, where he lived for approximately 25 years.  Mr. Simpson played on the ballfields on the grounds of the Facility, ate food grown in the Neighborhood, harvested watercress from the waterway behind the Facility, and hunted for small game in the area.  Mr. Simpson suffers from COPD, renal and kidney failure.  As the collected scientific references attached as Exhibit C demonstrate, COPD, renal and kidney failure can result from exposure to excessive amounts of lead, arsenic, and/or TCE. Mr. Simpson asserts personal injury claims in this action.

80.    **Margret Peebles.** Ms. Peebles is a resident of Danville who resides in and owns property at 412 Brookhaven Drive.  Ms. Peebles' home, where she has lived for the past 31 years, is located approximately 1.8 miles from the Facility, within the Affected Area.  Ms. Peebles, who was born in 1943, lived on Lebanon Road during her childhood.  Between 1970 and 1980, Ms. Peebles lived with her husband and two sons on Beech Street – a property .2 miles from the Facility in the Cowan Neighborhood.  Ms. Peebles suffers from degenerative bone disease and arthritis.  As the collected scientific references attached as Exhibit C demonstrate, both degenerative bone disease and arthritis can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively

46

impacted the use and value of properties within the Affected Area.  Ms. Peebles asserts property damage and personal injury claims in this action.

81.     **Charles Lawson.**  Mr. Lawson (Margaret Peebles' son) is a Lawrenceburg, Kentucky resident who lived in the Cowan Neighborhood during his childhood.  Mr. Lawson, who was born in 1963, lived on Lebanon Road directly across the street from the Facility, for the first ten years of his life.  His family thereafter moved to Beech Street, in the Cowan Neighborhood and approximately .2 miles from the Facility.  Mr. Lawson lived on Beech Street until he was twenty-five years old.  Mr. Lawson played on the Corning/Philips ballfield almost every weekend throughout his childhood.  He also rode his bicycle and played on a dirt field in front of the Facility.  Mr. Lawson suffers from diabetes, degenerative bone disorders, and neuropathy.  As the collected scientific references attached as Exhibit C demonstrate, diabetes, degenerative bone disorders, and neuropathy can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Mr.  Lawson asserts personal injury claims in this action.

82.     **Deborah Stevenson.**  Ms. Stevenson is a Lexington, Kentucky resident who resides at 938 Delaware Avenue.  Ms. Stevenson, who was born in 1951, spent her entire childhood in the Cowan Neighborhood.  She lived first with her family on Lebanon Road until she was eight years old, and then on McCowan Street until she turned thirteen.  Ms. Stevenson played on the Corning/Philips Ballfields, ate food grown in the Neighborhood, and ate watercress from the Clark's Run Watershed behind the Facility.  Ms. Stevenson suffers from digestive disorders, cramping in her hands and feet, and balance disorders.  She has also been diagnosed with breast cancer.  As the collected scientific references attached as Exhibit C demonstrate, the health problems suffered by Ms. Stevenson can result from exposure to

excessive amounts of lead, arsenic, and/or TCE.  Ms. Stevenson asserts personal injury claims in this action.

83.   **Connie Mullins.**  Ms. Mullins is a Danville resident who owns property and resides at 204 West Main Street.  204 West Main Street is approximately one mile from the Facility and is within the Affected Area. Ms. Mullins, who was born in 1931 and is now 87 years old, has owned 204 West Main Street for forty-five years.  Ms. Mullins has high blood pressure and suffers from dizziness and numbness in her extremities.  As the collected scientific references attached as Exhibit C demonstrate, high blood pressure, numbness, and dizziness can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.   Ms. Mullins asserts property damage and personal injury claims in this action.

84.   **Janet Mitchel.**  Ms. Mitchel is a Danville resident with an address of 320 Nichols Trace – approximately 1.2 miles from the facility and within the Affected Area.  Ms. Mitchel, who was born in 1960, worked for Philips from 1983-2001 as a store room/utility worker.  She also worked in the mix house as a repair technician between 1983-1984.  During that time, she was fitted for a respirator, but was never issued one.  Ms. Mitchel has myriad health problems, however as a former Philips employee she is limited to asserting property damage claims in this action.  As set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.   Ms. Mitchel asserts property damage claims in this action.

85.   **Danetta Owsley.**  Ms. Owsley is a Lexington, Kentucky resident with an address of 2820 Ryan Circle Drive, #3.  Ms. Owsley, who was born in 1962, grew up on North 5th Street

48

in Danville, where she lived throughout her childhood.  North 5th Street is approximately .9 miles from the Facility and within the Affected Area.  Ms. Owsley has high blood pressure and asthma. She has also been diagnosed with an aorta valve disorder.  As the collected scientific references attached as <u>Exhibit C</u> demonstrate, high blood pressure, asthma, and cardiovascular disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Owsley asserts personal injury claims in this action.

86.   **Sharon Price.**  Ms. Price is a Danville resident who owns property and resides at 418 Harding Street – a property that is .67 miles from the Facility and within the Affected Area. Ms. Price has lived on Harding Street for the past thirteen years.  Ms. Price has COPD, asthma, and chronic bronchitis.  Each of these medical conditions has developed since Ms. Price moved to Danville – even though she has never smoked.  As the collected scientific references attached as <u>Exhibit C</u> demonstrate, asthma, COPD and chronic bronchitis can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.    Ms. Price asserts property damage and personal injury claims in this action.

87.   **Donna Smith.**  Ms. Smith is a Danville resident who owns property and resides at 207 North Street – approximately 1.2 miles from the Facility and within the Affected Area.  As set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.    Ms. Smith asserts property damage claims in this action.

88.   **Walter Smith.**  Mr. Smith is a Danville resident who owns property and resides at 248 Randolph Hill – approximately .9 miles from the Facility and within the Affected Area.

49

As set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.   Mr. Smith asserts property damage claims in this action.

89.   **Fannie Walker.**  Ms. Walker is a Danville resident who owns property and resides at 921 Regency Road.  Ms. Walker's home is approximately 2.2 miles from the Facility and falls outside the Affected Area.  For the first sixty-seven years of her life, however, Ms. Walker (who was born in 1948) lived within the Affected Area.  Ms. Walker grew up on Frye's Lane (.7 miles from the Facility and within the Affected Area).  She thereafter lived on Meadow Lane (.2 miles from the Facility and within the Affected Area), Bate Street (.76 miles from the Facility and within the Affected Area), Harding Street (.6 miles from the Facility and within the Affected Area), and Southern Avenue (.7 miles from the Facility and within the Affected Area).  Ms. Walker played on the Corning/Philips Ballfields as a child.  She also harvested watercress and played in the Clark's Run Watershed behind the Facility.  Ms. Walker's family burned towels discarded by the Defendants in their stove at home for heat.  Ms. Walker also witnessed Defendants dumping barrels of waste at an unregulated dumpsite near her childhood home.  Ms. Walker has high blood pressure, arthritis, balance problems, and cardiovascular disease.   As the collected scientific references attached as Exhibit C demonstrate, high blood pressure, arthritis, balance problems and cardiovascular disease can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Walker asserts personal injury claims in this action.

90.   **Estate of Frank Walker**.  Mr. Walker was a member of the Walker Family, which lived in the Cowan Neighborhood for generations on Meadows Lane, off McCowan Street.  The Street has since been renamed Kilby Lane.  Mr. Walker, who was born in 1938, grew up on Meadows Lane, where he lived until 1968.  He thereafter lived on Bates Street,

50

Southern Avenue, and Harding Street – all of which are within the Affected Area.  Like other children growing up in the Cowan Neighborhood, Mr. Walker ate watercress harvested from the waterway behind the Facility and ate small game captured in the area.  He drank water from the various wells in the Cowan Neighborhood and also collected water from Spring 6 – the spring most heavily impacted by the TCE plume emanating from the Facility.  The Walker family ate mainly from the land.  They raised hogs and chickens on their Meadows Lane property, which they consumed and also sold to other families in the Neighborhood.  The Walker family also had a large vegetable garden and grew vegetables and even fruit trees.  Mr. Walker died from lung cancer.  As the collected scientific references attached as Exhibit C demonstrate, lung cancer can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  The Estate of Frank Walker asserts personal injury claims in this action.

91.     **Celia Wilkinson.**  Ms. Wilkinson is a Danville resident who owns property and resides at 336 McCowan Street – approximately .1 mile from the Facility in the Cowan Neighborhood.  Ms. Wilkinson was born and raised in Moreland, Kentucky.  For the last thirty-six years, however, she has lived in Danville within the Affected Area.  In 1972, Ms. Wilkinson moved to Danville and resided in the Parkview Apartments on Holiday Drive – approximately one mile from the Facility and within the Affected Area.  Ms. Wilkinson lived in Parkview Apartments for approximately 10 years.  Ms. Wilkinson bought her home on Cowan Street in 1982 and has lived there since that time. Ms. Wilkinson suffers from arthritis and high blood pressure.    As the collected scientific references attached as Exhibit C demonstrate, high blood pressure and arthritis can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value

51

of properties within the Affected Area.   Ms. Wilkinson asserts property damage and personal injury claims in this action.

92.   **Glenn Ball.**  Mr. Ball is a Danville resident who owns property and resides at 346 Swope Drive – approximately one mile from the Facility and within the Affected Area.  Mr. Ball was born in 1942, and has lived in Danville most of his life.  He grew up at 1217 Lebanon Road in the Cowan Neighborhood. Throughout his childhood, Mr. Ball drank water from a well in his backyard.  Mr. Ball also frequently played on the Corning/Philips Ballfields.  Mr. Ball experiences myriad health problems, including hypertension and high blood pressure.  As the collected scientific references attached as Exhibit C demonstrate, both hypertension and high blood pressure can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Mr. Ball asserts property damage and personal injury claims in this action.

93.   **Chenice Gaans.**  Ms. Gaans is a Lexington, Kentucky resident with an address of 2059 St. Michaels Drive.  Ms. Gaans, who was born in 1982, grew up at 1208 Sycamore Street in the Cowan Neighborhood. She ate watercress harvested from the Clark's Run Watershed as a child. Ms. Gaans experiences difficulty with balance.  As the collected scientific references attached as Exhibit C demonstrate, balance disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  Ms. Gaans asserts personal injury claims in this action.

94.   **The Estate of Betty Johnson.**  Ms. Johnson was a Danville resident who for the last forty-five years of her life owned and resided in property at 1204 West Walnut Street, in the Cowan Neighborhood and within the Affected Area.  Ms. Johnson died on November 9, 2017 at

52

the age of seventy-one as a result of throat cancer.  Ms. Johnson raised her children on West

Walnut, and fed them vegetables raised on the family's property.  As the collected scientific

references attached as <u>Exhibit C</u> demonstrate, various forms of cancer, including throat cancer,

can result from exposure to excessive amounts of lead, arsenic, and/or TCE.  In addition, and as

set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated

and dispersed by Defendants has negatively impacted the use and value of properties within the

Affected Area.  The Estate of Betty Johnson asserts property damage and personal injury claims

in this action.

      95.    **James Dollins.**  Mr. Dollins is a resident of Milton, Florida; however he grew up

at 1204 West Walnut Street – Betty Johnson was his mother.  As previously stated, West Walnut

Street is in the Cowan Neighborhood.  Mr. Dollins lived at 1204 West Walnut Street for more

than twenty years.  He played on the Corning/Philips Ballfields as a child, and ate vegetables

grown in the area.  Mr. Dollins, who was born in 1966, suffers from learning disabilities, high

blood pressure, and numbness and tingling in his extremities. As the collected scientific

references attached as <u>Exhibit C</u> demonstrate, learning disabilities, high blood pressure, and

numbness and tingling in extremities can result from exposure to excessive amounts of lead,

arsenic, and/or TCE.  Mr. Dollins asserts property damage and personal injury claims in this

action.

      96.    **The Estate of Mike Orberson.**  Mr. Orberson was a Danville resident who

owned property and resided within the Affected Area for most of his life.  Mr. Orberson, who

died in 2017, grew up playing baseball on the Corning/Philips Ballfields almost every day.  He

was a serious ball player who spent a considerable amount of time in this highly contaminated

area.  His cardiovascular and renal systems failed at an early age.  As the collected scientific

references attached as Exhibit C demonstrate, cardiovascular and renal disorders can result from exposure to excessive amounts of lead, arsenic, and/or TCE, particularly when exposure occurs at a young age.  Mr. Orberson asserts personal injury claims in this action.

97.    **Mary Emily Orberson.**  Ms. Orberson is a Danville resident who owns property at 315 East Lexington Avenue, approximately 1.3 miles from the Facility and within the Affected Area.  As set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Ms. Orberson asserts property damage claims in this action.

**Corporate Plaintiffs**

98.    **Modern Holdings, LLC.**  Modern Holdings is a Kentucky Limited Liability Company organized and doing business in the Commonwealth of Kentucky that owns property located at 1200 Lebanon Road, which is directly across the street from the Facility and within the Affected Area.  Modern Holdings' property has been demonstrably damaged by the Defendants' tortious activities.  As set forth more fully herein, Plaintiffs' experts have concluded that the contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Modern Holdings asserts property damage claims in this action.

99.    **Sellers And Sellers Company.**  Sellers and Sellers is a Kentucky corporation organized and doing business in the Commonwealth of Kentucky that owns the property located at 916 West Walnut Street, Danville, Kentucky, adjacent to the Facility.  Sellers and Sellers property has been demonstrably contaminated and damaged by the Defendants' tortious activities. As set forth more fully herein, Plaintiffs' experts have concluded that the

54

contamination generated and dispersed by Defendants has negatively impacted the use and value of properties within the Affected Area.  Sellers and Sellers asserts property damage claims in this action.

### B.   The Defendants.

100.   Defendant Philips Electronics North America Corporation is a Delaware foreign business corporation doing business in the Commonwealth of Kentucky with its corporate headquarters located at 3000 Minute Man Road, Andover, Massachusetts that owned and operated, through its agents and/or employees, the glass manufacturing Facility and Site at 320 Vaksdahl Avenue that is the subject of this lawsuit.

101.   Defendant Corning Incorporated is a corporation duly organized and existing under the laws of New York, with its corporate headquarters located at 1 Riverfront Plaza, Corning, New York.  On information and belief, Corning is now the owner of the Site and the Facility and is and has been physically in control of any removal of contaminated materials from the Facility or the remediation and removal of soil from the Site.

### C.   Jurisdiction And Venue.

102.   Jurisdiction is proper in this Court pursuant to 28 U.S.C.  § 1332(a); as this is an action in which (1) plaintiffs are citizens of a state different from defendants; (2) the amount in controversy exceeds $75,000 for each plaintiff.

103.   Venue is proper in this Court because the acts complained of occurred in this district.

III.     **FACTUAL ALLEGATIONS**

A.       **Defendants Utilize And/Or Generate Lead, Arsenic And TCE At The Facility.**

104.     Corning constructed and opened the Facility in 1952.  Prior to 1952, the property was undeveloped.

105.     Philips purchased the Site and Facility in 1983, and operated the Facility as a plant for manufacturing, packaging, and shipping of components for parabolic aluminized reflector (PAR) lamps.  Manufacturing operations by Philips continued at the Site until early 2011.

106.     Philips owned the Facility and Site until at least April, 2013, when, upon information and belief, Philips sold portions of the Site, including the Facility, back to Corning.

107.     The Site is approximately 32 acres, roughly rectangular shaped, and is located on the southwest side of Danville, Kentucky.  The Site consists of an approximately 335,000 square foot building with office, manufacturing, and warehouse space.  Other structures around the main building include a hazardous waste storage building, a general purpose storage building, gas cylinder storage building, and a pump house.  The Site is surrounded by a chain link fence.

