IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| MODERN HOLDINGS, LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No. 5:13-cv-00405-GFVT |
| CORNING, INC., et al, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MOTION TO
## EXCLUDE THE OPINIONS OF DR. ALBERT WESTERMAN

Defendants, Philips Electronics North America Corporation ("Philips") and Corning, Incorporated ("Corning") (collectively, "Defendants"), by counsel, submit this motion to exclude the expert report and opinions of Dr. Albert Westerman.

## INTRODUCTION

Plaintiffs' expert on toxicology, Dr. Albert Westerman, opines that *any* amount of lead found in soil, whether impacted by Defendants' facility or not, presents unquantified "risks" to unidentified individuals, is inconsistent with governing statutes and regulations and mainstream science. Based upon his belief that *any* amount of lead in soil is risky, Dr. Westerman concludes it is necessary to remediate the soil at Plaintiffs' properties to "background" levels of lead, leaving behind 23.68 parts per million ("ppm") which he claims would still be harmful and a continuing, unquantified risk to unidentified individuals. Dr. Westerman's opinions should be excluded because they lack scientific analysis and support, are internally inconsistent, and are contradicted by existing authoritative guidance, rendering them unreliable and unhelpful to the jury. Dr. Westerman's opinions suffer from two fundamental flaws.

1

*First*, Dr. Westerman's opinions are unsupported by scientific analysis, rendering them speculative and unhelpful to the jury. Dr. Westerman's primary opinion is that no amount of lead in soil (anywhere) is "safe." He then concludes without explanation, and in direct contrast to his primary opinion, that Danville-area "background levels" of lead are somehow "safe enough" that it would be okay to leave that level of lead on Plaintiffs' properties. He does not, because he cannot, quantify or define the difference in the "risk" between leaving 23.68 ppm of lead on Plaintiffs' properties (which is what Dr. Westerman thinks is acceptable "background"), leaving 30 ppm of lead on Plaintiffs' properties (as Plaintiffs' remediation expert proposes to do), leaving 40 ppm of lead on Plaintiffs' properties (the amount Plaintiffs' sampling expert concluded came from sources other than Defendants), or leaving behind whatever amount of lead is currently found on Plaintiffs' property.[1] His failure to even attempt defining the risk associated with any incremental level of lead from Defendants' facility renders his opinion unreliable.

*Second*, courts have routinely excluded experts who opine that *any* amount of a substance is unsafe, especially where, as here, such contaminants do not exceed applicable screening levels. Dr. Westerman's opinions are inconsistent with the United States Environmental Protection Agency ("EPA") and the Commonwealth of Kentucky screening levels. *See, e.g.*, U.S. EPA, *Regional Screening Levels Frequent Questions (Nov. 2020)*, https://www.epa.gov/risk/regional-

---

[1] Dr. Westerman concludes the average "background" of lead to be 23.68 parts per million ("ppm"). Yet, two of Plaintiffs' other experts claim Dr. Westerman told them to rely on two different "background" levels in forming their opinions. Neither of those experts rely on Dr. Westerman's 23.68 ppm level. Plaintiffs proffer Mr. Maurice Lloyd to attempt to tie Defendants' facility to the lead detected in the soil at Plaintiffs' properties by offering the opinion that any amount of lead detected above **40 ppm**—*i.e.*, the level he believes represents Dr. Westerman's "background"—is attributable to Defendants' facility. Plaintiffs proffer Mr. Paul Lanthier to opine that cleaning up to **30 ppm**—*i.e.*, the level he believes represents Dr. Westerman's "background" – is the appropriate remedy. This inconsistently calculated and applied "average" "background" is the result of Dr. Westerman's lack of scientific methodology and further undermines the reliability of all three experts.

screening-levels-frequent-questions (last visited July 10, 2021) (noting that screening levels are "considered by the Agency [EPA] to be protective for humans (including sensitive groups) over a lifetime").[2] The EPA has established the screening levels for lead at 400 mg/kg (parts per million) for residential properties and 800 mg/kg for industrial properties. *See id.* ("[S]oil lead levels less than 400 mg/kg are generally safe for residential use."). The Kentucky legislature has adopted those screening levels through KRS 224.1-530, which provides that "[n]otwithstanding any provision of law," the levels published by the EPA "are hereby established as screening levels."

