UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| MODERN HOLDINGS, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | Civil No. 5:13-cv-00405-GFVT-EBA |
| | ) | |
| v. | ) | |
| | ) | |
| CORNING, INC., *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| Defendants. | ) | **ORDER** |
| | ) | |

\*\*\*\*\*  \*\*\*\*\*  \*\*\*\*\*  \*\*\*\*\*

This matter is before the Court on Defendants Philips Electronics North America Corporation and Corning, Inc.'s five motions to exclude the opinions of Plaintiffs' experts and Plaintiffs' five motions to exclude the opinions of Philips Electronics' experts.  [R. 482; R. 483; R. 484; R. 485; R. 487; R. 488; R. 489; R. 490; R. 491; R. 492.]  For the reasons that follow, the parties' motions will be **GRANTED IN PART** and **DENIED IN PART**.

**I**

The Plaintiffs in this case include multiple companies and numerous individuals who own property in close proximity to a glass manufacturing facility in Danville, Kentucky.  Corning, Inc. owned and operated the facility between 1952 and 1983 and Philips North America owned and operated the facility between 1983 and 2013.  [R. 211 at 2.]  Plaintiffs allege that they have suffered health problems and property damage because of the release or dispersion of hazardous materials from the glass manufacturing facility over the years.  Accordingly, Plaintiffs bring numerous tort claims, including nuisance, trespass, and negligence.  *See id.* at 63–78.  Although

these motions were initially brought against both Philips Electronics North America Corporation and Corning, Inc., Plaintiffs have reached a global settlement with Corning, Inc., contingent upon the Plaintiffs providing Corning with a settlement agreement executed by each Plaintiff within 120 days of December 8, 2021.  [R. 544.]

The lengthy procedural history of this action, which was originally filed in November, 2013, has been discussed in detail in previously issued Court orders.  [*See, e.g.*, R. 160 at 1–2.] Therefore, the Court focuses on the pending motions to exclude.  Defendants seek to exclude the opinions of Dr. Albert Westerman, Dr. Ranajit (Ron) Sahu, Paul Lanthier, Jr., Mr. Maurice A. Lloyd, and John Kilpatrick, Ph.D.  [R. 482; R. 483; R. 484; R. 485; R. 487.]  The Plaintiffs seek to exclude the opinions and testimony of Jerry Dent, Marion Fedoruk, John Iwanski, Walter Shields, and C.W. Wilson.  [R. 488; R. 489; R. 490; R. 491; R. 492.]

## II

### A

In a diversity case, federal law generally governs procedural and evidentiary issues, including the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Admissibility of expert testimony is governed specifically by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Sixth Circuit has identified three specific Rule 702 requirements in deciding the admissibility of proposed expert testimony.  *In re Scrap Metal Antitrust Litig.*, 527

2

F.3d 517, 528–29 (6th Cir. 2008); *see also United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016).  First, the proposed expert must have the requisite qualifications, whether it be through "knowledge, skill, experience, training, or education." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702).

Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting Fed. R. Evid. 702).  In determining whether an expert's testimony will be relevant, courts look to "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Rios*, 830 F.3d at 413 (quoting Fed. R. Evid. 702, Adv. Comm. Notes).

Third, the testimony must be reliable.  *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529. Rule 702 provides several criteria by which a district court, in its gatekeeper role, should gauge the reliability of expert testimony.  A court should look to whether the testimony is based upon "sufficient facts or data;" whether it is the "product of reliable principles and methods;" and whether the expert "has applied these principles or methods reliably to the facts of the case." *Id.* (quoting Fed. R. Evid. 702).  In determining reliability, a district court should also consider "such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94).  The reliability inquiry is a flexible one, and the above factors are not a "definitive checklist or test." *Daubert*, 509 U.S. at 593.

District courts have wide latitude in determining whether a particular expert's testimony

3

is reliable.  *See, e.g., Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").  Notably, in exercising this discretion, a court must be careful not "to impinge on the role of the jury or opposing counsel."  *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014).  Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

**B**

**1**

Defendants Corning, Inc. and Philips North America first seek to exclude the opinions of toxicology expert Dr. Albert Westerman.  [R. 482.]  Dr. Westerman, the Plaintiffs' expert on toxicology, opined that the "levels of lead present on Plaintiffs' properties are such that Plaintiffs are at risk of suffering adverse health consequences as a result of interacting with the soils on their properties."  [R. 511 at 2; *see also* R. 457-6.]  Given the level of lead in the soil, Dr. Westerman further opined that the use of Plaintiffs' properties should "be constrained in several concrete ways, including maintaining vegetative ground cover, prohibiting children from playing in the yards, avoiding dermal contact with soils, and avoiding ingesting vegetables grown on the properties."  *Id.*

Defendants argue in their motion to exclude that Dr. Westerman opines that (1) "there is no safe level of lead in soil, so less lead is always 'better' than more lead," and (2) "the appropriate remedy is to clean the soil to leave only 23.68 ppm of lead in the soil on Plaintiffs' properties."  [R. 482 at 9.]  Philips North America and Corning, Inc. argue that these opinions

4

contradict applicable law, are unreliable, and will not assist the trier of fact.  *Id.* at 11–14.

In this motion, Philips North America and Corning, Inc. do not contest Dr. Westerman's

credentials.  The issues are whether Dr. Westerman's opinions are consistent with applicable

law, whether the opinions are relevant and will assist the trier of fact in understanding the facts at

issue, and whether the opinions are reliable.  Just over four years ago, the Court denied the

Defendants' motion to exclude the opinions of Dr. Westerman in relation to a pending Motion

for Class Certification.  [*See* R. 287.]  After review, the Court again finds it appropriate to deny

the Defendants' motion to exclude the opinions of Dr. Westerman.

**a**

Defendants first argue that Dr. Westerman's opinions contradict applicable law because

many decisions "addressing regulatory screening levels in similar situations have excluded

experts" when the amount of contaminant at issue is below the EPA or state screening levels.[1]

[R. 482 at 11.]  However, as the Court has previously held, the fact that the level of contaminant

does not reach or exceed the EPA's screening level does not mean that Dr. Westerman's opinion

will not be helpful in determining common law liability.  [*See* R. 287 at 7.]  The claims against

the Defendants include nuisance, trespass, negligence, and battery.  These are statutory claims

that are not necessarily tied to EPA or state-imposed statutory cleanup standards.  *Id.*; *see also*

*Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 478 n.11 (S.D. Ohio 2004) (finding that

property damage may still occur even if "municipal water supply has been deemed safe by the

Ohio EPA and/or determined to be below the federal and state established maximum

---

[1] According to the EPA, "soil lead levels less than 400 mg/kg are generally safe for residential use."  United States
Environmental Protection Agency, *Regional Screening Levels Frequent Questions*, (Nov. 2021),
https://www.epa.gov/risk/regional-screening-levels-frequent-questions (last visited Jan. 31, 2022).  In Kentucky, the
screening levels promulgated by the EPA are the screening levels adopted by the state.  *See* KRS 224.1-530.

5

contaminant levels"); *Smith v. Carbide and Chem. Corp.*, 507 F.3d 372, 378 (6th Cir. 2007) (finding that for intentional trespass claims, "[p]roperty owners are not required to prove contamination that is an actual and verifiable health risk") (quoting *Smith v. Carbide and Chem. Corp.*, S.W.3d 52, 55 (2007)).  Accordingly, the Court finds that Dr. Westerman's opinions do not contradict applicable law.

**b**

Defendants next argue that Dr. Westerman's Opinions are unreliable.  [R. 482 at 13.] Specifically, the Defendants take issue with what they call Dr. Westerman's "no safe dose" opinion in which Dr. Westerman argues that no amount of lead is safe.  *Id.*  The Defendants cite to numerous cases to support the proposition that "no safe dose" opinions are routinely rejected by courts.  *Id.* at 14.

While Defendants may be correct that "no safe dose" opinions should be viewed with suspicion, the Defendants misunderstand Dr. Westerman's opinion.  As the Plaintiffs note, Dr. Westerman has not adopted a "no safe dose" opinion.  [R. 511 at 9.]  Instead, he stated that both the CDC and the EPA have explained that no known safe level of exposure to lead has been identified.  [R. 482-3 at 7.]  Dr. Westerman's opinion on the subject, therefore, is in line with the general view of lead toxicity.  In fact, Dr. Westerman's view is affirmed by the United States Department of Health and Human Services *Toxicological Profile for Lead*, which states that "[t]oxic effects of [lead] have been observed in every organ system that has been rigorously studied" and that "no safe level has been identified."  [R. 511-3 at 19.]  Dr. Westerman was also careful to support his opinions with relevant literature from sources such as scholars in the field, the United States Department of Health, the EPA, and the Kentucky Department for Environmental Protection.  [R. 511-2.]  Therefore, the Court finds that Dr. Westerman's opinions

6

are sufficiently reliable.

**c**

Finally, Defendants Philips North America and Corning, Inc. argue that Dr. Westerman's opinions will not assist the trier of fact, particularly the opinion that any exposure to lead is harmful. [R. 482 at 14.] Defendants also argue that Dr. Westerman's belief that "23.68 ppm should be the appropriate remediation level is not tied to any analysis of an exposure to Plaintiffs that could result from that level, to any studies demonstrating harm at similar levels in soil, to any regulatory standards, or to any other scientific foundation." *Id.* at 16.

In 2004, the Kentucky Natural Resources and Environmental Protection Cabinet promulgated the Kentucky Guidance for Ambient Background Assessment. [R. 511-1 at 2.] The Guidance "is intended to assist in comparing site data and background data for sites undergoing environmental assessment." *Id.* The statistical procedures within the Guidance document "may be used for site-specific data or the generic statement values." *Id.* This means, as Dr. Westerman states in his opinion, that the Guidance supports two different approaches to facilitate cleanups: (1) "utilize[ation of] statewide values determined through the collection of samples from industrial and other commercial properties across the state;" or (2) "develop[ment of] site-specific backgrounds based on levels in samples collected outside the facility releases." [R. 511-2 at 2.]

Dr. Westerman utilized the site-specific background approach to form his opinions. *Id.* at 2–3. Defendants' argument that Dr. Westerman merely "believed" or made up his analysis and that it lacks scientific support are not convincing. The 23.68 ppm remediation level comes from

7

"the average soil lead from 15 samples" collected in the Danville city parks.[2]  *Id.*  Therefore, the number relied on by Dr. Westerman comes from a method of data gathering and analysis supported by the Kentucky Guidance for Ambient Background Assessment.

Furthermore, Dr. Westerman discussed the levels of lead identified by the Plaintiffs' environmental expert, Maurice Lloyd.  Mr. Lloyd took more than 400 soil samples in the Danville area and found that lead levels in the soil of the Plaintiffs' properties "were substantially higher than the published ambient background concentrations for lead in the 2004 Kentucky Background Assessment study."  [R. 511 at 5.]  Mr. Lloyd concluded that each of the Plaintiffs' properties "had been impacted by particulate emanating from the Facility."  *Id.*

The appropriate inquiry in determining relevance is "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."  *Rios*, 830 F.3d at 413.  Lead contamination in ground soil is a topic an untrained layman would not be qualified to intelligently determine, and the Court finds that Dr. Westerman's opinion would provide enlightenment given his specialized understanding of the subject.  Accordingly, Corning, Inc. and Philips North America's motion to exclude the opinions of Dr. Westerman will be denied.

**2**

Corning, Inc. and Philips North America next seek to exclude the opinions of the Plaintiffs' standard of care expert Dr. Ranajit (Ron) Sahu.  [R. 483.]  In his report, Dr. Sahu

---

[2] If Dr. Westerman had utilized the statewide values instead of taking the site-specific background approach, the appropriate background level would have been 30 ppm.  [R. 511-1 at 9.]  Under the Kentucky Guidance for Ambient Background Assessment, both 23.68 ppm and 30 ppm are reasonable.

provided the following three opinions:

> Opinion 1 – Defendants Corning and Philips had an obligation to adopt, adapt, and implement best available practices and technologies to minimize environmental impact regardless of whether there were statutory obligations to do so because of the known hazard and toxicity of their emissions. Defendant's actions were contrary to the good and standard industry practices of the day.
>
> Opinion 2 – Defendants Corning and Philips failed to exercise reasonable care to protect the community and neighboring properties from air pollution emanating from the Danville facility. Defendants had an obligation to continually improve their environmental performance and apply good industry practices in a timely manner. Defendants Corning and Philips' actions regarding pollution control were egregious and reflect a willful disregard for acting responsibly with respect to protecting their neighbors from the harmful constituents their operations generated.
>
> Opinion 3 – Defendants Philips and Corning knew, or should have known, that emissions originating from their operations were escaping the facility boundary and had the potential to adversely impact off-site locations. Defendants Philips and Corning's failure to investigate the potential impacts of their pollution on the surrounding area during their operation of the facility reflects a long-term pattern of disregard for the environment and community.

[R. 483-1 at 4.]

The Defendants argue that Dr. Sahu's opinions are (1) irrelevant "because he applies the wrong legal standard in attempting to establish the standard of care;" (2) inadequate because Dr. Sahu failed to conduct his analysis using the appropriate benchmarking methodology; (3) insufficiently supported because Dr. Sahu failed to support his opinions with relevant peer-reviewed literature; and (4) inappropriate because Dr. Sahu testifies as to the Defendants' state of mind.  [R. 483 at 6, 9, 12, 18.]  In response, the Plaintiffs argue that Dr. Sahu's opinions are (1) reliable under *Daubert*; (2) helpful to a trier of fact; (3) "not impermissibly premised on aspirational standards;" (4) appropriately analyzed using benchmarking methodology; and (5) appropriately analyzed so as to avoid opining on the Defendants' state of mind.  [R. 512 at 9, 11, 17, 20, 24.]  Corning, Inc. and Philips North America do not contest Dr. Sahu's qualifications,

9

choosing instead to focus specifically on the relevance and reliability requirements of Rule 702. For the reasons set forth below, Corning, Inc. and Philips North America's motion will be granted in part and denied in part.

