UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| MODERN HOLDINGS, LLC, *et al.*, | ) | |
| Plaintiffs | ) | Civil No. 5:13-cv-00405-GFVT |
| v. | ) | |
| CORNING, INC., *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| Defendants. | ) | **ORDER** |
| | ) | |

***** ***** ***** *****

This matter is before the Court on Defendant Philips Electronics North America Corporation's Motions to Exclude the Opinions of Albert Westerman and Renewed Motion for Summary Judgment. [R. 594; R. 595.] For the following reasons, Philips North America's motions will be DENIED.

**I**

On February 10, 2022, the parties informed the Court that Plaintiff Modern Holdings, LLC's expert witness Maurice Lloyd had passed away. [R. 566.] Modern Holdings asked the Court to permit substitution of an expert and "sixty (60) days to amend their Rule 26 expert disclosures to substitute an expert report of Dr. Albert Westerman for that of Plaintiffs' previously disclosed expert Maurice Lloyd." [R. 567 at 1.] Judge Atkins granted Modern Holdings' request on February 16. [R. 568.] On April 18, Modern Holdings served the supplemental expert report of Dr. Westerman on Defendant Philips North America. [R. 580.]

On June 17, approximately one month before the final pretrial conference and two months before trial, Philips North America filed a Motion to Exclude the Opinions of Dr. Westerman and a Renewed Motion for Summary Judgment based on Dr. Westerman's expert opinions. [R. 594; R. 595.] Modern Holdings responded to the motions on July 8, and Philips North America replied to the Motion to Exclude on July 11 and the Renewed Motion for Summary Judgment on July 12. [R. 632; R. 633; R. 634; R. 635.] The Court will first address Philips North America's Motion to Exclude and then the Motion for Summary Judgment.

## II

### A

In a diversity case, federal law generally governs procedural and evidentiary issues, including the admissibility of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Admissibility of expert testimony is governed specifically by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Sixth Circuit has identified three specific Rule 702 requirements in deciding the admissibility of proposed expert testimony. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008); *see also United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). First, the proposed expert must have the requisite qualifications, whether it be through "knowledge, skill, experience, training, or education." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702).

Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting Fed. R. Evid. 702). In determining whether an expert's testimony will be relevant, courts look to "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Rios*, 830 F.3d at 413 (quoting Fed. R. Evid. 702, Adv. Comm. Notes).

Third, the testimony must be reliable. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529. Rule 702 provides several criteria by which a district court, in its gatekeeper role, should gauge the reliability of expert testimony. A court should look to whether the testimony is based upon "sufficient facts or data;" whether it is the "product of reliable principles and methods;" and whether the expert "has applied these principles or methods reliably to the facts of the case." *Id.* (quoting Fed. R. Evid. 702). In determining reliability, a district court should also consider "such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). The reliability inquiry is a flexible one, and the above factors are not a "definitive checklist or test." *Daubert*, 509 U.S. at 593.

District courts have wide latitude in determining whether a particular expert's testimony is reliable. *See, e.g., Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Notably, in exercising this discretion, a court must be

careful not "to impinge on the role of the jury or opposing counsel." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Philips North America proffers four reasons, all generally related to the element of causation, why Dr. Westerman's opinions should be excluded: (1) Dr. Westerman failed to establish a baseline from the data regarding lead on the Plaintiffs' properties; (2) Dr. Westerman failed to engage in any air dispersion analysis, which renders unreliable his opinion that lead was deposited by air dispersion; (3) Dr. Westerman failed to consider lead data from Kentucky, which renders unreliable his opinion that the facility was the source of the lead; and (4) Dr. Westerman's opinions constitute improper vouching for Maurice Lloyd, Modern Holdings' prior expert. [R. 594 at 8–16.] Each argument will be addressed in turn.