108.     The property is located in a mixed commercial and industrial area.  The Site is bounded to the east by a rail yard owned by the Cincinnati, New Orleans and Texas Pacific Railway Company (Norfolk Southern Corporation [NS Line]) (the "Railroad"), to the west by Vaksdahl Avenue, to the north by property owned by Sellers and Sellers, and to the south by the property at 410 Vaksdahl Avenue, formerly owned by Greenleaf Plant Food Wholesale, Inc.

109.    The Facility opened in 1952, and was operated by Corning as a glass plant, which included diode glass production.  TCE was used in the diode glass production process until 1977. The diode glass manufacturing operation was moved to another Corning plant in 1983, prior to Philips's acquisition of the Site in 1983.

110.    From 1983 until 2011, Philips operated the Site as a glass manufacturing facility that mixed and melted various basic raw materials to form blown and drawn glass products for the lighting industry.  The materials were mixed in a specialized portion of the Facility called "the Mix House."

111.    Three basic types of glass were produced: a soda-lime glass which was drawn into tubing or blown into various types and sizes of glass envelopes for light bulbs; an alkali-lead glass which was drawn into tubing for other glass components used in the lighting industry; and borosilicate glass for manufacturing pressed glass components (reflectors and lenses) for the subsequent assembly into sealed-beam type lighting products.  Philips discontinued the bulb acid etching operation around 1999.  Fluorescent tubing and incandescent bulb production ceased in 2005 and 2008, respectively, and the borosilicate hard glass furnace and its pressing operation were the only ongoing operations at the time the plant operations ceased in early 2011.

112.    Until 2014, there were three settling ponds at the Site.  Wastewaters resulting from contact cooling of hot lead glass, precipitation runoff from glass cullet storage piles, and a small volume of rinse water from electroplating operations were discharged into a surface impoundment on the eastern side of the Site.

113.    From 1952 on, Defendants' Facility generated hazardous and other solid wastes within and around the facility itself.  The lead, arsenic and TCE generated in the Facility negatively impacted the health and well-being of not only the workers at the Facility but also of

57

non-employee Danville residents.  During its peak operation, there were approximately 400 employees working full time on the Site.

114.    Lead, arsenic and TCE were used or generated by the Defendants during their manufacturing process, and were spread throughout the Site and throughout Danville by virtue of the Defendants' negligent and/or intentional actions.

115.    Lead, arsenic and TCE have been defined as hazardous by federal and state legislation, including but not limited to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A)]; section 102 of CERCLA  [42 USCS § 9602]; (C) section 3001 of the Solid Waste Disposal Act [42 USCS § 6921];  (D) section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a)]; (E) section 112 of the Clean Air Act [42 USCS § 7412]; (F) section 7 of the Toxic Substances Control Act [15 USCS § 2606];(G) 40 CFR 261.311 and 40 CFR 261.32; (H) Kentucky Revised Statutes (KRS) 224.46-012 to 224.46-870, and regulations at 401 Kentucky Administrative Regulations (KAR) 30:005 to 40:060 and 401 KAR 43:005 to 44:080; and (I) state and federal permitting regulations.

116.    The Environmental Protection Agency's ("EPA") Integrated Risk Information System ("IRIS") is a human health assessment program that evaluates information on health effects that may result from exposure to environmental contaminants.  Through the IRIS Program, EPA provides science-based human health assessments to support the Agency's regulatory activities.  Lead, arsenic, and TCE have been identified by IRIS as being associated with one or more illnesses, and each is a known or suspected carcinogen that is believed to be the proximate cause of a number of neuromuscular or cancer-related illnesses which have affected the Named Plaintiffs.  The collected medical references attached to this Complaint as Exhibit C

provide additional authority linking the injuries alleged by the Named Plaintiffs to their exposure to lead, arsenic and TCE generated and dispersed by Defendants.

117.    Lead, arsenic and TCE are used in and attributable to the manufacturing processes that occurred within the Facility.

118.    Established human toxicological effects associated with lead, arsenic, and TCE (see collected medical references at Exhibit C) include asthma, hypertension, high blood pressure, cancer, and disorders of the thyroid, kidney, colon, skin, and digestive, cardiovascular, respiratory, and neurological systems, diabetes, degenerative bone disease, balance disorders, memory loss, and learning disabilities.  Unfortunately, this list is not exhaustive.  These and other established toxicological effects are described in the publications of the U.S. Department of Health and Human Services Public Health Agency for Toxic Substances and Disease Registry, as well as multiple scientific journals, including, but not limited to, Biological Trace Element Research[5] and the Journal of the American Medical Association.[6]

119.    People who are exposed to moderate amounts of TCE may experience headaches, dizziness, and sleepiness; large amounts of TCE may cause coma and even death. Some people who breathe high levels of TCE may develop damage to some of the nerves in the face.  Other effects seen in people exposed to high levels of TCE include evidence of nervous system effects related to hearing, seeing, and balance, changes in the rhythm of the heartbeat, liver damage, and evidence of kidney damage.  Some people who get concentrated solutions of TCE on their skin develop rashes.  Also, TCE breaks down over time into degradation products that can be even

---

[5]    See generally Yousefi, B. et al., Serum Arsenic and Lipid Peroxidation Levels in Patients with Multiple Sclerosis., 2014 Jun; 158(3):276-9.

[6]    See generally, Chen, Chi-Ling PhD et al., Ingested Arsenic, Cigarette Smoking, and Lung Cancer Risk, JAMA 2004:292(24), December 22/29, 2004.

59

more toxic than TCE, such as vinyl chloride.  The soil screening level (SSL) to protect groundwater for TCE is 0.18 μg/kg and only 0.0065 μg/kg for vinyl chloride according to the United States Environmental Protection Agency's (USEPA's) Risk-Based Generic Screening Tables (Nov. 2015).  Of note, the toxicity of TCE has been recognized by USEPA to be greater than in recent years (SSL of 3.0 μg/kg in Oct. 2004), so previous regulatory screening levels may not have accurately assessed the risk associated with the TCE.

120.    Typical background concentrations of lead in soil in Kentucky are below 50 mg/kg, with a mean concentration of 30 mg/kg.  Lead is harmful because it can cause high blood pressure, digestive problems, nerve disorders, memory and concentration problems, and muscle and joint pain.  Exposure to lead is particularly dangerous for pregnant women, as lead can cause premature birth, low birth weight, or miscarriage.  Children are especially at risk because they are more likely than adults to ingest soil that contains lead, and they are more sensitive to the effects of lead. Lead exposure in children has been shown to decrease IQ scores, slow growth, and cause hearing problems.  The World Health Organization has stated that "Children are particularly vulnerable to the neurotoxic effects of lead, and even relatively low levels of exposure can cause serious and in some cases irreversible neurological damage."

121.    The USEPA RSL for arsenic is 0.67 mg/kg.  However, the mean concentration of arsenic in Kentucky is higher, at 8.9 mg/kg.  Ingestion of toxic quantities of arsenic usually has effects within 30-60 min., and severe toxicity has been reported with as little as 1 mg of $As_2O_3$ (arsenic trioxide).  Arsenic trioxide is typically used in glass manufacturing to improve the clarity of glass.  Exposure to low levels of arsenic can cause nausea and vomiting, damage to blood vessels, and a sensation of "pins and needles" in hands and feet. Ingesting or breathing low levels of arsenic for a long time can cause a darkening of the skin and the appearance of small

60

corns or warts on the palms, soles, and torso.  Skin contact with arsenic may cause redness and

swelling.  Exposure to elevated levels of arsenic can increase the risk of several types of cancer

including:  skin, bladder, lung, kidney, liver, and prostate cancer.

122.    While USEPA's generic soil screening level for lead in residential soil is 400

mg/kg, that does not suggest that this level is safe or desirable, particularly when the presence of

other hazardous substances is detected.  This is because there is no "safe" level of lead exposure,

particularly when an individual is exposed to multiple contaminants, including lead.  It should be

noted that many cities and some states have established hazard levels for lead that are

significantly lower than the levels established by USEPA.

123.    The effects of low-level lead exposure in children have recently come into the

spotlight following the publicity surrounding the Flint, Michigan water crisis.  Dr. Mona Hanna-

Attisha, the pediatrician who first published the Flint, Michigan lead data, has stated: "Lead is a

potent neurotoxin, and childhood lead poisoning has an impact on many developmental and

biological processes, most notably intelligence, behavior, and overall life achievement.  With

estimated societal costs in the billions, lead poisoning has a disproportionate impact on low

income and minority children."  See Hanna-Attisha, Mona, "Elevated Blood Lead Levels In

Children Associated With the Flint Drinking Water Crisis: A Spatial Analysis Of Risk and

Public Health Response," Research and Practice (Dec. 2015).  Dr. Hanna-Attisha commented in

a recent news story that the multi-generational effects of lead poisoning can be devastating to

communities:  "If you were to put something in a population to keep them down for generations

and generations to come, it would be lead," Hanna-Attisha said. "It's a well-known, potent

neurotoxin. There's tons of evidence on what lead does to a child, and it is one of the most

damning things that you can do to a population. It drops your IQ, it affects your behavior, it's

been linked to criminality, it has multigenerational impacts. There is no safe level of lead in a child." See "How Tap Water Became Toxic In Flint Michigan," Sara Ganim and Linh Tran, CNN (available at http://edition.cnn.com/2016/01/11/health/toxic-tap-water-flint-michigan/index.html).

**B.      Defendants Corning And Philips Intentionally Or Recklessly Caused The Pollution Of Surrounding Properties.**

124.     Defendants illegally, recklessly or negligently dumped lead, arsenic and TCE onto properties outside the boundaries of the Site.

125.     These properties include but are not limited to Cowan Park, Lebanon Road, Redryer Lane, property owned by Sellers and Sellers, and the Railroad adjacent to the north, east, and south of the property.

126.     The Defendants also dumped lead, arsenic and TCE onto fields that were later leased by Defendants to the City of Danville for proposed use as playgrounds and sports fields by children.  Upon information and belief, the City of Danville was informed by Corning that the leased property was free of Hazardous Substances.  The dumping by Defendants was done without proper authorization or permits.  Furthermore, in providing the properties containing some of the dump sites in question to the City of Danville, Defendants affirmatively misrepresented and/or failed to disclose the nature of the substances being dumped and the health risks associated with utilizing the properties in question and/or failed in their duty to inform the City or the community at large regarding same.  Defendants likewise affirmatively misrepresented and/or failed in their duty to disclose the inherent dangers associated with the lead, arsenic and TCE that had been dumped onto the properties by Defendants – all to the

detriment of the Plaintiffs who reside in or around these dump sites or have utilized the City

facilities subsequently located thereon and have been adversely affected thereby.

127.    Defendants also used property owned by the City of Danville located near Clarks

Run to dump lead, arsenic and TCE despite knowing that there was, at minimum, a substantial

likelihood that lead, arsenic, and TCE would pollute Clarks Run and contaminate other

properties in the community.

128.    Upon information and belief, Defendants also illegally dumped Hazardous

Substances containing lead, arsenic and TCE at various additional sites throughout Danville that

are now owned by plaintiffs and used for commercial or residential purposes.  Whether or not

this dumping was done with the permission of the property owners, the dumping by Defendants

was done without proper authorization or permits.  Furthermore, Defendants affirmatively

misrepresented and/or failed to disclose to the City, the owners of the properties upon which the

Hazardous Substances were dumped, or the community at large the nature of the substances

being dumped or the health risks associated with dumping the Hazardous Substances in question,

all to the detriment of the Plaintiffs who reside in or around these dump sites and have been

adversely affected thereby.

129.    Upon information and belief, to the extent the dumping in question was done with

the permission of property owners who are plaintiffs in this litigation, these property owners

would not have permitted Defendants to dump the Hazardous Substances in question had the

nature of the materials or the adverse health effects associated with the lead, arsenic and TCE

contained in the Hazardous Substances been disclosed to them.

130.    Defendants furthermore routinely either negligently or intentionally allowed

Hazardous Substances containing lead, arsenic and TCE to be expelled from the Facility and the

63

Site into the air in violation of state and federal law.  Expert testimony and testing of the soil and groundwater demonstrate that lead, arsenic and TCE have migrated, and polluted the Affected Area.

131.    Expert testimony and testing of the soil and groundwater in the area demonstrate that lead, arsenic and TCE were expelled into the air, soil and groundwater by Defendants did enter and settle upon the property of Plaintiffs, and did cause damage to Plaintiffs' properties and persons in the Affected Area.  The Hazardous Substances were disseminated by the Defendants within the Affected Area, and such exposure proximately caused the Named Plaintiffs' personal injuries.

132.    Defendants furthermore routinely either negligently or intentionally allowed lead, arsenic, and TCE to be expelled from the Facility and the Site into the Clarks Run Watershed, which runs parallel to the Site and throughout Danville, without proper permits and in violation of state and federal law.  Expert testimony and testing of the soil and groundwater in the area demonstrate that lead, arsenic and TCE have migrated, and have polluted the Affected Area.

133.    The settling ponds on the Site were not properly maintained, and regularly overflowed when it rained, with the overflow running directly into the Clarks Run Watershed.

134.    Defendants have also knowingly or recklessly caused lead, arsenic and TCE throughout the Site and on the roof of the Facility to wash into the Clarks Run Watershed, thereby polluting the Affected Area.  Based on levels of lead and arsenic contamination reported at outfalls located on the Site, it is reasonably likely that adjacent properties have likewise been contaminated with lead and arsenic through the groundwater and other sources.

135.    Several Outfalls located on the Site discharged water directly into Clarks Run. Defendants were under a statutory obligation to notify state and/or federal regulatory agencies of

all Hazardous Substances being discharged through these Outfalls, and to obtain permits regarding same.  Defendants were furthermore under a statutory obligation to test the discharge flowing from these Outfalls for the presence of lead, arsenic and TCE and to employ remedial measures to ensure that the discharge at the Outfalls did not exceed regulatory levels.

136.    Defendants failed in their statutory duties to inform state and/or federal regulatory agencies of the existence of lead, arsenic and TCE being discharged into Clarks Run. Defendants furthermore either did not obtain the required permits for discharging lead, arsenic and TCE, and even where permits were obtained, the Defendants knowingly allowed the levels of lead, arsenic and TCE discharged through the Outfalls to exceed applicable statutory limits.

137.    The Clarks Run Watershed flows through Danville and empties into Herrington Lake, the source of drinking water for many thousands of people in the region.  The groundwater pollution caused by the Defendants has impacted the Clarks Run Watershed and at least those residents and property owners within the Affected Area.

138.    In addition, this contamination has injured Plaintiffs to the extent that they have ingested water taken from the Clarks Run Watershed, creeks, or tributaries, have harvested and ingested vegetation growing in or around these areas, or have hunted and consumed small game living in these areas.

139.    Defendants were aware that lead, arsenic and TCE could migrate from the Site and spread into surrounding properties.  This is at least partially demonstrated by the fact that Corning and Philips floor workers were routinely assigned the task of walking the Clarks Run Watershed to check for dead animals.

140.     Defendants have knowingly or recklessly caused contamination in the soil on the Site to migrate through the soil and contaminate the soil and groundwater in surrounding properties at least within a five-mile radius of the Site.

141.     Defendants have knowingly or recklessly caused lead, arsenic and TCE to spread from the Facility under and onto the Plaintiffs' properties.

142.     Defendants knew or should have known that lead, arsenic and TCE from the Facility continued to migrate onto the surrounding Plaintiffs' properties in an uncontrolled manner.

143.     Defendants have been utilizing the Plaintiffs' properties as de facto storage and disposal facilities without the permission of the Plaintiffs.

144.     These de facto storage and disposal facilities lack suitable siting and the extensive safeguards that are required of a permitted facility containing the nature and volume of lead, arsenic and TCE released by the Defendants.

145.     Because of the actions of each Defendant, the Plaintiffs currently suffer or are reasonably certain to suffer serious, severe, and permanent emotional and physical injuries for which medical attention has been or will be required.