Dr. Westerman's opinion that no amount of lead is safe is not science. It is a scare tactic that is no different than the "no safe dose" theory that plaintiffs' experts have attempted to use in a variety of cases around the country, and which have been routinely rejected. To be admissible, Dr. Westerman's opinions must be based on science, be reliable, and be helpful to the jury. None of these criteria are met here. As more fully set forth below, this Court should exclude Dr. Westerman's opinions.

## SUMMARY OF DR. WESTERMAN'S OPINION

Dr. Westerman concedes that "[a] level of 400 mg/kg [ppm] has been accepted by U.S. EPA as action level for surface soils."[3] (Westerman Rebuttal to Shields at 2.) Dr. Westerman nonetheless rejects the EPA screening levels and declares that "[t]he action level represents a

---

[2] Notably, even if lead levels on Plaintiffs' properties were 400 mg/kg, instead of being a fraction of that amount, that fact standing alone would not mean that remediation is necessary. Instead, it would merely trigger further inquiry into whether remediation might be necessary. *See id.*, explaining that screening levels "are not de facto cleanup standards and should not be applied as such. . . . Chemical concentrations above the [screening levels] would not automatically designate a site as 'dirty' or trigger a response action; however, exceeding a [screening level] suggests that further evaluation of the potential risks by site contaminants is appropriate."

[3] Dr. Westerman's Expert Report (Nov. 3, 2020) is attached as Ex. A ("Westerman Report"). Dr. Westerman's Rebuttal Report to Dr. Shields (Jan. 21, 2021) is attached as Ex. B ("Westerman Rebuttal to Shields"). Dr. Westerman's Rebuttal Report to Dr. Fedoruk (Jan. 21, 2021) is attached as Ex. C ("Westerman Rebuttal to Fedoruk"). Dr. Westerman's Sur-Rebuttal Report (June 18, 2021) is attached as Ex. D ("Westerman Sur-Rebuttal Report").

3

policy consideration that is not designed to prevent human health impacts." (*Id.*) That assertion simply is not accurate. The EPA screening levels are "considered by the Agency [EPA] to be protective for humans (including sensitive groups) over a lifetime." U.S. EPA, *Regional Screening Levels Frequent Questions (Nov. 2020)*, https://www.epa.gov/risk/regional-screening-levels-frequent-questions (last visited July 10, 2021). And specific to lead, "soil lead levels less than 400 mg/kg are generally safe for residential use." (*Id.*)[4]

The Commonwealth of Kentucky has specifically adopted the same lead screening levels. KRS 224.1-300 provides: "Notwithstanding any provision of law or administrative regulation to the contrary, the numerical values contained in the most current version of the document titled "Regional Screening Level (RSL) Table" published by the United States Environmental Protective Agency…are hereby established as screening levels and shall be used by the Cabinet in conformance with the guidance set out in the Risk-Based Concentration Table User's Guide." Dr. Westerman agrees the screening level for lead in residential soil is 400 mg/kg and in industrial soil is 800 mg/kg. Similarly, Kentucky's "Remediation requirements," which are required by KRS 224.01-530(2) to be "protective of human health, safety and the environment", state that contamination that does not exceed the residential screening value "does not otherwise require action" and "shall not rise to a level of concern under KRS 224.01-530." 401 KAR 100:030(4).[5]

Rather than applying the generally accepted EPA screening levels, Dr. Westerman

---

[4] *See* Deposition Transcript of Paul Lanthier, Jr. (Feb. 3, 2021) ("Lanthier Tr."), attached as Ex. E, at 63:23-64:08 (agreeing that the methodology in the EPA publication on which he purported to rely upon for his remediation estimates, which is based in part on the EPA's screening level of 400 ppm for lead in residential soils, "is intended to be protective of human health").

[5] The Kentucky Department of Public Health is also required by statute to promulgate administrative regulations relating to lead hazard detection and abatement. 902 KAR 48:040(14) provides that "Soil is considered to be a lead hazard on residential property or at a child occupied facility if the lead level exceeds (1) 400 parts per million in a play area; or (2) 1,200 parts per million of bare soil in the rest of the yard."

arbitrarily asserts, without supporting scientific analysis, that Defendants should clean up all soil located on each Plaintiff's property, whether residential or commercial, until it reaches what he believes is "Danville area background levels" found in parks (23.68 ppm),[6] instead of the 400 ppm level established by the EPA and statutorily adopted by the Commonwealth of Kentucky. (Westerman Report at 2.) At the heart of Dr. Westerman's opinion is his belief that "there is no safe level of lead." (Westerman Rebuttal to Fedoruk at 6-7 (characterizing lead toxicity as "the no known safe level of exposure voiced by the CDC [Centers for Disease Control and Prevention] and USEPA").) Dr. Westerman simply believes "the lower the level the safer it is," and because 23 ppm is less than 400 ppm, remediating to that level is "safer." (Westerman Tr. 132:02-132:13.)[7]