**a**

Corning, Inc. and Philips North America argue that Dr. Sahu found that the companies had violated the standard of care based on a "best practices" standard instead of basing his opinions on industry standards of care. [R. 483 at 6, 8.] The Defendants argue that Dr. Sahu's opinions are irrelevant and unhelpful to the jury because he relies on the incorrect standard of care. *Id.* at 6. In response, the Plaintiffs argue that the Defendants misunderstand Dr. Sahu's opinions. Plaintiffs argue that best practices or industry recommendations can constitute "relevant evidence of meeting a duty of care." [R. 512 at 18.] Furthermore, Dr. Sahu opines that "best" merely refers to "the most appropriate way to control an emission," not necessary the most advanced or costly method. [R. 483-1 at 49.] Dr. Sahu further provides that "Many Best Management Practices are low-cost to no-cost." *Id.*

The standard of care, particularly in negligence cases, is established "by looking to the conduct of the industry or profession in similar circumstances as of that date." *McKee v. Miles Laboratories, Inc.*, 675 F. Supp. 1060, 1064 (E.D. Ky. 1987) (citing *Ulrich v. Kasco Abrasives Co.*, 532 S.W.2d 197 (Ky. 1976)). Courts are split on whether to permit experts to opine about a company's failure to abide by "best practices." *Compare Archer v. Bond*, 2020 WL 4931397, at *2 (W.D. Ark. Aug. 21, 2020) ("[o]bviously, the Court will not permit Ms. McAleer to offer opinions based on a 'best practices' legal standard and Bond should object at trial if she attempts to do so"); *and MCI Commc'ns, Inc. v. Maverick Cutting and Breaking LLC*, 374 F. Supp. 3d 789, 808 (D. Minn. 2019) (finding that "best practices are not industry standards of care"

10

because "best practices are aspirational, generally requiring a higher standard of care than the industry standard of care"); *and Gross v. Baltimore Aircoil Co., Inc.*, 2016 WL 10607176, at *5 (S.D. Miss. Aug. 30, 2016) ("best practices are not the standard of care under a negligence theory"); *with In re E.I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*, 348 F. Supp. 3d 698, 724 (S.D. Ohio 2016) ("The expert may give his or her opinion that DuPont's conduct met, fell below, or rose above, those standards or common or best practices."); *and Myers v. Taylor*, 2015 WL 12763630, at *6 (N.D. W. Va. June 24, 2015) (permitting expert testimony that police officers "complied with national training and operational guidelines and best practices"); *and Dragna v. A & Z Transp.*, 2014 WL 5801515, at *2 (M.D. La. Nov. 7, 2014) ("the Court will allow each party's expert to provide their respective opinions regarding best practices for freight carrier selection").

Here, the Court finds that the following portion of Dr. Sahu's first opinion is inappropriate and should be excluded: "Defendants Corning and Philips had an obligation to adopt, adapt, and implement best available practices and technologies to minimize environmental impact regardless of whether there were statutory obligations to do so because of the known hazard and toxicity of their emissions."  [R. 483-1 at 46.]  To support this opinion, Dr. Sahu explicitly pointed to organizations "that have historically promoted [Best Management Practices]" such as the World Bank, the World Health Organization, the Association of American Railroads, and others.  *Id.* at 47.  However, noticeably absent from this list, or from his support for the opinion in general, is any reference to industry standards within the glass manufacturing industry.  After all, the standard of care is generally established "by looking to the *conduct of the industry or profession in similar circumstances* as of that date."  *McKee v*, 675 F. Supp. at 1064 (emphasis added).

11

Dr. Sahu was asked during his deposition about why he did not tether his opinion to the glass manufacturing industry specifically, and he stated that he did so intentionally because "to look specifically at glass manufacturing" would have been "irrelevant." [R. 483-2 at 16.] To further emphasize this point, Dr. Sahu stated that he was not going to "waste [his] time looking at what was going on at other glass manufacturers" and he confirmed that he did not identify any glass manufacturing facilities in operation between 1983 and 2011 that would have met the standard of care. *Id.* The Court finds that even if opining on best practices would have been appropriate in this case, Dr. Sahu is not in a position to do so based on the fact that he intentionally ignored the very industry at issue in this case.[3]

Furthermore, while Dr. Sahu listed organizations "that have historically promoted [Best Management Practices] and listed examples of "good practices," [R. 483-1 at 46] he did not explain whether these practices were routinely occurring in the glass manufacturing industry (or any related industry, for that matter)[4] during the operation of the glass manufacturing plant at issue in this case. *See McKee v*, 675 F. Supp. at 1064. In fact, Plaintiffs agree "that the standards and practices recommended by these organizations are voluntary." [R. 512 at 13.] The point that certain technology existed to limit lead pollution while the glass manufacturing plant

---

[3] The issue here is not that Dr. Sahu looked to other industries to formulate his opinions. It can sometimes be the case that other, particularly similar, industries can provide helpful context and background. The issue is that he *exclusively* looked to other industries and intentionally ignored reviewing the standards and practices of the glass manufacturing industry when forming his opinions. Dr. Sahu also further eroded his credibility in this regard during his deposition. When he was asked to identify "between 1952 and 1983 a glass manufacturing facility that, in [his] view, would have met the standard of care." *Id.* He answered that "all [glass manufacturers were] not doing any of it," implying that every glass manufacturer in America failed to meet the standard of care between 1983 and 2011. [R. 483-1 at 16.]

[4] Dr. Sahu opined that certain air pollution control technologies existed (such as baghouses and cyclones, Electrostatic Precipitators, and wet scrubbers) and were being used to some degree in other industries before the glass manufacturing plant at issue in this case was built. [R. 483-1 at 56.] For example, 2,855 Electrostate Precipitators "had been installed across a wide range of applications" by 1957. *Id.* However, the fact that certain technologies were being used at some level does not mean that a failure to use such technologies violated the standard of care.

12

was in operation is well taken. Dr. Sahu provides that certain pollution control technologies "date back to as early as the late 19th century" and that several pollution technologies were in use by the time the glass manufacturing plant was constructed. [R. 483-1 at 56.] However, Dr. Sahu failed to provide an example of a single glass manufacturing plant in operation in the United States between 1983 and 2011 that implemented the practices he recommends, much less a regulation or law that required a manufacturing plant to do so.

The Court also takes issue with Dr. Sahu's statement that Philips North America and Corning, Inc. were obligated "to adopt, adapt, and implement best available practices…regardless of whether there were statutory obligations to do so." [R. 483-1 at 46.] While companies should always strive to be good stewards of their resources and actively endeavor to limit negative environmental impacts, the law does not punish companies for failing to do what the benefit of hindsight indicates they could have done. "[T]he critical question for the jury in this case is whether the defendant corporations did what the law required them to do, not whether, from a societal perspective, they did what an 'ethical corporation' should have done." *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at *20 (N.D. Ohio Aug. 8, 2005).

Accordingly, the Court finds that while Dr. Sahu may opine about whether the "Defendant's actions were contrary to the good and standard industry practices of the day," the first sentence of Dr. Sahu's first opinion discussing best practices shall be excluded. [R. 483-1 at 46.] Although Defendants seek the exclusion of all of Dr. Sahu's opinions on the basis that his opinions all rest on a "best practices" framework [*see* R. 483 at 10], the Court finds that only a portion of his first opinion should be excluded on that basis.

13

**b**

Corning, Inc. and Philips North America next argue that Dr. Sahu "failed to use a reliable methodology to define the standard of care." [R. 483 at 9.]  Specifically, Corning, Inc. and Philips North America argue that Dr. Sahu failed to use "[t]he accepted methodology to conduct this analysis," which is "benchmarking."  *Id.*  In response, Plaintiffs argue that Dr. Sahu employed appropriate methods, and that his opinions are "based on historic records, accepted industry standards and the Defendants' own uncontradicted poor record of regulatory compliance." [R. 512 at 24.]

Corning, Inc. and Philips North America rely on an unpublished opinion from the Northern District of Alabama for the proposition that "the accepted methodology to conduct" a standard of care analysis is "benchmarking." [R. 483 at 9 (citing *Brantley v. Int'l Paper Co.*, 2017 WL 3325085, at *1 (M.D. Ala. Aug. 3, 2017)).]  However, although benchmarking is an accept methodology to conduct standard of care analysis, *Brantley* does not bind this Court and neither the Sixth Circuit nor any district court within the Sixth Circuit have held that benchmarking is the only acceptable way to analyze the standard of care.[5]  Therefore, the question the Court must answer is whether Dr. Sahu used reliable methodology in rendering his opinions.  With the exception of the portion already excluded, as discussed above, the Court finds that he did.

*Daubert* instructs that the reliability inquiry is a flexible one.  509 U.S. at 593.  Courts may consider "such factors as testing, peer review, publication, error rates, the existence and

---

[5] A Westlaw search revealed that only two Sixth Circuit cases have used the term "benchmarking."  *See Tharo Sys., Inc. v. Cab Produkttechnik GMBH & Co. KG*, 196 F. App'x 366 (6th Cir. 2006); *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394 (6th Cir. 2004).

maintenance of standards controlling the technique's operation, and general acceptance in the

relevant scientific [or technical] community." *Langan*, 263 F.3d at 621 (6th Cir. 2001) (citing

*Daubert*, 509 U.S. at 593–94).

Here, Dr. Sahu states that he relied upon and considered the following sources:

> I have considered a large volume of records including but not limited to process flow sheets, engineering drawings, material safety data sheets, plot plans, stack test reports, material balances, production records, corporate internal memoranda and correspondence, engineering studies, reports on operational practices, third-party inspection reports, testimonies and affidavits of corporate representatives and fact witnesses, soil and water testing results, wastewater testing, waste estimates, facility permits, environmental site assessments, aerial photographs and satellite images, WWW sources, and various other records. I have supplemented my review with authoritative publications from industrial, regulatory, and academic presses.

[R. 483-1 at 8.]  In reaching his opinions, Dr. Sahu reviewed materials in the record in addition

to conducting benchmarking analysis with other, similar industries reviewing EPA

recommendations, and the Defendants' own records.  Accordingly, the Court finds that Dr. Sahu

used reliable methodology in forming his opinions and will not exclude his opinions on that

basis.

### c

Corning, Inc. and Philips North America next argue that Dr. Sahu's opinions "are not

supported by the relevant peer-reviewed literature."  [R. 483 at 12.]  In response, the Plaintiffs

argue that not all of the *Daubert* factors apply with equal force or importance.  [R. 512 at 9.]

Corning Inc. and Philip North America's argument fails because peer review is not

required.  As the Court has previously discussed, peer review is one of several factors that the

Court may consider in determining reliability.  *Langan*, 263 F.3d at 621 (citing *Daubert*, 509

U.S. at 593–94).  The reliability inquiry is a flexible one, and the above factors are not a

15

"definitive checklist or test." *Daubert*, 509 U.S. at 593. Expert opinions are not necessarily unreliable "simply because they have not been subjected to the crucible of peer review, or [] their validity has not been confirmed through empirical analysis." *Jesa Enters. Ltd. v. Thermoflex Corp.*, 268 F. Supp. 3d 968, 974 (E.D. Mich. 2017).

Dr. Sahu has more than thirty years of experience in environmental, mechanical, and chemical engineering, and he reviewed "documents in the record relating to pollution control at the Facility," considered available pollution control devices during the relevant timeframe, and benchmarked the Defendants' practices with those in related industries and those of other industry actors. [R. 512 at 11.] Just because Dr. Sahu reviewed different documents or employed different methods in reaching his opinions than the Defendants' expert does not mean that his opinions are unreliable. Accordingly, the Court finds that Dr. Sohu's methods and experience render his expert testimony reliable, allowing the jury to decide the persuasiveness of his testimony. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529.

### d

Finally, Corning, Inc. and Philips North America argue that "Dr. Sahu's legal conclusions and opinions regarding Defendants" state of mind" should be excluded. [R. 483 at 18.] Corning, Inc. and Philips North America argue that "Dr. Sahu has improperly filled his report with opinions about Defendants' state of mind and intent." *Id.* For example, Dr. Sahu stated that Corning Inc. and Philips North America engaged in "a long-term pattern of reckless disregard," "willful disregard," and "willful neglect." [R. 483 at 18–19.] Plaintiffs respond that Corning, Inc. and Philips North America cherry picked "isolated portions of [] Dr. Sahu's lengthy reports" and that Dr. Sahu's "opinions in this regard are based upon his review of the evidence of record." Plaintiffs do concede, however, that if the Court finds that Dr. Sahu did improperly opine on

16

Corning, Inc. and Philip's North America's state of mind, the appropriate remedy is to "address any attempts to actually use such terms or phrases at trial." *Id.* at 24–25.

Corning, Inc. and Philips North America are correct that "Courts have typically barred expert opinions or testimony concerning a corporation's state of mind, subjective motivation, or intent." *Schall v. Suzuki Motor of America, Inc.*, 2020 WL 1162191, at *6 (W.D. Ky. Mar. 10, 2020) (quoting *In re E.I. du Pont de Nemours and Co. C-8 Pers. Injury Litig.*, 348 F. Supp. 3d 698, 718 (S.D. Ohio 2016)). The proper remedy is not to bar Dr. Sahu's testimony in its entirety.[6] Instead, the Court will exclude Dr. Sahu's legal conclusions and opinions regarding Defendants' state of mind that were raised in Corning, Inc. and Philips North America's motion. Furthermore, to the extent that Dr. Sahu attempts to testify at trial regarding the Defendants' state of mind, Plaintiffs may properly object. Accordingly, for the reasons explained above, Corning, Inc. and Philips North America's Motion to Exclude is granted in part and denied in part.