**1**

Philips North America first argues that Dr. Westerman's analysis is unreliable because he failed to establish a baseline from data regarding lead on the Plaintiffs' properties. [R. 594-1 at 8.] Specifically, Philips North America argues that Dr. Westerman does not know how much lead was on Plaintiffs' properties before Philips began its operations, "does not know and cannot testify" about how much lead any source has deposited on the Plaintiffs' properties, and failed to undertake any analysis to determine how much lead Corning, Inc. and Philips North America contributed, respectively. *Id.* at 9. Philips North America points to *Barnette v. Grizzly Processing, LLC*, 2012 WL 293305, at *3 (E.D. Ky. Jan. 31, 2012). In *Barnette*, the plaintiffs, who all lived near a coal screening plant, sued two companies that operated the plant during a two-year period in which the alleged coal dust and noise problems occurred. *Id.* During the

4

case, the court excluded the testimony of an expert witness with "a glittery resume and an impressive career" because he failed to rely on "sufficient facts or data" in forming his expert opinion. *Id.* at *2–3. Two of the primary shortfalls of the expert's opinion were that it was based primarily on the testimony and observations of a former employee at the plant and failed to "translate any of the [former employee's] observations into specific violations that relate to fugitive dust emissions." *Id.* at *3.

Modern Holdings responded that Dr. Westerman's conclusions demonstrated that lead on the Plaintiffs' properties was "substantially higher than the published ambient concentrations for lead in the 2004 Assessment of 30 mg/kg, which the Court previously determined proved "an appropriate baseline against which to measure sites that are undergoing an environmental assessment." [R. 632 at 20.] Furthermore, Modern Holdings argues that they have previously identified "Philips' Facility as the source of that contamination," and that "Dr. Westerman's conclusions are based on scientific methodology." *Id.* at 21.

The Court finds that Philips North America's argument that Dr. Westerman failed to establish a baseline from data regarding lead on the Plaintiffs' properties is without merit.[1] To demonstrate causation, "Plaintiffs must have proof that the levels of [lead] on their property now are greater than background levels in order to conclude that through its negligence Defendant deposited the [lead] on Plaintiffs' properties." *Mercer v. Rockwell Intern. Corp.*, 24 F. Supp. 2d 735, 751 (W.D. Ky. 1998). The Court has previously found that the 2004 Kentucky Background Assessment provides an appropriate baseline against which to measure sites that are undergoing

---

[1] Throughout both Philips North America's Motion to Exclude and Motion for Summary Judgment, Philips North America argues that with the impending settlement of Corning, Inc., Modern Holdings must establish the amount of lead on Plaintiffs' properties directly attributable to Philips North America specifically. [*See, e.g.*, 594 at 1; R. 595 at 1.] The Court will address this argument in the summary judgment portion of this Memorandum Opinion and Order.

an environmental assessment, including the Plaintiffs' properties.[2] [R. 576 at 14.] After measuring the soil samples Dr. Lloyd collected from the Plaintiffs' properties against the 2004 Kentucky Background Assessment, Dr. Westerman opined that the lead present in the soils of the Plaintiffs' properties was substantially higher than the published ambient concentrations for lead in the 2004 Background Assessment. [594-2 at 16.] Furthermore, in reaching his conclusions, Dr. Westerman "reviewed documents relating to the history of the Site, the general vicinity characteristics, operational history, previous on-site and off-site investigations, regulatory review, Lloyd's soil sampling results, Lloyd's on-site dust sampling…that he conducted off-site, studies involving similar sources of air pollution, and wind rose data for the Danville area." *Id.* at 2. Therefore, it cannot reasonably be argued that Dr. Westerman failed to establish a baseline from data regarding the lead levels on the Plaintiffs' properties.