146.     Because of the actions of each Defendant, the Plaintiffs have suffered damages as a result of toxic exposure, which will be established at trial by expert and other evidence.  The Plaintiffs are entitled to compensation for current and past illnesses, for past and future medical and hospital expenses, for past and future lost wages and employment benefits, for the increased risk of illness, for medical monitoring, for diminution in quality of life, for infliction of emotional distress, and for all other allowed compensation according to proof.

147.     In addition, the contamination of the Plaintiffs' properties at the hands of all Defendants has resulted in significant damage to the value of the properties, which has economically harmed the Plaintiffs.  The diminution in the value of Plaintiffs' properties will be established at trial by expert evidence, and arises from not only the actual contamination of Plaintiffs' Properties by Hazardous Substances originating from the Site, but also from the stigma associated with being located in the vicinity of the Site.

148.     Because of the Defendants' concealment and evasive actions, certain Plaintiffs' decedents suffered wrongful death.  These Plaintiffs or their estates must be compensated for their sorrow, mental anguish, expenses, and the pain and suffering of their loved ones.

149.     Because of the Defendants' actions, remaining Plaintiffs are reasonably likely to develop physical injuries in the future and, as such, those Plaintiffs require special medical monitoring.

150.     Throughout the Relevant Time Period, in an effort to limit their liability and their expenses associated with proper containment of lead, arsenic and TCE, the Defendants have knowingly permitted discharges of lead, arsenic and TCE off-site, through outfalls or discharges into the air, in violation of Local, State, and Federal regulations and without the proper permits.

151.     Defendants discharged lead, arsenic and TCE through discharge points for which they held no discharge permit.  With respect to discharge points for which Defendants held permits to discharge lead, arsenic and TCE, Defendants exceeded emissions limits.

152.     Defendants engaged in a conspiracy and concerted course of action to perpetrate a fraud on the public by failing to disclose these illegal discharges of lead, arsenic and TCE despite having a duty to do so.

67

153.    Because of these efforts, the local, state and federal agencies responsible for monitoring the Defendants' conduct have not had full and complete knowledge regarding the Defendants' operations or the nature or extent of the lead, arsenic and TCE that have migrated off-Site.

154.    To the extent that local, federal, and state agencies became aware of some of the Defendants' illegal actions, Defendants have received numerous citations for knowing violations of federal and state regulations.

155.    The Defendants engaged in a further conspiracy and concerted course of action to perpetrate a fraud upon the public by paying for or "funding" illegitimate or incomplete "studies" and making material misrepresentations regarding the character of their operations, their remediation efforts, and of the risks posed to human health as a result of exposure to the lead, arsenic and TCE.

156.    Defendants have therefore misled the public by fraudulently, negligently, and/or knowingly suppressing the true nature and extent to which lead, arsenic and TCE have migrated off the Site, all at the expense of the health and well-being of the Plaintiffs.

157.    Defendants knew or should have known of the hazards, never informed the Plaintiffs that their health and their very lives were at risk, and never instructed the Plaintiffs on how to avoid the risks to their health.

158.    Defendants violated commonly accepted and well-known safety standards within their industry by allowing and continuing such improper disposal of lead, arsenic and TCE. Further, disposal methods were violations of specific environmental statutes, although not cited.

159.    The Plaintiffs neither knew nor had reason to suspect that they and their properties had been exposed to lead, arsenic and TCE as a result of Defendants' conduct.  In fact, while

studies have recently been conducted establishing significant off-Site pollution, the extent of the off-Site pollution remains unknown.

160.    Because of each of the Defendants' actions, Plaintiffs who represent decedent property owners or residents discovered less than one year prior to the filing of this Complaint the connection between the deaths of the decedents and the Defendants' negligent or intentional actions.  Even with the exercise of reasonable diligence, Plaintiffs could not have discovered the connection between the death of their decedents and Defendants' negligent or deliberate actions until less than one year prior to the filing of this Complaint.

161.    Because of the Defendants' concealment and misrepresentation, the Plaintiffs discovered less than one year prior to the filing of this Complaint that they have been exposed to lead, arsenic and TCE and that their exposure to lead, arsenic and TCE had caused personal injury to them and their properties.  Even with the exercise of reasonable diligence, the Plaintiffs could not have discovered more than one year prior to the filing of this Complaint both the existence of the aforementioned injuries and damages, and their connection to Defendants' negligent or deliberate actions.

162.    Defendants have shown a reckless indifference to the impact of their grossly negligent and/or reckless behavior on the Danville community and the Plaintiffs.  Defendants have engaged in grossly negligent and/or reckless, oppressive and fraudulent behavior over the course of many years.

C.    **The Plaintiffs Continue To Suffer Damages As A Result Of The Defendants' Tortious Activities.**

163.    Facts regarding each named Plaintiff and the manner in which each has been injured by Defendants are set forth in Section II, supra.  Each of the Named Plaintiffs continues to suffer damage as a result of the Defendants' tortious conduct.

164.     Each of the Named Plaintiffs either owns or owned property, resides or resided within the Affected Area during the relevant time period.  As will be set forth in additional detail, infra, Plaintiffs' experts have determined that all such persons have been negatively impacted by the Defendants' tortious conduct.  Plaintiffs have also attached hereto medical reference documents supporting their allegations that the health ailments from which they suffer can arise from exposure to lead, arsenic and TCE.  Plaintiffs will produce expert evidence specific to each Named Plaintiff during the pendency of this action.

165.     In addition, and in connection with initial discovery and expert evaluation of several of the Named Plaintiffs' claims, several expert reports were generated regarding the adverse impact of the Defendants' tortious activities.  Many of these reports and affidavits have been filed in the record of this action.  While some of the expert findings are set forth herein, the Plaintiffs incorporate by reference any documentary or expert evidence that has been filed in the record of this action as if set forth fully herein.  The environmental contamination generated and dispersed as a result of the Defendants' actions has been causally connected to the injuries alleged by Plaintiffs in this proceeding.

166.     On February 2, 2016, in compliance with the Court's Lone Pine Case Management Order [DE147], Plaintiffs provided the Court with evidence supporting each of the elements of their claims.  [DE 176-181].

167.     A key component of these submissions was the Affidavit from environmental expert Maurice Lloyd specifically describing the testing performed on each Plaintiff's property [DE 183].  In his Affidavit, Mr. Lloyd extensively discusses the background relating to Defendants' activities at the Facility and the contaminants generated by Defendants, the documented evidence of contamination, and pollution pathways.  Mr. Lloyd summarizes much

70

of the information Plaintiffs have been able to obtain regarding the Defendants' activities in polluting the air and groundwater.  Mr. Lloyd also interviewed several residents of Danville, and concluded that environmental neglect has been demonstrated in many forms, as indicated by the tens of thousands of pages of environmental studies/investigations and subsequent regulatory enforcement actions.  Id.

168.    Plaintiffs also submitted the expert report of Vance Moseley for each property at issue.  That report provided, for each plaintiff, an estimate of the degree of diminution in value for each property, including the time-frame in which such diminution occurred.  [DE 176-4; 177-5; 178-5; 180-5; 181-5].  In addition, the Plaintiffs submitted an expert report for each property discussing the nature and costs of returning the properties in question to the state they would have been in but for the Defendants' tortious conduct.  [DE 176-3; 177-4; 178-4; 180-4; 181-4].  Each Plaintiff also provided the Court with a narrative description of the manner in which his or her enjoyment of the property in question has been impacted as a result of the unauthorized intrusion onto their properties by the Hazardous Substances generated and dispersed by Defendants.  [DE 176; 177; 178; 180; 181].

169.    For the personal injury claims, each Plaintiff submitted the expert report of Dr. David Changaris, a board-certified neurosurgeon.  Dr. Changaris's reports provide, for each Plaintiff, the specific illness allegedly sustained.  Dr. Changaris concluded that each Plaintiff he examined has suffered "[b]alance disorder with central processing disorder caused by lead exposure," and "[c]ognitive loss with processing caused by lead exposure or other neurotoxins." [DE 177-2; 178-2; 179-1; 180-2; 181-2].  Dr. Changaris specifically identifies lead, arsenic, and TCE as the toxic chemicals causing the condition, and supports this conclusion by reference to

71

reports provided to him regarding the hazardous chemicals generated and dispersed by Defendants.  Id.

170.    With regard to the Named Plaintiffs listed in the preceding Complaints, the expert and testimonial evidence gathered to-date is summarized as follows:

### 1.    Bobbie Lemons

171.    Bobbie Lemons owns property located at 1117 John W.D. Bowling Court in Danville, Kentucky.

172.    On December 22, 2015, Ms. Lemons reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Ms. Lemons has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Ms. Lemons has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins.

173.    On August 18, 2015, Alpha-Omega Environmental, LLC sampled Ms. Lemons' property to determine whether it had been contaminated by lead, arsenic, or other heavy metals generated and dispersed by the Facility.  The soil from the property was sampled using a soil core probe to extract samples of the upper 15 inches of soil on an approximate 30 foot by 30 foot grid pattern.  The samples were field screened and several analyzed for metals utilizing United States Environmental Protection Agency (USEPA) SW 846 protocols.

174.    The typical mean background concentration of lead in soil in Kentucky is 30 mg/kg as published by the Kentucky Division of Waste Management (KDWM).  The typical mean background concentration of arsenic in soil in Kentucky is 8.9 mg/kg as published by the KDWM.

175.    The lab results for lead in the surface soil samples taken from the property were all above the mean background level for lead described above, with a high reading of 251 mg/kg. The lab results for one of the surface soil samples reflects arsenic at 11.1 mg/kg – an amount exceeding the background level for arsenic described above.

176.    Vapor intrusion generally occurs when there is a migration of volatile chemicals from contaminated groundwater or soil into an overlying building. Volatile chemicals can emit vapors that may migrate through subsurface soils and into indoor air spaces of overlying buildings in ways similar to that of radon gas seeping into homes.  On January 19, 2016, a vapor intrusion (VI) screening was conducted at Ms. Lemons' property.  Wilcox Environmental Engineering of Indianapolis, Indiana provided a FROG-4000 portable GC PID (gas chromatograph with photoionization detector) to obtain real-time results while at the Property.  A GC PID is typically used for analyzing a wide variety of volatile organic compounds (VOCs), including chlorinated solvents.  The screening was specifically conducted for TCE due to the presence of TCE and its degradation products in local groundwater.  Groundwater impacts and complex karst geology can result in potential preferential pathways for vapor intrusion as discussed in USEPA's Vapor Intrusion Guidance released in June 2015.  Following field calibration, the VI screening was conducted within the crawl space of the property by inserting the GC PID probe into the open cavity of a utility line trench entering through the front wall. Ambient air from around the opening was collected for approximately one minute and analyzed by the GC PID.  The results were inconclusive in that chlorinated vapors were not detected, but seasonal variations can vary greatly.  Alpha Omega has recommended that additional vapor screening be performed on a quarterly basis to incorporate a full year's worth of data including when the weather is warmer**.**

177.    The results from the sampling conducted on the property demonstrate that Ms. Lemons' property has been invaded by lead and arsenic generated and dispersed by the Facility.

178.    Ms. Lemons' use and enjoyment of her property has been adversely impacted by the pollution generated and dispersed onto her property by the Defendants.  Because of the existence of elevated levels of lead and arsenic in the soil of her property and the existence of TCE in the groundwater, she is afraid to drink the tap water at her home.  Instead, she drinks bottled water and even uses bottled water for cooking.  The rest of her family living in Danville does the same.

179.    In addition, Ms. Lemons will not be able to utilize the groundwater under her property for any purpose.  She also can no longer garden on her property.  She has always enjoyed planting and maintaining flowerbeds on her property.  Ms. Lemons won't be able to engage in this activity because, based on the soil sample test results, disturbing the soil will expose her to lead, arsenic, and/or TCE generated and dispersed by the Facility in amounts over and above the exposure she has already suffered.  She is also unable to have a vegetable garden or eat vegetables grown on her property.  In fact, Ms. Lemons is now limited from engaging in any activity that disturbs the soil on her property because of the presence of the lead and arsenic found on her property.  The types of activities that would cause such disturbance are multiple in nature, and include building additional structures on the property or playing yard games in her backyard with family members or others.  Ms. Lemons' use and enjoyment of the property is furthermore adversely impacted by virtue of the fact that when and if she decides to sell the property she will have to disclose the existence of contamination that has been determined to exist on the property.

180.    Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $286,120.

181.    Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of Ms. Lemons' property by 20 percent – from $40,000 to $32,000 – since the contamination became publicly known.

## 2.    Rosetta Ford

182.    Rosetta Ford owns property located at 1310 West Walnut Street in Danville, Kentucky.

183.    On December 22, 2015, Ms. Ford reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Ms. Ford has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Ms. Ford has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins.

184.    On August 18, 2015, Alpha-Omega Environmental, LLC sampled Ms. Ford's property to determine whether it had been contaminated by lead and arsenic generated and dispersed by the Facility.  The soil from the property was sampled using a soil core probe to extract samples of the upper 15 inches of soil on an approximate 30 foot by 30 foot grid pattern. The samples were field screened and several analyzed for metals utilizing United States Environmental Protection Agency (USEPA) SW 846 protocols.

185.    On August 25, 2015, soil from the property was sampled in one location using a direct-push drilling apparatus that advanced stainless steel rods to refusal.  The samples from

various depths were field screened and one was analyzed for metals utilizing USEPA SW 846

protocols.

186.    The typical mean background concentration of lead in soil in Kentucky is 30

mg/kg as published by the KDWM.  The typical mean background concentration of arsenic in

soil in Kentucky is 8.9 mg/kg as published by the KDWM.

187.    The lab results for lead in the surface soil samples taken from the property were

all above the mean background level described above, with a high reading of 157 mg/kg.

188.    The lab result for the borehole sample taken from the property reflected a high

reading of 31.8 mg/kg for lead at a depth of six to eight feet below grade surface.

189.    On January 19, 2016, a vapor intrusion (VI) screening was conducted at Ms.

Ford's property.  Following field calibration, the VI screening was conducted within the crawl

space of the property by inserting the GC PID probe into the open cavity of a utility line trench

entering through the front wall.  Ambient air from around the opening was collected for

approximately one minute and analyzed by the GC PID.  The results were inconclusive in that

chlorinated vapors were not detected, but seasonal variations can vary greatly.  Alpha Omega has

recommended that additional vapor screening be performed on a quarterly basis to incorporate a

full year's worth of data including when the weather is warmer**.**

190.    The results from the sampling conducted on the property demonstrate that Ms.

Ford's property has been invaded by lead and arsenic generated and dispersed by the Facility.

191.    Ms. Ford's use and enjoyment of her property has been adversely impacted by the

pollution generated and dispersed onto the property by the Defendants.  Because of the existence

of elevated levels of lead and arsenic in the soil of her property and the existence of TCE in the

groundwater, she is afraid to drink the tap water at her home. Instead, she drinks bottled water and even uses bottled water for cooking. The rest of her family living in Danville does the same.

192.    In addition, Ms. Ford will not be able to utilize the groundwater under her property for any purpose. She also can no longer garden on her property. She won't be able to engage in this activity because, based on the soil sample test results, disturbing the soil will expose her to lead and arsenic generated and dispersed by the Facility in amounts over and above the exposure she has already suffered. She is also unable to have a vegetable garden or eat vegetables grown on her property. In fact, she is now limited from engaging in any activity that disturbs the soil on her property because of the presence of the Hazardous Substances at issue. The types of activities that would cause such disturbance are multiple in nature, and include building additional structures on the property or playing yard games in her backyard with family members or others. Her use and enjoyment of the property is furthermore adversely impacted by virtue of the fact that when and if she decides to sell the property, she will have to disclose the existence of contamination that has been determined to exist on the property.

193.    Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $278,435.