Dr. Westerman bases his opinion that no amount of lead is safe on his view that "[g]enerally, if anyone is asked if they would prefer being exposed to toxic chemicals at a level known to result in toxic effects or at a level calculated to reduce or minimize toxic effects, they would choose the latter." (Westerman Rebuttal to Fedoruk at 7.) Speculation as to what some unidentified person might think about a hypothetical question is not an admissible scientific opinion; it is an inadmissible scare tactic.

Dr. Westerman also purports to rely on an incongruent comment from the CDC that no amount of lead is safe. His reliance on that comment, however, is intentionally misleading. The CDC source on which he relies does not discuss lead levels in soil. It refers to **lead levels in children's blood**. (*See* Westerman Rebuttal to Fedoruk at 6.) The CDC explains that the safe level

---

[6] Again, Plaintiffs' remediation expert, Mr. Lanthier, opines that the proper remedy is to clean the soil to 30 ppm, 27% higher than Dr. Westerman's Danville park level. Plaintiffs' experts Lloyd and Kilpatrick rely on yet a different "background" level of 40 ppm. Dr. Westerman opines that all three levels are harmful and dangerous to human health.

[7] Deposition Transcript of Dr. Albert Westerman (Mar. 1, 2021) ("Westerman Tr.") is attached as Ex. F.

5

of lead in a child's blood has not yet been identified. That, however, has nothing to do with these property damage cases based on lead in the soil. Dr. Westerman mischaracterizes the CDC's statements and twists them to imply that there can be no safe level of lead in soil – an entirely different measurement and context. He then relies on that falsehood as his basis for abandoning the EPA screening levels that have been adopted by the rest of the scientific community.

Dr. Westerman admits it is difficult to define a clear relationship between toxic effects and the concentration of lead in soil (Westerman Tr. 40:19-41:13); that he has not seen any blood or tissue samples from anyone associated with the subject properties (*id.* 42:04-42:14); that he has not calculated what incremental lead blood level a child, adult, or worker would have from exposure to these properties (*id.* 90:09-91:17); and that he has not calculated the probability that exposure to any level of lead on the subject properties would have an adverse effect (*id.* 120:07-122:15). Instead, Dr. Westerman simply relates that if a child is exposed to 400 ppm as allowed by the EPA or the Commonwealth of Kentucky the chances for a toxic effect would be greater than if a child was exposed to 23.86 ppm. (*Id.* 121:18-122:15.)

Dr. Westerman does not quantify the harm or the "risk" associated with any specific amount of lead, including the harm from and "risk" created by his proposed remedy, which would leave behind at least 23.68 ppm of lead on Plaintiffs' properties. (Westerman Rebuttal to Shields at 2.) He offers only his belief that "[a]llowing contaminants such as lead to remain in soils in people's yards at levels that ***could*** result in toxic impacts on people living there ***does not seem appropriate*** as a cleanup level." (*Id.* (emphasis added).) Dr. Westerman does not indicate who other than he has concluded that amounts of lead detected on Plaintiffs' properties "does not seem appropriate." Nor does he explain the analytical process he used to determine what "could" happen if the EPA's widely accepted and applied screening levels were used.

6

Dr. Westerman's opinions are inherently inconsistent. If there is "no safe level" of lead, then his proposed remedy would not eliminate what he perceives to be the risks associated with the lead he would leave on each Plaintiff's property. Dr. Westerman's position is that his proposed remedy will diminish some theoretical risk to some arbitrary and unquantified degree, but it still would not eliminate that risk or create what he considers to be a safe environment. (*Id.* (concluding that "each day of exposure . . . can result in additional sequestering of those contaminants in people and the risk of detrimental health outcomes" without quantifying such "additional sequestering" or the resulting "risk").) Dr. Westerman, however, does not opine as to any analytical model or scientific framework by which anyone could determine the harm or quantify the risk, leaving the jury to speculate and do so on its own. Rather, Dr. Westerman's risk assessment concludes not only would it be unsafe for a child to play on the subject properties, it would be unsafe for any child to play in any Danville park for even one day per year. In fact, according to Dr. Westerman, the parks in Danville have lead in the soil 10 times higher than he submits would be safe to play in for one day per year. (Westerman Tr. 123:04-124:16.)