### 3

Corning, Inc. and Philips North America next move to exclude the opinions of Mr. Lanthier, Jr., the Plaintiffs' remediation expert. [R. 484.] Mr. Lanthier was retained by the Plaintiffs to determine what remediation efforts would be appropriate and to calculate the costs of those remediation efforts. [R. 484-1.] In his expert report, Mr. Lanthier briefly described the properties of the bellwether Plaintiffs, recommended a course of remedial action given the levels of lead in the soil, and provided a cost estimate as to each property. *Id.* Mr. Lanthier specifically

---

[6] In reply, Defendants agree with this conclusion. [R. 520 at 10.] Instead, Defendants specifically ask that "the Court [] preclude him from attempting to express any legal conclusions or personal opinions or otherwise speak to the Defendants' state of mind." *Id.*

proposed "excavation and removal of affected soils to a depth of two feet below ground surface (BGS), backfill of the excavation to grade with clean soil and restoration of the vegetative cover to approximately pre-excavation conditions." *Id.* at 15.

Corning, Inc. and Philips North America argue that Mr. Lanthier's opinions should be excluded because he (1) failed to apply a reliable method in reaching his conclusions; (2) provided opinions that are not based on data; (3) provided opinions regarding the commercial properties that are not supported by his own methods and diverge from generally-accepted standards; and (4) provided opinions that were "made for litigation" and not consistent with an environmental-remediation professionals' typical practice and are not appropriate under Kentucky law. *Id.* at 6, 9, 11, 12, 13. In response, the Plaintiffs argue that Mr. Lanthier's opinions use reliable methods, are supported by the work of other Plaintiffs' experts, and that Mr. Lanthier's opinions must be analyzed within the narrow context in which they were intended. [R. 514 at 9, 12, 15.] Corning, Inc. and Philips North America do not challenge Mr. Lanthier's qualifications, only the relevance and reliability of his opinions. Although the Court finds that Mr. Lanthier utilized reliable methods and relied on appropriate data, Mr. Lanthier's opinions shall be excluded in their entirety as irrelevant under Kentucky law.

**a**

Corning, Inc. and Philips North America first argue that Mr. Lanthier failed to apply a reliable method in reaching his opinions. The primary point of contention is that he failed to completely follow the EPA's Handbook that "provides a roadmap of the recommended clean-up process for lead-contaminated residential sites." [R. 484 at 6.] However, as the Court has previously held (and reiterated in the context of Dr. Westerman's opinions *supra*), the fact that the level of contaminant does not reach or exceed the EPA's screening level does not mean that

Mr. Lanthier's opinion will not be helpful in determining common law liability.  Mr. Lanthier's opinion followed the 2004 Kentucky Guidance for Ambient Background Assessment in using the 30 mg/kg number as the "safe" level of lead in soil.  [R. 484-1 at 20.]  As stated supra, the 2004 Kentucky Background Assessment document provides that the mean lead in soils throughout the Commonwealth is 30 mg/kg, though individuals may also gather samples to develop site-specific background concentrations.

Furthermore, the fact the Mr. Lanthier's opinion differed from the EPA's Superfund Handbook is reasonable because the Handbook is merely a guidance document.  The Handbook is not in and of itself law, policy, or binding on any party.  Instead, the Handbook merely contains "minimum considerations" and "project manager[s] [are] encouraged to use site-specific considerations in making final decisions."  [R. 485-2 at 4.]  If that was not clear enough, the Handbook explicitly includes a disclaimer that states it "is not a regulation itself" and "cannot impose legally-binding requirements" on anyone.  *Id.* at 9.  Parties may raise objections or questions about the Handbook and those utilizing the Handbook are free to "adopt approaches on a case-by-case basis that differ from this guidance where appropriate."  *Id.*  Therefore, it was reasonable of Mr. Lanthier to rely on certain portions of the Handbook but also to differ in his opinions based upon his professional experience and to provide opinions that take into account the particular circumstances of the properties at issue in this case.  Failing to follow the Handbook to the letter is not a sufficient ground for dismissing Mr. Lanthier's opinions.

Furthermore, the Court finds that Corning, Inc. and Philips North America's characterization of Mr. Lanthier's opinion as merely being "told" the remedy and then quantifying it for litigation purposes is somewhat disingenuous.  The work of conducting soil samples, analyzing the samples, and conducting cost assessments on remediation work is not

required to be done by one individual.  Neither the EPA Handbook or any other authoritative source holds otherwise.  *See Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 396 (W.D. Ky. 2018) ("pursuant to Rule 703, an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts").  Here, Plaintiffs' environmental engineer Maurice Lloyd collected more than 400 soil samples in the Danville area and averaged the samples taken from the bellwether Plaintiffs' properties.  [*see* R. 514 at 5.]  The Plaintiffs' toxicological expert Dr. Westerman then opined that level of lead present on the Plaintiffs' properties put the Plaintiffs at risk of suffering serious health consequences.  *Id.* at 2.  Then, given the work of the Plaintiffs' other experts, Mr. Lanthier determined the appropriate remediation plan and estimated its cost.  The Court finds that it was reasonable of Mr. Lanthier to "review[] site assessments and risk assessments performed by other experts" in making his opinions.  [R. 524 at 13.]

**b**

Corning, Inc. and Philips North America next argue that Mr. Lanthier's opinion, that the soil on the bellwether properties should be excavated to two feet, is based on speculation instead of data.  [R. 484 at 9.]  Corning, Inc. and Philips North America argue that Mr. Lanthier "has no basis to conclude that excavation to two feet is required or, alternatively, that it would be adequate."  *Id.*

While the Court does not find the EPA Handbook on which Mr. Lanthier purportedly relied to conflict with Mr. Lanthier's opinion that properties should be excavated to two feet,[7]

---

[7] The Handbook provides that "it is strongly recommended that a *minimum* of twelve (12) inches of clean soil be used to establish an adequate barrier from contaminated soil in a residential yard for the protection of human health. [R. 484-2 at 52 (emphasis added).]  Furthermore, the Handbook explicitly recommends removal of twenty-four inches of lead-contaminated soil "at sites in cold regions with non-soil lead-contamination sources, such as tailings

Corning, Inc. and Philips North America are correct that the data on which Mr. Lloyd relied failed to support his conclusion.  This is because the soil data which Mr. Lanthier used to create his initial cost estimates only extended to a depth of one foot, not two feet.  The Plaintiffs admitted this fact in their Response.  [*See* R. 514 at 15.]  For this reason, Mr. Lanthier supplemented his initial report with "a cost estimate for remediation to a depth of only one foot." [R. 484-5; R. 514 at 15.]  The Court finds that while Mr. Lanthier's initial opinion that soil on the bellwether properties should be excavated to two feet lacks a factual basis[8] and will be excluded, the Supplemental Report providing a cost estimate for remediation at a depth of one foot is sufficiently supported by the data and will not be excluded on the basis of speculation.

c

Corning, Inc. and Philips North America next argue that "Mr. Lanthier's opinions regarding the commercial properties are not supported by his own methodology and depart from generally-accepted standards."  [R. 484 at 11.]  Corning, Inc. and Philips North America provide two primary reasons for this: (1) The EPA Handbook "applies only to residential properties," and (2) the Kentucky Department for Environmental Protection already determined that the Sellers and Sellers property at 416 West Walnut had already been remediated.  *Id.*

While it is true that the EPA Handbook applies primarily to residential properties, the Handbook explains that "some of the concepts" contained within the Handbook "may be useful for" commercial or industrial properties as well.  [R. 484-2 at 16.]  Therefore, it was not unreasonable for Mr. Lanthier to apply certain principles from the Handbook to his opinions and

---

and crushed battery casings, and whenever it is cost-effective."  *Id.*  A recommendation calling for the removal of twenty-four inches of topsoil does not conflict with or contradict the Handbook's guidance on the subject.

[8] Mr. Lanthier testified that in his experience "to be protective" excavating two feet was appropriate.  [R. 484-3 at 9.]  However, he agreed that the data he relied on only analyzed the soil to a depth of twelve inches.  *Id.*

cost estimates regarding the commercial properties generally.

Specifically with regards to the Sellers and Sellers property at 416 West Walnut, however, the Plaintiffs failed in their response to address the fact that the property has already been remediated, at least to a level in compliance with KRS 224.1-400. The Court is cognizant of the fact that the level of lead in soil that is permissible under KRS 224.1-400 is much higher than the 30 mg/kg level discussed by Mr. Lanthier. However, "[w]hen a party fails to respond to a motion or argument therein, the Sixth Circuit has held that the lack of a response is grounds for the district court to assume opposition to the motion is waived, and grant the motion." *Powell v. Tosh*, 2013 WL 12234610, at *15 (W.D. Ky. Oct. 21, 2013); *see also Humphrey v. U.S. Atty's Office*, 279 F. App'x 328, 331 (6th Cir. 2008). Therefore, the Court will grant Corning, Inc. and Philips North America's Motion to Exclude Mr. Lanthier's opinions related to remediation costs to the Sellers and Sellers property at 416 West Walnut.

### d

Finally, Corning, Inc. and Philips North America argue that Mr. Lanthier's opinions "were developed for litigation and are inconsistent with environmental-remediation professionals' typical practice." [R. 484 at 12.] Corning, Inc. and Philips North America support their argument by stating that apart from this case, Mr. Lanthier "could not recall a single situation in his environmental-remediation practice where he did not use a cleanup standard that was higher than the background level." *Id.* Furthermore, Corning, Inc. and Philips North America argue that the costs and figures reached by Mr. Lanthier are not even recoverable under Kentucky law. *Id.* at 13.

Plaintiffs failed to respond to Corning, Inc. and Philips North America's argument that Mr. Lanthier's opinions "were developed for litigation" and therefore should be excluded. [R.

484 at 12.]  Given the fact that Mr. Lanthier has more than twenty years of environmental investigation and remediation experience [*see* R. 484-1 at 34] and this is the only project in which the project was to remediate the lead in soil to naturally occurring levels, the Court is concerned that Mr. Lanthier's opinions were developed for litigation.  [R. 484-3 at 12.]  The Sixth Circuit has provided that "expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution."  *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007).

Corning, Inc. and Philips North America also argue that Kentucky law does not permit the Plaintiffs to recover remediation costs that are in excess of the property's value.  [R. 484 at 13.]  Plaintiffs admit that the costs to remediate the Plaintiffs' properties, to either a one-foot or two-foot depth "are in excess of the diminution in value of the properties as established by the Plaintiffs' expert John Kilpatrick."  [R. 514 at 8.]  Under Kentucky law, "the amount by which the injury to the property diminishes its total value operates as an upper limit on any damage recovery."  *Ellison v. R & B Contracting, Inc.*, 32 S.W.3d 66, 70 (2000).  "The effect of *Ellison* is to prevent a claimant from seeking cost of repair damages that exceed the diminution in fair market value"  *Mountain Water Dist. v. Smith*, 314 S.W.3d 312, 315 (Ky. App. 2010).  Here, the Plaintiffs admit that the costs to remediate the Plaintiffs' properties "are in excess of the diminution in value of the properties," which *Ellison* explicitly forbids.  [R. 514 at 8.]  Plaintiffs already have an expert opining on the diminution in value of the properties.  Therefore, because the cost to remediate is in excess of the diminution in value of the Plaintiffs' properties, the Court will grant Corning Inc. and Philip North America's motion to exclude Mr. Lanthier's opinions in their entirety as irrelevant and unhelpful to the trier of fact.  *In re Scrap Metal*

23

*Antitrust Litig.*, 527 F.3d at 529.

## 4

Corning, Inc. and Philips North America next seek to exclude the opinions of Mr. Maurice A. Lloyd in their entirety. [R. 485.] The Plaintiffs retained Mr. Lloyd to "determine the extent of the contamination emanating from the facility." [R. 510.] On February 10, 2022, the parties filed a Joint Status Report informing the Court that Mr. Lloyd had passed away. [R. 566.] Plaintiffs filed a Motion to Substitute Expert, which Magistrate Judge Atkins granted on February 16. [R. 567; R. 568.] Accordingly, Corning, Inc. and Philips North America's motion to exclude the opinions of Mr. Maurice Lloyd will be denied as moot.

## 5

Corning, Inc. and Philips North America also seek to exclude the testimony of Dr. John Kilpatrick, the Plaintiffs' real estate valuation and mass appraisal methodologies expert. [R. 487.] The Plaintiffs hired Dr. Kilpatrick to "determine the diminution in value for the Plaintiffs' residential and commercial properties." [R. 513 at 2.] Dr. Kilpatrick described his role in this litigation as follows:

> My assignment has been to appraise each of the residential and industrial properties of the named plaintiffs in both an unimpaired and impaired condition. To accomplish this, I have used an Automated Valuation Model to find the unimpaired value of the residential properties, as if the contamination had never occurred. I relied on appraisals performed by local appraisers to appraise the industrial properties in a hypothetical unimpaired condition. In addition, I have appraised each of these properties in the "as-is" condition, determining if the value is diminished as a result of the contamination. The difference between these two values, if any, is the property value diminution for each property.

[R. 487-2 at 9.] Dr. Kilpatrick ultimately concluded "to a reasonable degree of certainty within the appraisal discipline, that property value diminution is 30% for the residential properties and approximately 30% for the industrial properties." *Id.* at 10. Although Dr. Kilpatrick utilized a

mass appraisal methodology, his analysis yielded "an individual damages figure for each Plaintiff" [R. 513 at 5.] As opposed to using an "[i]ndividual property valuation method" which "typically rel[ies] on small samples of comparable sales," Dr. Kilpatrick used a mass appraisal system that "looks at the broader geographical pattern and incorporates spatial analysis techniques results in stable, scientifically valid estimates of value impacts." [R. 487-2 at 18.]