To the extent Philips North America relies on *Barnette*, the Court finds this case is distinguishable. In *Barnette*, as Modern Holdings points out, the expert failed to undertake any sampling, conduct an investigation as to whether fugitive dust entered the plaintiffs' properties, or rule out alternative sources of coal dust. [R. 632 at 21.] By contrast, Dr. Westerman based his opinions on a radial sampling plan, interior dust sampling, comparison of lead levels on Plaintiffs' properties to both state and Danville-specific background lead levels, consideration of wind rose data, consideration of academic authorities, and analyzed and ruled out alternative sources. [R. 594-2 at 4.] Therefore, the Court finds *Barnette* inapposite.

---

[2] To the extent Philips North America argues that the 2004 Assessment only included one sample from "an unknown location in Boyle County," [R. 595-1 at 4] Dr. Westerman accounted for this by noting that the Inner Blue Grass Region area within the 2004 Assessment included seventy-one samples and that the additional background samples taken by Dr. Lloyd could be compared to the samples taken at the Plaintiffs' properties. [R. 594-2 at 6.]

6

2

Next, Philips North America argues that Dr. Westerman's failure to utilize any air dispersion analysis renders unreliable his opinion that lead from the facility was deposited by air dispersion.  [R. 594-1 at 11.]  Philips North America argues that Dr. Westerman "did no air dispersion modeling" and failed to "evaluate the impact of barriers or physical structures on the properties on the extent to which lead might accumulate there."  *Id.*  Philips North America further argues that Dr. Westerman's assumption that "because all other sources of lead only contributed 30 ppm of lead to the properties, all the remaining lead must have come from the Facility" is baseless and unsupported.  *Id.* at 12–13.  Finally, Philips North America argues that Dr. Westerman's failure to opine on when the lead traveled from the facility to the Plaintiffs' properties, or provide the specific amount of contamination for which Philips was responsible, renders his testimony unreliable.  *Id.* at 13.

In response, Modern Holdings argues that air dispersion modeling is not required, as confirmed by Philips North America's expert Walter Shields, and that Dr. Westerman properly relied on soil sampling and the 2004 Assessment.  [R. 632 at 18.]

Ultimately, this argument boils down to whether Dr. Westerman's failure to conduct air dispersion modeling renders his opinion unreliable.  The Court finds that it does not.  Philips North America's own expert confirmed that "[o]ftentimes the information required to reliably model dispersion and deposition is insufficient. So we often rely on off-site soil and dust samples to reconstruct the sources of the contaminants of concern in off-site soil and residential properties."  [R. 491-3 at 7.]  Here, Dr. Westerman did just that—he compared soil samples taken from the Plaintiffs' properties to those taken in the 2004 Assessment in rendering his opinions.

Philips North America points to *Adams v. Cooper Indus., Inc.*, WL 2219212 (E.D. Ky. July 30, 2007) for the proposition that air modeling is necessary to prove negligence involving emissions. [R. 594-1 at 11.] However, as Modern Holdings points out, the claims in *Adams* were personal injury claims instead of property claims which affects the causation analysis. In *Adams*, the court was addressing specific causation, or "whether exposure to an agent was responsible for a given individual's disease." In contrast, in the property damage context, "[t]he first step in proving that Defendant's breach caused them an injury is to show that the [contaminant] on their property came from Defendant's facility…Plaintiffs must have proof that the levels of [contaminant] on their property now are greater than background levels." *Mercer*, 24 F. Supp. 2d at 751. Dr. Westerman undertook this analysis by evaluating Dr. Lloyd's radial sampling, which is "well accepted within the industry with respect to particulate dispersion," and comparing the samples to those taken in the 2004 Assessment. [R. 594-2 at 6.]

Furthermore, as the Court previously determined regarding Dr. Shields' testimony [R. 571 at 53], while Philips North America may have preferred Dr. Westerman to engage in air dispersion analysis, "[a]n expert need not base [his] opinion on the 'best possible evidence,' or the 'most ideal scientific evidence' in order for it to gain admissibility. Instead, the role of the Court is to ensure that expert testimony is based upon 'good ground, based on what is known.'" *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours and Co.*, 90 F. Supp. 3d 746, 770 (S.D. Ohio 2015). Here, the Court finds that Dr. Westerman's opinions are based upon "good ground" and that Philips North America's second argument is without merit.