194.    Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred. The conclusion is that the contamination has reduced the value of her property by 20 percent – from $28,000 to $22,400 – since the contamination became publicly known.

### 3.   Gary Ford

195.    On December 22, 2015, Gary Ford reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Mr. Ford has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Mr. Ford has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins.

196.    Mr. Ford has recently learned that the property at 308 Fairview Street and the property at 1310 West Walnut are contaminated with lead, arsenic, and TCE generated and dispersed by the Facility.

197.    Mr. Ford's use and enjoyment of his home at 1310 West Walnut Street and also his place of current residence at 308 Fairview Street has been adversely impacted by the pollution generated and dispersed onto the properties by the Defendants.  Because of the existence of elevated levels of lead and arsenic in the soil of the properties and the existence of TCE in the groundwater, Mr. Ford is afraid to drink the tap water at either location.  Instead, he drinks bottled water and even uses bottled water for cooking.  The rest of his family living in Danville does the same.

198.    In addition, Mr. Ford will not be able to utilize the groundwater under the properties for any purpose.  He also can no longer garden on the properties.   He won't be able to engage in this activity because, based on the soil sample test results, disturbing the soil will expose him to lead and arsenic generated and dispersed by the Facility in amounts over and above the exposure he has already suffered.  Mr. Ford is also unable to have a vegetable garden or eat vegetables grown on the properties.  In fact, Mr. Ford is now limited from engaging in any activity that disturbs the soil on the properties because of the presence of the Hazardous

78

Substances at issue.  The types of activities that would cause such disturbance are multiple in nature, and include building additional structures on the properties or playing yard games in his backyard with family members or others.

### 4.   Charles Ford

199.     Plaintiff Charles Ford jointly owns, with his brother Otis Ford, property located at 308 Fairview Street, in Danville Kentucky, D08-021-019.

200.     On January 12, 2016, Mr. Ford reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Mr. Ford has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Mr. Ford has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused by lead exposure and other neurotoxins. Dr. Changaris noted his pituitary tumor.

201.     On August 19, 2015, Alpha-Omega Environmental, LLC sampled Charles and Otis Ford's property to determine whether it had been contaminated by lead, arsenic, or other heavy metals generated and dispersed by the Facility.  The soil from the property was sampled using a soil core probe to extract samples of the upper 15 inches of soil on an approximate 30 foot by 30 foot grid pattern.  The samples were field screened and several analyzed for metals utilizing United States Environmental Protection Agency (USEPA) SW 846 protocols.

202.     On August 25, 2015, soil from the property was sampled in one location using a direct-push drilling apparatus that advanced stainless steel rods to refusal.  The samples from various depths were field screened and one was analyzed for metals utilizing USEPA SW 846 protocols.

203.    The typical mean background concentration of lead in soil in Kentucky is 30 mg/kg as published by the KDWM.  The typical mean background concentration of arsenic in soil in Kentucky is 8.9 mg/kg as published by the KDWM.

204.    The lab results for lead in the surface soil samples taken from the property were all above the mean background level described above, with a high concentration of 167 mg/kg. The lab results for one of the surface soil samples taken from the property reflected a concentration for arsenic above the mean background level described above, with a concentration of 10.2 mg/kg.

205.    The lab result for the borehole sample taken from the property reflected a high concentration of 116 mg/kg for lead at a depth of zero to two feet below grade surface.

206.    On January 19, 2016, a vapor intrusion (VI) screening was conducted at the property.  Following field calibration, the VI screening was conducted within the crawl space of the property by inserting the GC PID probe into the open cavity of a utility line trench entering through the front wall.  Ambient air from around the opening was collected for approximately one minute and analyzed by the GC PID.  The results were inconclusive in that chlorinated vapors were not detected, but seasonal variations can vary greatly.  It is the opinion of Alpha Omega that additional vapor screening should be performed on a quarterly basis to incorporate a full year's worth of data including when the weather is warmer.

207.    The results from the sampling conducted on the property demonstrate that Charles and Otis Ford's property has been invaded by lead and arsenic generated and dispersed by the Facility.

208.    Mr. Ford's use and enjoyment of his property has been adversely impacted by the pollution generated and dispersed onto his property by the Defendants.  Because of the existence

of elevated levels of lead and arsenic in the soil of his property and the existence of TCE in the groundwater, he will not be able to utilize the groundwater under his property for any purpose. He is also constrained from engaging in any type of activity that disturbs the soil on the property because, based on the soil sample test results, disturbing the soil will expose him to lead and arsenic generated and dispersed by the Facility in amounts over and above the exposure he has already suffered.  His use and enjoyment of the property is furthermore adversely impacted by virtue of the fact that when and if he decides to sell the property he will have to disclose the existence of contamination that has been determined to exist on the property.

209.    Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $225,100.

210.    Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of the property by 20 percent – from $50,000 to $40,000 – since the contamination became publicly known.

### 5.    Otis Ford

211.    Otis Ford jointly owns, with his brother Charles Ford, property located at 308 Fairview Street, in Danville Kentucky, D08-021-019.

212.    On December 22, 2015, Mr. Ford reported to the office of Dr. David Changaris for a physical evaluation.  Dr. Changaris found that Mr. Ford has a history of heavy metal and organic toxin exposure.  Dr. Changaris further found that Mr. Ford has a balance disorder with central processing disorder caused by lead exposure and cognitive loss with processing caused

by lead exposure and other neurotoxins. Dr. Changaris noted Mr. Ford's skin lesions and prostate cancer in relation to his exposure.

213.    On August 19, 2015, Alpha-Omega Environmental, LLC sampled his property to determine whether it had been contaminated by lead, arsenic, or other heavy metals generated and dispersed by the Facility.  Drill sampling was conducted on August 25, 2015.  On January 19, 2016, a vapor intrusion screening was conducted at the property.

214.    The results from the sampling conducted on the property, as described in detail, supra, demonstrate that the property has been invaded by the lead and arsenic  generated and dispersed by the Facility.

215.    Mr. Ford's use and enjoyment of his property has been adversely impacted by the pollution generated and dispersed onto his property by the Defendants.  Because of the existence of elevated levels of lead and arsenic in the soil of his property and the existence of TCE in the groundwater, Mr. Ford is afraid to drink the tap water at his home.  Instead, he drinks bottled water and even uses bottled water for cooking.  The rest of his family living in Danville does the same.

216.    In addition, Mr. Ford will not be able to utilize the groundwater under his property for any purpose.  He also can no longer garden on his property.   He won't be able to engage in this activity because, based on the soil sample test results, disturbing the soil will expose him to lead and arsenic generated and dispersed by the Facility in amounts over and above the exposure he has already suffered.  He is also unable to have a vegetable garden or eat vegetables grown on his property.  In fact, Mr. Ford is now limited from engaging in any activity that disturbs the soil on his property because of the presence of the Hazardous Substances at issue.  The types of activities that would cause such disturbance are multiple in nature, and

include building additional structures on the Property or playing yard games in his backyard with family members or others.  Mr. Ford's use and enjoyment of the property is furthermore adversely impacted by virtue of the fact that when and if he decides to sell the property he will have to disclose the existence of contamination that has been determined to exist on the property.

217.    Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $225,100.

218.    Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of the property by 20 percent – from $50,000 to $40,000 – since the contamination became publicly known.

### 6.    Modern Holdings, LLC

219.    Modern Holdings owns the property located at 1200 Lebanon Road, Danville, Kentucky, Parcel Number D12-003-013.

220.    On August 18, 2015, Alpha-Omega Environmental, LLC sampled the property to determine whether it had been contaminated by lead, arsenic, or other heavy metals generated and dispersed by the Facility.  The soil from the property was sampled using a soil core probe to extract samples of the upper 15 inches of soil on an approximate 30 foot by 30 foot grid pattern. The samples were field screened and several analyzed for metals utilizing United States Environmental Protection Agency (USEPA) SW 846 protocols.

221.    The typical mean background concentration of lead in soil in Kentucky is 30 mg/kg as published by the KDWM.  The typical mean background concentration of arsenic in soil in Kentucky is 8.9 mg/kg as published by the KDWM.

222.     The lab results for lead in the surface soil samples taken from the property were all above the mean background level for lead described above, with a high reading of 452 mg/kg.

223.     On January 19, 2016, a vapor intrusion (VI) screening was conducted at the property.  Following field calibration, the VI screening was conducted under the concrete slab of the easternmost building on the Property.  The GC PID probe was inserted into the open cavity of a utility line opening entering through the floor along the eastern wall.  Positive air pressure was noted coming from below the slab into the building.  Ambient air from under the slab was collected for approximately one minute and analyzed by the GC PID.  The results indicated that chlorinated vapors (TCE) were present at 5.1 $\mu g/m^3$, just slightly below USEPA's screening level for commercial properties of 8.8 $\mu g/m^3$.  The northernmost building on the property also had a detection of TCE at 1.7 $\mu g/m^3$.  Because seasonal variations can vary greatly, it is Alpha Omega's opinion that additional vapor screening should be performed on a quarterly basis to incorporate a full year's worth of data including when the weather is warmer.

224.     The results from the sampling and screening conducted on the property demonstrate that Modern Holdings' property has been invaded by the lead and arsenic generated and dispersed by the Facility.  As a result, Modern Holdings' use and enjoyment of the property has been adversely impacted and limited.

225.     Jenkins Environmental, Inc. has evaluated the property to determine the costs for remediation, and estimates this cost to be $669,635.

226.     Kentucky Field Service Realty Inc. has evaluated the property to determine the amount by which the value of the property has been diminished and the timeframe in which the diminution occurred.  The conclusion is that the contamination has reduced the value of the

property by 20 percent – from $400,000 to $320,000 – since the contamination became publicly known.

### 7.      Sellers And Sellers

227.    The property at 916 West Walnut Street, Danville, has been owned by the Sellers family and now Sellers and Sellers Company since 1946.  During their operation of the Facility, Defendants continuously polluted this property with the Hazardous Substances they generated and dispersed.   Soil samples taken in 2012 and 2013 from this property establish lead levels ranging as high as 5,400 mg/kg and arsenic ranging as high as 130 mg/kg.

228.    These results demonstrate that the property belonging to Sellers and Sellers was invaded by the lead and arsenic generated and dispersed by the Facility.  As a result, Plaintiff's use and enjoyment of the property has been adversely impacted and limited.

229.    The property belonging to Sellers and Sellers was appraised on August 21, 2016, for $1,060,000.00.  At the time, a corporate entity then leasing the property was interested in buying it.  The entity's lease of the property was expiring, and the entity and the property owner were in negotiations regarding a possible sale of the property.   The entity expressed strong interest in buying the property.  Sellers and Sellers offered to sell the property to the entity for $750,000.

230.    The Article published in the Danville Advocate Messenger discussing the contamination generated and dispersed by the Facility was published on August 31, 2015, and the entity thereafter rejected the offer of sale and indicated that it was no longer interested in buying – only leasing – the Property.  The lease that was subsequently negotiated was for a shorter duration than is typical, and reflects several unfavorable lease terms that are directly related to the fact that the property was contaminated and to the stigma arising from the

85

property's location vis-a-vis the Facility.   The value of the Property has been diminished in an amount of at least $310,000, or approximately 29 percent.

231.    The Defendants' tortious conduct with regard to this property continued into 2014 and 2015, when Defendants performed work on the property without the knowledge or approval of the Plaintiff Sellers and Sellers.  In the course of performing this work, Defendants in fact caused further damage to the Plaintiff's property.

### D.    Philips Knew The Level Of Hazardous Substances Escaping From The Site Exceeded Applicable Regulatory Levels But Concealed The Extent Of The Contamination From Governmental Authorities.

232.    The deposition of Dr. Scott Harris was taken in Nashville on March 3, 2015.

233.    Dr. Harris' doctorate is in environmental science and he has extensive experience in the areas of disaster and emergency management and employee health and safety.  Dr. Harris worked for a time with the EPA leading emergency response groups before joining IESO, LLC in Lexington, Kentucky.  He is presently the Director of a Division of Underwriters Laboratory in the Nashville, Tennessee area.

234.    In 2011, at or around the time that the Facility was closed, IESO was engaged by NeoStar Glass, LLC ("NeoStar"), an entity owned by Anna Broughton.  Dr. Harris' role was to advise NeoStar as to the potential environmental liability issues associated with the Facility and Site – which she was considering purchasing for use as a glass manufacturing facility.

235.    As he was investigating environmental issues at the Site, Dr. Harris was provided with an environmental report prepared by Arcadis in August 2011 at the behest of Philips.  The 2011 Arcadis report reflected that a significant amount of Hazardous Substances generated at the Facility had been allowed to escape the Site.

86

236.     Specifically, the 2011 Arcadis report provided to Dr. Harris indicated that the lead levels at an Outfall on the Site known as "Outfall 2" were so high as to be considered an immediate emergency and "hazardous waste" and that Philips was under a duty to immediately report to state regulatory authorities, including the Kentucky Division of Water and the Waste Management, Hazardous Waste Branch.  The levels of lead detected at this Outfall, as reflected on the 2011 Arcadis report, were eight and a half times the hazardous waste level established by the Resource Conservation and Recovery Act (the "RCRA").  In addition, Dr. Harris discovered that Outfall 2 was not even permitted for the discharge of lead, which meant that no lead whatsoever was supposed to be discharged from this Outfall.

237.     Dr. Harris was concerned that the 2011 Arcadis report did not sufficiently describe or explore the extent of contamination by Hazardous Substances, both on-Site and off-Site.  For instance, Dr. Harris was concerned that despite evidence of Hazardous Substances migrating off-Site, of which Philips was aware, no off-Site testing had been performed by Arcadis to determine the extent to which the Hazardous Substances had contaminated surrounding properties.

238.     In addition, Dr. Harris was concerned that the soil sampling performed by Arcadis was not sufficiently deep – the testing only sampled the top 12 inches of soil.  Dr. Harris is of the opinion that if testing at 12 inches reveals elevated levels of Hazardous Substances, testing at deeper levels should have been done to determine the full depth of the contamination.

239.     Based on the information provided to Dr. Harris, he was furthermore able to conclude that lead and other Hazardous Substances had been carried off-Site by prevailing winds, yet no testing of adjacent properties had been performed by Arcadis.

240.    Arcadis furthermore failed to test for Hazardous Substances at the off-Site dumping area located on a Sellers and Sellers' adjacent property, and provided only a cursory analysis of a RCRA Hazardous Substances dumping area located on-Site in its report.

241.    Dr. Harris was later provided with a disclosure document provided by Philips to the KDEP, Division of Waste Management dated February, 2012 (the "2012 Arcadis Report"). Based on his review of the document, Dr. Harris was of the opinion that the hazardous levels of lead contamination previously identified by Arcadis in the 2011 Arcadis Report as existing at one or more Outfalls were not sufficiently described in the 2012 Arcadis Report so as to alert the KDEP to the existence of "hazardous waste" in those locations.  The document was provided to KDEP instead of the Division of Water – the appropriate state agency in control of water pollution.  The document furthermore did not include any information regarding arsenic levels, despite the fact that arsenic was utilized in their manufacturing processes at the Facility.  As a result, Philips utterly failed in its statutory duty to report the existence of hazardous waste to appropriate regulatory bodies.

242.    During the negotiation process, Dr. Harris participated in at least one meeting with Philips agents in which Dr. Harris learned that Philips was aware that Hazardous Substances had been permitted to escape the Site in levels that were in excess of regulatory limits which were dangerous to human health and safety, and yet did nothing to remediate these issues or alert the governmental authorities of the pollution.  Documents produced by Dr. Harris pursuant to Subpoena confirm such knowledge on the part of Philips, both before and after the time of closure of the Danville Facility.