Dr. Westerman's opinions are speculative, unsupported by scientific literature, internally inconsistent, and based on an unquantified assumption that his proposed remedy would reduce any damage to Plaintiffs' properties by an unstated amount. (*See id.*) These "opinions" are not formulated to a reasonable degree of scientific certainty nor are they the result of any widely accepted scientific methodology. They are merely reflections of Dr. Westerman's personal beliefs, contradicted by Kentucky statutes, and are not admissible.

## LEGAL STANDARD

Expert testimony must meet certain requirements in order to be admissible. *See*, *e.g.*, *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); FED. R. EVID. 702. Trial judges are the "gatekeepers" with

7

regard to such evidence, allowing only reliable expert testimony to reach the jury and excluding that which is dubious. *Saint Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 666 F. Supp. 2d 820, 830 (N.D. Ohio 2009) (citing *Daubert*, 509 U.S. at 589). "[C]lose judicial analysis of expert testimony is necessary 'because expert witnesses are not necessarily always unbiased scientists.'" *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) (quoting *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992)).

In *In re Scrap Metal Antitrust Litigation*, the Sixth Circuit explained that a proposed expert's opinion is admissible under Rule 702, at the discretion of the trial court, if the opinion satisfies three requirements: (1) the witness is qualified; (2) the testimony is relevant, meaning that it "will assist the trier of fact"; (3) and the testimony is reliable. 527 F.3d 517, 529 (6th Cir. 2008). "The [trial court's] fundamental objective when considering the admissibility of 'expert' testimony is 'to ensure the reliability and relevancy of that testimony.'" *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (quoting *Kumho*, 526 U.S. at 152).

This Circuit has held that an expert must utilize in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009) (internal quotation marks omitted); *see also Kumho Tire*, 526 U.S. at 152 (essence of the reliability requirement is to ensure "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). To this end, an expert's opinions must be based on a reliable, scientific methodology supported by authoritative sources and accepted principles. It may not be based on an expert's *ipse dixit* or untested hypotheses. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that

8

is connected to existing data only by the *ipse dixit* of the expert.").

Nor may an expert's opinion be based on facts that do not exist in the record or that are contradicted by the record. *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) (expert testimony is inadmissible where conclusions are drawn from facts that are contradicted by the record evidence); *Kumho Tire*, 526 U.S. at 152 (when determining the reliability of an expert, courts should look to whether the expert employs the same "rigor" as an "expert in the relevant field"); *Barnette v. Grizzly Processing, LLC*, No. 10-77-ART, 2012 WL 293305, at *3 (E.D. Ky. Jan. 31, 2012) (excluding plaintiff's expert because his methodology was "not necessarily the traditional one that state and federal regulators use in their jobs").

The party seeking the admission of expert testimony bears the burden of proving the testimony meets the *Daubert* requirements by a preponderance of the evidence. *Pride v. BIC Corporation*, 218 F.3d 566, 578 (6th Cir. 2000). Plaintiffs cannot carry this burden.

## ARGUMENT

Dr. Westerman offers two opinions. ***First***, he opines that there is no safe level of lead in soil, so less lead is always "better" than more lead. ***Second***, he opines that the appropriate remedy is to clean the soil to leave only 23.68 ppm of lead in the soil on Plaintiffs' properties. To support his first opinion, that there is no safe level of lead, Dr. Westerman misapplies CDC commentary regarding blood lead levels in children to lead levels in soil, yet he admits he did not consider how incremental levels of lead in soil relate to blood lead levels in children. (Westerman Tr. 90:09-91:17.) He then piles conjecture upon supposition and asserts that in his view, if you ask anyone, they would prefer to have less lead in their soil than more. (Westerman Rebuttal to Fedoruk at 7.) This is not reliable scientific testimony.