Corning, Inc. and Philips North America argue that Dr. Kilpatrick's opinions should be excluded for the following reasons: (1) he inappropriately uses mass appraisal methodology; (2) he fails to rely on actual sales data to render his opinions; (3) he speculates about the existence of environmental stigma and its impact on the Plaintiff's property values; (4) he inappropriately "permits recovery for a speculative future market impact;" and (5) he relies on inapposite literature and case studies. [R. 487 at 8, 13, 15, 20, 22.] Corning, Inc. and Philips North America do not challenge Dr. Kilpatrick's credentials.[9]

<strong>a</strong>

Corning, Inc. and Philips North America first argue that Dr. Kilpatrick inappropriately relied on mass appraisal methodology in this case. *Id.* at 8. Each property is unique, they argue, and it was wrong of Dr. Kilpatrick to "apply a mass appraisal methodology to [] six residential properties." *Id.* at 9.

While applying mass appraisal methodology to six residential properties may not have been the most precise method, use of mass appraisal methodology alone does not render Dr.

---

[9] The Court is aware that Dr. Kilpatrick has been retained as an expert in numerous lawsuits around the country, and Defendants point to nine cases they are aware of in which Dr. Kilpatrick's expert opinions have been excluded. [R. 487 at 1.] However, exclusion of an expert's opinions in one case does not mean that same expert's opinions must be excluded in another case, particularly in cases in district courts in other circuits. Dr. Kilpatrick's case list indicates that he has provided expert opinions in at least thirty-five cases. [R. 513-6.] Here, the Court will apply the law of the Circuit as provided in Section II.B supra to the facts of the case to determine whether Dr. Kilpatrick's opinions should be excluded.

Kilpatrick's opinions inadmissible. First, mass appraisal methodology is widely accepted by courts across the country. *See, e.g.*, *Andrews v. Plains All Am. Pipeline, L.P.*, 2018 WL 2717833, at *6 (C.D. Cal. Apr. 17, 2018) (approving the use of mass appraisal methodology); *Mass Mut. Life Ins. Co. v. DB Structured Prods, Inc.*, 2015 WL 2130060, at *9 (D. Mass. May 7, 2015) (finding Dr. Kilpatrick's use of automated valuation models relevant and reliable, particularly given that Dr. Kilpatrick's "methodology can be adequately tested on cross examination"); *In re Katrina Canal Breaches Consol. Litig.*, 2007 WL 3245438, at *13 (E.D. La. Nov. 1, 2007) (finding that "mass appraisal is an accepted methodology…it is a recognized standard under Rule 6 of the Uniform Standards of Professional Appraisal Practice" and "is used in appraiser's offices all over the country to determine value").

Second, while Corning, Inc. and Philips North America believe that Dr. Kilpatrick should have used a different method than an automatic valuation model, "any criticism of the expert appraiser's chosen approach goes to the weight of [his] testimony and not admissibility, and thus is a proper matter for cross-examination" rather than exclusion. *Powell v. Tosh*, 942 F. Supp. 2d 678, 691 (W.D. Ky. 2013) (quoting *Smith v. Carbide & Chems. Corp.*, 2009 WL 5184342, at *2 (W.D. Ky. Dec. 22, 2009)).

Dr. Kilpatrick's reliance on certain literature and case studies also goes to the weight of his testimony rather than the admissibility. *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours and Co.*, 90 F. Supp. 3d 746, 770 (S.D. Ohio 2015). "An expert need not base [his] opinion on the best possible evidence, or the 'most ideal scientific evidence' in order for it to gain admissibility. Instead, the role of the Court is to ensure that expert testimony is based upon good grounds, based on what is known." *Id.* (citations omitted). To the extent that Corning, Inc. and Philips North America believe that Dr. Kilpatrick should not have relied on his own prior

opinions or on studies that they believe reach a different conclusion, these are matters to address in cross examination.  Accordingly, the Court will not exclude Dr. Kilpatrick's opinions on the basis of his use of mass appraisal methodology.

### b

Next, Corning, Inc. and Philips North America argue that Dr. Kilpatrick's "failure to rely upon actual sales data renders his opinion inadmissible."  [R. 487 at 13.]  Corning, Inc. and Philips North America specifically argue that Dr. Kilpatrick's opinions run afoul of the International Association of Assessing Officers Standard on Mass Appraisal and also violate the Uniform Standards of Professional Appraisal Practice because Dr. Kilpatrick failed "to base any analysis of the effects of environmental risk on actual market data."  [R. 487 at 15.]  However, Dr. Kilpatrick's methods of determining the property values aligns with the governing Uniform Standards of Professional Appraisal Practice (USPAP), which Kentucky has adopted.  *See* 201 KAR 30.040.

The Uniform Standards of Professional Appraisal Practice defines a mass appraisal as "the process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing."  The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice 2020-2021 Edition*, at 7, https://www.millersamuel.com/files/2021/03/USPAP-Standards-1-4.pdf (last accessed Feb. 18, 2022).  Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice, which constitutes helpful but nonbinding guidance on appraisers, describes in detail the manner in which real property that may have been affected by environmental contamination should be performed.  [R. 513-1.]  According to Advisory Opinion 9, an appraiser should evaluate a contaminated property and appraise the property "as if unimpaired" and then "as-is" (impaired).

27

*Id.* at 4–5.  Here, Dr. Kilpatrick appraised the properties in compliance with the USPAP and did

consider market data in rendering his opinions.  Dr. Kilpatrick, after "examin[ing] sales

transactions," determined that the market data alone may not accurately reflect the true

diminution in value of the bellwether Plaintiff properties because there was "reason to believe

that at least some of these sales transactions occurred without complete knowledge of the

contamination situation in the neighborhood."  [R. 487-2 at 16.]

Furthermore, Dr. Kilpatrick gathered and analyzed local data in forming his opinions.

Dr. Kilpatrick and his team obtained "property characteristics and transaction data…from the

Boyle County Assessor's office."  [R. 487-2 at 24.]  This included "property characteristics and

transaction data from 5,390 property transactions from the period of January 1, 2013 to August 4,

2020."  *Id.*  In forming his opinions, Dr. Kilpatrick also relied on academic literature review,

analysis of sales transactions, and legal case studies.  *Id.* at 24–54.  While Corning, Inc. and

Philips North America may disagree with Dr. Kilpatrick's conclusions, the appropriate

mechanism to address these issues is in cross examination, not through exclusion.

### c

Corning, Inc. and Philips North America next argue that Dr. Kilpatrick's "speculation

about the existence of environmental stigma and its impact on Plaintiffs' property values is

unreliable and will not aid the trier of fact."  [R. 487 at 15.]  Corning, Inc. and Philips North

America argue that Dr. Kilpatrick failed to "test his environmental stigma hypothesis" and that

his "opinion as to the existence of environmental stigma and its effect on property value

diminution is [] unsupported."  *Id.* at 16, 19.

However, Dr. Kilpatrick did provide support for his stigma opinions.  First, after

reviewing and synthesizing numerous scholarly works, Dr. Kilpatrick opined that "[t]he

28

consensus among the academic literature is that stigma has both an income component and a marketability component. The impact of stigma is real."  [R. 487-2 at 44.]  Furthermore, the data "indicated that contamination stigma had affected values,"[10] though Dr. Kilpatrick, based on a combination of literature review, case studies, and sales analysis, opined that the actual diminution in value was likely higher than the sales analysis alone reflected.  *Id.* at 16.  Dr. Kilpatrick also explained that because "prices do not always reflect all available information," "information can be fractured and diffused unevenly."  *Id.* at 33.  In forming his opinions on stigma, Dr. Kilpatrick relied on scholarly works, decades of experience in the field (his qualifications were not challenged by Corning, Inc. and Philips North America), and studies.

Stigma damages are recoverable in Kentucky only where the plaintiffs can show:

(1) That there is a basis in reason and experience for a fear ...; (2) that such a fear enters into the calculations of a substantial number of persons who deal in the buying or selling of similar property; and (3) depreciation of market value because of the existence of such fear.

*Mercer v. Rockwell Intern. Corp.*, 24 F. Supp. 2d 735, 745 n.5 (W.D. Ky. 1998) (quoting *Gulledge v. Texas Gas Transmission Corp.*, 256 S.W.2d 349, 353 (Ky. 1952).  "Stigma damages are recoverable only in instances where there has been physical damage to the property in the first instance."  *Id.* at 744.  Dr. Kilpatrick, as the appraiser, is not himself required to provide information on the existence of the "scientific aspects of contamination."  [*See* R. 513 at 3, 4.] Other experts have demonstrated that physical damage is present in this case, and Dr. Kilpatrick may rely on their opinions in determining the extent of stigma damages.  Accordingly, the Court finds that Dr. Kilpatrick's opinions will aid the trier of fact and will deny Corning, Inc. and Philips North America's motion on this basis.

---

[10] Dr. Kilpatrick explicitly opined that "sales analysis found a diminution of 13%."  [R. 487-2 at 59.]

**d**

Finally, Corning, Inc. and Philips North America argue that Dr. Kilpatrick's opinions are inadmissible because they permit "recovery for a speculative future market impact." [R. 487 at 20.] Plaintiffs indirectly addressed this argument in their discussion of Dr. Kilpatrick's methodology for determining impaired value. [*See* 513 at 8.] As opposed to opining as to a speculative future market impact, as Corning, Inc. and Philips North America argue, Plaintiffs state that Dr. Kilpatrick was accounting for information fracturing and diffusion in reaching his opinion. [R. 487-2 at 33.]

Dr. Kilpatrick analyzed how markets react to contamination and opined that "a central assumption that market value reflects the most probable price" is that "each buyer and seller is acting prudently and knowledgeably." *Id.* Dr. Kilpatrick cited to numerous studies, including one from Texas, indicating that "when sellers are required to disclose information on contamination and cleanup, home values diminish by approximately 30.5%." *Id.* at 41. Here, Dr. Kilpatrick found when analyzing sales transactions in Boyle County that "there was reason to believe that at least some of these sales transactions occurred without complete knowledge of the contamination situation in the neighborhood." *Id.* at 16. As opposed to merely pulling his figures from mid-air, Dr. Kilpatrick based his opinions on a combination of literature, case studies, and sales analysis. *Id.* at 16. The Court finds that Dr. Kilpatrick's opinions are relevant and will be helpful to the trier of fact and will deny Corning, Inc. and Philips North America's motion to exclude the opinions of Dr. Kilpatrick.

**6**

The Plaintiffs seek to exclude (or partially exclude) the opinions and testimony of five of Corning, Inc. and Philips North America's experts, the first of which is Jerry Dent. [R. 488.]

Corning, Inc. and Philips North America engaged Mr. Dent to "review the expert report of Dr. John A. Kilpatrick to determine whether Dr. Kilpatrick applied appropriate methodology in evaluating alleged property value diminution and whether his resulting damages opinions are accurate, credible, and reliable."  [R. 488-2 at 3; R. 509 at 1.]  After reviewing Dr. Kilpatrick's report, and "based upon [his] research and analysis as a real estate expert," Mr. Dent formed the following seven opinions:

- Opinion 1: Dr. Kilpatrick's presumption of stigma is contrary to applicable appraisal standards;
- Opinion 2: Dr. Kilpatrick's unimpaired values are inaccurate and unreliable;
- Opinion 3: An academic literature review is not a valid method for determining property value diminution and does not result in an accurate, reliable, or valid determination of property value diminution;
- Opinion 4: Dr. Kilpatrick's case study analysis does not follow proper methodology and does not result in an accurate, reliable, or valid determination of property value diminution;
- Opinion 5: It is not appropriate appraisal methodology to disregard market data when it does not support the appraiser's preconceived opinion;
- Opinion 6: Dr. Kilpatrick's damages opinion for the residential Trial Plaintiffs is not accurate, reliable or valid; and
- Opinion 7: Dr. Kilpatrick's flawed analysis of property value diminution for the industrial Trial Plaintiffs is not based on market data and does not produce an accurate, reliable or credible estimate of damages.

[R. 488-2 at 3–4.]

The Plaintiffs do not seek to exclude all of Mr. Dent's opinions.  Instead, they specifically seek to prevent Mr. Dent from opining or testifying at trial about (1) the fact that Plaintiffs' properties "have not suffered from 'environmental contamination' or 'environmental risk' and (2) "the accuracy or reliability of the methodology or conclusions of Defense expert C.W. Wilson."  [R. 488-1 at 11.]  Plaintiffs' motion will be denied.

**a**

Plaintiffs first argue that Mr. Dent's opinion "that the Plaintiffs' properties have not been

31

impacted by environmental contamination is unreliable and must be excluded." [R. 488-1 at 6.] While not directly challenging Mr. Dent's qualifications per se, Plaintiffs begin by stating that Mr. Dent "is not a certified appraiser." [*Id.*; *see also* R. 528 at 2.] The purpose of making this statement, no doubt, is to imply that Mr. Dent is not qualified to opine on appraisal matters.