### 3

Next, Philips North America argues that Dr. Westerman's failure to consider lead data from an EPA study that conducted "urban background study in Kentucky" renders unreliable his

opinion that the facility was the source of the lead. [R. 594-1 at 13.] Philips North America argues that Dr. Westerman should not have minimized the EPA study, which found the average background for lead in Lexington is 410 ppm and for Louisville is 638 ppm. *Id.* Furthermore, Philips North America argues that Dr. Westerman failed to conduct "any independent analysis of other potential sources of lead in the Danville area." *Id.* at 14.

In response, Modern Holdings argues that Dr. Westerman properly discounted the EPA study because it was incomplete and unreliable. [R. 632 at 25.] Furthermore, Modern Holdings argues that Dr. Westerman did address other potential sources of lead in the Danville area and discounted each one. *Id.* at 12–13.

After review, the Court agrees with Modern Holdings. As discussed *supra*, the 2004 Assessment provides an appropriate baseline against which to measure sites that are undergoing an environmental assessment. Dr. Westerman testified that while he did not have an opinion one way or the other as to the EPA study's reliability, he expressed concern that it "hasn't been published as a complete study yet," and the sampling criteria used in the EPA study was "unusual." [R. 594-4 at 53, 55.] Philips North America is free to disagree with Dr. Westerman's testimony and opinions as to his chosen criteria. However, "any criticism of the expert appraiser's chosen approach goes to the weight of [his] testimony and not admissibility, and thus is a proper matter for cross-examination" rather than exclusion. *Powell v. Tosh*, 942 F. Supp. 2d 678, 691 (W.D. Ky. 2013) (quoting *Smith v. Carbide & Chems. Corp.*, 2009 WL 5184342, at *2 (W.D. Ky. Dec. 22, 2009)).

Furthermore, it is clear that the parties' experts disagree about the extent to which other potential sources of lead may have contributed to the lead levels on the Plaintiffs' properties. Dr. Shields determined that lead levels on the Plaintiffs' properties were "more likely affected by

9

alternative sources, such as lead paint, vehicle emissions, coal combustion, and pesticide use, than by emissions from the Facility." [R. 594-8 at 9.] Dr. Shields stated that she developed her findings "to a reasonable degree of scientific certainty" after visiting the site and the Plaintiffs' properties, reviewing relevant case documents including the affidavit of Plaintiffs' expert Maurice Lloyd, and evaluating site investigation reports, maps, photographs, and certain legal documents. *Id.* at 8, 14. Dr. Westerman, on the other hand, "considered several possible alternative sources of the elevated levels of lead" in the soil of Plaintiffs' properties including lead-based paint, vehicle emissions, coal ash, and fertilizers and pesticides, and determined that "they are not the source of the elevated levels of lead." [R. 594-2 at 15–17.] Dr. Westerman explained that "[h]istoric alternate sources of contaminants can be discounted due to their inclusion in the 2004 Assessment background data or Danville area background data, and he looked to authoritative sources to support his claims. *Id.* Again, to the extent Philips North America wishes to probe into Dr. Westerman's chosen approach, they can do so on cross-examination. *Powell*, 942 F. Supp. 2d at 691. Accordingly, Philips North America's third argument fails.