243.    Dr. Harris voiced his concerns regarding the extent to which Hazardous Substances had migrated off-Site.  Dr. Harris informed those involved in the negotiations that he

was of the opinion that the levels of Hazardous Substances detected in the soil on-Site and in the areas surrounding the Outfalls was of such degree as to qualify as a "hazardous spill," thereby triggering a statutory duty to alert state regulatory authorities.

244.    Dr. Harris also voiced his concern that additional testing for Hazardous Substance contamination, both on and off-Site, needed to be performed.

245.    Throughout the negotiation process between NeoStar and Philips, Dr. Harris continued to express his concern, both verbally and in writing, that Hazardous Substances had migrated off-Site onto properties not owned by the Defendant, and that additional testing on those properties, as well as the Danville Facility Site, needed to be performed to determine the extent of the contamination.  Dr. Harris urged that an environmental assessment be performed to determine the extent to which the contamination might adversely affect the Danville community.

246.    Despite having knowledge of the degree to which Hazardous Substances had migrated off-Site, during the year-long negotiation process between Ms. Broughton and Philips, Philips did not comply with Dr. Harris' request and did nothing to alert regulators about Dr. Harris' concerns.

247.    The concerns of Dr. Harris and NeoStar regarding the degree to which Hazardous Substances generated at the Facility had escaped the Site through Outfalls and groundwater contamination, and their additional concerns that this contamination needed to be reported to applicable regulatory authorities, abated, and remediated, were also expressed to Philips in writing by letter dated September 21, 2011.  The letter specifically informed Philips that:  "The Danville Glass Factory property is severely contaminated with arsenic, lead, and asbestos.  Based on Kentucky Division of Waste Management requirements, the level of contamination is

89

significantly higher than both state and federal standards and warrants an immediate disclosure and corrective action, remediation."

248.    The September 21, 2011 letter to Philips further specifically addresses the dissemination of Hazardous Substances that was then occurring as a result of the significant lead deposits on the roof of the Facility.  The letter referred to roof remediation as a priority because the lead on the roof was being dispersed through downspout discharge into the Outfalls, through adjacent water sewers and the sewers of Danville.

249.    Despite having knowledge of the degree to which Hazardous Substances had migrated off-Site, during the year-long negotiation process between NeoStar and Philips, Philips refused to fulfill its legal obligation to alert the state regulatory authorities.  Dr. Harris repeatedly voiced his opinion to agents of Philips that the state regulatory authorities should be notified, and he personally confirmed that no such report had been made.

250.    Furthermore, during this time period Philips did not take any measures to stop the illegal discharges or to remediate the known off-Site contamination.  This means that every time it rained, additional Hazardous Substances were being illegally discharged directly into Clarks Run Creek.

**E.    Recent Testing Of The Facility Revealed Excessive Levels Of Hazardous Substances.**

251.    In December 2013, Plaintiffs were permitted to access the Facility for the purpose of conducting preliminary sampling to test for the presence of metals and other compounds that may have adversely impacted air quality and the health of employees working in the Facility while it was operational.

252.     When the sampling was performed, substantial cleaning of the Facility had already occurred, and it is therefore impossible to determine exactly the air quality or environmental problems that may have existed inside the Facility while it was operational from the testing results obtained.  The results establish the presence of heavy metals throughout the Facility in amounts that remain elevated, despite the cleaning that had already occurred.

253.     Plaintiffs' consultants obtained over 40 wipe and bulk samples from locations throughout production areas inside the Facility, which were then tested for the presence of arsenic, manganese, nickel, cadmium, chromium, barium, beryllium, silver, zinc, lead, mercury, and selenium.

254.     The sampling indoors was performed at the direction and under the supervision of Bruce Fergusson, the President of Air Source Technology, Inc. ("ASTI").  ASTI is an environmental, health, and safety consulting firm, which has operated for over 20 years in a variety of environments.  A retired professional engineer, Mr. Fergusson is a Certified Industrial Hygienist (CIH # 10354 - Comprehensive Practice) who has been actively practicing industrial hygiene since 2003. Mr. Fergusson has personally provided industrial hygiene services in a glass manufacturing plant setting, as well as in a number of industrial, medical, and commercial environments.  In addition to his day-to-day industrial hygiene experience, Mr. Fergusson has presented peer-reviewed technical papers related to the testing and diagnostic methods for air quality at national conferences.

255.     Donald Gary Brown, Dr. PH, CIH, Associate Professor; EHS Graduate Program Coordinator for Eastern Kentucky University (EKU), Department of Environmental Health, Richmond, Kentucky provided personal support during this project.  Mr. Brown has over twenty

years' industrial hygiene experience in a variety of environments, in addition to his education duties at EKU.

256.    The sample lab results demonstrate the continued presence of these heavy metals throughout the Facility in elevated levels.

257.    Lead (Pb), Manganese (Mn) and Zinc (Zn) were found in every wipe sample.  Mn fumes are a known hazard with an ACGIH Threshold limit Value (TLV) of 0.02 mg/m$^3$ (TWA) (20 micrograms per cubic meter).

258.    Recent studies indicate neurological and neurobehavioral deficits may occur when workers are exposed to low levels of manganese (<0.2 mg/m$^3$) in welding fumes. These effects include changes in mood and short-term memory, altered reaction time, and reduced hand-eye coordination. Affected workers frequently show abnormal accumulations of manganese in a region of the brain known as the globus pallidus. The globus pallidus plays an important role in movement regulation.

259.    Several Lead wipe samples were at the following notably elevated surface levels: three samples @ >10,000ug/100cm$^2$ (micrograms per square centimeter); 12 samples @ >800 ug/100cm$^2$.  The EPA lead surface clearance limits for a residence are 0.043ug/100cm$^2$(floor) and 0.861ug/100cm$^2$(exterior surfaces), as expressed in the same units as the lab samples – several orders of magnitude lower than the sample results at the Facility.

260.    Mercury was recovered in five wipe samples, Arsenic (As) was recovered in 14 wipe samples, and Cadmium (Cd) was recovered in 17 wipe samples.  Health hazards associated with exposure to these substances are well known.

261.     Based on a preliminary review of the testing results, Mr. Fergusson has concluded that in several places throughout the Facility, surface levels of the heavy metals are in amounts shown to be hazardous for health and safety.

262.     Mr. Fergusson has furthermore concluded that, based on the lab results and the fact that substantial cleaning had taken place before the samples were collected, the results obtained were consistent with a working environment that was pervasively polluted with Hazardous Substances while operational.

263.     Mercury vapor screening was also performed during the Site visits.  This testing reflected the presence of mercury vapor in numerous places throughout the Facility.  Mr. Fergusson has concluded that the mercury vapor readings would most likely have been much higher when the Facility was operational because the Facility had been cleaned and also because mercury vapor pressure rises with temperature, and the Facility was unheated and cold (approximately 25F to 30F) at the time the readings in question were obtained.

264.     Plaintiffs also obtained bulk samples from two air filters found inside the Facility, and are awaiting the lab results with respect to these samples.  Assuming the filters were not changed since the operations ceased, the results of this testing may provide additional insight into the air quality as it was at the time the Facility was operational.

265.     A quick review of peer-reviewed studies, NIOSH, CDC, ATSDR, and other recognized sources yields much information about the toxicity of metals.

266.     Briefly, heavy metals "can bind to vital cellular components, such as structural proteins, enzymes, and nucleic acids, and interfere with their functioning." Symptoms and effects can vary according to the metal or metal compound, and the dose involved. Broadly, long-term exposure to heavy metals can have carcinogenic, central and peripheral nervous system and

circulatory effects. For humans, typical presentations associated with exposure to any of the "classical" heavy metals, or chromium (another heavy metal) or arsenic (a metalloid), are shown in the table that follows:

| Element | Acute exposure | Chronic exposure | Main article |
|---------|----------------|------------------|--------------|
| Cadmium | Pneumonitis (lung inflammation) | Lung cancer<br>Osteomalacia (softening of bones)<br>Proteinuria (excess protein in urine; possible kidney damage) | Cadmium poisoning |
| Mercury | Diarrhea<br>Fever<br>Vomiting | Stomatitis (inflammation of gums and mouth)<br>Nausea<br>Nephrotic syndrome (nonspecific kidney disorder)<br>Neurasthenia (neurotic disorder)<br>Parageusia (metallic taste)<br>Pink Disease (pain and pink discoloration of hands and feet)<br>Tremor | Mercury poisoning |
| Lead | Encephalopathy (brain dysfunction)<br>Nausea<br>Vomiting | Anemia<br>Encephalopathy<br>Foot drop/wrist drop (palsy)<br>Nephropathy (kidney disease) | Lead poisoning |
| Chromium | Gastrointestinal hemorrhage (bleeding)<br>Hemolysis (red blood cell destruction)<br>Acute renal failure | Pulmonary fibrosis (lung scarring)<br>Lung cancer | Chromium toxicity |

| Arsenic | Nausea<br>Vomiting<br>Diarrhea<br>Encephalopathy<br>Multi-organ effects<br>Arrhythmia<br>Painful neuropathy | Diabetes<br>Hypopigmentation/Hyperkeratosis<br>Cancer | Arsenic poisoning |
|---|---|---|---|

### F. The Plaintiffs' Environmental Expert Has Determined The Extent To Which Hazardous Substances Escaped From The Site, Thereby Establishing The "Affected Area."

267.     Plaintiffs also engaged the services of several different experts to ascertain the extent of the contamination generated and dispersed by Defendants, and the impact it has upon the use and enjoyment and value of the Plaintiffs' properties.  Plaintiffs also engaged experts to determine the extent to which the Plaintiffs' exposure to the lead, arsenic and TCE generated and dispersed by Defendants has adversely impacted the Plaintiffs' health.  Much of the expert evidence generated by Plaintiffs has been filed in the record of this action, and is incorporated herein by reference as if set forth fully herein.

268.     Perhaps most importantly, however, the work of Plaintiffs' environmental expert has established the extent to which the lead, arsenic, and TCE generated and dispersed by the Defendants have escaped the Site into the surrounding community.  This analysis has led to the definition of the "Affected Area," or the area in which persons and properties have been adversely impacted by the contamination in question.

269.     Maurice Lloyd, President of Alpha-Omega Environmental, conducted this analysis, on the basis of his review of historical documents and environmental testing performed under his direction.  Mr. Maurice Lloyd, PE, has over 25 years' experience with industrial permitting and corrective action and has provided regulatory consulting for dozens of industrial

95

remediation projects throughout the United States and abroad.  He has worked in municipal government, state government, and the private sector. These experiences allow him to view situations as a regulator as well as from the perspective of the regulated community.  His private sector experience has included consulting for companies such as DuPont, Dow Corning, and Alcoa at many of their facilities nationwide.  These projects have included both state and federally led investigations and corrective actions including many through the Kentucky Division of Waste Management. Federal programs involved include: the Resource Conservation and Recovery Act (RCRA); the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as the Superfund Act; the Superfund Amendments Reauthorization Act (SARA); and the Emergency Planning and Community Right-to-Know Act (EPCRA) among others.

270.    Mr. Lloyd's firm was engaged to conduct an assessment of contamination and to gather samples from the properties belonging to the Named Plaintiffs listed in the prior versions of the operative Complaint in this matter to establish the absence or presence and concentration of certain chemicals and pollutants on their properties.

271.    Mr. Lloyd has reviewed extensive documentation, spoken with numerous individuals, and conducted various environmental assessments at the Facility, on the Site, on these Plaintiffs' properties, and on various other properties in the vicinity.

272.    The analytical results of the sampling performed on the soil samples taken by Mr. Lloyd from the Plaintiffs' properties are discussed, supra.

273.    Mr. Lloyd's preliminary findings are set forth here for the Court's reference:

      a.    There are 26 known solid waste management units ("SWMUs") on and off the Site. Twelve other investigative areas have also been identified at the

96

Facility. The exact location for some of these areas is not known.  Reports
of liquid wastes (waste oil, solvent containing residue, paint, mineral
spirits and paint thinner) routinely being disposed directly onto the ground
by employees in and around the SWMUs in an uncontrolled manner are
indicative of the environmental mismanagement at the Site.  The
Kentucky Department for Environmental Protection ("KDEP") has had to
assert virtually continuous regulatory oversight at the Facility since 1987
because of the volume and myriad sources of contamination present.
Many hundreds and possibly thousands of samples have been collected
from soil, stream sediment, surface water, groundwater and bulk materials
as part of efforts to investigate contaminant sources throughout the
Facility and the surrounding area.  Despite the number of sampling events
and various corrective actions conducted at and around the Site, it does not
appear that the horizontal and vertical extents of contamination have been
fully determined, contained, or remedied.

b.    Three primary contaminants of concern have been consistently detected
and been the focus of historic investigations: arsenic, lead, and TCE.
Corning discontinued the use of TCE in 1981, and Philips discontinued the
use of arsenic in 1991.  The continued presence of these substances in the
soil and water of the area is therefore even more troubling than it would be
had these substances continued to be used through the Facility's closing in
2011.  As the previous investigations have focused on regulatory concerns
rather than the impact on human health, the documentation reflects

97

regulatory screening levels, and it should be noted that other contaminants that were detected below regulatory standards may still be present in concentrations that are in fact harmful to human health.   It has been Mr. Lloyd's experience that the cumulative effect of multiple contaminants will usually further enhance the harmful impacts to human health.

c.      Off-Site Investigations beyond the Site boundaries have shown a clear pattern of contaminant migration from the Site into the surrounding soil, sediment, surface water and groundwater.

d.      The documents reviewed have been obtained from the Plaintiffs through Open Records Requests, and because of the procedural posture of this case, the Plaintiffs have not yet been able to request or obtain additional documents from the files of the Defendants.  Documents from the Defendants' own files will contain information necessary to any further evaluation.

e.      The primary concern for off-Site contaminants has been lead and arsenic, although volatile organic compounds such as TCE and its degradation products have also been detected in concentrations above regulatory limits.

f.      People who are exposed to moderate amounts of TCE may experience headaches, dizziness, and sleepiness; large amounts of TCE may cause coma and even death.  Some people who breathe high levels of TCE may develop damage to some of the nerves in the face.  Other effects seen in people exposed to high levels of TCE include evidence of nervous system

98

effects related to hearing, seeing, and balance, changes in the rhythm of

the heartbeat, liver damage, and evidence of kidney damage. Some people

who get concentrated solutions of TCE on their skin develop rashes. Also,

TCE breaks down over time into degradation products that can be even

more toxic than TCE, such as vinyl chloride.  The soil screening level

(SSL) to protect groundwater for TCE is 0.18 µg/kg and only 0.0065

µg/kg for vinyl chloride according to the United States Environmental

Protection Agency's (USEPA's) Risk-Based Generic Screening Tables

(Nov. 2015).  Of note, the toxicity of TCE has been recognized by USEPA

to be greater than in recent years (SSL of 3.0 µg/kg in Oct. 2004), so

previous regulatory screening levels may not have accurately assessed the

risk associated with the TCE.

g.     Typical background concentrations of lead in soil in Kentucky are below

50 mg/kg, with a mean concentration of 30 mg/kg. Lead is harmful

because it can cause high blood pressure, digestive problems, nerve

disorders, memory and concentration problems, and muscle and joint pain.