To support his second opinion, that the soil should be cleaned to 23.68 ppm of lead, Dr. Westerman offers no scientific explanation whatsoever. None. He relies on his view that while

9

even one day's exposure to soil in the Danville parks is too much, less lead is better than more lead, and picks what he views as a local "background" level of lead. In doing so, he does not cite to literature or perform any analysis. In fact, to reach this conclusion, he must disregard the standards set by the EPA and Kentucky law—standards that are generally accepted and applied throughout Kentucky and the United States, and allow lead levels up to 400 ppm before even considering remediation. His explanation for disregarding these accepted standards is his belief they were not set for the purpose of establishing protective levels of lead. As noted above, his assertion is flatly incorrect: EPA screening levels are "considered by the Agency [EPA] to be protective for humans (including sensitive groups) over a lifetime." U.S. EPA, *Regional Screening Levels Frequent Questions (Nov. 2020)*, https://www.epa.gov/risk/regional-screening-levels-frequent-questions (last visited July 10, 2021); 401 KAR 100:030 ("KRS 224.01-530 establishes the Region 9 PRGs [Preliminary Remediation Goals] as screening values. Contamination on a property that does not exceed the residential value in the Region 9 PRGs . . . ***shall not rise to a level of concern under KRS 224.01-530***") (emphasis added).

Both opinions are inadmissible because they contradict applicable law, they are not the result of applying a reliable scientific methodology, and they are not based on sufficient facts or data. Dr. Westerman's opinions disregard the generally accepted and applicable EPA screening levels mandated by Kentucky statute, but he offers no scientific basis for his proposed standard to replace the Kentucky statute. An expert may not offer opinions, particularly those that break from the scientific mainstream without support to establish that they are reliable and will be helpful to a jury. Without such support, the opinions are inadmissible *ipse dixit*. *See, Joiner*, 522 U.S. at 146. Dr. Westerman's opinions lack the requisite support to survive exclusion under *Daubert*.

A.     **Dr. Westerman's Opinions Contradict Applicable Law.**

The Kentucky Supreme Court has recognized that "the mere presence of contaminants may only damage the property's reputation and not its use" and that, to recover under the common law, "some physical harm need[s] to be shown." *Smith v. Carbide & Chems. Corp.*, 226 S.W.3d 52, 56 (Ky. 2007) (citing *Rockwell Int'l Corp. v. Wilhite*, 143 S.W.3d 604 (Ky. App. 2003)); *Modern Holdings, LLC v. Corning, Inc.*, No. 13-405-GFVT, 2015 WL 1481457, at *5 (E.D. Ky. Mar. 31, 2015) ("it is not enough to show that these chemicals were merely present on the land; rather Plaintiffs must demonstrate that 'a hazard is presented by the [chemicals] in the concentrations found on the land[s] in question'"); *see also Mock v. Exxon Mobil Corp.*, No. 1:08-CV-2503-BBM, 2009 WL 10665142, at *10 (N.D. Ga. Dec. 21, 2009) (holding that because the levels of lead and arsenic on the plaintiff's property were below the EPA's screening levels, they could not give rise to a trespass or nuisance claim). Thus, Dr. Westerman's opinion is inconsistent with Kentucky law, will not assist the trier of fact, and is inadmissible as a result.

Numerous decisions addressing regulatory screening levels in similar situations have excluded experts and declined to hold defendants liable under the common law on the basis of regulatory exceedances alone. Exclusion is even more appropriate here because there are no exceedances of relevant standards.

As a recent federal court decision explained in regard to residents' claims that environmental contamination was allegedly affecting their health and properties:

> To begin with, screening levels do not reflect levels above which serious health effects may occur. Instead, ***they represent levels at which no effects are expected.*** They do not represent thresholds for adverse effects, either, as ***they have multiple conservatisms built in***. ***Exceeding a regulatory screening level thus does not indicate a risk of an adverse health effect.*** Exceeding a screening level does not even necessarily prompt any action or cleanup; further monitoring or assessment will sometimes be the only response.

*Schmucker v. Johnson Controls, Inc.*, 477 F. Supp. 3d 791, 823 (N.D. Ind. 2020) (emphasis added)

11

(citations omitted); *see also Mann v. CSX Transp., Inc.*, No. 1:07 Civ. 3512(DAP), 2009 WL 3766056, at *5 (N.D. Ohio Nov. 10, 2009) ("[T]he EPA soil cleanup level represents a threshold for the cleanup of contaminated soil, not a danger point above which individuals require medical monitoring."), *aff'd*, *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359 (6th Cir. 2011).[8]