Plaintiffs then list numerous items on which Mr. Dent has no opinion or did not review: (1) "diminution in value;" (2) whether Plaintiffs' properties "have been physically damages by airborne particulate emanating from the Facility;" (3) whether the Plaintiffs' "uses of their properties should be constrained or limited as a result of the contamination alleged in this case;" (4) "market data relative to properties in Danville;" (5) whether the "Plaintiffs' properties have suffered from stigma;" and (6) "soil sample results taken on Plaintiffs' properties." [R. 488-1 at 6–7.] In fact, Plaintiffs argue, Mr. Dent's only source of knowledge regarding environmental contamination as it relates to the bellwether Plaintiffs' properties is from the expert report of Walter Shields. *Id.* at 7. Given everything that Mr. Dent did not review, and Mr. Dent's reliance on Mr. Shields' report, Plaintiffs argue that Mr. Dent's statement in Paragraph 14 of his report that "none of the Trial Plaintiffs have experienced environmental contamination" is "unsupported by any analysis or authority" and should be excluded. *Id.* Plaintiffs also argue that Mr. Dent misconstrues Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice. *Id.* at 8–9.

Plaintiffs' argument that Mr. Dent is unqualified because he is not certified is unavailing. Mr. Dent has been designated an Accredited Senior Appraiser by the America Society of Appraisers, he is a Certified Commercial Investment Member, and he also holds numerous other designations within the field. [R. 488-2 at 53.] Furthermore, as Corning, Inc. and Philips North America point out, Mr. Dent's certification status is essentially irrelevant because "certification

32

under Kentucky law is voluntary." *See* KRS Chapter 423A.  Specifically, Kentucky law

> requires individual appraisers to have a license or certification only when
> appraising properties for loans that will be granted by federally insured lenders
> that are considered federally related transactions, real estate related loan
> transactions for Government Sponsored Enterprises, or for other clients that
> require the services of a state licensed or certified real property appraiser.

Kentucky Real Estate Appraisers Board, *How to Enter the Real Property Appraisal Profession in*

*Kentucky* (2019), https://kreab.ky.gov/Documents/KHREAB_AppraiserAppln.pdf (last visited

Feb. 8, 2022).  Because none of the situations requiring a license or certification are at issue here,

the fact that Mr. Dent is not certified does not prevent him from rendering his opinions in this

case.  Furthermore, given Mr. Dent's qualifications, the Court finds that he is sufficiently

qualified to satisfy *Daubert*.  *See Faughn v. Upright, Inc.*, 2007 WL 854259, at *1 (W.D. Ky.

Mar. 15, 2007) ("The law does not require that an admissible expert have every conceivable

qualification, only that his background provides a proper foundation for testimony which will

'assist the trier of fact in understanding and disposing of issues relevant to the case.'") (quoting

*Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)).

Furthermore, the Court will decline to exclude Mr. Dent's statement that "none of the

Trial Plaintiffs have experienced environmental contamination."  [R. 488-1 at 7.]  Here, the

parties agree that Mr. Dent relies in part on the expert testimony of Dr. Shields.  As previously

stated, an expert is permitted to rely on the opinions of another expert in crafting his own

opinions.  *See Jackson*, 326 F. Supp. 3d at 396 ("pursuant to Rule 703, an expert's testimony

may be formulated by the use of the facts, data and conclusions of other experts") (internal

citation omitted).  Although Plaintiffs argue that the degree to which Mr. Dent relies on the

expert testimony of Dr. Shields is excessive, the Court finds this argument unpersuasive because

both sides have experts that heavily rely on the opinions of other experts in crafting their own

33

expert opinions.

Plaintiffs also argue that Mr. Dent's opinion must be excluded because he misapplies the definition of "environmental contamination" contained within Advisory Opinion 9 of the Uniform Standards of Professional Appraisal Practice.  [R. 488-1 at 8.]  Advisory Opinion 9 defines "environmental contamination" as "adverse environmental conditions resulting from the release of hazardous substances into the air, surface water, groundwater or soil.  Generally, the concentrations of these substances would exceed regulatory limits established by the appropriate federal, state, and/or local agencies."  [R. 509 at 5 (quoting Advisory Opinion 9).]  The Plaintiffs argue that during Mr. Dent's deposition, Mr. Dent argued that the definition of environmental contamination "should include the word 'must' rather than 'generally' because he is familiar with what was intended by the authors of the definition when it was written."  [R. 488-1 at 9.] Mr. Dent testified during his deposition that after conducting literature review, particularly scholarly literature written by the author of Advisory Opinion 9, he found it appropriate to substitute the word "must" for "generally."  [R. 509 at 5–6.]  As Dr. Jackson, the author of Advisory Opinion 9, wrote in 2010, "[n]ote that the definition of *environmental contamination* in AO-9 specifically references 'regulatory limits established by the appropriate federal, state and/or local agencies,' and that concentrations of potentially hazardous substances must exceed these limits in order to be considered environmental contamination, as that term is defined for the appraisal profession."  [R. 509-4 at 5.]

The Court finds in this instance that Mr. Dent's position is sufficiently supported to withstand a motion to exclude.  Furthermore, to the extent that the Plaintiffs disagree with Mr. Dent's interpretation of the definition of environmental contamination, "any criticism of the expert appraiser's chosen approach goes to the weight of [his] testimony and not admissibility,

34

and thus is a proper matter for cross-examination" rather than exclusion.  *Powell*, 942 F. Supp. 2d at 691 (quoting *Smith*, 2009 WL 5184342, at *2).  Accordingly, the Plaintiff's motion to exclude will be denied on this basis.

**b**

Plaintiffs also ask that Mr. Dent be "precluded from offering any opinion or testimony at trial regarding the methodology employed by defense expert C.W. Wilson.  [R. 488-1 at 10.]  Plaintiffs argue that although Mr. Dent's report "does not include any analysis of the methodology utilized by C.W. Wilson," Mr. Dent testified that he has "seen [Mr.] Wilson's work and concurs with his conclusions."  *Id.* at 11.  Plaintiffs argue that because Mr. Dent's testimony "is entirely unsupported by any analysis, and is not within the opinions set forth in Dent's Report," Mr. Dent "should be precluded at trial form offering any opinion as to the accuracy or reliability of [Mr.] Wilson's work or the conclusions reached by [Mr.] Wilson."  *Id.*

However, as Corning, Inc. and Philips North America argue, a review of Mr. Dent's report clearly demonstrates that Mr. Dent reviewed and analyzed Mr. Wilson's methodology and property valuation conclusions in reaching his conclusions.  [*See, e.g.*, R. 509-1 at 7, 20, 24, 28, 38, 39, 40, 43.]  Plaintiffs' argument that "Dent's Report does not include any analysis of the methodology utilized by C.W. Wilson" [R. 488-1 at 10–11] is incorrect, and therefore is not a sufficient basis on which to grant the motion to exclude.  Furthermore, as addressed above, an expert may rely on the opinions of other experts in crafting his own opinions.  *Jackson*, 326 F. Supp. 3d at 396.  Nothing Mr. Dent testified about came as a surprise or was inconsistent with Mr. Dent's report.  Accordingly, the Plaintiffs' motion to exclude in part Mr. Dent's opinions and testimony is denied.

35

**7**

Plaintiffs next seek to partially exclude the opinions and testimony of Defendants' expert Marion Fedoruk.  [R. 489.]  Corning, Inc. and Philips North America retained Dr. Fedoruk to prepare a report that assessed "from an industrial hygiene and medical toxicology perspective, the underlying scientific basis for Plaintiffs' claims regarding the source, health significance, and remediation measures of indoor dusts containing lead, arsenic, and zinc found within exemplar properties."  [R. 489-4 at 5.]  Specifically, Plaintiffs seek to exclude the following opinions, Report, and testimony of Dr. Fedoruk:

> (1) Dr. Fedoruk must not be permitted to offer any opinions relative to Dr. Westerman's analysis of the manner in which the Plaintiffs' uses of their properties should be constrained; (2) Dr. Fedoruk should be excluded from offering any opinion as to the manner in which Plaintiffs' might experience health risk effects from interacting with the soils on their properties; (3) Dr. Fedoruk must be excluded from offering any opinion challenging Dr. Westerman's use of an RfD for lead or site-specific cleanup levels as being unsupported or speculative; (4) Dr. Fedoruk must be excluded from offering any opinions regarding whether the Facility is a source of the lead and arsenic particulates found in the soils and inside the homes on Plaintiffs' properties; and (5) Dr. Fedoruk must be excluded from offering any opinion regarding whether the Plaintiffs have actually been exposed to lead contaminated dusts within their homes.

[R. 489-1 at 18.]  For the reasons below, the Plaintiffs' motion will be granted in part and denied in part.

**a**

Plaintiffs first argue that Dr. Fedoruk should be precluded from offering testimony at trial regarding "the manner in which the Plaintiffs' uses of their properties should be constrained." *Id.* at 9.  Plaintiffs point to various portions of Dr. Fedoruk's deposition testimony to argue that Dr. Fedoruk never conducted a "risk assessment of the potential impacts to Plaintiffs resulting from interactions with the soils on their properties," failed to evaluate Dr. Westerman's opinions

that Plaintiffs should not eat vegetables grown on their properties and should prevent their children from playing in their yards, and asserted their belief that Dr. Fedoruk misunderstood "the nature of the Plaintiff's property damage claims in this case." *Id.* at 9–12.

For the most part, Plaintiffs misconstrue Dr. Fedoruk's testimony and cherry-pick portions of Dr. Fedoruk's testimony while leaving out other, pertinent portions. In his deposition, Dr. Fedoruk actually clarified that while his report primarily focused "on the indoor measures," he did also evaluate and include claims regarding outdoor soils as well. [R. 489-5 at 16–17.] Dr. Fedoruk's claim is supported by his report, in which he discusses "Dr. Westerman's proposed soil remediation level of 24 ppm." [R. 489-4 at 28.] This analysis directly addresses the health significance and remediation measures pertaining to outdoor soils, and the Court finds that Plaintiffs' argument to the contrary is unavailing.

As to Plaintiffs' argument that Dr. Fedoruk failed to evaluate Dr. Westerman's opinions regarding Plaintiffs' vegetable consumption and children playing on the Plaintiffs' properties, Dr. Fedoruk did explicitly discuss children playing on the properties in his report. *Id.* As for Plaintiffs' vegetable consumption, while Dr. Fedoruk did not explicitly mention that example in his report, his general opinion was that Dr. Westerman had "provided no evidence this soil level [above 24 ppm] would be expected to result in any toxicity." *Id.* This general opinion encompasses particular examples of what Plaintiffs could do on their properties, and the Court declines to grant Plaintiffs' motion on this basis.[11]

As to Plaintiffs' argument that Dr. Fedoruk misunderstands "the nature of the Plaintiff's

---

[11] Plaintiffs also argue that Dr. Fedoruk's knowledge (or lack thereof) regarding statements Dr. Westerman made to the bellwether Plaintiffs about not consuming "vegetables grown on their properties because of the levels of lead in the soil" supports exclusion. [R. 489-1 at 11–12.] However, as Defendants point out, Dr. Fedoruk's knowledge about what Dr. Westerman may or may not have told the bellwether Plaintiffs does not affect his ability to offer opinions or testimony as to the Plaintiffs' uses of their property. [R. 507 at 9.]

37

property damage claims in this case" based on his deposition testimony, the Court likewise finds

this argument unpersuasive.  Plaintiffs highlight the following portion of Dr. Fedoruk's

testimony:

> Q: [Y]ou do understand that the plaintiffs we're here about today are alleging that lead and arsenic particulate originating from the facility have settled upon their properties, right?
>
> A: In a general sense, yes.
>
> Q: Okay. And they're further alleging that the amounts of lead and arsenic particulates that have settled upon their properties originating from the facility are such that they are at risk to engage with their soils or the dust in their house without suffering some injury, right?
>
> A: No. I'm not sure that's the case."

[R. 489-5 at 24.]  However, Dr. Fedoruk immediately followed up that testimony with the

following:

> I didn't -- I'm -- I'm not aware that that's the specific case. Some of these houses, I mean, they're not even lived in. Right? Like, if you look at some of those, they're like a dilapidated house with -- you know, that's had no air conditioning, no power for years. So, I mean, that's a -- I mean, that's an entirely different scenario. Then some of the properties are industrial properties where industrial activities are occurring. Like where there's boiler making and metal activities and so forth. Another is a place where I understand there's a garage and shop that involve all kinds of other exposures and scenarios that might involve, from that activity, some of these situations. So, I mean, it's a very -- very broad issue in terms of trying to – you'd have to look at each one on an individual basis. And I didn't know that that was at play or at issue in this matter.

*Id.* at 24–25.  This context clarifies, as Corning, Inc. and Philips North America argue, that Dr.

Fedoruk's "I'm not sure" statement had more to do with making sure he understood the question

being asked of him, not his understanding of the nature of the Plaintiff's property damage claims

generally.

The Court finds that Dr. Fedoruk sufficiently addressed Dr. Westerman's contaminated

soils opinions and will deny Plaintiffs' motion on this basis.  However, even if Dr. Fedoruk

sought to testify about information that went beyond what was contained in his report, courts

across the country have held that "[a]bsent surprise or bad faith, an expert may testify beyond the

scope of his report."  *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 389 (D.N.J. 2006)

(citing *Bowersfield v. Suzuki Motor Corp.*, 151 F. Supp. 2d 625, 631–32 (E.D. Pa. 2001)); *Wanke*

*Cascade Distribution Ltd. v. Forbo Flooring, Inc.*, 2017 WL 1837862, at *4 (D. Or. May 4,

2017) (same); *see also Sunovion Pharm. Inc. v. Dey Pharma., L.P.*, 2012 WL 6858144, at *2 (D.

Del. Jan. 27, 2012) (finding "whether an expert may testify beyond the scope of her report is a

matter within the Court's discretion").