### 4

Finally, Philips North America argues that Dr. Westerman's opinions "constitute improper vouching for Lloyd." [R. 594-1 at 15.] Philips North America argues that when Dr. Westerman replaced Dr. Lloyd as the Plaintiffs' expert witness responsible for "determin[ing] the magnitude of impact by the chemicals of concern generated at the Facility that have migrated off-Site" [R. 594-2 at 3], Dr. Westerman impermissibly adopted Dr. Lloyd's expert opinions wholesale. [R. 594-1 at 15 (citing *Siegel v. Fisher & Paykel Appliances Holdings Ltd.*, 2010 WL 4174629, at *2 (W.D. Ky. Oct. 19, 2010)).] Philips North America argues that Dr. Westerman

10

"repeatedly acknowledged that opinions contained in his report were simply taken from Lloyd's reports without any independent verification." *Id.*

In response, Modern Holdings argues that an expert's testimony "may be formulated by the use of the facts, data and conclusions of other experts." [R. 632 at 22 (quoting *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004)).] Furthermore, Modern Holdings argues, an expert may "rely on evidence that is otherwise inadmissible in forming his opinion, if it is the type that is reasonably relied on by experts in that field." *Id.* (quoting *Bush v. Michelin Tire Corp.*, 963 F. Supp. 1436, 1446 (6th Cir. 1996)).

While it is true that one expert may not simply "adopt another expert's opinions wholesale," *Siegel*, 2010 WL 4174629, at *2, it is firmly established under Rule 703 that an expert's testimony may be formed using the conclusions and opinions of other experts. *See, e.g.*, *In re Davol, Inc.*, 546 F. Supp. 3d 666, 676 (S.D. Ohio 2021) ("An expert is able to base an opinion on another expert witness for a point of expert knowledge not personally possessed."); *Jackson v. E-Z-GO Division of Textron, Inc.*, 326 F. Sup. 3d 375, 396 (W.D. Ky. 2018) (finding under Rule 703 "an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts"); *United States v. Roberts*, 830 F. Supp. 2d 372, 383 (M.D. Tenn. 2011) (finding "experts may rely on data from others, at least to the extent that the data is of the type reasonably relied on by other experts in the field").

Here, the Court finds that Dr. Westerman did more than merely parrot back the findings of Dr. Lloyd. Dr. Westerman crafted his opinion based not only on the materials, sampling results, and reports of Dr. Lloyd but also on his own "independent knowledge of the history of the site and the records relating to that same, and [his] own knowledge and experience." [R. 594-2 at 4.] Specifically, Dr. Westerman "reviewed documents relating to the history of the Site,

the general vicinity characteristics, operational history, previous on-site and off-site investigations, regulatory review, Lloyd's soil sampling results, Lloyd's on-site dust sampling…that he conducted off-site, studies involving similar sources of air pollution, and wind rose data for the Danville area." *Id.* As the Court discussed in its March 9, 2022, Memorandum Opinion and Order, both sides have proffered experts that rely heavily on the opinions of other experts in crafting their own opinions. [R. 571 at 3–34.] The Court finds that Dr. Westerman 's expert report does not constitute impermissible vouching, and Philips North America's argument is without merit. Accordingly, the Court will deny Philips North America's Motion to Exclude the Expert Opinions of Dr. Westerman.

**B**

Philips North America also filed a Renewed Motion for Summary Judgment following the testimony of Dr. Westerman. [R. 595.] Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party bears the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this

burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court then must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251–52). In making this determination, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

1

Philips North America filed this Renewed Motion for Summary Judgment less than two months before trial, without leave of the Court, and long after the July 15, 2021, dispositive motions deadline had expired. While this motion pertains to a replacement expert that only submitted his report on April 18, 2022, Philips North America failed to request leave to file a late motion for summary judgment. The initial scheduling order in this matter stated that "[r]equests to modify any dates or deadlines established by this order shall be submitted upon motion filed prior to expiration of the deadline in question, and upon showing of good cause beyond the control of counsel in the exercise of due diligence." [R. 124 at 8 (citing L.R. 7.1(b)).] Failure to follow the scheduling order is itself a sufficient reason to deny Philips North America's motion. *See Perrotte v. Johnson*, 2020 WL 8678304, at *1 (E.D. Cal. Aug. 18, 2020) (finding "motions filed after the deadlines set in the scheduling order are untimely and may be denied solely on this ground") (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)); *Glass v. Fields*, 2012 WL 3528048, at *1 (E.D. Cal. Aug. 14, 2012) (denying motion for