Exposure to lead is particularly dangerous for pregnant women, as lead

can cause premature birth, low birth weight, or miscarriage. Children are

especially at risk because they are more likely than adults to ingest soil

that contains lead, and they are more sensitive to the effects of lead. Lead

exposure in children has been shown to decrease IQ scores, slow growth,

and cause hearing problems.  The World Health Organization has stated

that "Children are particularly vulnerable to the neurotoxic effects of lead,

and even relatively low levels of exposure can cause serious and in some cases irreversible neurological damage."

h.    The USEPA RSL for arsenic is 0.67 mg/kg.  However, the mean concentration of arsenic in Kentucky is higher, at 8.9 mg/kg. Ingestion of toxic quantities of arsenic usually has effects within 30–60 min, and severe toxicity has been reported with as little as 1 mg of $As_2O_3$ (arsenic trioxide).  Arsenic trioxide is typically used in glass manufacturing to improve the clarity of glass. Exposure to low levels of arsenic can cause nausea and vomiting, damage to blood vessels, and a sensation of  "pins and needles" in hands and feet. Ingesting or breathing low levels of arsenic for a long time can cause a darkening of the skin and the appearance of small corns or warts on the palms, soles, and torso. Skin contact with arsenic may cause redness and swelling. Exposure to elevated levels of arsenic can increase the risk of several types of cancer including: skin, bladder, lung, kidney, liver, and prostate cancer.

i.    While USEPA's generic soil screening level for lead in residential soil is 400 mg/kg, that does not suggest that this level is safe or desirable, particularly when the presence of other hazardous substances is detected. This is because there is no "safe" level of lead exposure, particularly when an individual is exposed to multiple contaminants, including lead.  It should be noted that many cities and some states have established hazard levels for lead that are significantly lower than the levels established by USEPA.

100

j.      Testing performed off-Site along the Clarks Run Watershed after manufacturing operations at the Facility ceased in 2011 show that significant concentrations of Hazardous Substances, including lead and arsenic, have in fact migrated off-Site onto adjacent properties and into the Clarks Run Watershed.  The analyses for off-Site lead from one study alone conducted for Philips indicated 118 soil and stream sediment samples above the Arcadis project remediation goal of 400 mg/kg with a high of 160,000 mg/kg. The same study indicated arsenic soil and sediment levels above Kentucky's mean arsenic concentration of 8.9 mg/kg in 183 samples with a high concentration of 180 mg/kg. Elevated concentrations for both lead and arsenic have been detected over ½-mile downstream from the Facility.

k.      The KDEP has noted that the detected levels of lead (as much as 160,000 mg/kg) off-Site in the downstream drainage represent an uncontrolled hazard to human health and the environment.

l.       January 2013 correspondence from DEP directs Philips to immediately begin interim measures to mitigate the release in the Clarks Run Watershed.  The KDEP states that the extent of lead and arsenic in Clarks Run is not yet defined, and that the KDEP is seeking to gain access to downstream property to continue defining the extent of the contamination. In fact, the KDEP proposes, in this correspondence, that the sampling be extended to include additional samples from Clarks Run down to the 4th Street Bridge, approximately one mile away from the Site**.**  The

101

correspondence also notes that the KDEP has concluded that additional investigation into surface contamination of off-Site properties caused by Defendants is necessary because of the high concentration of lead on nearby properties. The letter further notes that the KDEP investigation results demonstrate that the full extent to which Defendants' activities have resulted in contamination of off-Site properties is still unknown, and is both ongoing and at levels that are hazardous to human health.

m.   The contamination along the Clark's Run Watershed is so significant that the KDEP has required the posting of signage in the area that reads: "WARNING: SEDIMENTS & SOILS CONTAIN LEAD & ARSENIC AVOID CONTACTING AND/OR DISTURBING SEDIMENTS & SOILS." The signs direct individuals to contact the Kentucky Division of Waste Management Hazardous Waste Branch for additional details.

n.   Soil samples were taken in 2012 and 2013 from property belonging to the Railroad and Sellers and Sellers. The results establish lead levels ranging as high as 5,400 mg/kg and arsenic ranging as high as 130 mg/kg on property owned by Sellers (SD-35), and lead levels ranging as high as 8,300 mg/kg and arsenic as high as 99 mg/kg on property owned by the Railroad (SD-69). Sample point SD-77 reflects samples with lead levels at 62,000 mg/kg. The sample taken at SD-77 is located approximately 300 feet from the home in which local resident John Raines and his family lived for more than twenty years – a location well within the radius of the Affected Area. The home was recently demolished.

o.    The Second Phase Arcadis Report discusses that Corning used the Hazardous Substance TCE during its pre-1977 diode glass operations at the Facility.

p.    Agreed Order DWM 90001 establishes that in 1990 TCE had been detected in several ground water monitoring wells, and corrective action had been mandated by the KDEP.  The corrective action plan dictated by the KDEP included a requirement that Philips develop a work plan "designed to determine the presence, magnitude, extent, direction, and rates of movement of any hazardous waste and hazardous constituents both within and beyond the Facility boundary," and "evaluate the risk to human health and the environment" posed by the migration of the Hazardous Substances.

q.    A 1992 Preliminary Assessment prepared for Philips by GEI Consultants, Inc. ("GEI"), discusses GEI's investigation into the manner in which both Corning and Philips disposed of Hazardous Substances, including TCE, throughout the history of the Site.

r.    The Preliminary Assessment establishes that until at least 1981, 25 gallons of TCE was washed down floor pipes every three to four months when the substance was used to clean the floors inside the Facility.  These pipes discharged the untreated substance through a non-municipal sewer drain directly into a tributary of Clark's Run.  In addition, the sewer pipe carrying this discharge was deteriorated such that significant underground erosion had occurred, and the TCE carried by the pipe was in fact being

103

discharged directly into the ground under the Facility.  With respect to pollution migration pathways, the report states as follows: "[T]he section of pipe from approximately 30 feet inside the north end of the plant to approximately 250 feet west of outfall 001 is deteriorated.  The concrete is missing from the bottom of the pipe and only the reinforcing steel remains.  Between the north end of the building and the mix house, the bottom half of the pipe along a 30-foot-long section is missing and significant soil erosion has occurred resulting in a large void beneath the pipe.  The erosion in this area appears to have been severe for a long time.  About twenty years ago, a lift truck fell through in this area when the concrete and ground collapsed beneath it . . . In 1991, a crane foot broke through the surface approximately 10-20 feet to the north from the first collapse in 1970."

s.   KDEP follow-up correspondence to Philips dated July 7, 1993, notes that documentation submitted by Philips "establishes that there is a plume of solvent contaminated groundwater at the Philips Facility that is directly connected to 'Spring 6' in the upper reaches of Clarks Run.  The levels of solvents being detected at and below Spring 6 are significantly above their established Maximum Concentration Limit (MCLs) and therefore could pose a threat to human health and the Clark's Run Environment."  Id.  The letter goes on to inform Philips that Danville was considering the creation of a park along Clark's Run downstream from the Facility, and directs

104

Philips to conduct additional downstream sampling and install additional off-Site groundwater monitoring wells.  Id.

t.    In 2007, 17 years after the Agreed Order and 15 years after the 1992 Preliminary Assessment, the United States Environmental Protection Agency found that the TCE pollution emanating from the Defendants' operations continued to contaminate not only the shallow aquifer, but also the deep bedrock aquifer.  Correspondence from the EPA to Philips references the remedial efforts of Philips to remove contaminants, including TCE, from the shallow aquifer, but notes that the efforts had not been successful:  "The current system is not effective in controlling migration of groundwater in the deep bedrock aquifer.  The Facility has not defined the scope and extent of groundwater contamination in the deep bedrock aquifer.  The scope and extent of the TCE contamination should be defined.  In all likelihood, groundwater migration is not controlled from leaving the Facility boundary in the deep aquifer."  The letter goes on to discuss conversations between Philips and the EPA.  The EPA concludes that additional groundwater monitoring is necessary to "define the scope of groundwater contamination in the deep bedrock aquifer."

u.    The USEPA Comments on Philips' Groundwater Corrective Measures Status Report state that the fluctuation in concentrations of contaminants in well MW-111 "indicates plume movement."  "Plume movement" is a term used to describe the manner in which pollutants travel through groundwater.  Movement of water and dispersion within an aquifer

spreads pollutants over a wider area. Its advancing boundary, often called a plume edge, can intersect with groundwater wells or surface water such as springs, making the water supplies unsafe for humans and wildlife. Although not mentioned in USEPA's comments, in addition to exposure through direct contact with contaminated water, off-site residents and workers above the contaminated plume can be exposed to the TCE through vapor intrusion.  The movement of the plume, called a plume front, may be analyzed through a hydrological transport model or groundwater model.  The Report goes on to say that "[s]ince MW-111 is the most down gradient well, the Facility should continue delineating the scope and extent of the plume.  The Facility needs to submit a work plan to install off-Site groundwater monitoring wells in the deep bedrock aquifer to assess the scope and extent of groundwater contamination in the deep aquifer."  The comments further explain that the remediation efforts have had little impact on the TCE concentrations in the shallow aquifer, and that "[t]he source areas for TCE near RW-& and RW-8 will continue to be a source of groundwater contamination for Spring 6 and for TCE in the deep aquifer."  The comments also note that Philips "should propose a remediation strategy capable of destroying the TCE source areas near RW-7 and RW-8."

v.  The Second Phase Arcadis Report further reflects that in 2012, TCE was still found in the groundwater at the Site.  A more recent Ground Water

Corrective Measures Status Report dated July 30, 2014 demonstrates the continued presence of TCE and its related products in the groundwater.

w.   In 2007, the Facility was also one of 3,880 facilities nationwide placed by USEPA onto the 2020 Corrective Action Universe.  As a result of this placement, "the KDWM and the U.S. EPA expect that a final remedy will be in place (i.e. remedy construction completed) at your Facility by 2020, although actual attainment of clean up goals through remedy implementation may take a while longer."

x.   A review of analytical results from soil samples taken in 2012 and 2013 from an area of the Facility Premises used in the 1970s and 1980s as a little league baseball field by area residents the Corning/Philips Ballfields showed lead levels of up to 26,000 mg/kg (SS-01I), and arsenic levels of up to 160 mg/kg (SS-02D).  All of the lead and the vast majority of the arsenic analyses are above their KDWM established background concentrations.

y.   Numerous pathways are available to transport contaminants off-Site from their source including; air, surface water, groundwater, and possibly vapor intrusion.

z.   One of the primary contaminant transport methods at similar smelting facilities is airborne dust and particulate. Flue dust coming from the stacks was deposited directly onto the roof of the Facility, as demonstrated by bulk samples collected from the roof of the Facility in 2013 – well after the Facility ceased operations.  Even after the passing of two years, with

107

the attendant rainfall washing roof sediment away, bulk samples collected

from the roof of the Facility reflected the presence of lead at levels of up

to 73,000 mg/kg and 290 mg/kg for arsenic.

aa. The flue dust from the emissions stacks was easily carried off-Site by

wind, as demonstrated by the Anaconda, Montana smelter Superfund Site

study, which included an area encompassing communities up to 10 miles

away from the smelter due to windblown contaminants, primarily arsenic.

bb. The nearest Kentucky Mesonet weather station in Lincoln County

indicates the prevailing wind is generally from west to east. It is clear,

however, that the winds shift frequently with the prevailing wind being to

the south eight days, to the north five days and to the west two days.

cc. The soil sample results obtained from the Plaintiffs' properties support the

conclusion that lead and other particulate matter generated and dispersed

by the Facility escaped the bounds of the Facility's premises through air

dispersion and adversely impacted surrounding properties.

dd. As part of his investigation, Mr. Lloyd, who spoke with the Plaintiffs and

others who lived or worked in the vicinity of the Facility, reports that their

statements corroborate the dispersion of lead and other particulate

generated by the Facility through the air.  For instance, Ronald Hawkins,

who worked in the adjacent rail yard from 1977 through 1999, stated that

dust fallout from the Facility emission stacks coated the tops of the rail

cars each day.  Another railroad employee, John Raines, worked in a

watch tower approximately 30 feet high and reported that the plume of

emissions emanating from the stacks was routinely opaque and dark in color.  James Jones, who lived from the late 1950s until the early 1970s in a house West of the Facility on Lebanon Road, stated that he remembered his family receiving checks from Lloyds of London to compensate them for the corrosion of the paint on their cars due to the dust emanating from the Facility stacks.

ee.   Soil samples from one residential property to the East of the Facility and very nearby, in the direction of the prevailing winds, reflect the presence of lead with a high concentration of 752 mg/kg – well above the EPA Hazard level of 400 mg/kg.  These samples were taken from property belonging to Michael Johnson at 501 Russell Street, which is approximately 3,000 feet from the former emission stacks at the Facility, in a heavily populated neighborhood area of Danville.  Mercury was detected in all samples, with a high concentration of 4.25 mg/kg, which is well above KDWM's ambient background concentration of 0.06 mg/kg.

ff.   Surface water and groundwater has and will continue to be a catalyst for transporting inorganic materials as they become soluble in nearby streams. The concentrations of lead (1800 mg/kg) and arsenic (44 mg/kg) recently detected along creek banks and in stream sediments over ½-mile downstream of the Facility, as discussed supra, will continue to create potential adverse human exposure.

gg.   Also, groundwater contaminants such as TCE and dichloroethene ("DCE") are continuing to impact surface water through discharge from

109

springs and directly into nearby streams. The karst geology underlying the area makes groundwater flow and contaminant transport unpredictable. Shallow, intermediate, and deep aquifers have been identified under the Site. From numerous groundwater studies conducted at the Site, the shallow and intermediate aquifers reportedly travel southeasterly while the deep aquifer flows north and west. This is consistent with groundwater studies completed throughout the Bluegrass region as groundwater finds preferential pathways through fractures and solution channels within the rock.

hh.   Numerous groundwater studies have detected TCE and its degradation product DCE in groundwater and springs. Groundwater corrective measures to address Volatile Organic Compounds (VOCs) have been ongoing since 1995, with multiple injections of an oxidizing compound to expedite removal.  Unremarkable progress has been made in reducing the VOC concentrations.  Therefore, it is likely that VOCs will continue to discharge into nearby springs and streams.

ii.   Because of the presence of TCE and its degradation products in local groundwater, it is Mr. Lloyd's opinion that the properties of the named Plaintiffs are at potential risk for harmful impact due to vapor intrusion. Vapor intrusion generally occurs when there is a migration of volatile chemicals from contaminated groundwater or soil into an overlying building. Volatile chemicals can emit vapors that may migrate through subsurface soils and into indoor air spaces of overlying buildings in ways

110

similar to that of radon gas seeping into homes.  Additional testing of the Plaintiffs' properties to account for seasonal fluctuations is necessary and warranted.

jj.   It is evident that during the Facility's operation, environmental neglect was encountered in many forms as indicated by the tens of thousands of pages of environmental studies/investigations and subsequent regulatory enforcement actions.  Despite the large volume of data, it does not appear that the horizontal or vertical extent of contamination has been completely identified.

kk.   There is evidence that contaminants detected on-Site are not bound by the property boundaries and have migrated and may continue to migrate off-Site via surface water, groundwater, and air. Recent corrective measures do not appear to have sufficiently removed the contaminants.

ll.   Site cleanup goals should be based upon a detailed toxicological evaluation and not generic screening levels because of the presence of multiple contaminants and the media affected.

mm.   There may be a cumulative affect for human exposure to multiple contaminants that needs to be accounted for.

nn.   Off-Site waste impoundments have been reported but not yet identified or investigated. Testing performed at these Sites may in fact reveal contamination to such a degree as to adversely impact soil, surface water, and groundwater throughout the City of Danville.

oo.   The shallow, intermediate, and deep groundwater aquifers all show elevated concentrations of TCE and its degradation product DCE. These chemicals will continue to degrade and will eventually become vinyl chloride, which is even more toxic than its parent products.

pp.   Surface samples along the northeast border of the Site show over 5000 mg/kg lead, which would be expected to be carried off-Site as surface water travels downgradient toward a tributary of Clark's Run Creek. This is confirmed by elevated lead concentrations (>3000 mg/kg) immediately downgradient on the tributary's creek bank.  Additionally, lead and arsenic can be carried into the local groundwater as water percolates through contaminated soil.

qq.   Specific valences of materials such as arsenic and chromium are more toxic than others. Specific valences of arsenic (trivalent vs. pentavalent) and chromium (trivalent vs. hexavalent) should be identified rather than just total concentrations.

rr.   Properties located nearby to the Facility have been detrimentally impacted by the contaminants generated and dispersed by the Defendants.