Courts have excluded experts' opinions even where regulatory standards were exceeded, finding that an exceedance of a regulatory standard alone is not a reliable basis for concluding that the alleged exposures were harmful. An expert must offer some reasoned, scientifically reliable explanation for how and why the exceedance caused harm to the plaintiffs. *See, e.g.*, *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 880 (S.D. Ohio 2010) ("[T]o the extent that Dr. Dahlgren relies on the fact that Plaintiffs' illnesses were caused because they were exposed to benzene in excess of regulatory levels, his opinions are not admissible."), *aff'd*, 533 F. App'x 509 (6th Cir. 2013); *Nelson*, 243 F.3d at 252-53 (affirming the exclusion of an expert because it was a "significant flaw" to assume harm solely "because PCBs were present in the environment in excess of allowable limits"); *Coleman v. Union Carbide Corp.*, No. 2:11-0366, 2013 WL 5461855, at *35 (S.D. W. Va. Sep. 30, 2013) (observing that "regulatory soil screening levels are designed to allow parties to assess whether to voluntarily remediate an area impacted by a chemical," and exceedances do "not mean that a particular area is in fact a toxicological hazard"); *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 675 (7th Cir. 2009) (affirming the exclusion of an expert because "[e]ven if the plaintiffs were exposed to an unsafe level of PCE, it would not follow that it was the cause of their ailments"); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996) (noting that

---

[8] To further illustrate how far Dr. Westerman's opinions fall outside of the mainstream, one of Plaintiffs' other experts, Paul Lanthier, could not recall another project where lead-contaminated soil was remediated to background or naturally occurring levels, as Dr. Westerman opines should occur here. (Lanthier Tr. 56:02-57:09.)

12

"agencies' threshold of proof is reasonably lower than that appropriate in tort law" because of "the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances"); *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 212 (2d Cir. 2009) (noting that "the mere fact that some samples taken from the [] site may exceed [state remedial] standards provides an insufficient basis for a jury to find a reasonable prospect of future harm that is both near-term and potentially serious"); *Cantrell v. Ashland Inc.*, Nos. 2003-CA-001784-MR, 2003-CA-001865-MR, 2006 WL 2632567, at *9 (Ky. Ct. App. Sep. 15, 2006) ("[T]he appellants in this case have not shown that the mere presence of low levels of radiation would unreasonably interfere with their use and enjoyment of the properties" and thus "cannot recover damages [for] an unsupported fear of that radiation").

**B.     Dr. Westerman's Opinions Are Unreliable.**

The Court in *Daubert* noted that "widespread acceptance can be an important factor in ruling particular evidence admissible, and a 'known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (internal citations omitted). "[G]eneral acceptance in the scientific community remains a factor to be considered by the court in passing on the admissibility of an expert opinion." *Nelson v. Tenn. Gas Pipeline Co.*, No. 95-1112, 1998 WL 1297690, at *6 (W.D. Tenn. Aug. 28, 1998), *aff'd*, 243 F.3d 244 (6th Cir. 2001). "No safe dose" opinions such as Dr. Westerman's have been routinely rejected because they are unreliable and not accepted in the scientific community.

One of the central tenets of toxicology is that "the dose makes the poison." *Id.* at *18-19; *see also* Reference Manual on Scientific Evidence, 3d Ed., p. 636 (2011) (the concept of "the dose makes the poison," which is one of the "three central tenants of toxicology," "implies that all chemical agents are intrinsically hazardous – whether they cause harm is only a question of dose"). "A dose-response relationship is, while not necessary to infer causation, a factor to be considered

13

in determining the existence of a causal relationship." *Id.* at *19 (excluding expert's opinion because he "has been perfectly willing to assume that plaintiffs had a sufficient dose of PCBs to cause their illnesses and to give an opinion devoid of any information concerning dosage"). Dr. Westerman's supposition that any amounts of lead constitute a harm actionable at law ignores this general rule of toxicology.

Courts have routinely excluded these "any exposure" and "above background"-type opinions because they unreliably ignore this "central tenet" of toxicology. *See, e.g.*, *Baker*, 680 F. Supp. 2d at 885 (observing that "the no threshold or one-hit theory is not an accepted causation theory under *Daubert*"); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 679 (6th Cir. 2011) (finding "any exposure" "analysis unpersuasive, particularly because the levels of benzene in the Plucks' wells never exceeded the maximum permissible contaminant level of 5 ppb designated by the EPA"); *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 846 (E.D.N.C. 2015) ("Numerous courts have excluded expert testimony or evidence grounded in this [any exposure] theory, reasoning that it lacks sufficient support in facts and data." (citing cases)). In excluding an expert's opinion, the *Yates* court noted that "references to exposures 'above background' do not meaningfully distinguish his theory from other 'each and every exposure,' theories, because the same shortcomings that plague the latter equally apply to the former." *Id.* at 847. It is also an "amorphous concept" because "background levels vary widely between communities" such that there "is no standard or universality to background." *Id.* at 848. This Court properly should likewise disregard such arbitrary expert opinions.