### b

Plaintiffs next call Dr. Fedoruk's credentials into question, arguing that he "is not

qualified to perform a risk assessment relative to exposures faced by residential property owners

interacting with the soils on their properties."  [R. 489-1 at 13.]  Plaintiffs' primary argument in

support of this claim is that Dr. Fedoruk could not identify "any instance in which he has

performed a risk assessment for residential property owners relative to lead or arsenic

contaminated soils on their properties."  *Id.*

The point that this is the first time Dr. Fedoruk has been asked to provide an expert

opinion regarding the presence of contaminated soils of residential properties is well taken.  *Id.*

However, that fact alone does not demonstrate that Dr. Fedoruk is unqualified to render such an

opinion.  Dr. Fedoruk's credentials are impressive.  To name just a few of Dr. Fedoruk's

credentials, he is a licensed medical doctor and holds a primary board certification by the

American Board of Preventative Medicine in Occupational Medicine, he is a Fellow of the

American College of Medical Toxicology, and he is one of only two physicians in the United

States "who hold board certification in occupational medicine, medical toxicology, and industrial hygiene." [R. 489-4 at 5.]

However, "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). In specifically looking at the issues in this case, the Court finds that Dr. Fedoruk is sufficiently qualified. Dr. Fedoruk has more than forty years of experience "in consulting activities related to chemical hazards, including measuring occupational and environmental exposures, conducting risk assessments of workplace and environmental exposures, and designing and implementing medical surveillance programs, and developing worker and environmental communication programs." [R. 489-4 at 5.]

Although this is the first residential property case that Dr. Fedoruk recalls working on, the Court finds that his credentials and vast experience in the field qualify him to provide expert opinions in this matter and will deny the Plaintiffs' request to exclude Dr. Fedoruk's testimony based on his qualifications. *See Lackey v. Robert Bosch Tool Corp.*, 2017 WL 129891, at *5 (E.D. Ky. Jan. 12, 2017) ("an expert…may bring [his] extensive knowledge of a field…to bear on a range of scenarios"); *see also Faughn*, 2007 WL 854259, at *1 ("The law does not require that an admissible expert have every conceivable qualification, only that his background provides a proper foundation for testimony which will 'assist the trier of fact in understanding and disposing of issues relevant to the case.'") (quoting *Pride*, 218 F.3d at 578).

**c**

Plaintiffs next seek to exclude Dr. Fedoruk's opinions "challenging Dr. Westerman's use of RFD or site-specific clean up levels." [R. 489-1 at 13.] In his report, Dr. Fedoruk opined that

40

"Dr. Westerman's proposed soil remediation level of 24 ppm is not accepted as a threshold level for demarcation where adverse health effects would be anticipated, it is not an accepted regulatory level that triggers environmental clean-up." [R. 489-4 at 28.]  In making this assertion, Dr. Fedoruk argues that Dr. Westerman's chosen RfD (Reference Dose) "has not been adopted by the EPA or other health or environmental regulatory agencies." *Id.*  Plaintiffs take issue with this assertion, arguing that Dr. Westerman's report utilizes Kentucky site-specific remediation standards.  In response, Corning, Inc. and Philips North America argue that Kentucky has adopted the EPA's screening levels, which are "17 times higher" than the ppm level "Dr. Westerman applies in his analysis." [R. 507 at 11.]

After review, this request will be granted in part.  Dr. Fedoruk states in his report that Dr. Westerman "fails to cite to the source of the RfD that he uses for making this health risk characterization." [R. 489-4 at 14.]  However, in his deposition, Dr. Fedoruk agreed that Dr. Westerman had actually relied on a Kentucky Department for Environmental Protection recommendation. [R. 489-5 at 27.]  Accordingly, the specific statement that Dr. Westerman "fails to cite to the source of the RfD that he uses for making this health risk characterization" shall be excluded because Dr. Fedoruk has conceded that Dr. Westerman cited to a Kentucky Department for Environmental Protection recommendation.

However, the Court finds there is a reasonable disagreement between Dr. Fedoruk and Dr. Westerman as to the appropriate background levels for cleanup standards.  Dr. Westerman asserts "that Kentucky has utilized site specific background levels for cleanup standards," and Dr. Fedoruk argues that the EPA's current screening level, which is seventeen times higher than the one applied by Dr. Westerman, is the appropriate standard. [R. 489-1 at 15; R. 507 at 11.] Plaintiffs argue that Dr. Fedoruk bases his opinion "solely on his assertion that Dr. Westerman

41

lacks support for the RfD for lead used in his calculations." [R. 489-1 at 13.] However, the record does not support the Plaintiffs' argument. For example, Dr. Fedoruk cites to the EPA to opine that the correct standard is "400 ppm for lead in soil at residential properties" instead of 24 ppm as Dr. Westerman argues. [R. 489-4 at 28.] Ultimately, "if reasonable experts disagree, that is usually for the jury, not the court." *United States v. Gissantaner*, 990 F.3d 457, 469 (6th Cir. 2021) (citing *Kumho Tire*, 526 U.S. at 153). Accordingly, other than the specific statement that Dr. Westerman "fails to cite to the source of the RfD that he uses for making this health risk characterization," Plaintiffs' motion will be denied.

### d

Plaintiffs also argue that Dr. Fedoruk should be excluded from offering any Opinion regarding whether "the facility is a source of lead and arsenic particulates found on Plaintiffs' properties." [R. 489-1 at 16.] Plaintiffs also argue that Dr. Fedoruk "has no basis for his assertion that Plaintiffs' have not been exposed to lead contaminated dust[] inside their homes" and that this opinion should also be excluded. *Id.* at 17. Both of these arguments fail.

Plaintiffs seek to exclude Dr. Fedoruk's opinion because he failed to "conduct[] any analysis into whether the Facility is a source of the lead and arsenic particulates found on and inside the Plaintiffs' properties." *Id.* at 16. Plaintiffs further argue that Dr. Fedoruk's opinion should be excluded because he "did not perform source attribution analysis" or "analysis regarding whether the Facility could be a potential source." *Id.* at 16–17. However, an expert is "not required to conduct his own testing" because he "may base an opinion on facts or data in a case that [he] has been made aware of or personally observed." *Czuchaj v. Conair Corp.*, 2016 WL 4414673, at *5 (S.D. Cal. Aug. 19, 2016) (citing Fed. R. Evid. 703); *see also In re: General Motors LLC Ignition Switch Litig.*, 2015 WL 9480448, at *5 (S.D.N.Y. Dec. 29, 2015) ("an

expert is not required to conduct independent testing in all cases").  An expert may base his

opinion on "his experience, knowledge, and education."  *Czuchaj*, 2016 WL 4414673, at *5.

Here, Dr. Fedoruk reviewed the facts and evidence and provided a reasonable opinion

based upon his understanding of those facts.  For example, Dr. Fedoruk noted that Dr. Twilley,

one of the Plaintiffs' experts, failed to account for levels of zinc and lead that occur naturally in

the soil "and potential indoor sources" in reaching her conclusions.  [R. 489-4 at 2.]

Furthermore, Dr. Fedoruk's opinion that the "presence of lead in attic dust in and of itself does

not represent a health risk to occupants," flowed naturally from Dr. Twilley's finding that "[t]he

attics were anticipated to have undisturbed dust loadings from the Facility."  [R. 507-5 at 1.]

An expert may provide an opinion or testimony that merely critiques the assumptions and

methodologies of another expert, and that is the approach Dr. Fedoruk took in opining about the

source of lead and arsenic particulates found on the Plaintiffs' properties and the lack of an

exposure pathway identified by the Plaintiffs' expert Dr. Twilley.  *See TAMKO Bldg. Prods, Inc.*

*v. Factual Mut. Ins. Co.*, 890 F. Supp. 2d 1129, 1144 (E.D. Mo. 2012).  Accordingly, except for

the specific statement that Dr. Westerman "fails to cite to the source of the RfD that he uses for

making this health risk characterization," Plaintiffs' motion to partially exclude the opinions of

Dr. Fedoruk will be denied.

## 8

Plaintiffs also seek to exclude the testimony of Defendants' expert John Iwanski.  [R.

490.]  Corning, Inc. and Philips North America asked Mr. Iwanski to "develop opinions, and

review and evaluate the opinions of the Plaintiffs' experts, with respect to the air emissions from

the Danville facility while it operated in the period from 1952 through approximately 2011."  [R.

490-2 at 6.]  In making his opinions, Mr. Iwanski and his team reviewed and considered

43

depositions and deposition exhibits, expert reports, EPA and Kentucky Division for Air Quality correspondence and reference documentation, Danville facility documentation, and technical and reference literature specific to the issues in this case.  *Id.*  Ultimately, Mr. Iwanski provided the following three opinions:

> The Danville facility met or exceeded an appropriate standard of care by exceeding duty of care obligations.

> The Danville facility ESP installation on the lead glass melting furnace in 1974 was amongst the first tier of such equipment installed within the glass manufacturing industry, using state-of-the-art technology at that time. This original ESP demonstrated the ability to meet and exceed the applicable particulate matter (and lead) emissions removal requirements. A replacement ESP installed in 2006-2007 was equally effective in providing particulate matter (and lead) emissions control.

> The impacts of lead emissions from the Danville facility have been characterized, and those characterizations showed the Danville facility exercised acceptable control of lead emissions to the ambient air to prevent harmful effects.

*Id.* at 10–11.

Plaintiffs seek to exclude the opinions and testimony of Mr. Iwanski because he lacks the appropriate qualifications to opine on the standard of care "relating to the operation of an electrostatic precipitator to control lead particulate emanating from a glass manufacturing facility," and because the methods he used to develop his standard of care opinion are unreliable. [R. 490 at 1.]  In the alternative, Plaintiffs ask the Court to exclude "any portion of his opinions or testimony relating to Corning's monitoring or maintenance of the electrostatic precipitator because Section 5.4 of his May 2021 report and all testimony related thereto is entirely unsupported by any concrete evidence in the record."  *Id.*  For the reasons set forth below, the Plaintiffs' motion to exclude the opinions and testimony of Mr. Iwanski will be denied.

**a**

Plaintiffs first challenge Mr. Iwanski's qualifications.  Plaintiffs note that Mr. Iwanski holds a bachelor's degree in meteorology and "has not received any additional certifications or schooling."  [R. 490-1 at 6.]  Mr. Iwanski has been employed by Trinity Consultants since 1998. Plaintiffs characterize Trinity Consultants as "an expert testimony 'mill' usually acting on behalf of large corporate entities" and point out that Mr. Iwanski has "held a management role within the company" for the past twenty years and argue that "his technical work has been limited." *Id.* at 6–7.  Plaintiffs argue that Mr. Iwanski (1) lacks training or experience "with regard to the operation of electrostatic precipitators," (2) has only worked on projects that involved electrostatic precipitators twice in his career, and (3) has never managed a project that involved a glass manufacturing plant. *Id.* at 7.  Therefore, Plaintiffs argue that Mr. Iwanski lacks the requisite education, experience, and training to offer his opinions in this case. *Id.*

In response, Corning, Inc. and Philips North America argue that Mr. Iwanski is "imminently qualified" because he has "helped regulated industries comply with air emission regulations for more than 30 years."  [R. 506 at 1.]  Furthermore, despite his managerial role, Mr. Iwanski testified that he "still had time to devote to consulting work" and continued "to be active with clients."  [R. 490-5 at 7.]  Mr. Iwanski also testified that he has "consulted with compan[ies] specifically regarding the manner in which lead particulate can be controlled." *Id.* at 8.

Corning, Inc. and Philips North America further argue that the Plaintiffs' view of specifically how Mr. Iwanski must be qualified is too narrowly focused on whether Mr. Iwanski has sufficient expertise to opine on the "operation and maintenance of an air emission control device known as an EP [electrostatic precipitator]."  [R. 506 at 2.]  Corning, Inc. and Philips North America argue that the issue in this case is more general and focuses on whether the

45

Defendants' "operations as a whole led to excessive emissions," which "is precisely the issue that Mr. Iwanski evaluated." *Id.* Corning, Inc. and Philips North America also argue that "this is not a product liability case that would require an expert to have in-depth expertise regarding all aspects of EP construction and operation." *Id.* at 3.

In determining whether an expert is qualified to render testimony or an opinion in a case, the Sixth Circuit takes "a liberal view of what knowledge, skill, experience, training, or education is sufficient to satisfy the requirement." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 209 (6th Cir. 2015); *see also Lackey*, 2017 WL 129891, at *5. Other Circuits have also been careful not to impose overly restrictive expert qualification requirements. *E.g.*, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("We have eschewed imposing overly rigorous requirements of experts and have been satisfied with more generalized qualifications."); *AVX Corp. v. U.S.*, 518 F. App'x 130, 135 (4th Cir. 2013) (concluding that district court "did not abuse its discretion in admitting" expert testimony after applying Rule 702's "specialized knowledge" requirement liberally); *Hardeman v. Monsanto Co.*, 997 F.3d 941, 960 (9th Cir. 2021) (addressing the flexibly nature of the *Daubert* inquiry generally and nothing that it "should be applied with a liberal thrust favoring admission"); *United States v. Gomez*, 67 F.3d 1515, 1526 (10th Cir. 1995) (affirming district court's acceptance of expert's qualifications because they easily satisfied "the liberal standard" under Rule 702 "regarding expert qualifications").

While this is a close call, close calls in motions to exclude generally weigh in favor of permitting the expert's testimony or opinion. *E.g.*, *Whyte v. Stanley Black & Decker, Inc.*, 514 F. Supp. 3d 684, 693 (W.D. Pa. 2021); *Price v. Atlantic Ro-Ro Carriers, Inc.*, 2017 WL 2876473, at *4 (D. Md. July 6, 2017); *Ohio Oil Gathering Corp. III v. Welding, Inc.*, 2010 WL 5135999, at *7 (S.D. Ohio Dec. 9, 2010). Here, although Mr. Iwanski only has a bachelor's degree, he has

46

more than thirty years of experience in environmental consulting with a particular emphasis on air quality compliance.  [R. 490-2 at 7; *see also Tigrett v. Cooper*, 2013 WL 12407199, at *7 (W.D. Tenn. Dec. 23, 2013) (finding an expert is qualified "if he or she has specialized knowledge 'greater than the average layman'") (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).]  And although Mr. Iwanski has worked in management for the past twenty years, this has not prevented him from continuing to devote time to consulting work and staying engaged in the field.  [R. 490-5 at 7.]