summary judgment filed "after the dispositive deadline had passed" because "Plaintiff did not file a motion to amend the dispositive motion deadline or seek leave to file a late motion for summary judgment"); *see also Century Indemnity Co. v. Begley Co.*, 323 F.R.D. 237, 240 (E.D. Ky. 2018) ("A scheduling order maintains orderly proceedings and is 'not a frivolous piece of paper, idly entered, which can be cavalierly disregarded … without peril.'") (quoting *Birge v. Dollar Gen. Corp.*, 2006 WL 133480, at *1 (W.D. Tenn. Jan. 12, 2006)).  However, as discussed *infra*, the motion also fails on the merits.

## 2

Philips North America argues that Dr. Westerman's expert opinion "merely concludes that the *Facility* is the source of lead on Plaintiffs' properties" and fails to opine on the amount of lead Philips specifically contributed.  [R. 595-1 at 3.]  Therefore, Philips North America argues, Dr. Westerman has failed to prove causation and summary judgment is appropriate.  *Id.* at 5.

In response, Modern Holdings argues that only two things have changed since this Court previously found that Plaintiffs had "presented sufficient evidence of causation to present their claims to the jury:" (1) Plaintiffs reached a global settlement with Defendant Corning, Inc.; and (2) Plaintiffs substituted Dr. Westerman as their environmental expert after the passing of Maurice Lloyd.  [R. 633 at 1.]  Specifically, Modern Holdings argues that (1) the evidence demonstrates that Philips North America's actions were a substantial factor in causing damage to the Plaintiffs' properties; (2) joint and several liability applies here because successive tortfeasors caused an indivisible harm; and (3) alternatively, at trial, Philips will have to prove Corning Inc.'s negligence to be entitled to an apportionment instruction.  [R. 633 at 7–19.]

After review, the Court finds that Modern Holdings has sufficiently supported the causation element.  First, Modern Holdings is correct that the Court has already determined that

the issue of causation should go to the jury. [R. 576 at 14–15.] Furthermore, as discussed *supra*, to establish causation, "Plaintiffs must have proof that the levels of [lead] on their property now are greater than background levels in order to conclude that through its negligence Defendant deposited the [lead] on Plaintiffs' properties." *Mercer*, 24 F. Supp. 2d at 751. Through expert testimony examining soil samples and comparing the samples against the 2004 Assessment (it is undisputed that Philips North America, and not Corning, Inc. was operating the facility in 2004), the Court finds that Modern Holdings has proffered proof that the lead levels on the Plaintiffs' properties are greater than background levels, and that this case should go to the jury.

Less than two months before this matter is scheduled to go to trial, and after this litigation has been pending for eight and a half years, it appears that Philips North America is attempting to leverage the death of one of Modern Holdings' experts and the eleventh-hour settlement of its co-defendant Corning, Inc. to raise this novel argument.[3] However, the Court agrees with Philips North America that Modern Holdings must "carry its burden" of proving its case before addressing the issue of apportionment between Corning, Inc. and Philips North America. [R. 635 at 3–4]; *see also Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 472 n.5 (Ky. 2001) (finding "[f]ault may not be properly allocated to a party, a dismissed party or settling nonparty unless the court or the jury first finds that the party was at fault"). Therefore, the Court need not address the issue of apportionment at this time.

---

[3] Counsel for Corning, Inc. appeared at the Final Pretrial Conference in this matter and still, approximately two weeks before trial, has not filed notice of settlement in this matter and has not officially be terminated as a party.

## III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant Philips North America's Motion to Exclude the Opinions of Dr. Albert Westerman **[R. 594]** is **DENIED**; and

2. Defendant Philips North America's Renewed Motion for Summary Judgment **[R. 595]** is **DENIED**.

This the 22d day of July, 2022.

Gregory F. Van Tatenhove
United States District Judge