274.   Based on the foregoing, Mr. Lloyd has concluded that the Defendants have dispersed Hazardous Substances, including lead, arsenic, and TCE, in amounts that are hazardous to human health and the environment. Mr. Lloyd concluded that the area affected by the Defendants' tortious activities – the "Affected Area" – consists of a parabolic shaped area extending 11,000 feet to the northeast from the easternmost property boundary of the Site; extending 2,200 feet southwest from the southwest corner of the Site; extending 3,800 feet due

112

south from the southwest corner of the Site; and extending 2,800 feet due north from the northernmost boundary line of the Site.

**G.    The Plaintiffs Have Presented Substantial Expert Evidence In Support Of Their Allegations That Plaintiffs Within The Affected Area Have Suffered Injuries As A Result Of The Defendants' Tortious Conduct.**

275.    Plaintiffs, at great expense, have obtained the Reports and Affidavits of several experts in support of their claims.  The expert evidence supports the Plaintiffs' argument that properties and individuals throughout the Affected Area, which includes each of the Named Plaintiffs, have been harmed by the lead, arsenic, and TCE generated and negligently or recklessly dispersed by the Defendants' continuous course of conduct throughout the Relevant Time Period.

**Dr. Albert Westerman**

276.    Dr. Albert Westerman, a toxicological expert retained by Plaintiffs, examined the results of the environmental testing conducted by Plaintiffs throughout the Affected Area to determine whether the existing levels of lead, arsenic and TCE represent a threat to the health of residents, and/or interfere with or limit the use of properties within the Affected Area.  As reflected in Dr. Westerman's Report and Rebuttal Report previously filed in the record of this action and incorporated herein by reference, he concludes that the levels of lead, arsenic, and TCE found throughout the Affected Area represent a hazard to the health of the individuals living within the Affected Area and impact the use of the properties in the Affected Area.

277.    Dr. Westerman's Report and Rebuttal Report provide the Court with citation to extensive scientific literature discussing the cumulative effects of lead.  Dr. Westerman discusses the various pathways through which Plaintiffs suffer exposure to the Hazardous Substances, and debunks the argument that Plaintiffs can establish harm only if the levels of lead and arsenic

113

found on their properties exceeds the EPA action levels for residential and commercial

properties.  Westerman Report, "Human Health Effects of Exposure to Lead and Arsenic," [DE

253, Appx. 29, pp. 1-9].  Dr. Westerman notes that the EPA action levels for lead in drinking

water and soils were not human-health based, but rather were developed by policy.  Id.[7]

279.     Using a formulaic risk assessment, Dr. Westerman reaches the conclusion that the

soil sample results obtained by Plaintiffs demonstrate that residents of the Affected Area have

been exposed to levels of lead and arsenic in amounts that are dangerous to human health.  Id. at

pp. 9-14.

279.     Dr. Westerman recommends that the use of the properties within the Affected

Area be constrained in the following manner:  that the ground cover on the properties should be

maintained so as to avoid dermal contact with the soil.  Id.  In the alternative, Dr. Westerman

asserts that property owners should limit outdoor property use.  He notes that consumption of

vegetables grown in the contaminated soil should be limited within the Affected Area.  Id. at p.

---

[7]       Dr. Westerman's conclusions are supported by case law.  Courts have repeatedly found that the action
levels for lead and other hazardous substances in soil or drinking water do not establish "injury thresholds"
for the purpose of civil claims.  See, e.g., In re MTBE Prods. Liab. Litig., 458 F. Supp. 2d 149, 158 (S.D.
N.Y. 2006) (stating that drinking water standards serve as convenient guideposts in determining that a
particular level of contamination may have caused an injury, but do not define whether an injury has
occurred); Bentley v. Honeywell, 223 F.R.D. 471, 478, n. 11 (S.D. Ohio 2004) ("Regardless of whether
[plaintiff's] water supply has been deemed safe . . . and/or determined to be below federal and state
established [regulatory levels], the [plaintiffs] still may have suffered diminution in their property values.");
Suffolk County Water Auth. v. Dow Chem. Co., 121 A.D. 3d 50, 56 (N.Y. 2d Dep't 2014) ("The MCL is
only a regulatory standard which governs conduct in supplying water to the public. While the MCL may be
helpful in determining whether an injury has occurred, the MCL does not set a bar below which an injury
cannot have occurred…  Similarly, the MCL does not define whether an injury has occurred, since
contamination below that level could result in some injury, such as increased monitoring costs.");
Plainview Water Dist. v. Exxon Mobil Corp., 2006 N.Y. Misc. LEXIS 3730, at *16-17 (N.Y. Sup. Ct. Nov.
27, 2006) ("The Court also disagrees with the defendants' contention that a legally redressable injury will
result only if the plaintiff can currently project and demonstrate that the potentially impending
contamination will exceed the applicable, 'maximum contaminant level' standard imposed by law.").

15.  These restrictions on property usage should no longer be necessary once the remediation sought has been effected.

280.    With regard to TCE, Dr. Westerman notes that members of the Affected Area are at risk for exposure to the Hazardous Substance through inhalation, drinking water from contaminated wells, and from vapor intrusion through the migration of the substance up through the soil:  "Area groundwater is highly contaminated with TCE so exposure to the toxic chemical . . . is currently a health hazard for people and will remain so in future use."  Westerman Report, "Trichloroethylene and Human Health," [DE 253, Appx. 29 at p. 1].

281.    Dr. Westerman also notes:  "Since releases of TCE from the Philips/Corning Facility likely have taken place since 1952 and they continue to occur due to the groundwater legacy of contamination, human health effects in the area have likely occurred for many years and will likely persist for years to come."  Id. at p. 2.  Importantly, while the documentation obtained by Plaintiffs indicates that the shallow, intermediate, and deep aquifers in the area around the Facility are contaminated with TCE, and that the plume flow is in all directions away from the Facility, the plume has not been mapped by Defendants despite repeated regulatory directions to do so.  As Dr. Westerman points out, "in spite of treatment to control the plume, (hydrogen releasing compound ("HRC") injections and pump and treatment of groundwater) designed to keep TCE on the facility property, contamination remains on and continues to migrate off-site."  Id.

282.    Dr. Westerman further discusses the fact that based on the documents produced by Defendants, the concentrations of TCE at springs and monitoring wells within the Affected Area have been elevated for at least the last 20 years – since 1996 – and have warranted a health advisory for the spring nearest to the Facility (Spring 6):

115

> For example, in three out of the last four sampling quarters (last year) the concentration of TCE was 450 times greater than the one year non-cancer water exposure for children.  Indications are from the sampling data that concentrations were higher in the past.  For example, in the four quarters of 1996, the levels in the Spring were 869 times greater than the risk-based level designed to be protective of children's health and 500 times greater than the adult health-based value.

Id. at p. 4.

283.    A key conclusion reached by Dr. Westerman in his Rebuttal Report with regard to the property damage claims is that the question to be considered is not "whether the levels of contaminants vary throughout the [Affected Area], but rather whether an area of general contamination surrounding the point source (Philips/Corning Plant) can be identified."  He concludes that the "soil sampling performed by Alpha-Omega Environmental at multiple locations taken on different properties has helped determine the radial extent of contamination from the plant . . . ."  Westerman Rebuttal Report, [DE 253, Appx. 30, pp. 3-4].  Dr. Westerman thoroughly discusses and rules out possible alternative sources of the contamination at issue.  Id. at pp. 8-11.

284.    In his Rebuttal Report, Dr. Westerman concludes, after reviewing all of the evidence presented by Plaintiffs, that the levels of Hazardous Substances throughout the Affected Area are sufficient to cause health conditions in persons residing within the Affected Area.  Westerman Rebuttal Report, [DE 253, Appx. 30, p. 1].

**Dr. John Kilpatrick**

285.    Plaintiffs engaged Dr. Kilpatrick to analyze the Affected Area as calculated by Mr. Lloyd.  The Affected Area consists of approximately 3,000 parcels.  Plaintiffs asked Dr. Kilpatrick to offer an opinion as to whether, from a real estate analysis and appraisal perspective,

116

the alleged damages to properties in this case can be determined on a mass appraisal basis.  See Kilpatrick Report, [DE 253, Appx. 31]; Kilpatrick Rebuttal Report, [DE 253, Appx. 32].  In Dr. Kilpatrick's expert opinion, which is based on a reasonable degree of scientific certainty, the answer is yes.  Id.

286.    Specifically, Kilpatrick opines that the use of a mass appraisal "hedonic regression model" will allow for mass valuation.  Kilpatrick Report, Appx. 31.  Id.[8]  In support of his opinion, Dr. Kilpatrick notes that:  mass appraisal is a methodology that allows multiple properties to be appraised at the same time using large, statistically valid data sets; hedonic mass appraisal is a widely accepted and commonly used appraisal methodology with published standards and in peer review literature; a mass appraisal methodology is superior to an individual appraisal in that it provides a statistical measure of reliability and a consistent application of qualitative judgments to determine the actual value of a property; a mass appraisal methodology is more efficient than individual appraisals in that it does not require an individualized appraisal of each and every property in the Affected Area to determine the actual impact of the

---

[8]     Mass appraisal is an accepted methodology.  It is recognized under Rule 6 of the Uniform Standards of Professional Appraisal Practice ("USPAP"), and has been accepted in many courts where plaintiffs have claimed property damages.  See Mass. Mut. Life Ins. Co. v. DB Structured Prods., 2015 U.S. Dist. LEXIS 59998, *32-37 (D. Mass., May 7, 2015) (concluding that the AVM/hedonic regression model for mass appraisal used by Dr. Kilpatrick ". . . [has] been subject to peer review and [is] accepted within the real estate appraisal and underwriting industry[.]) (citing Assured Guar. Mun. Corp. v. Flagstar Bank, FSB, 920 F. Supp. 2d 475, 505 (S.D.N.Y. 2013) (noting that underwriters routinely apply AVMs as part of valuation due diligence); In re Katrina Canal Breaches Consol. Litig., 2007 U.S. Dist. LEXIS 82887, *13 (E.D. La. Nov. 1, 2007) (stating that "[c]learly, mass appraisal is an accepted methodology . . .  This approach is used in appraisers' offices all over the country to determine value."); Turner v. Murphy Oil, USA, Inc., 2006 U.S. Dist. LEXIS 985, *22 (E.D. La. Jan. 12, 2006) (stating that "Dr. Kilpatrick is qualified and is using generally-accepted methodology.")); see also Hartle v. FirstEnergy Generation Corp., 2014 U.S. Dist. LEXIS 43033, *29-30 (W.D. Pa. Mar. 31, 2014) (finding that Dr. Kilpatrick's hedonic regression analysis meets the threshold for admissibility); In re Toyota Motor Corp. Hybrid Brake Mktg., 2012 U.S. Dist. LEXIS 151559, *18-19 (C.D. Cal. Sept. 20, 2012) (stating that hedonic regression analysis for purpose of product valuation is generally accepted, has been tested, and is part of peer-reviewed studies); O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 341 (C.D. Cal. 1998) (finding that plaintiffs' expert's use of a hedonic multiple regression model to "assess the loss of property values on an area-wide basis despite the fact that the Contamination Area contains various properties . . ." could be used for this purpose, and subsequently finding that common issues predominate).

environmental contamination from the Facility; the Boyle County Property Appraiser maintains a database of property features for each and every property in the Affected Area that is sufficiently robust to allow for its use in a mass appraisal model; a mass appraisal can determine, on a property-by-property basis, the diminution in value, if any, attributable to the contamination emanating from the Facility; and, the majority of the properties within the Affected Area can be assessed using a mass appraisal methodology.  Id.  Mass appraisal therefore offers efficiencies that far outweigh, and are thus superior to, the chaos of individualized damage computations.

### COUNT I
### (Nuisance)

287.     Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

288.     In the operation of the Facility, all Defendants utilized and generated Hazardous Substances, including lead, arsenic, and TCE.

289.     In the operation of its facility, all Defendants discharged fallout, odors, chemicals, lead, arsenic, and TCE into the air and groundwater, and thereby into the Plaintiffs' neighborhoods, encompassing those properties falling within at least a five-mile radius.  These Hazardous Substances are invasive and have caused and continue to cause damage to Plaintiffs who own property within this radius.

290.     The nuisance described, supra, is ongoing, the full extent of which is yet unknown.

291.     All Defendants had a duty to prevent the discharge of lead, arsenic, and TCE onto the Plaintiffs' properties, and to prevent lead, arsenic, and TCE from escaping from the Site onto the Plaintiffs' property.

118

292.    A condition or activity that unreasonably interferes with the use of property is a nuisance.

293.    Plaintiffs did not consent for the lead, arsenic, or TCE to physically invade their personal and real property.

294.    By causing lead, arsenic, and TCE accumulated and controlled by Defendants to physically invade the Plaintiffs' personal and real property, all Defendants substantially and unreasonably interfered with the Plaintiffs' use and enjoyment of their property.

295.    Plaintiffs who own or owned property within the Affected Area as of the date this action was initiated have been damaged as a result of Defendants' tortious conduct in that the fair market value of their properties has been materially reduced.

296.    Upon information and belief, the lead, arsenic and TCE emitted by Defendants have contaminated property belonging to the Plaintiffs named herein and to others throughout the Affected Area in more than a minute quantity, the extent of which is presently unknown, thereby causing a material reduction in the value of the Plaintiffs' properties.

297.    Plaintiffs and others throughout the Affected Area are furthermore harmed by the contamination that has invaded their properties as a result of the Defendants' tortious activities because such contamination exposes Plaintiffs to potential legal and environmental liabilities.

298.    The Defendants' tortious activities in permitting lead, arsenic, and TCE to migrate off-Site and contaminate surrounding properties has damaged the Plaintiffs named herein, as well as others throughout the Affected Area, in that the value of their properties has suffered from the stigma of being closely situated to the Site.

299.    The Defendants' tortious activities have furthermore interfered with the Plaintiffs' use and enjoyment of their properties, because the presence of contamination and lead, arsenic and

119

TCE on these properties has and will continue to impair the ability of Plaintiffs to dispose of their properties through sale or lease, or to otherwise utilize their properties for the purpose for which they are best suited.

300.   Defendants' substantial and unreasonable interference with Plaintiffs' use and enjoyment of their properties constitutes a nuisance for which all Defendants are liable to Plaintiffs for all damages arising from such nuisance, including compensatory and exemplary relief.  Each of the Plaintiffs is entitled to recover damages for the following, including but not limited to:  the loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the value of property; damages arising from the stigma of being closely situated to the Site, costs associated with determining the nature and extent of the pollution of their properties and the method by which the properties could be remediated; restoration costs; consequential and incidental damages; disgorgement of profits realized; unjust enrichment; and punitive damages.

## COUNT II
### (Trespass)

301.   Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

302.   All Defendants engaged in extra-hazardous activities in permitting lead, arsenic and TCE to escape the Site and pollute surrounding properties.

303.   All Defendants intentionally, recklessly, willfully, wantonly, maliciously, and negligently failed to properly construct, maintain, and/or operate the Facility, which caused the invasion and damage of Plaintiffs' personal and real property by lead, arsenic and TCE.

304.   The trespass described, supra, is ongoing, the full extent of which is yet unknown.

120

305.    As a direct and proximate result of the foregoing conduct of all Defendants, lead, arsenic and TCE accumulated upon, entered upon, settled upon, seeped onto, and otherwise physically invaded the Plaintiffs' personal and real property.

306.    It was reasonably foreseeable that all Defendants' failure to properly construct, maintain, and/or operate the Facility could result in an invasion of Plaintiffs' possessory interests through the emissions of lead, arsenic and TCE.