C.   **Dr. Westerman's Opinions Will Not Assist the Trier of Fact.**

Not only are expert opinions that any exposure to a substance is harmful typically stricken as unreliable, they also are unhelpful to the trier of fact. For example, in *Pluck*, the Sixth Circuit affirmed the district court's exclusion of an expert who opined that "there is no safe level for

14

benzene," finding the analysis "unpersuasive, particularly because the levels of benzene in the [plaintiffs'] wells never exceeded the maximum permissible contaminant level of 5 ppb designated by the EPA." 640 F.3d at 679. In *Adams v. Cooper Industries*, No. 03-476-JBC, 2007 WL 1805586 (E.D. Ky. June 21, 2007), plaintiffs' proposed expert opined that any "levels above the mean are 'abnormal'" in attempting to tie contamination allegedly emitted from a facility to the town's residents. *Id.* at *4. The *Adams* court excluded the expert, noting that "this method would permit an expert to allege that roughly one-half of the United States population exhibits abnormal levels" of the contaminant, and "[s]uch a definition of abnormality would deprive the term of all meaning." *Id.* The *Adams* court additionally observed that the expert's "failure to account for the statistical spread or range of the [] data is a severe problem with his methodology." *Id.* Dr. Westerman's opinion suffers from this same "severe problem." *See id.*

As one court in the Western District of Kentucky put it: "Plaintiff must prove more than mere presence. Plaintiffs must prove that the PCB's harmed their property. The only way Plaintiffs can show harm is to show that PCB's in these amounts are a health hazard." *Mercer v. Rockwell Int'l Corp.*, 24 F. Supp. 2d 735, 752 (W.D. Ky. 1998). Plaintiffs there furnished an expert opinion very similar to Dr. Westerman's: "if there are additional PCB's on these properties, then there is an additional risk to health." *Id.* In excluding that opinion, the court concluded that the expert had "done no independent research on this subject," and did not cite any "scientific study or research to support his personal opinion," which led the court to conclude that his "above-background" opinion was "highly personal" and amounted to "little more than a strongly held and fervently stated belief." *Id.* at 752-53. This requirement is especially important where, as here, the case involves a ubiquitous substance like lead that is present in soil everywhere.

Dr. Westerman's fervently stated belief that 23.68 ppm should be the appropriate

15

remediation level is not tied to any analysis of an exposure to Plaintiffs that could result from that level, to any studies demonstrating harm at similar levels in soil, to any regulatory standards, or to any other scientific foundation. Dr. Westerman has offered no scientific analysis to support his chosen 23.68 ppm cleanup standard, and admits it is not only difficult to relate concentrations of chemicals in the environment to toxic effects (Westerman Tr. 40:19-41:13), but also that he has made no attempt to determine the incremental effect of exposure to Plaintiffs' soil, (*id.* 90:09-91:17), or the probability of an adverse effect from exposure (*id.* 120:07-122:15). He further admits his purported background level is above what he considers to be a safe level, but nevertheless falls back on his "less is better" opinion. (*Id.* 114:14-115:10, 121:18-122:15.) His willingness to opine that there is no safe level of lead in a child's blood, untethered to any analysis or quantification of how soil lead levels (levels that are an order of magnitude below EPA and Kentucky screening levels) actually will impact theoretical blood levels is not reliable science and it will not assist the trier of fact.[9]

## CONCLUSION

The mere fact that Dr. Westerman has a degree and experience in toxicology does not permit him to offer opinions that fly in the face of the scientific mainstream and that are contrary to generally-accepted standards adopted throughout the country. *See Barnette*, No. 10-77-ART, 2012 WL 293305, at *2 (excluding expert despite his credentials by observing that "a glittery resume and an impressive career do not necessarily open the door to federal court," and instead

---

[9] Defendants' experts have provided testimony that demonstrates the flaws in Dr. Westerman's approach. Dr. Fedoruk discussed how EPA screening levels and those set by the Commonwealth of Kentucky were "established by regulatory agencies for protection against adverse health effects in children and adults." (Dr. Fedoruk's Expert Report (Dec. 16, 2020) is attached as Ex. G ("Fedoruk Report"), at 24.) Notably, "Dr. Westerman's report provides no validation for this RfD [reference dose], which," to Dr. Fedoruk's knowledge, "has not been adopted by the EPA or other health or environmental regulatory agencies. Further, Dr. Westerman provides no evidence this soil level would be expected to result in any toxicity." (*Id.*)

16

"courts must ensure that an expert's opinion is reliable"). His opinions in this case are irrelevant, unreliable and contrary to Kentucky law.