Furthermore, the Court finds that the Plaintiffs' argument that Mr. Iwanski is unqualified because he "does not have any training or expertise with regard to the operation of electrostatic precipitators" is too narrow and a little misleading.  [R. 490-1 at 7.]  The issues in this case have more to do with air quality compliance generally than the technical characteristics of electrostatic precipitators.  Furthermore, in addition to working on multiple projects involving electrostatic precipitators in a maintenance records and operations review capacity, Mr. Iwanski has consulted on "air quality compliance, permitting, and strategy" in the fields of "electric utility, fuels preparation, surface coating, wood products manufacturing, chemical manufacturing, refining, cement, stone and lime, rubber and tire manufacturing, pulp and paper manufacturing, and the agricultural products industry."  [R. 490-2 at 7.]  An expert who is qualified in an area generally, such as air quality compliance, may apply that general knowledge in a range of situations. *Lackey*, 2017 WL 129891, at *5 ("an expert…may bring [his] extensive knowledge of a field…to bear on a range of scenarios"); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are

47

directly pertinent.")[12]  The Court is persuaded that Mr. Iwanski has sufficient qualifications to render his opinions in this case and will not exclude his opinions on that basis.

**b**

Next, Plaintiffs argue that Mr. Iwanski's standard of care opinion is unreliable.  [R. 490-1 at 8.]  Plaintiffs first argue that Mr. Iwanski's opinion is unreliable because he has only given an expert opinion regarding the standard of care in one other case, which involved corn mill emissions.  [*Id*; *see also* R. 490-5 at 10.]  Plaintiffs also argue that Mr. Iwanski's three-step process in forming his standard of care opinions were essentially made up "without reference to any guiding source materials or peer review procedures suggested by established scientific methods."  [R. 490-1 at 9; *see also* R. 490-5 at 11.]  In response, Corning, Inc. and Philips North America argue that Mr. Iwanski's methodology in rendering his standard of care opinions is "supported by courts that have addressed the admissibility of standard of care expert opinions." [R. 506 at 7.]  Corning, Inc. and Philips North America argue that Mr. Iwanski's "methodology is based upon objective, testable metrics rather than a personal belief that companies that do not engage in 'best practices' violate the standard of care."  *Id.* at 7–8.

The Court notes at the outset that the mere fact that Mr. Iwanski has only rendered one other standard of care expert opinion does not render his opinion unreliable.  Furthermore, so long as Mr. Iwanski follows an appropriate and objective methodology, the fact that he did not reference peer review procedures or other source materials does not render his opinions

---

[12] The Court also finds it disingenuous of the Plaintiffs to argue Mr. Iwanski is not qualified because "he has never managed a project involving the glass manufacturing industry" while the Plaintiffs' own expert does not view glass manufacturing facilities as different from other, similar manufacturing facilities.  [R. 490-1 at 7; R. 506 at 6.] Plaintiffs do not contest that Mr. Iwanski has consulted in the areas of "electric utility, fuels preparation, surface coating, wood products manufacturing, chemical manufacturing, refining, cement, stone and lime, rubber and tire manufacturing, pulp and paper manufacturing, and the agricultural products industry."  [R. 490-2 at 7.]

inadmissible.

As discussed above in relation to Dr. Sahu's expert opinion, the standard of care, particularly in negligence cases, is established "by looking to the conduct of the industry or profession in similar circumstances as of that date." *McKee*, 675 F. Supp. at 1064.  In determining reliability, Courts may consider "such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community." *Langan*, 263 F.3d at 621 (citing *Daubert*, 509 U.S. at 593–94).  As *Langan* makes clear, the reliability inquiry is a flexible one.  Furthermore, an expert opinion is not necessarily unreliable "simply because they have not been subjected to the crucible of peer review, or [] their validity has not been confirmed through empirical analysis." *Jesa Enters. Ltd.*, 268 F. Supp. 3d at 974.

Here, in rendering his standard of care opinion, Mr. Iwanski looked at the processes used at the glass manufacturing facility and conducted benchmarking analysis with "comparisons to other similar facilities, timeliness of actions, proactivity and/or anticipation of new future obligations, and trends of data required under duty of care obligations."  [R. 506-1 at 13.]  As discussed *supra*, while benchmarking is not the only reliable method to determine the appropriate standard of care, benchmarking is an accepted method within the scientific community.  Furthermore, Mr. Iwanski's report clearly shows what comparisons he made as part of his benchmarking analysis. *See, e.g.*, *id.* at 17, 29.  For example, Mr. Iwanski compares emissions at the glass manufacturing facility to the top ten lead emitters in Kentucky during the appropriate time period. *Id.* at 29.  To the extent that Mr. Iwanski and the Plaintiffs' expert disagree as to the standard of care, the "battle of the experts is properly resolved by the jury, which must weigh the experts' testimony and decide accordingly." *Nelson v. Costco Wholesale*

49

*Corp.*, 2021 WL 2459472, at *11 (W.D. Ky. June 16, 2021), aff'd, 2022 WL 221638 (6th Cir. Jan. 26, 2022).  Therefore, the Court finds that Mr. Iwanski's opinions are sufficiently reliable and will not be excluded.

c

Finally, Plaintiffs argue that Mr. Iwanski should not be permitted to provide an opinion that Corning maintained the electrostatic precipitator "because it is entirely unsupported by any concrete evidence of record."  [R. 490-1 at 10.]  In response, Corning, Inc. and Philips North America argue that although detailed maintenance records from the facility from "approximately a half-century ago" no longer exist, "Mr. Iwanski's opinion that the EP was properly maintained is sufficiently supported by other evidence."  [R. 506 at 9.]

To support his opinion that the electrostatic precipitator was properly maintained, Mr. Iwanski looked to circumstantial evidence.  Mr. Iwanski noted that the original contractual documents between Corning and United McGill, the company that installed the glass furnaces at issue in this case, "cite operating manuals and spare parts lists."  [R. 490-3 at 28.]  Soon after the electrostatic precipitator was installed, the Danville facility "specifically requested…that [] United McGill provide a spare parts list, and cited the need to 'prepare our operating and maintenance catalogue.'"  *Id.*  This evidence, in addition to the fact that tests conducted in 1990, 1994 and 1995, "showed compliance with particulate matter emission limits at the lead glass melting furnace" and further "indicates the equipment, whether maintenance records were available or not, was still performing as it was intended."  *Id.*  Courts routinely find that experts may base their opinions on circumstantial evidence.  *See, e.g.*, *Great Northern Ins. Co. v. Ruiz*, 688 F. Supp. 2d 1362, 1371 (S.D. Ga. 2010) ("Although [an expert] lacks direct evidence of the cause of the fire, [the expert] may rely upon circumstantial evidence to support his theory.")

50

(quoting *Allstate Ins. Co. v. Hugh Cole Builder, Inc.,* 137 F.Supp.2d 1283, 1289 (M.D. Ala. 2001); *Peerless Ins. Co. v. Marley Engineered Prods. LLC*, 2008 WL 7440158, at *6 (E.D.N.Y. June 12, 2008) (finding "even if direct evidence is lacking, an expert 'may rely upon circumstantial evidence to support his theory' when other sufficient factors are present") (quoting *Royal Ins. Co. of America v. Joseph Daniel Const., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002).

The Court finds that Mr. Iwanski has provided a sufficient basis to opine as to the maintenance of the electrostatic precipitator after it was installed.  While the Plaintiff criticizes Mr. Iwanski's analysis and the facts on which Mr. Iwanski relies, the Court finds that such arguments go more to the weight of the evidence than its admissibility.  "Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  Accordingly, the Court will deny the Plaintiffs' motion to exclude the opinions of Mr. Iwanski.

**9**

Plaintiffs next seek to partially exclude or limit the opinions and testimony of Corning, Inc. and Philips North America's expert Walter Shields.  Dr. Shields analyzed "the chemical characteristics of historic Facility operations and emissions, and the elemental composition of the soil and dust samples collected by the Plaintiffs' experts."  [R. 491-2 at 11.]  Dr. Shields also "conducted an extensive literature search for lead content of soil and interior dust from other communities in the United States" and provided rebuttal testimony to Maurice Lloyd, Albert Westerman, Michele Twilley, Jacob Scher, Paul Lanthier.  *Id.*  Dr. Shields ultimately concluded that "the Plaintiffs' soils do not require remediation," that "lead concentrations in both the soil

51

samples and interior dust samples are within the normal background range established by many published surveys," and "the lead analyzed in the living space dust samples was caused by sources other than Facility emissions" because the facility ceased to operate in 2011 and the "interior spaces would have been cleaned at least once between 2011 and 2020. *Id.*

Plaintiffs seek to exclude the following opinions:

- That the Facility is not a source of the lead on Plaintiffs properties;

- That coal ash influenced the soil lead levels on Plaintiffs' properties;

- That the soil lead levels on Plaintiffs' properties are typical of other urban or suburban areas; and

- Testimony regarding Plaintiffs' potential exposures to lead arising from ingestion of home-grown vegetables.

[R. 491.]  For the reasons set forth below, the Plaintiffs motion will be denied.

**a**

Plaintiffs first seek to exclude a portion of Dr. Shields' opinion found in Section 4.2 of his report that Plaintiffs' samples "do[] not indicate deposition of emissions from the Facility." [R. 491-1 at 4; R. 491-2 at 18.]  Plaintiffs argue that Dr. Shields "admitted in his deposition that the Facility is the only industrial source point for lead in the Danville area…that particulate emanating from the Facility escaped from the boundaries of that property…and that he has not ruled out the Facility as a source of the contamination on Plaintiffs' properties."  [R. 491-1 at 4–5.]  Plaintiffs further argue that Dr. Shields failed to engage in "historical reconstruction of emissions or air modeling to determine the extent of the impact of the Facility's emissions" and that he engaged in "pure conjecture."  *Id.* at 5–6.  In response, Corning, Inc. and Philips North

America argue that Dr. Shields was merely arguing that the evidence indicates that "other potential sources of lead" are "more likely contributors of the lead detected on Plaintiffs' properties." [R. 505 at 3.]

A review of the report demonstrates that Dr. Shields relied on more than conjecture in rendering his opinions on the source of emissions on the Plaintiffs' properties. Dr. Shields points to "historic sources" as contributing to the lead concentrations on the Plaintiffs' properties as well as the wind rose for Danville. [R. 491-2 at 18–19.] Dr. Shields argues that if "the Facility was the single prominent sources of lead…then there would be a marked gradient of concentrations decreasing steadily from the Facility in a downwind direction," but the data does not support this conclusion. *Id.* at 19. Furthermore, in his deposition, Dr. Shields was merely stating that while "particles might have landed within Danville," the sampling indicated "normal urban sources of lead, arsenic and zinc," which cuts against the facility being the source of the lead on the property. [R. 491-3 at 7.]

While the Plaintiffs may have preferred Dr. Shields to engage in "historical reconstruction of emissions or air modeling," Plaintiffs have failed to demonstrate that Dr. Shields methodology was unscientific or inappropriate. *See Little Hocking Water Ass'n, Inc.*, 90 F. Supp. 3d at 770. ("An expert need not base [his] opinion on the 'best possible evidence,' or the 'most ideal scientific evidence' in order for it to gain admissibility. Instead, the role of the Court is to ensure that expert testimony is based upon 'good grounds, based on what is known.") Dr. Shields conducted stack testing, analyzed wind rose data, and analyzed the soil sampling conducted by the Plaintiffs' experts. *Id.* at 7.

Having found that Dr. Shields' opinion in Section 4.2 of his report is reasonable from a scientific perspective, the Court must next determine whether there are any other bases on which

to exclude this portion of Dr. Shields' testimony.  Ultimately, the Plaintiffs' request comes down to a matter of semantics.  Plaintiffs are seeking to preclude Dr. Shields from "opining that the Facility is not a source of the contamination on Plaintiffs' properties."  [R. 491-1 at 7.] However, Dr. Shields has admitted that is an opinion he will not render, nor is that the opinion provided in his report.  Instead, Dr. Shields is arguing that the lead concentrations in the soil were more likely influenced by sources other than the facility, not that the facility emitted no lead whatsoever on the Plaintiffs' properties.  [*See* R. 491-2 at 18–19.]  The Court finds no reason to exclude this portion of Dr. Shields' report based upon his opinion and testimony and will deny the Plaintiffs' request to exclude the portion of Section 4.2.

**b**

Plaintiffs next seek to exclude a portion of Section 4.3 of Dr. Shields' report in which he opines that coal ash may have contributed to elevated lead or arsenic in the Plaintiffs' soil samples.  [R. 491-1 at 7.]  Plaintiffs argue that Dr. Shields' citation to an EPA report regarding "the general manner in which coal ash can influence soil lead levels" does not support the lead levels of the Plaintiffs' properties in Danville.  [R. 491-1 at 7.]  Furthermore, Plaintiffs argue that Dr. Shields' only support for his opinion regarding coal ash is anecdotal evidence that "has not been peer reviewed, and is not based on data, but rather an interview with an unavailable witness with whom Shields has not spoken."  *Id.* at 8.

Corning, Inc. and Philips North America respond that Dr. Shields' "use of a local history book" is "entirely admissible under the Federal Rules."  [R. 505 at 7.]  Furthermore, Defendants' experts may "merely criticize Plaintiffs' experts and have no burden to produce models of their own."  *Id.* (citations omitted).