307.    The lead, arsenic and TCE that entered, settled, physically invaded, and damaged Plaintiffs' personal and real property interfered with and continue to damage the Plaintiffs' interests in the exclusive possession of the Plaintiffs' land and property and constitute a continuous trespass upon the Plaintiffs' property.

308.    Plaintiffs did not consent for the lead, arsenic and TCE to physically invade their land and property.

309.    The lead, arsenic and TCE that Defendants have caused to invade Plaintiffs' properties have in fact contaminated the subject properties owned by Plaintiffs to the extent that the levels of Hazardous Substances pose a hazard to human health.

310.    The lead, arsenic and TCE that have invaded the properties of Plaintiffs, have harmed the properties in that the contamination has and will continue to impair the ability of Plaintiffs to dispose of their properties through sale or lease, or to otherwise utilize their properties for the purposes for which they are best suited.

311.    Upon information and belief, the lead, arsenic and TCE emitted by Defendants have contaminated the properties of Plaintiffs in more than a minute quantity, the extent of which is presently unknown, thereby causing a material reduction in the value of the Plaintiffs' properties.

121

312.    Plaintiffs are furthermore harmed by the contamination that has invaded their properties as a result of the Defendants' tortious activities because such contamination exposes Plaintiffs to potential legal and environmental liabilities.

313.    Finally, the Defendants' tortious activities in permitting lead, arsenic and TCE to migrate off-Site and contaminate surrounding properties has damaged Plaintiffs in that the value of their properties has suffered from the stigma of being closely situated to the Site.

314.    As a further direct and proximate result of the foregoing conduct of all Defendants, Plaintiffs suffered substantial damages to their personal and real property as alleged herein.  Each of the Plaintiffs is entitled to recover damages for the following, including but not limited to:  the loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the value of property; costs associated with determining the nature and extent of the pollution of their properties and the method by which the properties could be remediated; restoration costs; consequential and incidental damages; disgorgement of profits realized; unjust enrichment; and punitive damages.

315.    By reason of all Defendants' trespass on the Plaintiffs' properties, the Plaintiffs are entitled to injunctive relief requiring the Defendants to promptly and completely remove all lead, arsenic and TCE from the Plaintiffs' land, and prevent the future migration of lead, arsenic and TCE onto the Plaintiffs' land.

316.    All Defendants' actions, which resulted in the trespass upon the Plaintiffs' land and property were, and continue to be, intentional, willful, and malicious and made with a conscious disregard for the rights and safety of the Plaintiffs, entitling the Plaintiffs to compensatory, exemplary, injunctive, and punitive relief.

## COUNT III
### (Negligence, Gross Negligence And Recklessness)

317.     Plaintiffs incorporate herein by reference the allegations set forth in each

Paragraph above as if fully stated herein.

318.     In constructing, maintaining, operating, controlling, engineering and/or designing

the Facility, all Defendants had a duty to exercise ordinary care and diligence so that lead,

arsenic and TCE did not escape their Facility and Site, and/or invade the Plaintiffs' personal and

real property.

319.     All Defendants knowingly or recklessly breached their duty to exercise ordinary

care and diligence when they improperly constructed, maintained, operated, engineered, and/or

designed the Facility, and when they disposed of or dispersed the lead, arsenic and TCE into the

environment.

320.     Defendants knew or should have known that such actions would cause lead,

arsenic and TCE to escape the Facility and Site, and/or that such actions would cause Plaintiffs'

real property to be invaded by lead, arsenic and TCE.

321.     Defendants furthermore knew or should have known that exposure to such

substances would likely cause physical injury and/or property damages to those residing and/or

owning property in the Danville community.

322.     As a direct and proximate result of the failure of all Defendants to exercise

ordinary care, thereby causing contamination of the Affected Area and Plaintiffs' properties in

amounts that are hazardous to human health and which interfere with the Plaintiffs' use and

enjoyment of the property, Plaintiffs within the Affected Area have been damaged and are

entitled to recover damages arising from the loss of use and enjoyment of property; the loss of

use of the groundwater; the diminution of the value of property; costs associated with determining the nature and extent of the pollution of their properties and the method by which the properties could be remediated; restoration costs; consequential and incidental damages.

323.    As a direct and proximate result of all Defendants' failure to exercise ordinary care, Plaintiffs residing within the Affected Area between 1952 and the present date have suffered personal injury, wrongful death, injury arising from an increased risk of personal injury and sickness in the future, mental anguish, suffering, anxiety, embarrassment, humiliation, distress, agony, and other related nervous conditions and emotional trauma.

324.    The conduct of all Defendants in knowingly allowing conditions to exist that caused or permitted the lead, arsenic and TCE to escape the Facility and Site and/or to physically invade the Plaintiffs' personal and real property, constitutes gross negligence, as Defendants' conduct demonstrates a substantial lack of concern for whether an injury resulted to the Plaintiffs, and at least constitutes recklessness.

325.    All Defendants are vicariously liable for the negligence and/or gross negligence of their officers, employees, representatives, and agents, who, during the course and scope of their employment, allowed or failed to correct the problem which caused lead, arsenic and TCE to escape the Facility and Site and/or to physically invade the Plaintiffs' personal and real property.

326.    Defendants' recklessness entitles Plaintiffs to an award of punitive damages, because their conduct was in willful disregard for Plaintiffs and constitutes outrageous conduct.

## <u>COUNT IV</u>
### (<u>Negligence Per Se</u>)

327.    Plaintiffs incorporate herein by reference the allegations set forth in each

Paragraph above as if fully stated herein.

328.    In constructing, maintaining, operating, controlling, engineering and/or designing

the Facility, all Defendants had a duty to abide by the various state and federal regulations

governing the use and disposal of lead, arsenic and TCE, including but not limited to those

statutes listed, <u>supra</u> (the "Statutes").

329.    The Statutes were intended to protect the Plaintiffs from the harm of the type they

have suffered.

330.    All Defendants breached their duties under one or more of the statutes when they

improperly constructed, maintained, operated, engineered, and/or designed the Facility and when

they disposed of or dispersed the lead, arsenic and TCE into the environment.

331.    As a direct and proximate result of the failure of all Defendants to comply with

the Statutes, the Plaintiffs' properties have become contaminated in amounts that are hazardous

to human health and which interfere with the Plaintiffs' use and enjoyment of the property,

Plaintiffs who own property or who owned property within the Affected Area as of the date of

the filing of this action have been damaged and are entitled to recover damages arising from the

loss of use and enjoyment of property; the loss of use of the groundwater; the diminution of the

value of property; costs associated with determining the nature and extent of the pollution of

their properties and the method by which the properties could be remediated; restoration costs;

consequential and incidental damages.

125

332.    As a direct and proximate result of all Defendants' failure to comply with the Statutes, Plaintiffs residing within the Affected Area between 1952 and the present date have suffered personal injury, wrongful death, injury arising from an increased risk of personal injury and sickness in the future, mental anguish, suffering, anxiety, embarrassment, humiliation, distress, agony, and other related nervous conditions and emotional trauma.

333.    All Defendants are vicariously liable for the negligence and/or gross negligence of their officers, employees, representatives, and agents, who, during the course and scope of their employment, failed to comply with the Statutes.

## COUNT V
### (Battery)

334.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully restated herein.

335.    All Defendants acted with knowledge that they were illegally and tortiously permitting lead, arsenic and TCE generated and stored at the Facility to escape the Facility and Site and/or to leak and seep on, under and around the Plaintiffs' properties, and furthermore acted with the knowledge that such activities were substantially likely to and were in fact causing personal injury to persons who were touched by or exposed to such Hazardous Substances.

336.    The Defendants' actions in intentionally allowing the discharge of lead, arsenic and TCE off-Site, intentionally and willfully caused a direct, harmful and/or offensive contact with the Plaintiffs and thereby committed battery upon such Plaintiffs.  Separate and apart from acting negligently or with gross negligence, at all relevant times, the Defendants caused personal injury to the Plaintiffs, and/or an increased risk of serious latent disease and damages, through

126

acts and omissions accompanied by malice and/or accompanied by a wanton, reckless, and willful disregard of persons who foreseeably might be harmed by such acts or omissions.

337.    As a direct and proximate result of Defendants' misconduct as set forth herein, the Plaintiffs have suffered and continue to suffer personal injury, wrongful death, injury arising from an enhanced risk of serious future latent disease, economic losses, the loss of value to their property, the loss of use and enjoyment of their property, and the need for the establishment of a medical monitoring program for those exposed to the lead, arsenic and TCE.

## COUNT VI
### (Fraudulent Concealment)

338.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully stated herein.

339.    Defendants had, and continue to have, a duty to disclose to local, state and federal authorities, and to Plaintiffs, the nature and extent of Hazardous Substances generated by the Facility that have either migrated off-Site or been intentionally dumped off-Site by Defendants.

340.    As set forth in detail, supra, during the Relevant Time Period, all Defendants intentionally concealed and failed to disclose to the Plaintiffs, and to the public authorities and/or agencies, material facts concerning the nature, extent, magnitude, and effects of the exposure of the Plaintiffs and their properties to the lead, arsenic and TCE emitted, released, stored, handled, generated, processed and/or disposed of in and around the Facility and the surrounding environment.

341.    Defendants continue to intentionally conceal and fail to disclose to the Plaintiffs, and to the public authorities and/or agencies, material facts concerning the nature, extent, magnitude, and effects of the exposure of Plaintiffs and their properties to the lead, arsenic and

127

TCE emitted, released, stored, handled, generated, processed and/or disposed of in and around the Facility and the surrounding environment.

342.    All Defendants intentionally concealed such material information. Defendants knew or should have known that the Plaintiffs and their properties would be exposed to the lead, arsenic and TCE.

343.    All Defendants knew that their concealment of such information would subject and continue to subject the Plaintiffs to continued exposure to the lead, arsenic and TCE indefinitely, up to and including today.

344.    If the Plaintiffs, who were residents of and/or owned property in Danville, Kentucky, had known of the material information intentionally concealed by Defendants, the Plaintiffs would not have consented to being exposed to the lead, arsenic and TCE and would not have willingly continued to reside or own property within the Affected Area.

345.    Plaintiffs reasonably believed that the groundwater, air, soil, and natural resources in and around the Facility and their surrounding community did not pose any potential health hazard, and thus reasonably relied upon such belief in continuing to reside or own property within the Affected Area, thereby sustaining injuries.

346.    Plaintiffs reasonably believed that the groundwater, air, soil, and natural resources in and around the Facility and their surrounding community did not pose any potential health hazard, and thus reasonably relied upon such belief in refraining, until the filing of this suit, from seeking redress or taking precautions.

347.    Separate and apart from acting negligently or with gross negligence, at all times, the Defendants caused serious personal injury, property damage and/or an increased risk of serious latent disease to the Plaintiffs through acts and omissions actuated by malice and/or

128

accompanied by a wanton, reckless and willful disregard for the persons who might foreseeably be harmed by such acts or omissions.

348.    As a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs have suffered and continue to suffer personal injury, injury arising from an enhanced risk of serious future latent disease, economic losses, the loss of value to their property, the loss of use and enjoyment of their property, and the need for the establishment of a medical monitoring program for those exposed to the lead, arsenic and TCE.

**COUNT VII**
**(Negligent Infliction Of Emotional Distress)**

349.    Plaintiffs incorporate herein by reference the allegations set forth in each Paragraph above as if fully restated herein.

350.    The Defendants failed to act with reasonable care by failing to adequately or fully warn Plaintiffs of their exposure to or the risks associated with exposure to lead, arsenic and TCE.  Such conduct placed the Plaintiffs, their unborn children, and members of their households at a significantly increased risk of developing physical injuries and health related problems in the future.

351.    By failing to warn the Plaintiffs or others, despite subjectively realizing the specific unsafe and hazardous nature of the pollution Defendants permitted to escape off-Site, and by taking actions that deliberately misled Plaintiffs and concealed from them the true hazards and risks associated with the nature and extent to which lead, arsenic and TCE have migrated off-Site, the Defendants acted wantonly, willfully, recklessly, and with malice and oppression.

352.     As set forth herein, all Plaintiffs residing within the Affected Area between 1952 and 1982 have alleged that they suffered a physical injury or health related problems proximately resulting from their exposure to lead, arsenic and TCE emitted by Defendants.  In the alternative, the Plaintiffs allege that, to the extent they have not yet suffered any physical injury or health related problems from such exposure, some or all of Plaintiffs have suffered serious emotional distress proximately resulting from their significantly increased risk of developing future disease, which in turn resulted from the Defendants' negligent and reckless conduct.

WHEREFORE, the Plaintiffs respectfully request Judgment on their Fifth Amended Complaint against Corning Incorporated and Philips Electronics North America Corporation as follows:

a.     A trial by jury on all Counts so triable;

b.     Joint and several liability as to all Defendants;

c.     Determination of the Defendants' liability, with the question of damages being bifurcated and subject to further proceedings, provided that the Court believes bifurcation is necessary in its discretion and in the interests of justice.

d.     The creation of a program for the Plaintiffs for medical monitoring, to be paid for by Defendants, under Court supervision, to provide medical monitoring services, including but not limited to, testing, examination, preventative and diagnostic screening for conditions that can result from or potentially result from exposure to the Hazardous Substances;

e.     Judgment on Count I jointly and severally against all Defendants for both compensatory and punitive damages for nuisance in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

f.      Judgment on Count II jointly and severally against all Defendants for both compensatory and punitive damages for trespass in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

g.      Judgment on Count III jointly and severally against all Defendants for both compensatory and punitive damages for negligence, gross negligence and recklessness in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

h.      Judgment on Count IV jointly and severally against all Defendants for both compensatory and punitive damages for negligence per se in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

i.      Judgment on Count V jointly and severally against all Defendants for both compensatory and punitive damages for battery in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

j.      Judgment on Count VI jointly and severally against all Defendants for both compensatory and punitive damages for fraudulent concealment in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

k.      Judgment on Count VII jointly and severally against all Defendants for compensatory damages for negligent infliction of emotional distress in an amount to be determined at trial in excess of the minimum jurisdictional limits of this Court;

l.      Award the Plaintiffs' reasonable costs incurred herein;

m.      Award Reasonable attorneys' fees;

n.      Award prejudgment and post-judgment interest as provided by law;

o.      Award compensatory damages;

p.      Award punitive and exemplary damages; and

q.      An Order requiring Defendants to pay the costs associated with determining the nature and extent of the pollution of the Plaintiffs' properties and the method by which the properties could be remediated, and to thereafter promptly and completely remove all lead, arsenic and TCE from the Plaintiffs' properties to prevent further migration of such lead, arsenic and TCE and to preserve portions of the Facility and top soil at or near the Facility for subsequent testing and analysis on behalf of Plaintiffs herein.

Respectfully submitted,

 /s/ Richard A. Getty
RICHARD A. GETTY
JESSICA WINTERS
MATTHEW ENGLISH
   and
MARY ANN GETTY

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 259-1900
Facsimile:   (859) 259-1909
E-Mail:  rgetty@gettylawgroup.com
E-Mail:  jwinters@gettylawgroup.com
E-Mail:  menglish@gettylawgroup.com
E-Mail:  mgetty@gettylawgroup.com

133

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 17th day of January, 2019, the foregoing Fifth Amended Complaint was served electronically through this Court's CM/ECF system upon the following:

Brian K. Johnson, Esq.
Dickinson Wright, PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky  40507
Counsel for Philips Electronics North America Corporation

Donald J. Kelly, Esq.
Wyatt, Tarrant & Combs, LLP
500 West Jefferson Street, Suite 2800
Louisville Kentucky  40202-2898

and

Joseph Madonia, Esq.
Barnes & Thornburg LLP
1 North Wacker Drive, Suite 4400
Chicago, Illinois  60606

Counsel for Corning Incorporated


/s/ Richard A. Getty
COUNSEL FOR PLAINTIFFS

jkwpld1205