Dr. Westerman's effort to set aside existing state and federal screening levels and replace them with an arbitrary substitute is unreliable and inadmissible. He defies applicable regulatory standards by opining that even the naturally occurring amounts of lead on Plaintiffs' properties (amounts that are far below regulatory standards and below his proposed surrogate standard) create an unlawful but unquantified health risk on Plaintiffs' properties. Dr. Westerman also fails to follow a sound scientific methodology to create and support the standard he thinks should supplant governing regulatory standards. Instead, his alternative standard is speculative and unsupported by scientific analysis that is generally accepted within the scientific community.

The inherent inconsistency in Dr. Westerman's opinions makes it impossible for Dr. Westerman to offer reliable scientific testimony. It is not possible for Dr. Westerman to offer a reasoned, reliable, and scientifically supported opinion that no amount of lead is safe on Plaintiffs' properties, while also offering a reasoned, reliable, and scientifically supportable opinion that it is appropriate to leave behind at least 23.68 ppm (or 30 ppm or 40 ppm or whatever value Plaintiffs' experts choose to use) on Plaintiffs' properties. These opinions conflict and prevent Dr. Westerman from properly supporting either opinion.

Rather than address the inherent inconsistency in his position through reliable scientific analysis, Dr. Westerman sidesteps the issue by avoiding any discussion, analysis, or risk assessment of incremental risk imposed by the lead in soils and blindly assumes that less is better. Dr. Westerman offers no basis for the jury to define or quantify the harm to any of Plaintiffs' properties, leaving it entirely to the jury's speculation, fomented by Dr. Westerman's warning that no amount of lead is safe. Dr. Westerman's opinions should be excluded.

17

Dated: July 15, 2020

Respectfully submitted,

Mark L. Durbin (*pro hac vice*)
Joseph F. Madonia (*pro hac vice*)
BARNES & THORNBURG LLP
1 N. Wacker Drive, Suite 4400
Chicago, Illinois 60606
312.357.1313

<u>/s/ Donald J. Kelly</u>
Donald J. Kelly
Jordan M. White
WYATT, TARRANT & COMBS, LLP
400 West Market Street Suite 2000
Louisville, Kentucky 40202
502.589.5235

COUNSEL FOR DEFENDANT CORNING INCORPORATED

<u>/s/ Brian M. Johnson (by DJK w/permission)</u>
Brian M. Johnson
Logan J. Mayfield
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
(859) 899-8700

COUNSEL FOR DEFENDANT
PHILIPS ELECTRONICS NORTH AMERICA CORPORATION

18

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of July, 2021, I electronically filed the foregoing with the clerk of the Court by using the CM/ECF system, which will send electronic notice to the following counsel of record:

- Evan McDonald Rice    erice@gettylawgroup.com
- George J. Miller    gmiller@wyattfirm.com, athompson@wyattfirm.com
- Jessica Katherine Winters    jwinters@gettylawgroup.com
- Joseph F. Madonia    jmadonia@btlaw.com
- Mark L. Durbin    mark.durbin@btlaw.com, cclifford@btlaw.com, lmauro@btlaw.com
- Peter N. Moore    peter.moore@btlaw.com
- Christine E. Skoczylas    christine.skoczylas@btlaw.com
- Richard A. Getty    rgetty@gettylawgroup.com, astith@gettylawgroup.com, klambert@gettylawgroup.com
- Mary Ann Getty    mgetty58@aol.com
- Donald J. Kelly    dkelly@wyattfirm.com, sneely@wyattfirm.com
- Matthew English    menglish@gettylawgroup.com
- Max Bridges    mbridges@wyattfirm.com, vhinton@wyattfirm.com
- Jordan M. White    jwhite@wyattfirm.com, lmattingly@wyattfirm.com

                                                   */s/Donald J. Kelly*
                                                   COUNSEL FOR CORNING INCORPORATED