Defense experts are permitted to critique the opinions of the plaintiffs' experts and "have

no burden to produce models or methods of their own." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 285.  Furthermore, the fact that Dr. Shields' authority "has not been peer reviewed, and is not based on data," does not automatically disqualify the opinion.  [R. 491-1 at 8.]  As previously stated, expert opinions are not necessarily unreliable "simply because they have not been subjected to the crucible of peer review, or [] their validity has not been confirmed through empirical analysis." *Jesa Enters. Ltd.*, 268 F. Supp. 3d at 974.  However, the Sixth Circuit has cautioned that "reliance on anecdotal evidence" can be a red flag "that caution[s] against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

Dr. Shields' opinion has a sufficiently scientific basis to withstand Plaintiffs' motion to exclude.  Dr. Shields critiqued the Plaintiffs' expert's dismissal of coal ash as a source of lead and looked to a study of coal ash that, while not specific to Danville, would be helpful to the trier of fact.  Although Dr. Shields' reliance on anecdotal evidence for the use of stokers in and around Danville is a red flag, the Court will not exclude Dr. Shields' opinion on that basis.  *See Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 729 (6th Cir. 1994) (holding that Rule 703 "permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion") (citing *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261–62 (9th Cir. 1984)); *see also Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness…an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.")  Accordingly, Dr. Shields' opinion as to coal ash will not be excluded.

**c**

Plaintiffs next seek to exclude Section 4.4 of Dr. Shields' report in which he states that

"Mr. Lloyd's soil lead data demonstrate that Danville is typical of other urban and suburban locations." [R. 491-1 at 10; R. 491-2 at 20.]  The Plaintiffs' primary contentions with Dr. Shields' opinion are that it is irrelevant because it "wholly ignores the extensive study of soil lead samples throughout Kentucky conducted by the Kentucky Department for Environmental Protection," and instead compares data from a study conducted in Appleton, Wisconsin (population 250,000) with data from Danville (population 16,000).  [R. 491-1 at 10.]  Corning, Inc. and Philips North America respond generally that rebuttal expert witnesses are beholden to a less demanding admissibility standard than the standard applied to Plaintiffs' experts.  [R. 505 at 7.]

Testimony is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702).  Here, Dr. Shields does not "ignore" the Kentucky Department for Environmental Protection study of soil lead levels so much as argue that the appropriate source for soil lead concentration levels comes from the EPA.  [R. 491-3 at 20.]  As with Drs. Fedoruk and Westerman discussed supra, "if reasonable experts disagree, that is usually for the jury, not the court." *Gissantaner*, 990 F.3d at 470.

Furthermore, Dr. Shields did not rely solely on the Appleton, Wisconsin, study.  Dr. Shields also opined that Mr. Lloyd failed to adequately account for the fact that properties with houses built prior to 1978 may have soil samples with higher lead concentrations because of the widespread use of leaded paint in house construction.  [R. 491-3 at 21.]  To the extent that Dr. Shields did rely on a study of soil data for lead in Appleton, Wisconsin, the Court finds that the data can still assist the trial of fact to understand the evidence or determine a fact in issue. Plaintiffs' concerns with the difference in populations between the cities can be addressed during

56

cross examination.  Accordingly, the Court will deny the Plaintiffs' motion as to this issue.

**d**

Finally, Plaintiffs ask that Dr. Shields "be precluded from opining that Plaintiffs cannot be exposed to lead through ingestion of vegetables grown on their properties."  [R. 491-1 at 11.] The specific portion of Dr. Shields' report at issue is Section 5.1, in which Dr. Shields states that Plaintiffs "were not exposed to lead through consumption of home-grown vegetables" because, during their depositions in 2020, all the Plaintiffs but one stated that they had not grown or attempted to grow vegetables on their property.  [R. 491-2 at 27– 28.]  One Plaintiff "attempted to grow vegetables once about five years ago," but her attempt "was unsuccessful and she did not try again."  *Id.* at 28.

To the extent that Dr. Shields wishes to rebut Dr. Westerman's allegation that Plaintiffs experienced lead exposure through consuming home-grown vegetables using facts from the Plaintiffs' own depositions, he may.  However, Dr. Shields may not opine as to the effect of future vegetable growth on the Plaintiff properties or opine about toxicology in general because he is not qualified to do so.  However, neither future vegetable growth or toxicological analysis are contained within Dr. Shields' expert report.  Dr. Shields acknowledged his limitations regarding toxicology testimony when he testified that he would defer to Defendants' toxicologist Dr. Marian Fedoruk to address such issues.  [491-2 at 18.]  Therefore, the Court finds that exclusion is not necessary and will deny the Plaintiffs' motion.

**10**

Finally, Plaintiffs seek to exclude the opinions and testimony of Corning, Inc. and Philips North America's expert C.W. Wilson.  [R. 492.]  Corning, Inc. and Philips North America hired Mr. Wilson to do the following:

> [E]stimate the market value…for each of nine (9) parcels of real estate in Danville, Kentucky under two different scenarios: (1) 'as if' there was no known contamination on these sites (referred to as unimpaired); and (2) 'as is' given that the real estate market participants have knowledge of the reports, studies and publicity related [to] the allegations of significant contamination (referred to as impaired).

[R. 492-2 at 7.]  Mr. Wilson utilized the sales comparison estimation method, in which he determined the value of the Plaintiffs' properties before the impact of the alleged contamination (the unimpaired value), determined the value of the Plaintiffs' properties after the impact of the alleged contamination (the impaired value), and then calculated the difference between these two values.  *Id.* at 19.  After conducting his analysis and review, Mr. Wilson concluded that the unimpaired and impaired values of the Plaintiffs' properties were the same.  *Id.* at 6.  Plaintiffs now seek to exclude Mr. Wilson's testimony and opinions in their entirety because Mr. Wilson is unqualified and his appraisal was not compliant with the applicable industry standards and therefore will not assist the trier of fact.  [R. 492 at 2.]  Plaintiffs' motion will be denied.

**a**

Plaintiffs first challenge Mr. Wilson's qualifications.  Plaintiffs argue both that Mr. Wilson "has never testified as to contaminated properties or diminution in their value" and that Mr. Wilson "lacks the necessary experience and has never appraised contaminated property." [R. 492-1 at 7.]

As with Dr. Fedoruk discussed supra, the fact that this is Mr. Wilson's first time providing a particular expert opinion in a case does not automatically disqualify him.  If Mr. Wilson must have previously testified in a case about appraising contaminated properties to become qualified to testify about appraising contaminated properties, how could he, or any other expert for that matter, ever testify?  The Sixth Circuit takes "a liberal view of what knowledge,

skill, experience, training, or education is sufficient to satisfy the requirement." *Bradley*, 800 F.3d at 209.  After all, "[t]he law does not require that an admissible expert have every conceivable qualification, only that his background provides a proper foundation for testimony which will 'assist the trier of fact in understanding and disposing of issues relevant to the case." *See Faughn*, 2007 WL 854259, at *1 (quoting *Pride*, 218 F.3d at 578.

As to Mr. Wilson's qualifications, he owns Wilson Appraisal Group in Harrodsburg, Kentucky, and states that he has been involved in more than fifty cases as a general certified appraiser.  [R. 492-2 at 59–62.]  Mr. Wilson is a licensed certified real property appraiser in Kentucky, a licensed Residential Accredited Appraiser, a General Accredited Appraiser, and a licensed real estate broker in Kentucky.  *Id.* at 56–58.  Mr. Wilson is also certified as a National Uniform Standards of Professional Appraisal Practice instructor and has taught continuing education classes in Kentucky, Ohio, West Virginia and Tennessee since 1991.  *Id.* at 57.  Mr. Wilson testified that the classes he has taught addresses such issues as contamination in soils and contamination from a point source.  [R. 492-5 at 7.]

Plaintiffs' argument that Mr. Wilson runs afoul of the Uniform Standards of Professional Appraisal Practice competency rule, which provides that an appraiser must be competent to perform the type of appraisal being conducted or withdraw from the assignment, is unavailing. [R. 492-1.]  The competency rule does not provide that an appraiser is unqualified simply because this is his first time performing an appraisal given a particular factual predicate.  The Plaintiffs make much of the fact that Mr. Wilson testified that he had very little education or experience with contamination, but he followed up that statement by testifying that the actual issue he was called upon to address was "the issue of market value in Danville Kentucky in two specified zones," which he stated he was "absolutely competent" to address.  [R. 492-3 at 24.]

59

The fact that the underlying facts were different does not mean that Mr. Wilson was unqualified to provide an opinion on market values in Danville.  *See Lackey*, 2017 WL 129891, at *5 ("an expert…may bring [his] extensive knowledge of a field…to bear on a range of scenarios").

Given the Sixth Circuit's liberal view of the qualifications requirement and Mr. Wilson's extensive experience as an appraiser and teaching experience in the contaminated properties context, the Court finds that Mr. Wilson's opinions and testimony will assist the trier of fact in understanding the issues in this case.  Accordingly, the Court finds that Mr. Wilson is sufficiently qualified and will deny the Plaintiffs' motion to exclude his expert opinions on the basis of his qualifications.  Plaintiffs' particular concerns with Mr. Wilson's qualifications are more appropriately addressed through cross-examination rather than exclusion.  *E.g.*, *Giusto v. Int. Paper Co.*, --- F. Supp. 3d ----, 2021 WL 5493494, at *12 (N.D. Ga. Nov. 23, 2021) (finding the expert's "qualifications might be fertile ground for cross-examination, but not grounds for exclusion").

**b**

Plaintiffs also argue that Mr. Wilson's appraisal of the Plaintiffs' properties fails to comply with the Uniform Standards of Professional Appraisal Practice and "is therefore unreliable, not relevant, and not helpful to a trier of fact."  [R. 492-1 at 9.]  Plaintiffs argue that the Uniform Standards of Professional Appraisal Practice has been adopted by Kentucky "as the minimum standards for real estate appraisals" and that Mr. Wilson's report fails to abide by the appropriate guidance "for assessing properties alleged to have been impacted by environmental contamination.  *Id.* at 11, 16.  Specifically, the Plaintiffs argue, Mr. Wilson's "report does not follow the [Advisory Opinion 9] Guidance for assessing properties alleged to have been impacted by environmental contamination."  *Id.* at 16.

60

The Court finds it necessary to examine what portion of the Uniform Standards of Professional Appraisal Practice Kentucky has adopted.  Kentucky requires the following certificate holders and licensees to "comply with the Uniform Standards of Professional Appraisal Practice:

- A certified general real property appraiser;
- A certified residential real property appraisal;
- A licensed residential real property appraiser;
- An associate real property appraiser; and
- A licensed nonfederal real property appraiser."

201 KAR 30.040.  However, Advisory Opinions are separate from the standards themselves and are not binding.  The Uniform Standards of Professional Appraisal Practice has made it clear that "Advisory Opinions are not part of USPAP and can be approved by the Appraisal Standards Board without public exposure or comment."  [R. 508 at 11 (citing USPAP AO Foreward).]

It is true that Kentucky has adopted the Uniform Standards of Professional Appraisal Practice.  However, the core of Plaintiffs' argument is that Mr. Wilson failed to follow Advisory Opinion 9 when crafting his opinions and testimony.  [R. 492-1 at 16–20.]  Because advisory opinions are not mandatory, the Court finds that failure to follow Advisory Opinion 9 is not grounds for excluding Mr. Wilson's opinions and testimony.

Furthermore, Mr. Wilson is intimately familiar with the Uniform Standards of Professional Appraisal Practice, including Advisory Opinion 9, because he "teach[es] it."  [R. 492-5 at 23.]  Mr. Wilson states that his report complies "with the appraisal standards and criteria specified in the 2020-2021 Uniform Standards of Professional Appraisal Practice," and the Plaintiffs' only argument to the contrary is that Mr. Wilson failed to follow a nonbinding advisory opinion.  In creating his opinions, Mr. Wilson utilized the sales comparison

methodology, which is a "commonly accepted appraisal method." *Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 860 (E.D. Ky. 2013) (citing *Younglove Constr., LLC v. PSD Development, LLC*, 782 F. Supp. 2d 457, 459 (N.D. Ohio 2011)). Furthermore, Plaintiffs' challenges as to Mr. Wilson's appraisal method "go to the weight of [Mr. Wilson's] testimony and admissibility. *Powell*, 942 F. Supp. 2d at 691 (quoting *Smith*, 2009 WL 5184342, at *2. Therefore, Plaintiffs' motion will be denied.

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Corning, Inc. and Philips North America's motions to exclude the opinions of Dr. Westerman **[R. 482]** and Dr. Kilpatrick **[R. 487]** are **DENIED**;

2. Corning, Inc. and Philips North America's motion to exclude the opinions of Dr. Sahu **[R. 483]** is **GRANTED IN PART** and **DENIED IN PART** consistent with section II.B.2 supra;

3. Corning, Inc. and Philips North America's motion to exclude the opinion of Mr. Lloyd **[R. 485]** is **DENIED AS MOOT**;

4. Corning, Inc. and Philips North America's motion to exclude the opinion of Mr. Lanthier **[R. 484]** is **GRANTED**;

5. Plaintiffs' motions to exclude the opinions of Mr. Dent **[R. 488]**, Mr. Iwanski **[R. 490]**, Dr. Shields **[R. 491]**, and Mr. Wilson **[R. 492]** are **DENIED**; and

6. Plaintiffs' motion to exclude the opinions of Dr. Fedoruk **[R. 489]** is **GRANTED IN PART** and **DENIED IN PART** consistent with section II.B.7 supra.

This the 9th day of March, 2022.

Gregory F. Van Tatenhove
United States District Judge

63